FILED

2010 FEB -8  PM 1: 21

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY_____

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
DARREN J. ROBBINS (168593)
DAVID C. WALTON (167268)
CATHERINE J. KOWALEWSKI (216665)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
darrenr@csgrr.com
davew@csgrr.com
katek@csgrr.com

LAW OFFICES OF BERNARD M.
  GROSS, P.C.
DEBORAH R. GROSS
Wanamaker Bldg., Suite 450
100 Penn Square East
Philadelphia, PA 19107
Telephone: 215/561-3600
215/561-3000 (fax)
debbie@bernardmgross.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| HARRY STACKHOUSE, Individually and on Behalf of All Others Similarly Situated, | VIA FAX  CV10 0922 DSF AJWx |
| Plaintiff, | CLASS ACTION |
| vs. | COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| TOYOTA MOTOR CORPORATION, TOYOTA MOTOR SALES, U.S.A., INC., TOYOTA MOTOR NORTH AMERICA, INC., AKIO TOYODA, FUJIO CHO, ROBERT S. CARTER, IRVING A. MILLER, YOSHIMI INABA, JAMES E. LENTZ, III and ROBERT C. DALY, | |
| Defendants. | DEMAND FOR JURY TRIAL |

**JURISDICTION AND VENUE**

1.     The claims asserted herein arise under and pursuant §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act") [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

2.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act.

3.     Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C. §1391(b).  Toyota Motors Sales, U.S.A., Inc. maintains offices in this District and many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

4.     In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

**INTRODUCTION AND OVERVIEW**

5.     This is a securities class action on behalf of all persons who purchased or otherwise acquired the publicly traded securities of Toyota Motor Corporation ("Toyota" or the "Company"), including the American Depository Shares ("ADSs") of Toyota, between August 4, 2009 and February 2, 2010, inclusive (the "Class Period"), against Toyota and certain of its officers and/or directors for violations of the 1934 Act.  These claims are asserted against Toyota and certain of its affiliates and certain of their officers and/or directors who made materially false and misleading statements during the Class Period in press releases, analyst conference calls, and filings with the SEC.

6.     Toyota's principal executive offices are located in Toyota City, Japan, with branch offices in the United States and around the globe.  The Company's ADSs are listed on the New York Stock Exchange ("NYSE").  The defects giving rise to the

- 1 -

1  recalls and production stoppages alleged herein were the result of manufacturing
2  issues in the United States.

3        7.      During the Class Period, defendants issued materially false and
4  misleading statements regarding the Company's operations and its business and
5  financial results and outlook.  Defendants misled investors by failing to disclose that
6  there was a major design defect in Toyota's acceleration system, which could cause
7  unintended acceleration.  As a result of defendants' false statements, Toyota's
8  securities traded at artificially inflated prices during the Class Period, reaching a high
9  of $91.78 per ADS on January 19, 2010.

10       8.      For over a decade, Toyota has received numerous incident reports where
11 Toyota and Lexus owners in the United States have reported that their vehicles
12 suddenly accelerated on their own, in many cases resulting in accidents, including
13 several fatalities.  Unintended acceleration is an automobile safety defect that occurs
14 when a vehicle suddenly accelerates without intent of the driver, and without the
15 driver commanding it to do so through the throttle or gas pedal user inputs.  According
16 to Safety Research & Strategies, Inc., unintended acceleration has been responsible for
17 815 crashes, 314 injuries and 19 fatalities in Toyota vehicles since 1999. Toyota
18 initially blamed the incidents on driver error and later blamed it on faulty floor mats,
19 denying that there was a design defect in its acceleration system.

20       9.      On January 21, 2010, Toyota announced it would be recalling 2.3 million
21 Toyota brand vehicles in North America because of problems with the acceleration
22 pedal sticking.  According to the  Company-issued press release:

23             "In recent months, Toyota has investigated isolated reports of
24       sticking accelerator pedal mechanisms in certain vehicles without the
25       presence of floor mats," said TMS Group Vice President Irv Miller.
26       ***"Our investigation indicates that there is a possibility that certain***
27       ***accelerator pedal mechanisms may, in rare instances, mechanically***
28       ***stick in a partially depressed position or return slowly to the idle***

- 2 -

1     *position. Consistent with our commitment to the safety of our cars and*

2     *our customers, we have initiated this voluntary recall action*."

3          10.     On January 26, 2010, Toyota announced it was immediately halting the

4 sale of the eight Toyota models involved in the January 21, 2010 recall in response to

5 the growing concerns that possible defects may cause the vehicles to accelerate

6 unintentionally. The eight models represent the Company's most popular models in

7 the U.S., making up over 57% of Toyota's 2009 sales in the U.S. The Company

8 further announced it would be shutting down its assembly line at its North American

9 plants for one week beginning February 1, 2010.

10          11.     As a result of this news, Toyota's ADSs plunged $7.01 per share to close

11 at $79.77 per share on January 27, 2010, on high volume.

12          12.     On January 27, 2010, Toyota announced that 1.1 million cars and trucks

13 would be included in a recall the Company originally issued in November 2009

14 related to a problem certain vehicles experienced related to floor mats interfering with

15 the accelerator pedal.

16          13.     On January 29, 2010, Toyota announced that the recall would be

17 extended to eight Toyota models offered in Europe.

18          14.     On this news, Toyota's ADSs fell $0.67 per share, closing at $77.00 per

19 share on January 29, 2010, on high volume.

20          15.     On February 1, 2010, defendant James E. Lentz, III ("Lentz"), appeared

21 on NBC's Today show and was interviewed by host Matt Lauer. Shockingly,

22 contradicting the Company's previous statements that that there were "*no defects*"

23 related to sudden acceleration in Toyota vehicles aside from faulty floor mats, Lentz

24 admitted that the Company had known about sticky accelerator pedal problems since

25 at least *October 2009*:

26          [MATT LAUER:] Before we go forward, let me go back. When

27          did your company know, when did you personally know, and other

28

1    officials at your company know, that you had a serious problem with

2    unwanted acceleration or slow response from acceleration?

3    [LENTZ:]   In, in the case of the slow response, this most recent

4    one, the first technical report that we had, that we could duplicate the

5    issue was in *late October of last year*.

6    * * *

7    [LENTZ:]   ... *[T]he sticking accelerator pedal, we had*

8    *knowledge of that in October of last year*.

9    16.   On February 2, 2010, after the market closed, Toyota reported that its

10   U.S. sales for January 2010 had dropped by 16% from a year ago  due to the recall and

11   subsequent sales suspension of its most popular models.  In contrast, industry wide

12   sales for the month increased from January 2009 with both Ford Motor Company and

13   General Motors reporting improvements in their January sales numbers.

14   17.   Then, on February 3, 2010, the U.S. Secretary of Transportation, Ray

15   LaHood ("LaHood"), head of the National Highway Traffic Safety Administration

16   ("NHTSA"), urged Toyota owners concerned about their cars to stop driving them and

17   take them into their Toyota dealerships to be repaired immediately. He encouraged all

18   vehicle owners covered by the recall to contact their local dealers to get their vehicles

19   fixed as soon as possible.  Moreover, LaHood called for a meeting with Toyota's

20   Chief Executive Officer, defendant Akio Toyoda, to discuss the recent safety concerns

21   involving Toyota vehicles and the Company's handling of the recalls.  It was reported

22   that NHTSA was considering a civil penalty against the Company over its handling of

23   the recalls.

24   18.   Additionally on February 3, 2010, before the market opened, Toyota

25   announced that it had received reports of brake problems in its 2010 model year Prius

26   hybrid.  According to news reports, the Japanese government ordered Toyota to

27   investigate a possible defect in its brake system after receiving 14 reports of brake

28   trouble in its newest hybrid model.  It was further reported that the NHTSA had also

- 4 -

1   received at least 136 complaints about the Prius brakes.  Four of the complaints in the
2   U.S. resulted in accidents, with two resulting in injuries.

3        19.   As a result of this news, Toyota's ADSs fell $4.69 per share, closing at
4   $73.49 per share on February 3, 2010, on high volume.  Toyota's common stock also
5   dropped approximately 6%.

6        20.   As a result of defendants' false statements, Toyota's publicly traded
7   securities traded at inflated levels during the Class Period.   After the above
8   revelations, when it became apparent that many of Toyota's vehicles contained a
9   design defect that could cause unintended acceleration, the Company's securities
10  declined.  The price of the Company's ADSs declined nearly 20% from its Class
11  Period high.  This drop removed the inflation from Toyota's securities prices, causing
12  real economic loss to investors who had purchased Toyota securities during the Class
13  Period.

14                                   **PARTIES**

15       21.   Plaintiff Harry Stackhouse acquired Toyota ADSs as set forth in the
16  attached certification and has been damaged thereby.

17       22.   Defendant Toyota operates in the automotive industry worldwide.   It
18  engages in the design, manufacture, assembly, and sale of passenger cars, minivans,
19  and trucks and related parts and accessories.  Its shares trade in an efficient market on
20  the NYSE and its common stock trades in an efficient market on the Tokyo Stock
21  Exchange.  Toyota is headquartered in Toyota City, Japan with executive offices in
22  Torrance, California and a presence around the globe.

23       23.   Defendant Toyota Motor Sales, U.S.A., Inc. ("Toyota USA") is the U.S.
24  sales, distribution, and marketing unit for Toyota USA's Toyota, Lexus, and Scion
25  brands.  About half of the more than 2 million Toyotas sold in the U.S. also are made
26  in North America.  Toyota USA is in charge of sales, marketing, and service of its
27  cars, light trucks, hybrids, and SUVs in 49 states.  Sales are conducted through about

28

1,500 dealerships throughout the U.S. Toyota USA's executive office is located at 19001 S. Western Avenue, Torrance, California.

24. Defendant Toyota Motor North America, Inc. ("Toyota NA"), is a wholly owned subsidiary of Toyota. Toyota NA is the holding company for all other Toyota companies and operations in North America, covering sales, engineering, and manufacturing subsidiaries from offices in New York, Miami, and Washington, DC. Toyota NA oversees functions related to government and regulatory affairs, energy, economic research, philanthropy, advertising, corporate communications, and investor relations. Toyota NA is located in New York, New York.

25. Defendant Akio Toyoda ("Toyoda") is, and at all relevant times was, a director and President of Toyota. Defendant Toyoda is the grandson of the founder of Toyota.

26. Defendant Fujio Cho ("Cho") is, and at all relevant times was, Chairman of the Board and Representative director of Toyota. Cho has been serving in that capacity since June 2006. Cho joined the Company in April 1960. His previous titles include Managing Director, Senior Managing Director, Vice President, President and Vice Chairman of the Board.

27. Defendant Robert S. Carter ("Carter") is, and at relevant times was, Group Vice President and Toyota Division General Manager of Toyota USA.

28. Defendant Irving A. Miller ("Miller") is, and at relevant times was, Group Vice President of Environmental and Public Affairs of Toyota USA.

29. Defendant Yoshimi Inaba ("Inaba") is, and at all relevant times was, President and Chief Operating Officer ("COO") of Toyota NA. Defendant Inaba additionally serves as Chairman and Chief Executive Officer ("CEO") of Toyota USA. Inaba is responsible for Toyota NA's sales, marketing and external affairs operations. Inaba also serves as a director of Toyota in Japan.

30. Defendant James E. Lentz, III ("Lentz") is, and at all relevant times was, President and COO of Toyota USA. Lentz also serves as a director of Toyota and

serves in a global advisory capacity as managing officer for Toyota. Lentz has overall responsibility for sales, marketing and distribution for Toyota, Scion and Lexus products in the United States, in addition to overseeing all corporate matters at Toyota USA.

31.     Defendant Robert C. Daly ("Daly") is, and at all relevant times was, Senior Vice President of Toyota USA. Defendant Daly also serves on Toyota USA's seven member executive committee. Daly is responsible for the customer services division, information systems, University of Toyota, finance, corporate shared services, human resources, North America Planning, and legal affairs.

32.     The defendants referenced above in ¶¶25-31 are referred to herein as the "Individual Defendants." The Individual Defendants made, or caused to be made, false statements minimizing the severity of the sudden acceleration problems, which caused Toyota's publicly traded securities to be artificially inflated during the Class Period.

## CLASS ACTION ALLEGATIONS

33.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired the publicly traded securities of Toyota, including Toyota's ADSs, during the Class Period (the "Class"). Excluded from the Class are defendants and their family members, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

34.     The members of the Class are so numerous that joinder of all members is impracticable. Toyota's ADSs were actively traded on the NYSE. Toyota's common stock was actively traded on the Tokyo Stock Exchange. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds of members in the proposed Class. Record owners and other members of the Class may be identified

1    from records maintained by Toyota or its transfer agent and may be notified of the

2    pendency of this action by mail, using the form of notice similar to that customarily

3    used in securities class actions.

4         35.    Plaintiff's claims are typical of the claims of the members of the Class as

5    all members of the Class are similarly affected by defendants' wrongful conduct in

6    violation of federal law that is complained of herein.

7         36.    Plaintiff will fairly and adequately protect the interests of the members of

8    the Class and has retained counsel competent and experienced in class and securities

9    litigation.

10        37.    Common questions of law and fact predominate and include whether

11   defendants: (i) violated the 1934 Act; (ii) omitted and/or misrepresented material

12   facts; (iii) knew or recklessly disregarded that their statements were false; and (iv)

13   artificially inflated the price of Toyota securities and the extent of and appropriate

14   measure of damages.

15        38.    A class action is superior to all other available methods for the fair and

16   efficient adjudication of this controversy since joinder of all members is

17   impracticable.  Furthermore, as the damages suffered by individual Class members

18   may be relatively small, the expense and burden of individual litigation make it

19   impossible for members of the Class to individually redress the wrongs done to them.

20   There will be no difficulty in the management of this action as a class action.

21                                    **BACKGROUND**

22        39.    Toyota is one of the world's largest automakers, with reported sales of

23   over 10 million cars in 2008.  Toyota's world headquarters are located in Toyota City,

24   Japan.   Toyota USA is the Toyota sales, marketing, and distribution subsidiary

25   devoted to the U.S. market.  Toyota USA maintains its headquarters in Torrance,

26   California.  Toyota NA is the holding company for Toyota's companies in North

27   America.   Toyota NA is headquartered in New York City.  Toyota has a huge

28   presence in the United States, with five major assembly plants located in Huntsville,

1  Alabama; Georgetown, Kentucky; Princeton, Indiana; San Antonio, Texas; and
2  Buffalo, West Virginia.

3       40.    Toyota had for generations built a reputation based on quality, such that it
4  became a company that other automobile manufacturers sought to emulate.  Toyota
5  and Lexus were the clear winners of *Consumer Reports*' quality rankings.  This began
6  to change when Toyota's focus on growth overwhelmed its focus on quality.  As Paul
7  Ingrassia wrote on January 28, 2010:

8      Some 4.8 million Toyota cars and trucks might suffer from sticking
9      accelerator pedals or faulty floor mats that seem to grab the accelerator
10     (some have been recalled for both reasons) and can cause the car to
11     accelerate out of control. Several deaths have been attributed to the
12     problem.

13         How could this possibly happen to the car company that was the
14     undisputed leader in quality, the company that all the others from
15     Germany and America and even Japan wanted to emulate? The answer is
16     almost too simple.

17         Toyota is suffering from trying to get too big, too fast. In the early
18     years of this century the company sensed weakness among its Detroit
19     rivals in the American market, and also opportunity in China and other
20     emerging markets outside the U.S. So it began a headlong expansion
21     spree around the world.

22         In doing this Toyota abandoned one of the shibboleths of its
23     conservative culture: never building a new product in a new factory with
24     a new workforce. Any new Toyota factory, anywhere in the world,
25     would first build a vehicle that Toyota was making at one of its existing
26     plants. That approach minimized quality-control variables.

27      41.    In 2002, Toyota began using a "drive-by-wire" system in its Toyota and
28 Lexus models in the United States starting with the Lexus ES 300.  Thereafter, reports

of unintended acceleration related to Toyota and Lexus vehicles jumped substantially – reports of unintended acceleration linked to the Lexus ES 300 model increased from 26 per year on average in 2001 to 132 per year in 2002.

42.     The drive-by-wire system uses sensors, microprocessors and electric motors rather than a traditional mechanical link such as a steel cable to connect the accelerator pedal to the throttle plate in the engine.  The acceleration pedal has no direct connection to the engine through a cable or mechanical link.  The connection between the pedal and the engine is made by electrical signals traveling through wires. The system costs less to install than a traditional mechanical link system.

43.     Unintended acceleration occurs when the throttle gets stuck in a wide-open position contrary to the driver's intention.  The vehicle will continue to accelerate despite any attempts by the driver to employ the brakes.  Toyota's highly computerized engine control system lacks a fail-safe mechanism that can quickly extinguish unintended acceleration.  In contrast, European automakers have been using smart gas pedal technology for years.  Smart pedals sense when a vehicle's gas and brake pedals are being pressed simultaneously and a computer tells the engine to disregard the gas pedal.  Belatedly, Toyota has begun to include a fail-safe mechanism in its vehicles starting with its 2010 models.

44.     According to independent safety expert Sean Kane, president of Safety Research & Strategies, there have been at least 2,000 unintended acceleration incidents involving Toyota vehicles built since 2001.  In many cases, the occurrences resulted in accidents with vehicles slamming into trees, parked cars and other fixed objects.  The crashes have resulted in over 800 accidents and at least 19 fatalities and numerous other injuries.

45.     The driver complaints resulted in eight separate investigations into Toyota and Lexus vehicles by the NHTSA.  In response to the complaints and investigations, Toyota issued six minor recalls to fix various problems related to its acceleration system.  Nonetheless, despite knowledge of the defect in its acceleration

system, the Company initially blamed human error for the problems.  The Company would later acknowledge that there were problems related to sticking acceleration pedals during the Class Period, but they would attribute the problems to faulty floor mats rather than a design flaw.

46.     In March 2007, Toyota identified problems with the accelerator pedals on the Tundra pickup.  According to the Company, it determined the problem was caused by the material in the accelerators' friction lever and made a change.  Toyota claimed it was a drivability issue and not a safety issue.

47.     Similar issues arose with the Tacoma.  Toyota denied there was any problem with the acceleration system.  As reported in an article in the *Detroit Free Press* on April 7, 2008, entitled "Toyota Pickup Probe Pushed; Sudden Acceleration Claims Hard to Pin Down":

> Toyota spokesman Bill Kwong says the company has found no problems with the Tacoma that would explain the complaints.
>
> "We don't feel it's an issue with the vehicle," he said. Regulators "get sudden acceleration complaints from consumers for various manufacturers . . . and in most cases they have found it's a misapplication of the pedals by the driver."

48.     The Company further claimed there were no flaws in its trucks design and the reports of sudden acceleration were "inspired by publicity."  As reported in an article in the *Detroit Free Press* on June 10, 2008, entitled "Toyota Denies Tacoma is Defective; Media Inspired Acceleration Claims, it Says":

> Some 431 customers from around the country have reported unintended or sudden acceleration in their Toyota Tacoma pickups, resulting in 51 crashes and 12 injuries, but the automaker said there are no flaws in the trucks and that many reports were "inspired by publicity."

*          *          *

It also said "extensive media coverage" spurred additional reports and could explain why no other pickup has similar complaints.

"Toyota believes that it is likely that many of the consumer complaints about the general issue of unwanted acceleration . . . as well as many of the complaints about this subject that have been received by Toyota, were inspired by publicity," Toyota said in a letter to the NHTSA released Thursday.

"But even taking them at face value, it is clear that the majority of the complaints are related to minor drivability issues and are not indicative of a safety-related defect."

\*          \*          \*

Toyota spokesman Bill Kwong said tests by the automaker and the NHTSA revealed no problems that would explain the complaints.  He said the problems were not as prevalent as the number of complaints suggested, saying the NHTSA asked for any cases where engine idle speed increased.

"We remain confident in the safety of the vehicles," Kwong said.

49.   In December 2008, a similar issue arose in Europe in the right-hand versions of Toyota's Aygo and Yaris models.  After an investigation, the Company found that condensation from heaters caused increased friction in the accelerator pedal, making it stick.  In mid-August 2009, Toyota made a design change in its European cars which lengthened the arm of the friction lever and changed its materials on all vehicles being produced in Europe. Despite the fact that the same material used in the manufacturing of the gas pedals in Europe was the same as the material used in the U.S., Toyota did not make the change to its U.S. vehicles.

50.   On April 23, 2009, *Westword* published an article entitled "The Prius can take owners on a wild ride."  The article discussed several incidents involving

situations where Prius drivers experienced "unintended acceleration" problems. When asked for a response, the Company denied any problems with its accelerators:

> Toyota responded to the acceleration problem in 2007 by recalling "faulty floor mats" that the company said could cause the gas pedal to stick. Another explanation from Toyota is simple driver error.
>
> "You get these customers that say, 'I stood on the brake with all my might and the car just kept on accelerating.' They're not stepping on the brake," says corporate Toyota spokesman Bill Kwong. "People are so under stress right now, people have so much on their minds. With pagers and cell phones and IM, people are just so busy with kids and family and boyfriends and girlfriends. So you're driving along, and the next thing you know, you're two miles down the road and you don't remember driving, because you're thinking about something else."

### DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

51.   On August 4, 2009, Toyota announced its first quarter 2009 financial results,[1] in a release which stated in part:

> TOYOTA MOTOR CORPORATION (TMC) today announced financial results for the first quarter ending June 30, 2009.
>
> On a consolidated basis, net revenues for the first quarter totaled 3.836 trillion yen, a decrease of 38.3 percent compared to the same period last fiscal year. Operating income decreased from 412.5 billion yen to a loss of 194.9 billion yen, while income before income taxes and equity in earnings of affiliated companies was a loss of 138.5 billion yen. Net income decreased from 353.6 billion yen to a loss of 77.8 billion yen.

---

[1]   Toyota's fiscal year ends March 31.

1              *    *    *

2    For the fiscal year ending March 2010, TMC upwardly revises its

3    forecast of consolidated vehicle sales from 6.5 million to 6.6 million

4    units, reflecting improving vehicle sales in Japan.

5    TMC also revises its consolidated financial forecasts for this year,

6    to net revenues of 16.8 trillion yen, operating loss of 750.0 billion yen,

7    loss before income taxes and equity in earnings of affiliated companies

8    of 700.0 billion yen and net loss of 450.0 billion yen. These are based on

9    the assumption of the foreign exchange rates: 90 yen against the U.S.

10   dollar and 130 yen against the euro.

11   Senior Managing Director Ijichi commented on the outlook: "The

12   introduction of demand-stimulating measures such as scrappage

13   incentives by individual governments including Japan have begun to

14   trigger a revival in some countries and regions. The upward revision of

15   Japanese sales reflects the positive effects of the Government's measures

16   such as the 'eco-car tax break' being felt throughout the market. In

17   addition, the recently launched new hybrid models such as the third

18   generation Prius and the Lexus HS250h have received a very positive

19   response from our customers.

20   In view of this, and a continuing reduction in fixed costs, we raise

21   our target for Emergency Profit Improvement activities from 800 billion

22   yen to 900 billion yen. We will strongly promote profit improvement

23   activities across the company in order to further improve our earning

24   prospects."

25   (Footnotes omitted.)

26   52.    Defendants' statements concealed a major threat to the Company with

27   respect to the accelerator defect which would adversely affect the Company's result in

28   2010.

53.    On August 28, 2009, off-duty California Highway Patrol officer Mark Saylor and three of his family members were killed after the 2009 Lexus ES 350 he was driving suddenly accelerated out of control.

54.    On September 14, 2009, Toyota issued a press release entitled "Lexus ES 350 Accident Investigation," which stated in part:

> On August 28th, 2009, California Highway Patrol Officer Mark Saylor and three members of his family tragically lost their lives on a highway near San Diego California, while driving a 2009 ES350 loaned to them by a local Lexus dealer.  Our deepest sympathies go out to the friends and family of Mark, Cleofe, Mahala, and Cleofe's brother Chris Lastrella.

> Preliminary information from law enforcement investigators indicates that the cause may have been an all-weather floor mat from a different Lexus model which, if installed incorrectly in the ES350, could cause it to interfere with the accelerator pedal.

> All-weather floor mats are installed by dealers or customers as an accessory item.

> Driver's floor mat interference with the accelerator pedal is possible in any vehicle make with any combination of floor mats when the floor mat is not properly secured or if it is not the factory designed floor mat for the vehicle.

> Toyota Motor Sales, USA, Inc. takes public safety very seriously and will fully cooperate with any investigation.  We believe our vehicles to be among the safest on the road today.

> We are instructing all of our Lexus and Toyota dealers to immediately inspect their new, used, and loaner fleet vehicles and we urge all other automakers, dealers, vehicle owners, and the independent service and car wash industries to assure that any floor mat, whether

1    factory or aftermarket, is correct for the vehicle and properly installed

2    and secured.

3        55.   On September 29, 2009, Toyota issued a press release entitled

4    "Toyota/Lexus Consumer Safety Advisory: Potential Floor Mat Interference with

5    Accelerator Pedal," stating in part:

6           Toyota Motor Sales, USA, Inc. takes public safety very seriously.

7    It believes its vehicles to be among the safest on the road today.

8           Recent events have prompted Toyota to take a closer look at the

9    potential for an accelerator pedal to get stuck in the full open position

10   due to an unsecured or incompatible driver's floor mat.  A stuck open

11   accelerator pedal may result in very high vehicle speeds and make it

12   difficult to stop the vehicle, which could cause a crash, serious injury or

13   death.

14          Toyota considers this a critical matter and will soon launch a

15   safety campaign on specific Toyota and Lexus vehicles. Throughout the

16   process of developing the details of the action plan, it will advise the

17   National Highway Traffic Safety Administration (NHTSA).

18          Until Toyota develops a remedy, it is asking owners of specific

19   Toyota and Lexus models to take out any removable driver's floor mat

20   and NOT replace it with any other floor mat. The following models are

21   affected:

22          •   2007 – 2010 Camry

23          •   2005 – 2010 Avalon

24          •   2004 – 2009 Prius

25          •   2005 – 2010 Tacoma

26          •   2007 – 2010 Tundra

27          •   2007 – 2010 ES350

28          •   2006 – 2010 IS250 and IS350

56.   Toyota repeated such assurances in the coming months, stating that the faulty floor mats were the only cause of unintended acceleration in Toyota vehicles. Assured by Toyota's representations, Toyota's analysts took the announcement in stride.  In a September 30, 2009 news article, Deutsche Securities auto analyst Kurt Sanger stated that he "wouldn't expect it to be a major issue for Toyota," noting that labor costs, which typically make up the bulk of recalls, would likely be minimal.

57.   On October 2, 2009, *Associated Press* issued an article entitled "Toyota president expresses regret over fatal crash," which stated:

> Toyota's president said it was "extremely regrettable" an American family died in a crash in which a floor mat in one of the Japanese automaker's vehicles is suspected as the cause.
>
> "Four precious lives have been lost," Toyota Motor Corp. President Akio Toyoda said Friday. "I offer my deepest condolences."
>
> Without giving specifics, he said an investigation was under way into the problem which potentially affects 3.8 million Toyota vehicles in the U.S., and may cause the accelerator to get stuck. If Toyota decides on a recall, it would be its biggest ever in the U.S.
>
> Toyoda, who took helm at the world's top automaker in June, told reporters in Tokyo that Toyota was cooperating with the National Highway Traffic Safety Administration in the U.S. to investigate the cause of the August accident.
>
> That crash killed California Highway Patrol Officer Mark Saylor, 45 – who was driving a Lexus, a Toyota luxury model – and three family members on State Route 125 outside San Diego.
>
> The vehicle was traveling at more than 120 mph when it launched off an embankment, rolled several times and burst into flames.

Toyoda said the company was still deciding what action it would take and did not acknowledge any vehicle problem during his appearance at the Japan National Press Club.

He apologized for any worries customers may have.

"I feel sorry that people who are driving Toyota and Lexus cars believing in their safety are now feeling uncertainties," he said.

NHTSA investigators determined that a rubber all-weather floor mat found in the wreckage was slightly longer than the mat that belonged in the vehicle, something that could have snared or covered the accelerator pedal.

Toyota has issued a safety advisory urging owners of 3.8 million car and trucks – including popular models like Camry, Prius and Tacoma – to remove driver-side mats. It wants drivers to watch out for loose or incorrect mats that could slide out of position and cover pedals.

NHTSA has said it had received reports of 102 incidents in which the accelerator may have become stuck in the Toyota vehicles involved. It was unclear how many led to crashes.

The warning affects 2007-2010 model year Toyota Camry, 2005-2010 Toyota Avalon, 2004-2009 Toyota Prius, 2005-2010 Tacoma, 2007-2010 Toyota Tundra, 2007-2010 Lexus ES350 and 2006-2010 Lexus IS250 and IS350.

In mid-September, Toyota ordered 1,400 Toyota and Lexus dealers nationwide to ensure that each new, used and loaner vehicle had the proper floor mats and that the mats were properly secured.

In September 2007, Toyota recalled an accessory all-weather floor mat sold for use in some 2007 and 2008 model year Lexus ES 350 and Toyota Camry vehicles because of similar problems.

1        Toyoda, 53, grandson of Toyota's founder, declined comment
2        when asked whether floor mat problems could hurt sales and earnings.

3        Toyota's global sales were battered by last year's financial crisis
4        but were gradually showing signs of recovery. Toyota is still expecting
5        to stay in the red for the second straight fiscal year through March 2010.

6        Toyoda warned his company was in a "near rock-bottom" crisis,
7        but said a comeback was possible. He said troubled companies look for
8        "salvation," but customers, not the president, are the only ones who can
9        deliver it.

10       Toyota became the world's top-selling automaker in 2008,
11       dethroning General Motors Co. It had appeared on track to hit 10 million
12       in annual global vehicle sales, but is now expecting to sell 7.3 million
13       vehicles around the world this calendar year, down from 8.97 million
14       vehicles last year.

15       "What's important is each and every customer. That is my
16       management philosophy," said Toyoda.

17       58.    On November 2, 2009, Toyota issued a press release entitled "Toyota

18  Begins Interim Notification to Owners Regarding Future Voluntary Safety Recall

19  Related to Floor Mats," which stated in part:

20       Toyota Motor Sales (TMS), U.S.A., Inc., today announced that it has
21       begun mailing letters to owners of certain Toyota and Lexus models
22       regarding the potential for an unsecured or incompatible driver's floor
23       mat to interfere with the accelerator pedal and cause it to get stuck in the
24       wide-open position.

25       The letter, in compliance with the National Traffic and Motor
26       Vehicle Safety Act and reviewed by the National Highway Traffic Safety
27       Administration (NHTSA) also confirms that ***no defect exists in vehicles***

28

*in which the driver's floor mat is compatible with the vehicle and properly secured*.

The Toyota finding is consistent with a recent decision by NHTSA denying a request for an additional investigation of unwanted and unintended acceleration of model year 2007 Lexus ES350 vehicles and model years 2002-2003 Lexus ES300. After conducting an extensive technical review of the issue, including interviews with consumers who had complained of unwanted acceleration, NHTSA concluded that "… the only defect trend related to vehicle speed control in the subject vehicles involved the potential for accelerator pedals to become trapped near the floor by out-of-position or inappropriate floor mat installations."

This is the sixth time in the past six years that NHTSA has undertaken such an exhaustive review of allegations of unintended acceleration on Toyota and Lexus vehicles and the sixth time the agency has found *no vehicle based cause for the unwanted acceleration allegations*.

"*The question of unintended acceleration involving Toyota and Lexus vehicles has been repeatedly and thoroughly investigated by NHTSA, without any finding of defect other than the risk from an unsecured or incompatible driver's floor mat*," said Bob Daly, TMS senior vice president.

"Toyota takes public safety seriously. We believe our vehicles are among the safest on the road. Our engineers are working hard to develop an effective remedy that can help prevent floor mat interference with the pedal. As soon as it is ready, we will notify owners of the relevant models to bring their vehicle to a dealer for the necessary modification at no charge," Mr. Daly added.

In the recently completed investigation, NHTSA conducted extensive testing on a Lexus ES350.  The agency reported that:

"The vehicle was fully instrumented to monitor and acquire data relating to yaw rate, speed, acceleration, deceleration, brake pedal effort, brake line hydraulic pressure, brake pad temperature, engine vacuum, brake booster vacuum, throttle plate position, and accelerator pedal position. Multiple electrical signals were introduced into the electrical system to test the robustness of the electronics against single point failures due to electrical interference. The system proved to have multiple redundancies and showed no vulnerabilities to electrical signal activities. Magnetic fields were introduced in proximity to the throttle body and accelerator pedal potentiometers and did result in an increase in engine revolutions per minute (RPM) of up to approximately 1,000 RPM, similar to a cold-idle engine RPM level. Mechanical interferences at the throttle body caused the engine to shut down."

The Toyota letter is an interim notice to owners of a future voluntary safety recall campaign.  The following models are affected:

- 2007 – 2010 Camry
- 2005 – 2010 Avalon
- 2004 – 2009 Prius
- 2005 – 2010 Tacoma
- 2007 – 2010 Tundra
- 2007 – 2010 ES350
- 2006 – 2010 IS250 and IS350

59.    On November 2, 2009, defendants held a conference call with media representatives at *Thomson Reuters* Autos Summit, in which defendant Carter represented:

1        [MEDIA:]   And then Bob might be remiss, too, but I am going to

2    ask about the floormat recall. I understand the customer letters went out

3    Friday. What is the latest there? Where are you in developing that?

4        [CARTER:]  We are working very closely with NHTSA on this

5    situation. There is a concern which we immediately once we became

6    aware of this concern, that there is a potential of incompatible floormat,

7    for a floormat that is not appropriately attached in the vehicle coming in

8    contact and fouling the accelerator pedal.

9        With that, we immediately released a consumer alert, and we are

10    working with NHTSA on developing appropriate actions as we go

11    forward. Our consumer report was to advise the consumer that it is

12    extremely important that they have a compatible floormat in the vehicle,

13    that is designed for the vehicle, and it be properly attached. We are also

14    working with the Association of Carwashes to make sure that car washes

15    take floormats in and out, they don't create a situation on behalf of the

16    consumer.

17        Beyond that, we are working with them, with NHTSA, to develop

18    what the future engineering – what can possibly be engineered for the

19    future. *There has been some speculation in the media that says that*

20    *the –*

21        [MEDIA:]  *It's not just the floormat. Yes*.

22        [CARTER:]  *It is not just the floormat. There has been*

23    *speculation and theories that there are some concerns with our fuel*

24    *delivery systems, our braking systems, our throttle systems. I will tell*

25    *you there is absolutely no evidence to support any of that*.

26        *In fact, last week NHTSA just closed another investigation of a*

27    *vehicle that was looked at, and again they concluded that the source*

28

*was an incompatible floormat or a floormat that was not attached properly.*

So our position is this. Until we thoroughly review this and work with NHTSA, is to tell consumers that this potential exists; if there is any concern, remove the floormat.

At the same time, if it is a properly designed floormat for the vehicle and it is attached on the hooks that come from the factory, there is no concern, there is no evidence of any accelerator pedal interference.

If consumers would like to keep the floormat installed, we are suggesting four things. One, make sure it is a compatible mat. Two, make sure that it is hooked properly to the floor. Three, that floormats are designed to fit in the car. Don't reverse the floormat and expose the rubber side. And then the fourth is, in many inclement areas such as Detroit, some consumers will keep their carpet and floormats in their car and place a rubber mat on top and stack the mats. We highly recommend against that.

Beyond that, anything else, future actions once we have a clear solution and idea, we will notify our consumers again and take care of it.

[MEDIA:] *But at the moment, though, as this moves to recall, I guess what you said will happen. The focus is just the floormat, floormat design, nothing beyond that?*

[CARTER:]   *Absolutely. Absolutely. There is no evidence that goes beyond that.*

60.    In a highly unusual move, NHTSA publicly reprimanded Toyota for statements made by the Company in its October 30th notification letter to owners.  On November 4, 2009, *Associated Press* issued an article entitled "Govt criticizes Toyota press release on floor mats," which stated:

1     *Toyota Motor Corp. released misleading information about an*
2     *investigation into problems with stuck gas pedals that led to a massive*
3     *Toyota recall, the government said Wednesday, stressing the issue is*
4     *still under review by federal safety regulators.*
5          *The National Highway Traffic Safety Administration said it was*
6     *still investigating the case and meeting with Toyota to hear about the*
7     *company's plan to redesign the vehicles and fix "this very dangerous*
8     *problem."*
9          Toyota recalled 3.8 million vehicles last month over problems
10    with gas pedals that got stuck on floor mats and told owners to remove
11    driver's side floor mats and not replace them until the automaker had
12    determined a fix to the problem.
13         Toyota said in a statement on Monday that NHTSA had confirmed
14    "that no defect exists in vehicles in which the driver's floor mat is
15    compatible with the vehicle and properly secured."
16         *But NHTSA said that was inaccurate and the government was*
17    *investigating possible causes of the acceleration problem. Removing*
18    *the floor mats was "simply an interim measure" and "does not correct*
19    *the underlying defect in the vehicles involving the potential for*
20    *entrapment of the accelerator by floor mats, which is related to*
21    *accelerator and floor pan design."*
22         *"The matter is not closed until Toyota has effectively addressed*
23    *the defect by providing a suitable vehicle based solution,"* NHTSA said
24    in the statement, which the department said was issued to correct
25    *"inaccurate and misleading information" from the automaker.*
26         Toyota spokesman John Hanson said "it was never our intention to
27    mislead or provide inaccurate information. Toyota agrees with NHTSA's
28    position that the removal of the floor mats is an interim measure and that

further action is required. We continue to discuss an appropriate vehicle remedy or remedies."

The recall includes 2007-2010 model year Toyota Camry, 2005-2010 Toyota Avalon, 2004-2009 Toyota Prius, 2005-2010 Tacoma, 2007-2010 Toyota Tundra, 2007-2010 Lexus ES350 and 2006-2010 Lexus IS250/IS350.

The recall, Toyota's largest in the U.S., was prompted by a high-speed crash in August involving a 2009 Lexus ES350 near San Diego, Calif. Mark Saylor, a 45-year-old California Highway Patrol officer, and three members of his family were killed when their vehicle hit speeds exceeding 120 mph, struck a sport utility vehicle, launched off an embankment, rolled several times and burst into flames.

Family members made a frantic 911 call from the Lexus and told a dispatcher the accelerator was stuck and they couldn't stop the vehicle.

The high-profile incident led Toyota President Akio Toyoda to call the fatal crash "extremely regrettable" and offer his "deepest condolences."

61.    On November 5, 2009, Toyota issued its financial results for the six months ended September 30, 2009, in a release which stated in part:

TOYOTA MOTOR CORPORATION (TMC) today announced financial results for the six months ended September 30, 2009.

On a consolidated basis, the net revenues for the first half of the fiscal year totaled 8.378 trillion yen, a decrease of 31.3 percent compared to the same period last fiscal year. Operating income decreased from 582.0 billion yen to a loss of 136.9 billion yen, while income before income taxes and equity in earnings of affiliated companies was a loss of 63.0 billion yen. Net income decreased from 493.4 billion yen to a loss of 56.0 billion yen.

*     *     *

TMC again revised its consolidated vehicle sales for the full fiscal year ending March 31, 2010 from 6.60 million to 7.03 million units, an increase of 430 thousand units. This figure is a revision to the previous forecast announced in August 2009 and reflects the increase in sales due to the success of various governments' measures to stimulate demand this year, as well as sales of TMC's own hybrids and other environmentally-friendly vehicles.

TMC also revised its target for Emergency Profit Improvement activities from 900 billion yen to 1.250 trillion yen, reflecting the improved outlook for vehicle sales and the progress of variable and fixed cost improvements in excess of our previous plan.

As a result, consolidated net revenues were revised up to 18 trillion yen, operating income to a loss of 350 billion yen and net income to a loss of 200 billion yen.

Commenting on the amended forecasts for FY2010, Executive Vice President Ichimaru said, "We will continue to promote profit improvement activities across the company. However, the outlook for global vehicle demand still remains uncertain. We will therefore continue to carefully analyze the global market going forward in order to further improve our earnings prospects."

(Footnote omitted.)

62.    On November 25, 2009, Toyota issued a press release entitled "Toyota Announces Details of Remedy to Address Potential Accelerator Pedal Entrapment," which stated in part:

Toyota Motor Sales, U.S.A., Inc. (TMS) announced today details of the vehicle-based remedy to address the root cause of the potential risk for floor mat entrapment of accelerator pedals in certain Toyota and Lexus

models. Toyota issued a consumer safety advisory on September 29 on this issue and has, as an interim measure, commenced the mailing of safety notices to certain Toyota and Lexus owners on October 30.

The models involved are: 2007 to 2010 MY (model year) Camry, 2005 to 2010 MY Avalon, 2004 to 2009 MY Prius, 2005 to 2010 MY Tacoma, 2007 to 2010 MY Tundra, 2007 to 2010 MY ES350, 2006 to 2010 MY IS250, and 2006 to 2010 MY IS 350.

The specific measures of the vehicle-based remedy are as follows:

1.     The shape of the accelerator pedal will be reconfigured to address the risk of floor mat entrapment, even when an older-design all-weather floor mat or other inappropriate floor mat is improperly attached, or is placed on top of another floor mat. For the ES350, Camry, and Avalon models involved, the shape of the floor surface underneath will also be reconfigured to increase the space between the accelerator pedal and the floor.

2.     Vehicles with any genuine Toyota or Lexus accessory all-weather floor mat will be provided with newly-designed replacement driver- and front passenger-side all-weather floor mats.

*In addition, as a separate measure independent of the vehicle-based remedy, Toyota will install a brake override system onto the involved Camry, Avalon, and Lexus ES 350, IS 350 and IS 250 models as an extra measure of confidence. This system cuts engine power in case of simultaneous application of both the accelerator and brake pedals.*

Toyota is in the process of completing development of these actions and for the ES 350, Camry, and Avalon will start notifying owners of the involved vehicles via first-class mail by the end of this

year.  The remedy process regarding the other five models will occur on a rolling schedule during 2010.

Dealers will be trained and equipped to make the necessary modifications to these models starting at the beginning of 2010. Initially, dealers will be instructed on how to reshape the accelerator pedal for the repair.  As replacement parts with the same shape as the modified pedal become available, they will be made available to dealers for the repair, beginning around April 2010.  Customers who have had the remedy completed will have the opportunity to receive a new pedal if they desire.

In the meantime, owners of the involved vehicles are asked to take out any removable driver's floor mat and not replace it with any other floor mat until they are notified of the vehicle-based remedy, as notified in the consumer safety advisory and the interim notice.

The brake override system will be made standard equipment throughout the Toyota and Lexus product lines starting with January 2010 production of ES 350 and Camry and is scheduled to be incorporated into new production of most models by the end of 2010.

The safety of our owners and the public is our utmost concern and Toyota has and will continue to thoroughly investigate and take appropriate measures to address any defect trends that are identified.

63.    Subsequently, on November 25, 2009, defendants held a conference call with media representatives.  As reported in *The International Herald Tribune* on November 26, 2009:

> *"We are very, very confident that we have addressed this issue,"*
> *a Toyota spokesman, Irv Miller, said during a conference call*
> *Wednesday.  "We can come up with no indication whatsoever that*
> *there is a throttle or electronic control system malfunction."*

64.    Further, on November 29, 2009, *The New York Times* reported:

At a news conference, Toyota said it would instruct dealers to shorten the vehicles' existing pedal by about three-quarters of an inch. The company said it would also start equipping its vehicles with smart pedals, a system that the Center for Auto Safety said should be required for all cars.

Smart gas pedals sense when a vehicle's gas and brake pedals are being pressed simultaneously, and a computer tells the engine to disregard the gas pedal. The technology has been used for years by European automakers like BMW, Audi and Volkswagen.

*Toyota is confident the steps will solve the unintended-acceleration problem, said Irv Miller, a company spokesman. "We have come to the conclusion this is pedal misapplication or pedal entrapment," he said. "We continue to find no reason to believe that there is a problem with the electronic control systems."*

65.    On December 5, 2009, the *Los Angeles Times* printed an editorial entitled "Toyota's acceleration issue – Blaming floor mats may not be enough; the automaker needs to look at its vehicles' electronics," which stated in part:

Toyota did the right thing when it recalled more than 4 million cars and trucks in response to mounting reports of unexpected and uncontrolled acceleration. But rather than sticking to its argument that the malfunctions stem from poorly designed pedals that get entangled with floor mats, the automaker should consider what happened to Eric Weiss. Otherwise, it may never get to the root of a problem that has claimed 19 lives in recent years.

As The Times' Ken Bensinger and Ralph Vartabedian have reported, Weiss says he had stopped his 2008 Tacoma pickup at an intersection in Long Beach in October when the truck, on its own,

suddenly accelerated toward oncoming traffic. He was able to avoid a collision by clamping on the brakes and turning off the engine, but the incident left him reluctant to get behind the Tacoma's wheel again. And Weiss says the mats weren't the problem – he'd removed them months ago on his dealer's advice. His experience, combined with similar complaints by other Toyota owners and additional pieces of evidence, points to a potential electronic problem, not a mechanical one.

Weiss was fortunate that his truck didn't have a keyless ignition system like those in many Lexus and Prius models. To turn off one of those engines while moving, drivers must press the "on" button for three seconds – a task that's neither intuitive nor easy in a runaway vehicle.

Toyota insists that there are no problems with its "drive by wire" electronic throttles, a standard feature in all of its current cars and trucks. The technology's supplier tested it for sudden acceleration problems three years ago at the request of the National Highway Traffic Safety Administration, and it received a clean bill of health. In response to a complaint this year, the NHTSA again blamed the floor mats.

Car owners have been reporting incidents of uncontrolled acceleration for decades, but the causes became significantly harder to track after mechanical throttles gave way to electronic ones in the 1980s. The NHTSA often blamed errant floor mats or confused drivers, which may well explain most of these incidents. But the number of complaints involving Toyotas and Lexuses – still low compared with total sales – grew significantly after the company introduced the drive-by-wire technology. That justifies more scrutiny.

To its credit, Toyota plans to do more than just shorten accelerator pedals to lift the bottom edge higher off the cabin floor. It says it also will add "smart pedal" software, idling the engine whenever the brake is

1    pressed at the same time as the gas pedal. That kind of fail-safe
2    technology is potentially lifesaving. But in addition to coming up with an
3    effective treatment for the problem's symptoms, Toyota should also
4    spend more time studying what's causing them.

5        66.    On December 5, 2009, defendant Miller submitted the following letter to
6    the *Los Angeles Times* in response to its December 5, 2009 editorial, which the *Los*
7    *Angeles Times* published on December 9, 2009:

8    December 5, 2009

9    To: Letters to the Editor, Los Angeles Times

10       Toyota's highest priority is the safety of our customers and public,
11   and we believe we are demonstrating this in the voluntary recall of
12   selected models we are currently undertaking.

13       We appreciate the LA Times' acknowledgement that Toyota "did
14   the right thing" in instituting a recall in response to incidents of
15   unwanted acceleration, and in committing to add "smart pedal" software
16   technology as an added fail-safe measure. We also respect the Times' in-
17   depth reporting of this issue, though we disagree with some of the
18   theories it has embraced.

19       *The issue of unintended acceleration involving Toyota and*
20   *Lexus vehicles has been thoroughly and methodically investigated on*
21   *several occasions over the past few years. These investigations have*
22   *used a variety of proven and recognized scientific methods.*
23   *Importantly, none of these studies has ever found that an electronic*
24   *engine control system malfunction is the cause of unintended*
25   *acceleration.*

26       *In fact, electronic throttle control, which has been adopted in*
27   *some form by nearly all automakers, has several fail-safe features and*
28   *enhances vehicle safety by making possible functions such as traction*

*control, stability control, adaptive laser cruise control and snow mode power control on current or future vehicles.*

*Based on the comprehensive investigation and testing, we are highly confident that we have addressed the root cause of unwanted acceleration – the entrapment of the accelerator pedal.* As the Times acknowledged, Toyota moved quickly, in cooperation with the National Highway Traffic Safety Administration, to issue an initial safety advisory and then to develop a comprehensive package of measures that both reduce the risk of pedal entrapment and better enable drivers to deal with this situation when it occurs.

The safety measures we are undertaking include the incorporation of a brake override system that cuts engine power if the accelerator and brake are depressed at the same time. This will become standard on all Toyota and Lexus vehicles globally by the end of 2010. Dealers will be ready to implement this remedy starting in January. We will begin mailing letters to customers at the end of this month, advising them how to proceed.

Again, the safety of our owners and the public is our utmost concern, and Toyota will continue to thoroughly investigate and take appropriate measures to address any vehicle defect trends that are identified. We also will continue to introduce advanced safety technology into Toyota and Lexus vehicles with the goal of ensuring that they meet the highest industry standards.

67.    On December 23, 2009, the *Los Angeles Times* issued its fourth investigative article concerning claims of unintended acceleration in Toyota vehicles. The *Times* article accused Toyota of hiding defects from customers and regulators over the past decade.

68.    On December 23, 2009, in response to the story in the *Los Angeles Times*, defendant Miller issued a release in Toyota USA's Point of View newsroom entitled "Setting the Record Straight," which stated:

> Today the *Los Angeles Times* published an article that wrongly and unfairly attacks Toyota's integrity and reputation.
>
> While outraged by the *Times*' attack, we were not totally surprised. The tone of the article was foreshadowed by the phrasing of a lengthy list of detailed questions that the *Times* emailed to us recently. The questions were couched in accusatory terms.
>
> Despite the tone, we answered each of the many questions and sent them to the *Times*. Needless to say, we were disappointed by the article that appeared today, and in particular by the fact that so little of our response to the questions appeared in the article and much of what was used was distorted.
>
> Toyota has a well-earned reputation for integrity and we will vigorously defend it.

69.    On December 26, 2009, four people were killed in an accident involving a Toyota Avalon.  A mechanical problem with the accelerator pedal was a suspected cause for the crash.  It was determined that the floor mats could not have caused the accident as they were in the trunk at the time of the crash.

70.    On January 19, 2010, Toyota's ADSs reached their Class Period high, closing at $91.78 per share.

71.    On January 21, 2010, Toyota USA issued a press release entitled "Toyota Files Voluntary Safety Recall on Select Toyota Division Vehicles for Sticking Accelerator Pedal," which stated in part:

> Toyota Motor Sales (TMS), U.S.A., Inc, today announced it would recall approximately 2.3 million vehicles to correct sticking accelerator pedals on specific Toyota Division models. This action is separate from the on-

going recall of approximately 4.2 million Toyota and Lexus vehicles to reduce the risk of pedal entrapment by incorrect or out of place accessory floor mats. Approximately 1.7 million Toyota Division vehicles are subject to both separate recall actions.

"In recent months, Toyota has investigated isolated reports of sticking accelerator pedal mechanisms in certain vehicles without the presence of floor mats," said TMS Group Vice President Irv Miller. "Our investigation indicates that there is a possibility that certain accelerator pedal mechanisms may, in rare instances, mechanically stick in a partially depressed position or return slowly to the idle position. Consistent with our commitment to the safety of our cars and our customers, we have initiated this voluntary recall action."

72.    On January 26, 2010, Toyota's ADSs closed at $86.78 per ADS.

73.    On January 27, 2010, Toyota USA issued a press release entitled "Toyota Temporarily Suspends Sales of Selected Vehicles," which stated in part:

Toyota Motor Sales (TMS), U.S.A., Inc., today announced that it is instructing Toyota dealers to temporarily suspend sales of eight models involved in the recall for sticking accelerator pedal, announced on January 21, 2010.

"Helping ensure the safety of our customers and restoring confidence in Toyota are very important to our company," said Group Vice President and Toyota Division General Manager Bob Carter. "This action is necessary until a remedy is finalized. We're making every effort to address this situation for our customers as quickly as possible."

Toyota announced it would recall approximately 2.3 million vehicles to correct sticking accelerator pedals on specific Toyota Division models. Toyota has investigated isolated reports of sticking accelerator pedal mechanisms in certain vehicles without the presence of

floor mats. There is a possibility that certain accelerator pedal mechanisms may, in rare instances, mechanically stick in a partially depressed position or return slowly to the idle position.

74.   On January 27, 2010, Toyota issued a press release entitled "Toyota Amends Recall on Potential Floor Mat Interference with Accelerator Pedal," which stated in part:

On Wednesday, January 27, 2010, Toyota sent a letter to the National Highway Traffic Safety Administration amending Toyota's Defect Information Report of October 5, 2009 regarding the potential risk for floor mat entrapment of accelerator pedals in certain Toyota and Lexus models. Toyota has decided to include certain other models in the campaign. This action is separate from the recall of select Toyota vehicles for sticking accelerator pedals.

The specific model names and years associated with the newly-expanded population of subject vehicles for the pedal entrapment recall include:

2008-2010 Highlander

2009-2010 Corolla

2009-2010 Venza

2009-2010 Matrix

2009-2010 Pontiac Vibe

As of January 26, 2010 the total vehicle population increased by approximately 1,093,000 vehicles.

Toyota's remedy plan is to modify or replace the accelerator pedals on the subject vehicles to address the risk of floor mat entrapment, even when an older-design all weather floor mat or other inappropriate mat is improperly attached, or is placed on top of another floor mat. Floor surface modifications are also being considered and will

1    be included in the remedy plan for any model for which it is deemed
2    appropriate.

3        Initially, dealers will be instructed on how to reshape the
4    accelerator pedal for the repair.  As replacement parts with the same
5    shape as the modified pedal become available, they will be made
6    available to the dealers for the repair. Customers who have had the pedal
7    reshape remedy completed will have the opportunity to receive a new
8    pedal if they desire, after replacement pedals become available.

9        In addition, Toyota will replace any Toyota all-weather floor mat
10   in a subject vehicle with a newly designed mat, free of charge. For those
11   customers who have the previous design all-weather floor mat but do not
12   need or want the newly designed all-weather floor mat, Toyota will
13   recover the previous design all-weather floor mat and reimburse its price.

14       75.    On January 29, 2010, Toyota announced that the recall would be
15   extended to eight Toyota models offered in Europe.

16       76.    On this news, Toyota's ADSs fell $0.67 per share, closing at $77.00 per
17   share on January 29, 2010, on high volume.  Toyota's common stock also dropped
18   approximately 10%.

19       77.    On February 1, 2010, defendant Lentz appeared on NBC's Today show
20   and was interviewed by host Matt Lauer.  Contradicting Toyota USA's previous
21   statements that there were "*no defects*" related to unintended acceleration in Toyota
22   vehicles aside from the issues involving the floor mats, Lentz admitted that Toyota
23   USA had known about sticky accelerator pedal problems since at least *October 2009*:

24       [MATT LAUER:] Before we go forward, let me go back.  When
25       did your company know, when did you personally know, and other
26       officials at your company know, that you had a serious problem with
27       unwanted acceleration or slow response from acceleration?

28

1    [LENTZ:]   In, in the case of the slow response, this most recent

2    one, the first technical report that we had, that we could duplicate the

3    issue was in late October of last year.

4    [MATT LAUER:]   Now you've, you've seen the *Los Angeles*

5    *Times* report.   It says that in, in the last decade, there have been 2,000

6    reports of unwanted acceleration, some 800 accidents, 19 of those linked

7    to fatalities.   Your company was unaware of those reports for that period

8    of time?

9    [LENTZ:]   The, the number of, of, of deaths, the number of

10   accidents, whether it's one or whether it's 2,000, doesn't really make a

11   difference.   We've been investigating this for a long time and we are

12   quite confident –

13   [MATT LAUER:]   Well, but for a long time.   Did you know

14   about it since October of last year or have you been investigating it for a

15   long time?

16   [LENTZ:]   There are, there are two different issues involved in

17   this.   One is entrapment of the pedal.

18   [MATT LAUER:]   Mm-hmm.

19   [LENTZ:]   Uh, that was –

20   [MATT LAUER:]   With the floor mats.

21   [LENTZ:]:   With the floor mats.   But the sticking accelerator

22   pedal, we had knowledge of that in October of last year.

23   78.   On February 2, 2010, after the market closed, Toyota reported that its

24   U.S. sales for January 2010 had dropped by 16% from a year ago  due to the recall and

25   subsequent sales suspension of its most popular models.   In contrast, industry wide

26   sales for the month increased from January 2009 with both Ford Motor Company and

27   General Motors reporting improvements in their January sales numbers.

28

1    79.    Then, on February 3, 2010, LaHood, the head of NHTSA, urged Toyota

2    owners concerned about their cars to stop driving them and take them into their

3    Toyota dealerships to be repaired immediately.  He encouraged all vehicle owners

4    covered by the recall to contact their local dealers to get their vehicles fixed as soon as

5    possible.  Moreover, LaHood called for a meeting with defendant Toyoda to discuss

6    the recent safety concerns involving Toyota vehicles and the Company's handling of

7    the recalls.  It was reported that NHTSA was considering a civil penalty against the

8    Company over its handling of the recalls.

9    80.    Additionally on February 3, 2010, before the market opened, Toyota

10   announced that it had received reports of brake problems in its 2010 model year Prius

11   hybrid.  According to news reports, the Japanese government ordered Toyota to

12   investigate a possible defect in its brake system after receiving 14 reports of brake

13   trouble in its newest hybrid model.  It was further reported that the NHTSA had also

14   received at least 136 complaints about the Prius brakes.  Four of the complaints in the

15   U.S. resulted in accidents, with two resulting in injuries.

16   81.    As a result of this news, Toyota's ADSs fell $4.69 per share, closing at

17   $73.49 per share on February 3, 2010, on high volume.  Toyota's common stock also

18   dropped approximately 6%.

19   82.    As a result of defendants' false statements, Toyota's publicly traded

20   securities traded at inflated levels during the Class Period.  After the above

21   revelations, when it became apparent that many of Toyota's vehicles contained a

22   design defect that could cause unintended acceleration, the Company's securities

23   declined.  The price of the Company's ADSs declined nearly 20% from its Class

24   Period high. This drop removed inflation from Toyota's securities prices, causing real

25   economic loss to investors who had purchased Toyota securities during the Class

26   Period.

27

28

1

**ADDITIONAL SCIENTER ALLEGATIONS**

2        83.    During the Class Period, the Individual Defendants had both the motive

3  and opportunity to conduct fraud.  They also had actual knowledge of the falsity of the

4  statements they made or acted in reckless disregard of the truth or falsity of those

5  statements.  In so doing, the Individual Defendants participated in a scheme to defraud

6  and committed acts, practices and participated in a course of business that operated as

7  a fraud or deceit on purchasers of Toyota securities during the Class Period.

8

**LOSS CAUSATION/ECONOMIC LOSS**

9        84.    During the Class Period, as detailed herein, the Individual Defendants

10  made false and misleading statements and engaged in a scheme to deceive the market

11  and a course of conduct that artificially inflated the prices of Toyota securities and

12  operated as a fraud or deceit on Class Period purchasers of Toyota securities by

13  misrepresenting the Company's business and prospects.  Later, when the Individual

14  Defendants' prior misrepresentations and fraudulent conduct became apparent to the

15  market, the prices of Toyota securities fell precipitously, as the prior artificial inflation

16  came out of the prices over time.  As a result of their purchases of Toyota securities

17  during the Class Period, plaintiff and other members of the Class suffered economic

18  loss, *i.e.*, damages, under the federal securities laws.

19

**APPLICABILITY OF THE PRESUMPTION OF RELIANCE
AND FRAUD ON THE MARKET**

20

21        85.    Plaintiff will rely upon the presumption of reliance established by the

fraud-on-the-market doctrine in that, among other things:

22

23        (a)    The Individual Defendants made public misrepresentations or

failed to disclose material facts during the Class Period;

24

25        (b)    The omissions and misrepresentations were material;

26        (c)    The Company's securities traded in an efficient market;

27        (d)    The misrepresentations alleged would tend to induce a reasonable

investor to misjudge the value of the Company's securities; and

28

(e)     Plaintiff and other members of the Class purchased Toyota securities between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

86.     At all relevant times, the markets for Toyota securities were efficient for the following reasons, among others:

(a)     As a regulated issuer, Toyota filed periodic public reports with the SEC; and

(b)     Toyota regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

87.     Plaintiff incorporates all allegations in ¶¶1-86 above by reference.

88.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

89.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes, and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

1         (c)    Engaged in acts, practices, and a course of business that operated

2  as a fraud or deceit upon plaintiff and others similarly situated in connection with their

3  purchases of Toyota securities during the Class Period.

4      90.   Plaintiff and the Class have suffered damages in that, in reliance on the

5  integrity of the market, they paid artificially inflated prices for Toyota securities.

6  Plaintiff and the Class would not have purchased Toyota securities at the prices they

7  paid, or at all, if they had been aware that the market prices had been artificially and

8  falsely inflated by the Individual Defendants' misleading statements.

9      91.   As a direct and proximate result of these defendants' wrongful conduct,

10  plaintiff and the other members of the Class suffered damages in connection with their

11  purchases of Toyota securities during the Class Period.

12  **COUNT II**

13  **For Violation of §20(a) of the 1934 Act**
**Against All Defendants**

14      92.   Plaintiff incorporates all allegations in ¶¶1-91 above by reference.

15      93.   The Individual Defendants acted as controlling persons of Toyota within

16  the meaning of §20(a) of the 1934 Act. By virtue of their positions and their power to

17  control public statements about Toyota, the Individual Defendants had the power and

18  ability to control the actions of Toyota and its employees. Toyota, Toyota NA and

19  Toyota USA controlled the Individual Defendants and their other officers and

20  employees. By reason of such conduct, defendants are liable pursuant to §20(a) of the

21  1934 Act.

22  **PRAYER FOR RELIEF**

23  WHEREFORE, plaintiff prays for judgment as follows:

24  A.   Declaring this action to be a proper class action pursuant to Fed. R. Civ.

25  P. 23;

26  B.   Awarding damages and interest;

27  C.   Awarding plaintiff's reasonable costs, including attorneys' fees; and

28

1       D.    Awarding such equitable/injunctive or other relief as the Court may deem

2  just and proper.

3                          **JURY DEMAND**

4      Plaintiff demands a trial by jury.

5  DATED: February 8, 2010          COUGHLIN STOIA GELLER
                           RUDMAN & ROBBINS LLP

6                        DARREN J. ROBBINS
                        DAVID C. WALTON

7                        CATHERINE J. KOWALEWSKI

8

9                           */s/ David C. Walton*

10                            DAVID C. WALTON

11                        655 West Broadway, Suite 1900
                        San Diego, CA 92101-3301

12                        Telephone: 619/231-1058
                        619/231-7423 (fax)

13                        LAW OFFICES OF BERNARD M.
                           GROSS, P.C.

14                        DEBORAH R. GROSS
                        Wanamaker Bldg., Suite 450

15                        100 Penn Square East
                        Philadelphia, PA 19107

16                        Telephone: 215/561-3600
                        215/561-3000 (fax)

17                        Attorneys for Plaintiff

18

19

20

21

22

23

24

25

26

27

28  S:\CptDraft\Securities\Cpt Toyota Motor Corp.doc

LAW OFFICES BERNARD M. GROSS, P.C.

## CERTIFICATION OF HARRY STACKHOUSE

1.    I, Harry Stackhouse, have reviewed the Complaint and have authorized the filing of same;

2.    I did not purchase the American Depository Shares ("ADS") of TOYOTA MOTOR CORP. at the direction of counsel or in order to participate in any private action arising under the federal securities laws;

3.    I am willing to serve as class representative and provide testimony at deposition and trial, if necessary;

4.    During the period June 24, 2009 through February 2, 2010, my transactions in ADS of Toyota Motor Corp. consisted of the following:

| Date | Purchases | Amount | Price |
|------|-----------|--------|-------|
| 10/28/09 | purchase | 25 ADS | $79.06 |
| 12/9/09 | purchase | 15 ADS | $83.76 |

5.    During the previous three years, I have not been a lead plaintiff in the any securities fraud class action.

6.    I will not accept any payment for serving as a class representative beyond my pro rata share of any recovery, except as ordered or approved by the Court with respect to an award for reasonable costs and expenses (including lost wages).

I declare under penalty of perjury that the foregoing is true and correct. Executed this 5th day of February, 2010, at Richboro, PA.

Harry Stackhouse

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐)<br>HARRY STACKHOUSE, Individually and on Behalf of All Others Similarly Situated | DEFENDANTS<br>TOYOTA MOTOR CORPORATION, TOYOTA MOTOR SALES, U.S.A., INC., TOYOTA MOTOR NORTH AMERICA, INC., AKIO TOYODA, (See Attachment A) |
|---|---|
| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)<br>David C. Walton<br>Coughlin Stoia Geller Rudman & Robbins LLP<br>655 West Broadway, Suite 1900, San Diego, CA 92101  619/231-1058 | Attorneys (If Known) |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff   ☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant   ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☒ Yes   ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☒ Yes   ☐ No          ☐ **MONEY DEMANDED IN COMPLAINT: $** _____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Complaint for Violation of the Federal Securities Laws  15 U.S.C. §§78j(b) 78t(a)

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☒ 850 Securities/Commodities/ Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | REAL PROPERTY | IMMIGRATION | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | ☐ 462 Naturalization Application | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 463 Habeas Corpus- Alien Detainee | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | ☐ 465 Other Immigration Actions | | | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | | | | ☐ 871 IRS-Third Party 26 USC 7609 |

**FOR OFFICE USE ONLY:**   Case Number:   **CV10  0922**

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

CV-71 (05/08)                          CIVIL COVER SHEET                          Page 1 of 2

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a).  IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?  ☑ No   ☐ Yes
If yes, list case number(s): _____

**VIII(b).  RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?  ☑ No   ☐ Yes
If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**
(Check all boxes that apply)   ☐ A.  Arise from the same or closely related transactions, happenings, or events; or
☐ B.  Call for determination of the same or substantially related or similar questions of law and fact; or
☐ C.  For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D.  Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX.  VENUE:**  (When completing the following information, use an additional sheet if necessary.)

(a)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐   Check here if the government, its agencies or employees is a named plaintiff.  If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
|  | Richboro, Pennsylvania |

(b)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant.  If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County |  |

(c)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
**Note:  In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County |  |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved.

**X.  SIGNATURE OF ATTORNEY (OR PRO PER):** _____   Date February 8, 2010

**Notice to Counsel/Parties:**   The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law.  This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet.  (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

ATTACHMENT A

Defendants (cont.)

FUJIO CHO, ROBERT S. CARTER, IRVING A. MILLER, YOSHIMI INABA, JAMES E. LENTZ, III and ROBERT C. DALY

Name & Address:

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| HARRY STACKHOUSE, Individually and on Behalf of All Others Similarly Situated, | CASE NUMBER |
|---|---|
| PLAINTIFF(S) | CV10 0922  DSF  AJWx |
| v. | |
| TOYOTA MOTOR CORPORATION, TOYOTA MOTOR SALES, U.S.A., INC., (See Attachment A) | SUMMONS |
| DEFENDANT(S). | |

TO:    DEFENDANT(S): _____

A lawsuit has been filed against you.

   Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, David C. Walton_____, whose address is Coughlin Stoia, et al., 655 West Broadway, Suite 1900, San Diego, CA 92101_____.  If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

                                              Clerk, U.S. District Court

FEB - 3 2010

                                              CHRISTOPHER POWERS

Dated: _____            By: _____
                                              Deputy Clerk          SEAL

                                              (Seal of the Court)

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

CV-01A (12/07)                          SUMMONS

ATTACHMENT A

Defendants (cont.)

TOYOTA MOTOR NORTH AMERICA, INC., AKIO TOYODA, FUJIO CHO, ROBERT S.
CARTER, IRVING A. MILLER, YOSHIMI INABA, JAMES E. LENTZ, III and ROBERT C.
DALY

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Dale S. Fischer and the assigned discovery Magistrate Judge is Andrew J. Wistrich.

The case number on all documents filed with the Court should read as follows:

## CV10- 922 DSF (AJWx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

====================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

[X] **Western Division**
312 N. Spring St., Rm. G-8
Los Angeles, CA 90012

[ ] **Southern Division**
411 West Fourth St., Rm. 1-053
Santa Ana, CA 92701-4516

[ ] **Eastern Division**
3470 Twelfth St., Rm. 134
Riverside, CA 92501

Failure to file at the proper location will result in your documents being returned to you.