Michael Goldberg (#188669)
mgoldberg@glancylaw.com
GLANCY BINKOW & GOLDBERG LLP
1801 Avenue of the Stars, Suite 311
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Proposed Liaison Counsel for*
*Lead Plaintiff and the Class*

Joseph F. Rice                       Christopher J. Keller
jrice@motleyrice.com                 ckeller@labaton.com
James M. Hughes                      Alan I. Ellman
jhughes@motleyrice.com               aellman@labaton.com
William S. Norton                    Stefanie J. Sundel
bnorton@motleyrice.com               ssundel@labaton.com
MOTLEY RICE LLC                      LABATON SUCHAROW LLP
28 Bridgeside Blvd.                  140 Broadway
Mount Pleasant, South Carolina  29464   New York, New York 10005
Tel: (843) 216-9000                  Telephone: (212) 907-0700
Fax: (843) 216-9440                  Facsimile: (212) 818-0477

*Proposed Lead Counsel for Lead Plaintiff and the Class*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| HARRY STACKHOUSE, Individually and on Behalf of All Others Similarly Situated,<br><br>                          Plaintiff,<br><br>          vs.<br><br>TOYOTA MOTOR CORPORATION, et al.,<br><br>                          Defendants. | No.: 2:10-cv-00922-DSF-AJW<br><br>CLASS ACTION<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF THE MOTION OF THE GLOBAL INSTITUTIONAL INVESTOR GROUP FOR CONSOLIDATION OF RELATED ACTIONS, APPOINTMENT AS LEAD PLAINTIFF, AND APPROVAL OF SELECTION OF COUNSEL, AND IN OPPOSITION TO THE COMPETING MOTIONS**<br><br>DATE:   May 10, 2010<br>TIME:   1:30 p.m.<br>CTRM:   840 |

| | |
|---|---|
| TOM MUSTRIC, Individually and On Behalf of All Others Similarly Situated, | No.: 2:10-cv-01429-DSF-AJW |
| Plaintiff, | |
| vs. | |
| TOYOTA MOTOR CORPORATION, et al., Defendants. | |
| KATHRYN A. SQUIRES, On Behalf of Herself and All Others Similarly Situated, | No.: 2:10-cv-01452-DSF-AJW |
| Plaintiff, | |
| vs. | |
| TOYOTA MOTOR CORPORATION, et al., Defendants. | |
| ROBERT M. MOSS, Individually and on Behalf of All Others Similarly Situated, | No.: 2:10-cv-01911-DSF-AJW |
| Plaintiff, | |
| vs. | |
| TOYOTA MOTOR CORPORATION, et al., Defendants. | |

1

2

_____

PHILIP GELENBERG, Individually and On          )     No.: 2:10-cv-02196-DSF-AJW
Behalf of All Others Similarly Situated,       )
                                               )
                                               )
                                Plaintiff,     )
                                               )
           vs.                                 )
                                               )
TOYOTA MOTOR CORPORATION, et al.,              )
                                               )
                                Defendants.    )
_____        )

L. PATRICIA SAMPOLI, On Behalf of              )     No.: 2:10-cv-02253-DSF-AJW
Herself and All Others Similarly Situated,     )
                                               )
                                               )
                                Plaintiff,     )
                                               )
           vs.                                 )
                                               )
TOYOTA MOTOR CORPORATION,  et al.,             )
                                               )
                                Defendants.    )
_____        )

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

ARGUMENT ......................................................................................................... 4

I.  THE GIIG IS THE MOST ADEQUATE PLAINTIFF AND
    SHOULD BE APPOINTED LEAD PLAINTIFF FOR THE CLASS ................ 4

    A.  The GIIG Has the "Largest Financial
        Interest In the Relief Sought by the Class" ................................... 5

        1.  The GIIG Has the Largest Amount of Potential Recovery ............ 5

II.  THE GIIG SATISFIES THE REQUIREMENTS OF RULE 23 ..................... 11

    A.  The GIIG Satisfies the Typicality Requirement ...................................... 12

    B.  The GIIG Satisfies the Adequacy Requirement...................................... 13

        1.  The GIIG and Their Counsel Are Free of Conflict ....................... 13

        2.  The GIIG and Their Counsel
            Will Vigorously Prosecute the Action........................................... 13

        3.  The GIIG Is a Proper Group ......................................................... 15

        4.  The GIIG Includes the Movant with
            the Single Largest Financial Interest ........................................... 17

III.  ALL COMPETING MOTIONS SHOULD BE DENIED ................................ 18

CONCLUSION..................................................................................................... 19

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL CASES

<u>Boyd v. NovaStar Fin., Inc.</u>,
No. 07-0139-CV-W-ODS, 2007 WL 2026130
(W.D. Mo. July 9, 2007) ............................................................................. 6

<u>In re Cavanaugh</u>,
306 F.3d 726 (9th Cir. 2002) ................................................. 1, 4, 5, 18

<u>In re Cendant Corp. Sec. Litig.</u>,
264 F.3d 201 (3d Cir. 2001) .................................................................. 15

<u>In re Comdisco Sec. Litig.</u>,
150 F. Supp. 2d 943 (N.D. Ill. 2001) ...................................................... 7

<u>In re Comverse Tech. Inc. Sec. Litig.</u>,
No. 06-CV-1825 (NGG), 2007 WL 680779
(E.D.N.Y. Mar. 2, 2007) .................................................................... 8, 9

<u>In re Critical Path, Inc. Sec. Litig.</u>,
156 F. Supp. 2d 1102 (N.D. Cal. 2001) ................................................. 6

<u>Crossen v. CV Therapeutics</u>,
No. C 03-03709 SI, 2005 U.S. Dist. LEXIS 41396
(N.D. Cal. Aug. 9, 2005) ...................................................................... 12

<u>In re Donnkenny Inc. Sec. Litig.</u>,
171 F.R.D. 156 (S.D.N.Y. 1997) .......................................................... 15

<u>Dura Pharms., Inc. v. Broudo</u>,
544 U.S. 336 (2005) ........................................................................... 2, 7

<u>Durgin v. Tousa, Inc.</u>,
06-civ-61844, 2008 WL 2761301 (S.D. Fla. July 15, 2008) .................. 9

<u>Eichenholtz v. Verifone Holdings, Inc.</u>,
No. C 07-06140 MHP, 2008 WL 3925289
(N.D. Cal. Aug. 22, 2008) ................................................................... 3, 8

No.: 2:10-cv-00922-DSF-AJW — MPA ISO THE MOT. OF THE GIIG
FOR CONSOL. OF RELATED ACTIONS, APPOINTMENT AS LEAD PL., &
APPROVAL OF SELECTION OF COUNSEL, & IN OPP. TO THE COMPETING MOTS.

ii

Hanlon v. Chrysler Corp.,
    150 F.3d 1011 (9th Cir. 1998) ....................................................................... 12, 13

Hodges v. Akeena Solar, Inc.,
    263 F.R.D. 528 (N.D. Cal. 2009).......................................................................... 5

Kops v. NVE Corp.,
    No. 06-cv-574 (MJD/JJG), 2006 WL 2035508
    (D. Minn. July 19, 2006).................................................................................... 9

Leech v. Brooks Automation, Inc.,
    No. 06-cv-11068-RWZ, 2006 WL 3690736
    (D. Mass. Dec. 13, 2006) ................................................................................... 6

In re Level 3 Commc'ns, Inc. Sec. Litig.,
    No. 09-cv-200-PAB-CBS, 2009 U.S. Dist. LEXIS 44706
    (D. Colo. May 4, 2009)....................................................................................... 9

In re Network Assoc., Inc. Sec. Litig.,
    76 F. Supp. 2d 1017 (N.D. Cal. 1999) ............................................................. 1, 6

In re Peregrine Sys., Inc. Sec. Litig.,
    02-cv-870, 2002 WL 32769239 (S.D. Cal. Oct. 11, 2002) ................................... 5

Reimer v. Ambac Fin. Group, Inc.,
    08 civ. 411(NRB), 2008 WL 2073931
    (S.D.N.Y. May 9, 2008)..................................................................................... 15

Ruland v. InfoSonics Corp.,
    No. 06-cv-1231 BTM-WMC, 2006 WL 3746716
    (S.D. Cal. Nov. 7, 2006) ..........................................................................3, 5, 6, 7

Siegall v. Tibco Software, Inc.,
    05-cv-2146 (SBA), 2006 WL 1050173
    (N.D. Cal. Feb. 24, 2006) ............................................................................. 5, 12

In Spectranetics Corp. Sec. Litig.,
    08-cv-2048-REB-KLM, 2009 WL 1663953
    (D. Colo. June 15, 2009)................................................................................... 16

No.: 2:10-CV-00922-DSF-AJW — MPA ISO THE MOT. OF THE GIIG
FOR CONSOL. OF RELATED ACTIONS, APPOINTMENT AS LEAD PL., &
APPROVAL OF SELECTION OF COUNSEL, & IN OPP. TO THE COMPETING MOTS.

iii

Surebeam Corp. Sec. Litig.,
    No. 03 CV 1721 JM(POR), 2004 WL 5159061
    (S.D. Cal. Jan. 5, 2004) ....................................................................... 18

Teamsters Local 445 Freight Div. Pension Fund v. Bombardier,
    No. 05-cv-1898 (SAS), 2005 WL 1322721
    (S.D.N.Y. June 1, 2005)....................................................................... 19

In re Versata, Inc., Sec. Litig.,
    01-cv-1439-SI, 2001 WL 34012374 (N.D. Cal. Aug. 20, 2001)........................... 15

Weisz v. Calpine Corp.,
    4:02-cv-1200, 2002 WL 32818827 (N.D. Cal. Aug. 19, 2002) ........................... 6

**DOCKETED CASES**

Brooks v. Interlink Elecs.,
    No. 05-cv-8133 PA (SHx), slip op.
    (C.D. Cal. July 14, 2006) ....................................................................... 8

Cole v. Health Mgmt Assocs., Inc.,
    No. 07-cv-484-FtM-34SPC, slip op. (M.D. Fla. May 14, 2008)........................... 9

Eshe Fund v. Fifth Third Bancorp,
    No. 08-cv-421, slip op. (S.D. Ohio Dec. 16, 2008)............................... 16

In re NVIDIA Corp. Sec. Litig.,
    NO. C 08-04260 JW, slip op. (N.D. Cal. Dec. 23, 2008)....................................... 5

Pappas v. Countrywide Fin. Corp.,
    No. CV-07-5295-MRP (MANx), slip op.
    (C.D. Cal. Nov. 28, 2007) ....................................................................... 11

**STATUTES**

15 U.S.C. § 78u-4(a)(3)(B) ............................................................... 1, 4, 5, 12

No.: 2:10-CV-00922-DSF-AJW — MPA ISO THE MOT. OF THE GIIG
FOR CONSOL. OF RELATED ACTIONS, APPOINTMENT AS LEAD PL., &
APPROVAL OF SELECTION OF COUNSEL, & IN OPP. TO THE COMPETING MOTS.

iv

1    The Global Institutional Investor Group ("GIIG") respectfully submits this

2    memorandum of law in further support of its motion for consolidation of the above-

3    captioned, related actions (collectively, the "Action"), appointment as Lead Plaintiff,

4    and approval of selection of Lead Counsel, and in opposition to the competing

5    motions.

6                                              **<u>INTRODUCTION</u>**

7        The lead plaintiff provision of the PSLRA was enacted to place the leadership

8    of securities class actions in the hands of class members who have the largest financial

9    interest in the relief sought.  15 U.S.C. § 78u-4(a)(3)(B)(iii).  The Ninth Circuit in <u>In</u>

10   <u>re Cavanaugh</u> explained that the focus of the court's evaluation of financial interest is

11   to determine which movant "***has the most to gain from the lawsuit***."  306 F.3d 726,

12   730 (9th Cir. 2002) (emphasis added).  While the GIIG did not suffer the largest

13   trading loss in Toyota securities, it, emphatically, suffered the largest loss ***as a result***

14   ***of the Defendants' fraud and has the largest financial interest in this case***.

15       Courts in the Ninth Circuit, particularly in California, utilize what is known as a

16   "net purchases" analysis—rather than a pure "trading loss" analysis—to determine the

17   movant with the largest financial interest.  A net purchases analysis compares the

18   amount of shares a movant purchased during the Class Period, versus how many it

19   sold.  The greater the difference between shares purchased and shares sold, the greater

20   the potential recovery for the movant.  The net purchases analysis is preferable to the

21   trading loss analysis because it excludes losses incurred on shares sold prior to the

22   corrective disclosure that were not proximately caused by the fraud.  As Judge Alsup

23   explained in <u>In re Network Assocs., Inc. Sec. Litig.</u>, 76 F. Supp. 2d 1017, 1027 (N.D.

24   Cal. 1999) "the candidate with the most net shares purchased will normally have the

25   largest potential damage recovery. . . .  The test simply reduces to the net number of

26   shares bought and sold during the class period." <u>Id.</u>

27

28

The GIIG had Class Period net purchases of 1,527,964, far in excess of all other movants, as the accompanying chart illustrates:

| Movant Name[1] | Security Type | Net Shares Purchased |
|---|---|---|
| **GIIG** | ORD & ADR | 1,527,964 |
| **IIG** | ORD & ADR | 1,363,750 |
| **Harel Pia** | TMCC Bonds | 953,000 |
| **PRIM** | ORD | 846,600 |
| **Pension and Retirement Funds** | ORD | 635,571 |
| **Condon and Weinstein** | ADR | 9,999 |
| **Squires** | ADR | 29 |

See Expert Declaration of Kenneth Kotz of Forensic Economics (the "Kotz Decl.") ¶¶ 21-22.[2]  Accordingly, under a net purchases analysis, the GIIG has the largest financial interest in this case.

In addition to having the most net shares purchased during the Class Period, the GIIG also has the largest trading loss consistent with the Supreme Court's holding in Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336 (2005), a landmark ruling on loss causation under the federal securities laws.  In Dura, the Supreme Court held that gains or losses on shares sold during the Class Period that occur prior to disclosure of the fraud are not proximately caused by the alleged fraud and, therefore, not recoverable.  Id. at 342.

It flows naturally from Dura that determining which lead plaintiff applicant has the "most to gain" from this lawsuit should involve analysis that excludes losses

---

[1] The competing movants are: (1) the "Institutional Investor Group," or "IIG"; (2) Harel Pia Mutual Fund ("Harel Pia"); (3) Commonwealth of Massachusetts Pension Reserves Investment Management Board ("PRIM"); (4) the "Pension and Retirement Funds"; (5) William P. Condon and Judith W. Weinstein; and (6) Kathryn A. Squires.

[2] The Kotz Declaration is attached as Exhibit A to the accompanying Declaration of Alan I. Ellman ("Ellman Decl.").

associated with shares purchased and sold prior to disclosure of the fraud.   Following <u>Dura</u>, courts now regularly exclude in-and-out losses in determining which lead plaintiff applicant has the largest financial interest. <u>See e.g.</u>, <u>Eichenholtz v. Verifone Holdings, Inc.</u>, No. C 07-06140 MHP, 2008 WL 3925289, at *4 (N.D. Cal. Aug. 22, 2008) ("[T]he court finds no reason to include losses in its calculations that would later be considered uncompensable."); <u>Ruland v. InfoSonics Corp.</u>, No. 06-cv-1231 BTM-WMC, 2006 WL 3746716, at *4 (S.D. Cal. Oct. 23, 2006) (eliminating the effect of in-and-out trades "is the better measure of financial stake in the case.").

As the Kotz Declaration shows, the GIIG has the largest trading loss when "in-and-out" losses are excluded.  The GIIG suffered recoverable losses of $39,274,757—***over four million dollars more*** than the losses incurred by the next largest movant on shares purchased during the Class Period and held through disclosure of the fraud.[3] The GIIG therefore has the largest recoverable financial interest in the relief sought in this litigation under both a pure net purchases analysis as well as a trading loss analysis consistent with the Supreme Court's ruling in <u>Dura</u>.

Further, the GIIG is both adequate and typical under Rule 23.  As did other members of the class, the GIIG purchased Toyota stock during the class period and suffered significant losses upon Toyota's disclosure of its serious safety problems. Furthermore, it has retained experienced counsel, and has authorized its counsel's retention of investigators, automotive industry experts, and Japanese corporate governance experts.  In addition, the GIIG has executed a joint declaration demonstrating their commitment to oversight of this case and their lawyers, and pursuit of a recovery on behalf of all Class members (attached as Ex. B to the Ellman

---

[3] Excluding in-and-out losses, the competing movants' losses are: (1) IIG ($34,757,224); (2) PRIM ($20,17,224); and (3) Pension and Retirement Funds ($3,301,203).  As explained *infra* at 11, these losses are calculated based on the last-in-first-out ("LIFO") accounting methodology.  The remaining movants' losses are considerably smaller and were therefore not calculated under this methodology.

No.: 2:10-cv-00922-DSF-AJW — MPA ISO THE MOT. OF THE GIIG
FOR CONSOL. OF RELATED ACTIONS, APPOINTMENT AS LEAD PL., &
APPROVAL OF SELECTION OF COUNSEL, & IN OPP. TO THE COMPETING MOTS.

3

1  Decl.).  The GIIG is the paradigmatic institutional lead plaintiff envisioned by

2  Congress in passing the PSLRA and should be appointed as such.

3  **ARGUMENT**

4  **I.   THE GIIG IS THE MOST ADEQUATE PLAINTIFF AND**
5  **SHOULD BE APPOINTED LEAD PLAINTIFF FOR THE CLASS**

6          In the Ninth Circuit, lead plaintiff appointment is governed by <u>Cavanaugh</u>,

7  which prescribes a straightforward three-step process.  The first step is to determine if

8  the procedural requirements, including proper notice of the pendency of the action and

9  timely filing of motions, were met.  <u>See</u> <u>Cavanaugh</u>, 306 F.3d at 729.  The GIIG has

10 timely moved for lead plaintiff and otherwise complied with all procedural

11 requirements.

12         In the second step, the Court selects as the 'presumptively most adequate

13 plaintiff'—and hence the presumptive lead plaintiff—the movant who 'has the largest

14 financial interest in the relief sought by the class' and 'otherwise satisfies the

15 requirements of Rule 23 of the Federal Rules of Civil Procedure.'"  <u>Id.</u> at 729-30

16 (quoting 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)).  The Court "must then focus its attention

17 on ***that*** plaintiff and determine, based on the information he has provided in his

18 pleadings and declarations, whether he satisfies the requirements of Rule 23(a), in

19 particular those of 'typicality' and 'adequacy.'"  <u>Id.</u>  A straightforward application of

20 the statutory scheme "provides no occasion for comparing plaintiffs with each other

21 on any basis other than their financial stake in the case."  <u>Id.</u> at 732.

22         In the third step of the process, competing movants are afforded an opportunity

23 to rebut the presumptive lead plaintiff's showing that it satisfies Rule 23's typicality

24 and adequacy requirements.  <u>Id.</u> at 730; 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).  If the

25 presumption is not rebutted, the movant identified in the second step must be

26 appointed Lead Plaintiff.

27         As demonstrated below, the GIIG has the "largest financial interest" in this

28 litigation and satisfies Rule 23's requirements of typicality and adequacy.  Hence, the

1   Court should appoint the GIIG as Lead Plaintiff.

2       **A.**    **The GIIG Has the "Largest Financial**
3              **Interest In the Relief Sought by the Class"**

4         The PSLRA "does not specify what factors to consider when making [the]

5   determination" of largest financial interest.  In re Peregrine Sys., Inc. Sec. Litig., 02-

6   cv-870, 2002 WL 32769239, at *4 (S.D. Cal. Oct. 11, 2002); see also 15 U.S.C. §

7   78u-4(a)(3)(B)(iii)(I)(bb).  The Ninth Circuit has held that district courts must

8   compare the financial interests of lead plaintiff movants using "accounting methods

9   that are both rational and consistently applied."  Cavanaugh, 306 F.3d at 730 n.4.  As

10  noted above, the Ninth Circuit explained that the court must determine which movant

11  "has the most to gain from the lawsuit."  Id. at 730.  Although the PSLRA does not

12  countenance a precise determination of damages at this stage of the litigation, "courts

13  typically equate 'largest financial interest' with the amount of ***potential recovery***."

14  Ruland, 2006 WL 3746716, at *5 (citing Siegall v. Tibco Software, Inc., 05-cv-2146

15  (SBA), 2006 WL 1050173, at *4 (N.D. Cal. Feb. 24, 2006) and Network Assocs., 76

16  F. Supp. at 1030).

17        **1.**    **The GIIG Has the Largest Amount of Potential Recovery**

18          **(a)**    **Net Shares Purchased Has Long**
19                **Been a Favored Metric to Determine**
              **Financial Interest in California District Courts**

20        District Courts in California, consistent with a rationale that focuses on losses

21  ***caused*** by the defendants' fraud, give ***determinative*** weight to the number of net

22  shares purchased by lead plaintiff movants.  See, e.g., Hodges v. Akeena Solar, Inc.,

23  263 F.R.D. 528, 531-32 (N.D. Cal. 2009) ("Under the 'net shares' method, a court can

24  estimate the potential recovery of a plaintiff by calculating the total number of shares

25  purchased during the Class Period and subtracting the total number of shares sold

26  during the Class Period."); In re NVIDIA Corp. Sec. Litig., No. C 08-04260 JW, slip

27  op. at 4 (N.D. Cal. Dec. 23, 2008) (attached as Ex. C to the Ellman Decl.) (same);

28

---

No.: 2:10-CV-00922-DSF-AJW — MPA ISO THE MOT. OF THE GIIG
FOR CONSOL. OF RELATED ACTIONS, APPOINTMENT AS LEAD PL., &
APPROVAL OF SELECTION OF COUNSEL, & IN OPP. TO THE COMPETING MOTS.

5

Ruland, 2006 WL 3746716, at *6; Weisz v. Calpine Corp., 4:02-cv-1200, 2002 WL
32818827, at *5 (N.D. Cal. Aug. 19, 2002) (adopting net shares method that
"equate[s] 'largest financial interest' with the amount of potential recovery"); In re
Critical Path, Inc. Sec. Litig., 156 F. Supp. 2d 1102, 1108 (N.D. Cal. 2001) (holding
that the "number of net shares purchased during the class period is determinative");
Network Assocs., 76 F. Supp. 2d at 1027; Leech v. Brooks Automation, Inc., No. 06-
cv-11068-RWZ, 2006 WL 3690736, at *2 (D. Mass. Dec. 13, 2006) ("[C]ourts have
equated 'largest financial interest' with largest 'potential recovery'. . . .  Under this
method, 'the number of net shares purchased during the class period is determinative'
because the plaintiff who purchased the most net shares would receive the largest
'potential recovery.'") (citation omitted).

  These courts reason that the movant with the largest number of net shares
purchased and held through disclosure of the fraud is the movant that suffered the
largest loss directly attributable to a defendant's fraudulent conduct.  As explained by
Judge Alsup in Network Associates:

> ***At least as a first approximation, the candidate with the most net shares
> purchased will normally have the largest potential damage recovery.***
> This approach gets into trouble only if the amount of the "fraud
> premium" varied over the course of the class period. In that case, the
> problem would be that some transactions resulted in greater losses than
> others and thus not all transactions were equal.  At this stage, however, it
> is impossible to determine such variations.  The best that can be done is
> to assume a constant fraud premium per share throughout the class
> period.  It really does not matter what size premium is used, for all shares
> would have been inflated to the same extent. ***The test simply reduces to
> the net number of shares bought and sold during the class period.***

76 F. Supp. 2d at 1027 (emphasis added).  See also Ruland, 2006 WL 3746716, at *6
("Ignoring in-and-out losses or gains, the focus is on the net number of shares
purchased."); Boyd v. NovaStar Fin., Inc., No. 07-0139-CV-W-ODS, 2007 WL
2026130, at *3 (W.D. Mo. July 9, 2007) ("[I]f an investor buys *and* sells the stock
after the fraud occurs and before the truth is revealed, any fluctuation in the stock

No.: 2:10-cv-00922-DSF-AJW — MPA ISO THE MOT. OF THE GIIG
FOR CONSOL. OF RELATED ACTIONS, APPOINTMENT AS LEAD PL., &
APPROVAL OF SELECTION OF COUNSEL, & IN OPP. TO THE COMPETING MOTS.

6

price cannot be attributed to the fraud.  Therefore, the number of shares purchased during the class period is less relevant than the ***net*** number of shares purchased during the class period, as the latter figure will represent the number of shares purchased after the fraud and held when the fraud was revealed.") (citations omitted).

Indeed, when presented with a choice between the net purchases analysis and a trading losses analysis, courts have rejected the latter.  In In re Comdisco Securities Litigation, the court "reject[ed] the kind of artificial 'loss' that is manufactured by [movant's] attempted FIFO construct in favor of a calculation that properly nets out purchases and sales ***during*** the class period and determines gains or losses in those terms.  That is all of a piece with the concept of 'actual damages' recovery . . . ." 150 F. Supp. 2d. 943, 945-46 (N.D. Ill. 2001).

As the chart above illustrates, see supra at 2, the GIIG purchased ***164,214 more net shares*** than the next largest movant, the IIG, and has the largest financial interest in the litigation.

**(b)    The Supreme Court's Decision in <u>Dura</u>
Confirmed the Focus on Potential Recovery
in Determining Largest Financial Interest**

In addition to having the most "net purchases," the GIIG also has the largest financial loss on shares purchased and held through disclosure of the Toyota fraud. The Supreme Court in <u>Dura</u>, explaining that only losses caused by a defendant's wrongful conduct can be properly compensated, reasoned that a plaintiff may not recover if she "sells the shares quickly before the relevant truth begins to leak out," because "the misrepresentation will not have led to any loss."  544 U.S. at 342. Pursuant to <u>Dura</u>, when the theory of loss causation pled is based on a corrective disclosure, as is the case here, losses on shares sold before disclosure of the truth are not recoverable as a matter of law.

The Supreme Court's holding in <u>Dura</u> is grounded on the same logic that courts use in according determinative weight to the amount of "net purchases" in selecting

the most adequate lead plaintiff—in that the paramount concern is identifying losses
that were proximately caused by disclosure of the fraud.

Applying <u>Dura</u> to determine financial interest, Judge Anderson in <u>Brooks v.
Interlink Electronics, Inc.</u> held that an in-and-out seller who sold its shares before any
corrective disclosure did not have the largest financial interest, reasoning that "under
<u>Dura</u> there can be no loss causation for plaintiffs who purchased and sold stock at the
inflated share price" prior to any corrective disclosure, "and thus these plaintiffs may
not recover at all."  No. 05-cv-8133 PA (SHx), slip op. at 1-2 (C.D. Cal. July 14,
2006) (quoting <u>In re Cornerstone Propane Partners, L.P. Sec. Litig.</u>, No. C 03-2522
MHP, 2006 WL 110267, at *8 (N.D. Cal. May 3, 2006)) (attached as Ex. C to the
Ellman Decl.).  Similarly, the court in <u>Eichenholtz</u> excluded in-and-out trades,
reasoning that "it is difficult, if not impossible, to demonstrate loss causation for
shares bought ***and*** sold before the disclosure of the misstatements or omissions."
2008 WL 3925289, at *4.  The <u>Eichenholtz</u> court cited favorably to the decision in <u>In
re Comverse Technology Inc. Securities Litigation</u>, No. 06-CV-1825 (NGG)(RER),
2007 WL 680779 (E.D.N.Y. Mar. 2, 2007), which explained that <u>Dura</u> had a material
impact on the lead plaintiff selection process, such that pre-disclosure losses that are
not caused by the defendants' fraud should not figure into the lead plaintiff financial
interest analysis.  In <u>Comverse</u>, the district court reversed a magistrate judge's
appointment of a movant who claimed a $2.9 million loss and appointed instead a
competing movant who had $343,202.50 in losses.  The court held that <u>Dura</u> requires
exclusion of losses that resulted from sales prior to a corrective disclosure: "The
exclusion of in-and-out shares [from the financial interest analysis] follows directly
from the underlying holding in <u>Dura</u> . . . ." <u>Id.</u> at *6.  Accordingly, the district court
excluded all pre-disclosure losses from the financial interest analysis and considered
only losses incurred on shares retained through the disclosure alleged in the
complaint.  <u>See</u> <u>id.</u> at *7.

1    Likewise, the court in <u>Kops v. NVE Corp.</u> held that losses incurred prior to the

2    first disclosure alleged in the action must, pursuant to <u>Dura</u>, be excluded from the

3    PSLRA financial interest analysis:

4         In <u>Dura</u> . . . the Supreme Court held that in order to state a claim for
          securities fraud, a plaintiff cannot simply allege that the price of the

5         stock was inflated by a misrepresentation at the time that he purchased

6         it.  Instead, the plaintiff must claim that the share prices fell after the

7         truth became known, causing a loss to the plaintiff. . . .  ***Under <u>Dura</u>,***
          ***the Court only calculates losses incurred from sales occurring after***

8         ***disclosure, that is, losses proximately caused by the alleged fraud***.

9    No. 06-cv-574 (MJD/JJG), 2006 WL 2035508, at *5 (D. Minn. July 19, 2006)

10   (emphasis added).

11       Numerous other courts agree that in-and-out losses suffered by lead plaintiff

12   movants should not be included in the calculation of financial interest.  <u>See, e.g.</u>, <u>In re</u>

13   <u>Level 3 Commc'ns, Inc. Sec. Litig.</u>, No. 09-cv-200-PAB-CBS, 2009 U.S. Dist. LEXIS

14   44706 (D. Colo. May 4, 2009) ("It would be difficult at best for [movant] to prove

15   loss causation with respect to shares it sold 'before the relevant truth begins to leak

16   out' because the Supreme Court has held that in such cases, 'the misrepresentation

17   will not have led to any loss.'") (quoting <u>Dura</u>, 544 U.S. at 342); <u>Durgin v. Tousa,</u>

18   <u>Inc.</u>, 06-cv-61844, 2008 WL 2761301, at *2 (S.D. Fla. July 15, 2008) ("[C]ourts

19   routinely analyze the loss calculation in lead plaintiff applications in terms of trading

20   and removed losses suffered prior to a corrected disclosure."); <u>Cole v. Health Mgmt.</u>

21   <u>Assocs., Inc.</u>, No. 07-cv-484-FtM-34SPC, slip op. at 11-13 (M.D. Fla. May 14, 2008)

22   ("[F]or the purpose of resolving the instant Motions, under <u>Dura</u>, [the court] should

23   not consider the losses suffered by [movant] prior to [defendant's] issuance of the July

24   31, 2007 corrective [disclosure] . . . .") (attached as Ex. D to the Ellman Decl.).

25       As each of the complaints allege, the Toyota unintended acceleration scandal

26   came to light in late January 2010.  Prior to that date, Toyota continually blamed

27   unintended acceleration by its vehicles on the floor mat becoming entangled with the

28

No.: 2:10-CV-00922-DSF-AJW — MPA ISO THE MOT. OF THE GIIG
FOR CONSOL. OF RELATED ACTIONS, APPOINTMENT AS LEAD PL., &
APPROVAL OF SELECTION OF COUNSEL, & IN OPP. TO THE COMPETING MOTS.

9

accelerator pedal, successfully quelling investor and consumer concerns.  For example, Toyota blamed its September 29, 2009 recall of 3.8 million vehicles on faulty floor mats.  Compl. ¶ 55.[4]

On January 21, 2010, however, Toyota began releasing a steady stream of shocking consumer safety news.  On that date, Toyota announced that it was issuing a recall of 2.3 million vehicles relating to unintended acceleration in vehicles *without the presence of floor mats*, and stating that there was a possibility that the accelerator pedal mechanism could be flawed.  Compl. ¶ 9.

On January 26, 2010, Toyota issued a press release that confirmed a deepening crisis.  Toyota announced that it had taken the drastic measure of instructing dealers to temporarily suspend sales of eight models involved in the January 21, 2010 recall for one week.  Compl. ¶ 10.

On January 27, 2010, Toyota issued another press release increasing the scope of the September 2009 recall by adding five 2008-2010 models to the recall population.  Compl. ¶ 74.

On January 29, 2010, Toyota extended recalls to eight additional models offered in Europe to solve a potential accelerator pedal issue.  Compl. ¶ 75.

On February 2, 2010, after the market closed, Toyota reported that its U.S. sales for January 2010 had dropped by 16 percent from the previous year due to the recalls and subsequent sales suspension of its most popular models.  Compl. ¶ 78.

On February 3, 2010, before the market opened, Toyota disclosed that in January it found a software glitch that cause brakes in its popular Prius model to momentarily lose power.  Compl. ¶ 80.

The January 21, 2010 corrective disclosure thus represents the first in a string of corrective disclosures that hammered away at Toyota stock, exposing the cause of

---

[4] "Compl. ¶ __" refers to the Complaint for Violation of the Federal Securities Laws, filed Feb. 8, 2010 (Stackhouse, Dkt. #1).

No.: 2:10-cv-00922-DSF-AJW — MPA ISO THE MOT. OF THE GIIG FOR CONSOL. OF RELATED ACTIONS, APPOINTMENT AS LEAD PL., & APPROVAL OF SELECTION OF COUNSEL, & IN OPP. TO THE COMPETING MOTS.

10

1  unintended acceleration and causing Toyota stock to substantially decline with each

2  successive piece of news.

3       The GIIG does ***not*** argue that losses incurred prior to the January 21, 2010

4  corrective disclosure are, as a matter of law, not compensable.  Rather, at this initial

5  stage of the case, when the Court is trying to identify the lead plaintiff movant that is

6  likely to have the largest financial interest, it should ignore "in-and-out" transactions.

7  Losses on such transaction may, or may not, ultimately be compensable to some

8  extent based upon the facts developed during the litigation, but at this point, it makes

9  more sense to appoint as lead plaintiff the applicant whose losses are far more likely

10 to have been caused by disclosure of the truth about Toyota's fraud.

11      With losses of $39,274,757, the GIIG clearly has the largest LIFO loss under

12 the <u>Dura</u> analysis.  <u>See</u> Kotz Decl. ¶¶ 31-32 & Ex. 5.  Though the IIG has a slightly

13 larger FIFO loss than the GIIG, "courts have generally ***rejected*** FIFO as an

14 appropriate means of calculating losses in securities fraud cases."  <u>Pappas v.</u>

15 <u>Countrywide Fin. Corp.</u>, No. CV-07-5295-MRP (MANx), slip op. at 14 (C.D. Cal.

16 Nov. 28, 2007) (quotation and citation omitted) (attached as Ex. E to the Ellman

17 Decl.).  FIFO is disfavored because it "encompasses purchases made outside the class

18 period . . . and thus in some cases will identify damages where in reality there is

19 none."  <u>Id.</u> at 14-15 (quoting <u>Weisz</u>, 2002 WL 32818827, at *7 and <u>In re Clearly</u>

20 <u>Canadian Sec. Litig.</u>, No. C93-037-VRW, 1999 WL 707737, at *4 (N.D. Cal. Sept. 3,

21 1999)) (internal quotations omitted).

22      The GIIG thus has the largest financial interest under the net shares purchased

23 method as well as under the <u>Dura</u> in-and-out method.  The GIIG is, therefore, the

24 presumptive "most adequate plaintiff . . . ."  15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).

25 **II.   THE GIIG SATISFIES THE REQUIREMENTS OF RULE 23**

26      Pursuant to the PSLRA, in addition to possessing the largest financial interest

27 in the outcome of the litigation, the Lead Plaintiff must also "otherwise satisf[y] the

28

1   requirements of Rule 23 of the Federal Rules of Civil Procedure."  15 U.S.C. § 78u-

2   4(a)(3)(B).  Of the four prerequisites to class certification, only two—typicality and

3   adequacy—directly address the personal characteristics of the class representative.

4   Siegall, 2006 WL 1050173, at *15 ("In the context of determining the appropriate lead

5   plaintiff, the requirements of 'typicality' and adequacy of representation are key

6   factors.").  The GIIG is typical and adequate, and, because it has the largest financial

7   interest, is the presumptive lead plaintiff.

8        A.    **The GIIG Satisfies the Typicality Requirement**

9        The typicality requirement is satisfied when the representative plaintiff's claims

10   arise from the same event or course of conduct that gives rise to claims of other class

11   members, and when the claims are based on the same legal theory.  See Crossen v. CV

12   Therapeutics, No. C 03-03709 SI, 2005 U.S. Dist. LEXIS 41396, at *13 (N.D. Cal.

13   Aug. 9, 2005).  The requirement that the proposed class representatives' claims be

14   typical of the claims of the class does not mean, however, that the claims must be

15   identical.  See Hanlon v. Chrysler Corp., 150 F.3d 1011, 1020 (9th Cir. 1998).

16        In this case, the typicality requirement is met because the GIIG's claims are

17   identical, non-competing, and non-conflicting with the claims of the other Class

18   members.  The members of the GIIG, like all other Class members: (1) purchased

19   Toyota stock during the class period; (2) purchased Toyota stock at artificially-

20   inflated prices as a result of Defendants' misrepresentations and omissions; and (3)

21   suffered damages upon disclosure of defendants' alleged fraud.  The GIIG's claims

22   and injuries "arise from the same conduct from which the other class members' claims

23   and injuries arise."  Crossen, 2005 U.S. Dist. LEXIS 41396, at *13.

24

25

26

27

28

No.: 2:10-cv-00922-DSF-AJW — MPA ISO THE MOT. OF THE GIIG
FOR CONSOL. OF RELATED ACTIONS, APPOINTMENT AS LEAD PL., &
APPROVAL OF SELECTION OF COUNSEL, & IN OPP. TO THE COMPETING MOTS.

12

### B.   The GIIG Satisfies the Adequacy Requirement

The adequacy requirement is met if: (1) the named plaintiffs and their counsel do not have any conflicts of interest with other class members; and (2) the named plaintiffs and their counsel will prosecute the action vigorously on behalf of the class. Hanlon, 150 F.3d at 1020.

### 1.   The GIIG and Their Counsel Are Free of Conflict

The GIIG's interests are clearly aligned with the members of the Class because its claims are identical to the claims of the Class.  There is no evidence of antagonism between its interests and those of the proposed Class members.  Furthermore, the GIIG has a significant, compelling interest in prosecuting this Action to a successful conclusion based upon the large financial interest it possesses as a result of the defendants' wrongful conduct.

### 2.   The GIIG and Their Counsel Will Vigorously Prosecute the Action

The GIIG's commitment to the vigorous prosecution of the Action is evidenced by its authorization of proposed lead counsel to: (1) conduct a comprehensive investigation into the factual and legal issues raised in the Action; and (2) retain leading automotive and Japanese corporate governance experts.

### (a)   The GIIG's Investigation to Date

Specifically, Motley Rice LLC and Labaton Sucharow LLP have obtained and analyzed several thousand pages of  documents produced by Toyota to three U.S. Congressional committees—the House Committee on Energy & Commerce, the House Committee on Oversight & Government Reform (the "OGR"), and the Senate Committee on Commerce, Science & Transportation.  Many of the Toyota documents reviewed to date are damning.  For example, among the documents are Field Technical Reports ("FTRs")—*i.e.*, documents generated when a driver brings a vehicle into a dealership with a complaint—that demonstrate Toyota's knowledge  of defective accelerator pedals causing sudden unintended acceleration in vehicles long

No.: 2:10-cv-00922-DSF-AJW — MPA ISO THE MOT. OF THE GIIG FOR CONSOL. OF RELATED ACTIONS, APPOINTMENT AS LEAD PL., & APPROVAL OF SELECTION OF COUNSEL, & IN OPP. TO THE COMPETING MOTS.

13

before the first floor mat recall was initiated (excerpts attached as Ex. G to the Ellman
Decl.).  Significantly, in stark contrast to Toyota's public statements about its ability
to replicate sudden unintended acceleration in recalled vehicles, these FTRs
repeatedly state that Toyota technicians road tested vehicles and were "***able to
reproduce the customers [sic] concerns***" of sudden unintended acceleration on
multiple occasions.  See Ex. G (emphasis added).

There are also emails that illustrate Toyota's efforts to conceal information
from government agencies such as the National Highway Transportation Safety
Administration ("NHTSA").  For example, on August 23, 2007, Chris Santucci, a
Toyota official who had previously worked at NHTSA, emailed his colleagues,
including Christopher Tinto (Vice President of Technical & Regulatory Affairs at
Toyota Motor North America, Inc.), to update them on a visit he made to NHTSA to
discuss potential floor mat interference.  See Excerpt from a Letter from Henry
Waxman & Bart Stupak, Chairmen of the Congressional Subcommittee on Oversight
& Investigations, to Ray LaHood, Secretary of the U.S. Department of Transportation
(Feb. 22, 2010), at 8 (attached as Ex. H to the Ellman Decl.).  Santucci wrote:

> I ran into a lot of different investigators and [NHTSA] staff and when
> asked why I was there, I told them for the ES350 floor mats, they either
> laughed or rolled their eyes in disbelief.

The GIIG's counsels' review of these Congressional documents evidence its
zealous commitment to the prosecution of this Action.

### (b)    Expert Retention

The GIIG has also authorized the retention of leading automotive Japanese
corporate governance experts.  Motley Rice and Labaton Sucharow have retained
Clarence M. Ditlow, Executive Director of the Center for Auto Safety, a non-profit
organization founded in 1970 by the Consumers Union and Ralph Nader (but is now
independent of both).  On February 24, 2010, Mr. Ditlow testified in front of the OGR
as an automotive safety expert in the Toyota recall hearings.  Mr. Ditlow facilitated

No.: 2:10-cv-00922-DSF-AJW — MPA ISO THE MOT. OF THE GIIG
FOR CONSOL. OF RELATED ACTIONS, APPOINTMENT AS LEAD PL., &
APPROVAL OF SELECTION OF COUNSEL, & IN OPP. TO THE COMPETING MOTS.

14

the GIIG's access to documents produced by Toyota to NHTSA, among other entities.

Professors Hideaki Miyajima and Curtis J. Milhaupt, two of the foremost authorities with regard to Japanese corporate governance, have also been retained to work on behalf of the Global Institutional Investors Group.  Curtis J. Milhaupt is the Fuyo Professor of Japanese Law and Director of Center for Japanese Legal Studies at Columbia Law School.  Professor Milhaupt's research interests include comparative corporate governance, the legal systems of East Asia, and particularly Japan.  Hideaki Miyajima is a professor at the Graduate School of Governance at Waseda University in Japan, and has agreed to consult with proposed lead counsel on all Japanese corporate governance matters relating to Toyota.  Professor Miyajima is one of Japan's preeminent academics working in the area of corporate governance.  See Ditlow, Milhaupt, and Miyajima Resumes (attached as Ex. I to the Ellman Decl.).

Accordingly, if appointed Lead Plaintiff and Lead Counsel, the GIIG and its attorneys will vigorously prosecute the Action.

### 3. The GIIG Is a Proper Group

#### (a) The GIIG Is a Cohesive Group of Sophisticated Institutional Investors

Courts across the country have taken different positions on the issue of whether a group of unrelated investors may aggregate their losses for the purposes of establishing a collective financial interest.  Compare In re Cendant Corp. Litig., 264 F.3d 201, 266 (3d Cir. 2001) (stating that the PSLRA "contains no requirement mandating that the members of a proper group be 'related' in some manner; it requires only that any such group 'fairly and adequately protect the interests of the class'") and Reimer v. Ambac Fin. Group, Inc., 08 civ. 411(NRB), 2008 WL 2073931, at *2 (S.D.N.Y. May 9, 2008) (stating that the position against aggregation of group members' losses "is now the minority view.") with In re Donnkenny Inc. Sec. Litig., 171 F.R.D. 156, 157-58 (S.D.N.Y. 1997) (finding that to allow an aggregation of

No.: 2:10-cv-00922-DSF-AJW — MPA ISO THE MOT. OF THE GIIG FOR CONSOL. OF RELATED ACTIONS, APPOINTMENT AS LEAD PL., & APPROVAL OF SELECTION OF COUNSEL, & IN OPP. TO THE COMPETING MOTS.

15

1   unrelated plaintiffs to serve as lead plaintiff contravenes the PSLRA's purpose of

2   eliminating lawyer-driven litigation).

3       Most courts now follow what is called the "middle of the road" approach

4   endorsed by the Third Circuit in <u>Cendant</u>, which evaluates movant groups on a case-

5   by-case basis, and allows unrelated investors to aggregate losses so long as they will

6   "fairly and adequately protect the interests of the class."  264 F.3d at 266; <u>see also</u> <u>In</u>

7   <u>re Versata, Inc., Sec. Litig.</u>, 01-cv-1439-SI, 2001 WL 34012374, at *6 (N.D. Cal.

8   Aug. 20, 2001) ("A case-by-case approach governed by the rule of reason allows the

9   court both to guard against improper plaintiffs—whether or not they have a pre-

10  litigation relationship—and to select investors who are most willing and able to

11  represent the interests of the class.").

12      Under this middle approach, the GIIG has amply demonstrated its cohesiveness,

13  independence from counsel, and ability to fairly and adequately protect the interests of

14  the class.  Each member of the GIIG has the resources to effectively direct and

15  monitor the prosecution of the litigation.  The members of the GIIG participated in

16  multiple conference calls to discuss their motion and strategy for this litigation.  <u>See</u>

17  the GIIG's Joint Declaration in Support of Their Motion for Consolidation of Related

18  Actions, Appointment as Lead Plaintiff, and Approval of Selection of Counsel ("Joint

19  Decl.") ¶ 8 (Ex. B to the Ellman Decl.).  This communication and cooperation, as well

20  as their execution of the Joint Declaration, demonstrate that they will work cohesively

21  as a group.  <u>See, e.g.</u>, <u>In Spectranetics Corp. Sec. Litig.</u>, 08-cv-2048-REB-KLM, 2009

22  WL 1663953, at *6 (D. Colo. June 15, 2009) (appointing group of investors as lead

23  plaintiff because "the certifications and declarations submitted by the . . .  members of

24  the [group] demonstrate that [the group members] can and will work together to

25  oversee the litigation, and to monitor the work of counsel."); <u>Eshe Fund v. Fifth Third</u>

26  <u>Bancorp</u>, No. 08-cv-421, slip op. at 9 (S.D. Ohio Dec. 16, 2008) (appointing group of

27  investors who "presented sufficient information [in a joint declaration] to show that

28

No.: 2:10-CV-00922-DSF-AJW — MPA ISO THE MOT. OF THE GIIG
FOR CONSOL. OF RELATED ACTIONS, APPOINTMENT AS LEAD PL., &
APPROVAL OF SELECTION OF COUNSEL, & IN OPP. TO THE COMPETING MOTS.

16

they are willing to work together in the best interests of the proposed class.") (attached as Ex. J to the Ellman Decl.).

### (b) The GIIG Will Monitor Counsel and Control the Litigation

Importantly, the decision to seek joint appointment as a lead plaintiff group was not made by counsel.  Joint Decl. ¶ 8.  Skandia Liv, Union, Universal, Boston, and Local 810/United Wire directed counsel to contact appropriate partners based on their experience working cooperatively with other funds as co-lead plaintiffs in securities class actions, and/or in filing lead plaintiff motions.  Id.  The members of the GIIG engaged in multiple conference calls with proposed lead counsel to discuss their shared objectives in serving as lead plaintiff, the benefits of collaborating, and protocols for managing the litigation.  Id.  The GIIG discussed their duty to monitor lead counsels' work and to "ensure that [lead counsel] litigate the action efficiently, cost-effectively, and without duplication of effort or expenses." See id. ¶ 11.

The GIIG and its proposed lead counsel also have entered into a Joint Prosecution Agreement, available for in camera review, confirming that the GIIG's counsel is committed to efficiently prosecuting the Action without duplication of costs, and keeping the GIIG apprised of the latest developments in the Action.  The experience of these firms litigating in similar co-lead counsel structures, coupled with the oversight protocols established by the GIIG, sufficiently establish counsel's ability to efficiently litigate this case.  The GIIG's active involvement in this case and supervision of counsel will further ensure that the counsel structure is working efficiently and serving the class's best interests.  The Court can be assured that the GIIG will effectively monitor and direct their counsel.

### 4. The GIIG Includes the Movant with the Single Largest Financial Interest

It is unarguable that the PSLRA provides that the appropriate lead plaintiff may be a "group of persons."  The GIIG is just such an appropriate lead plaintiff.

No.: 2:10-CV-00922-DSF-AJW — MPA ISO THE MOT. OF THE GIIG
FOR CONSOL. OF RELATED ACTIONS, APPOINTMENT AS LEAD PL., &
APPROVAL OF SELECTION OF COUNSEL, & IN OPP. TO THE COMPETING MOTS.

17

1   However, in the event the Court declines to recognize any group of investors as an

2   appropriate lead plaintiff and appoints the single largest investor, the GIIG notes that

3   its member Skandia Liv possesses the single largest <u>Dura</u> loss—$19,448,356 under

4   LIFO and FIFO—as well as the single largest LIFO loss when in-and-out trades are

5   included—$34,846,935.  <u>See</u> Kotz Decl. Ex. 7.  "[C]ourts in [the Ninth C]ircuit

6   routinely break apart a proposed group in search of the most adequate plaintiff."  <u>In re</u>

7   <u>Surebeam Corp. Sec. Litig.</u>, No. 03 CV 1721 JM(POR), 2004 WL 5159061, at *7

8   (S.D. Cal. 2004) (citing <u>Yousefi v. Lockheed Martin Corp.</u>, 70 F. Supp. 2d 1061, 1070

9   (C.D. Cal. 1999); <u>Takeda v. Turbodyne Tech., Inc.</u>, 67 F. Supp. 2d 1129, 1135 (C.D.

10   Cal. 1999); <u>Advanced Tissue Scis. Sec. Litig.</u>, 184 F.R.D. 346 (S.D. Cal. 1998)).

11   **III.   ALL COMPETING MOTIONS SHOULD BE DENIED**

12        None of the competing movants possesses the largest financial interest and

13   there is no proof to rebut the presumption established by the financial interest of the

14   GIIG.  Accordingly, their motions should be denied.  <u>See</u> <u>Cavanaugh</u>, 306 F.3d at 732

15   ("The statutory process is sequential: The court must examine potential lead plaintiffs

16   one at a time, starting with the one who has the greatest financial interest, and

17   continuing in descending order if and only if the presumptive lead plaintiff is found

18   inadequate or atypical.").

19        In addition, the GIIG opposes the motion of Harel Pia to consolidate the action

20   it filed on April 8, 2010—one day before the statutory deadline for the filing of lead

21   plaintiff motions—with this Action.  Harel Pia's action is on behalf of a class of

22   purchasers of Toyota securities and/or Toyota Motor Credit Corporation ("TMCC")

23   notes or bonds on either the United States stock exchanges or any non-United States

24   stock exchanges.  The GIIG's opposes consolidation of the Harel Pia's action with

25   this Action because only Toyota securities—not TMCC securities—were included in

26   the notices of pendency published by the various plaintiffs who filed complaints.

27   Purchasers of TMCC notes or bonds were therefore not given sufficient notice, if any,

28

that they had the right to file a motion for lead plaintiff on April 9, 2010.  <u>See Teamsters Local 445 Freight Div. Pension Fund v. Bombardier</u>, No. 05-cv-1898 (SAS), 2005 WL 1322721, at *2 (S.D.N.Y. June 1, 2005) ("In this case, the potential injustice is clear.  A class member who owned only Series 1998-C securities, encountering a notice regarding only the Series 2000-A securities, would have no idea that she had the opportunity to move for appointment as lead plaintiff.  The overwhelming likelihood is that such an investor would disregard the notice, unaware that an amendment had been filed placing her squarely within the alleged class.").  Accordingly, TMCC note or bondholders should be afforded their own lead plaintiff deadline 60 days from publication of notice by Harel Pia.

## CONCLUSION

For all of the foregoing reasons, the GIIG respectfully moves this Court for an Order:  (1) consolidating all of the above-captioned, related actions; (2) appointing the GIIG to serve as Lead Plaintiff in the Action; (3) approving the GIIG's selection of Motley Rice LLC and Labaton Sucharow LLP as Lead Counsel and Glancy Binkow & Goldberg LLP as Liaison Counsel for the Class; and (4) granting such other and further relief as the Court may deem just and proper.


Dated:  April 19, 2010                     Respectfully submitted,


                                            s/ Michael Goldberg
                                           Michael Goldberg (#188669)
                                           mgoldberg@glancylaw.com
                                           GLANCY BINKOW & GOLDBERG LLP
                                           1801 Avenue of the Stars, Suite 311
                                           Los Angeles, California 90067
                                           Telephone: (310) 201-9150
                                           Facsimile: (310) 201-9160

                                           *Proposed Liaison Counsel*
                                           *for Lead Plaintiff and the Class*

1
2
3
4
5
6
7
8

Joseph F. Rice
jrice@motleyrice.com
James M. Hughes
jhughes@motleyrice.com
William S. Norton
bnorton@motleyrice.com
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, South Carolina 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9440

9
10
11
12
13
14
15
16

Christopher J. Keller
ckeller@labaton.com
Alan I. Ellman
aellman@labaton.com
Stefanie J. Sundel
ssundel@labaton.com
LABATON SUCHAROW LLP
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

17
18

*Proposed Lead Counsel for*
*Lead Plaintiff and the Class*

19
20
21
22
23
24
25
26
27
28

No.: 2:10-cv-00922-DSF-AJW — MPA ISO THE MOT. OF THE GIIG
FOR CONSOL. OF RELATED ACTIONS, APPOINTMENT AS LEAD PL., &
APPROVAL OF SELECTION OF COUNSEL, & IN OPP. TO THE COMPETING MOTS.

20

**PROOF OF SERVICE VIA ELECTRONIC POSTING PURSUANT TO CENTRAL DISTRICT OF CALIFORNIA LOCAL RULES AND ECF GENERAL ORDER NO. 08-02**

I, the undersigned, say:

I am a citizen of the United States and am employed in the office of a member of the Bar of this Court. I am over the age of 18 and not a party to the within action. My business address is 1801 Avenue of the Stars, Suite 311, Los Angeles, California 90067.

On April 19, 2010, I caused to be served the following documents:

1. Memorandum of Points and Authorities in Further Support of the Motion of the GIIG for Consolidation of Related Actions, Appointment as Lead Plaintiff, and Approval of Selection of Counsel, and in Opposition to the Competing Motions, and

2. Declaration of Alan I. Ellman in Support thereof

by posting these documents to the ECF Website of the United States District Court for the Central District of California, for receipt electronically by the parties on the attached Service List and by mail upon those parties so listed.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on April 19, 2010, at Los Angeles, California.

　　　　　　　　　　　　　　　　　*s/ Daniel C. Rann*
　　　　　　　　　　　　　　　　　Daniel C. Rann

No.: 2:10-cv-00922-DSF-AJW — MPA ISO THE MOT. OF THE GIIG FOR CONSOL. OF RELATED ACTIONS, APPOINTMENT AS LEAD PL., & APPROVAL OF SELECTION OF COUNSEL, & IN OPP. TO THE COMPETING MOTS.

21

# SERVICE LIST

# VIA ELECTRONIC NOTICE

\* Michael J. Dowd
  miked@rgrdlaw.com, e_file_sd@rgrdlaw.com

\* William James Doyle, II
  bill@doylelowther.com

\* Jeffrey S. Facter
  jfacter@shearman.com, rcheatham@shearman.com

\* Deborah R. Gross
  debbie@bernardmgross.com

\* Catherine J. Kowalewski
  katek@rgrdlaw.com, e_file_sd@rgrdlaw.com

\* Jeffrey R. Krinsk
  fk@classactionlaw.com, mlk@classactionlaw.com

\* Nicole Lavallee
  nlavallee@bermandevalerio.com, lstern@bermandevalerio.com, kdonovan@bermandevalerio.com, ysoboleva@bermandevalerio.com, jblock@bermandevalerio.com

\* John A. Lowther, IV
  john@doylelowther.com

\* Blair A. Nicholas
  blairn@blbglaw.com, mfrank@murrayfrank.com, denab@blbglaw.com, kayem@blbglaw.com, kristinas@blbglaw.com, ianb@blbglaw.com

\* Brian Oliver O'Mara
  bomara@rgrdlaw.com

\* Darren J. Robbins
  e_file_sd@rgrdlaw.com

\* Sean T. Strauss
  sean.strauss@shearman.com

No.: 2:10-CV-00922-DSF-AJW — MPA ISO THE MOT. OF THE GIIG
FOR CONSOL. OF RELATED ACTIONS, APPOINTMENT AS LEAD PL., &
APPROVAL OF SELECTION OF COUNSEL, & IN OPP. TO THE COMPETING MOTS.

22

1   * Joseph J. Tabacco, Jr.
2      jtabacco@bermanesq.com, ysoboleva@bermandevalerio.com

3   * Avi N. Wagner
4      avi@thewagnerfirm.com, anwagneresq@hotmail.com

5   * David C. Walton
6      davew@rgrdlaw.com, e_file_sd@rgrdlaw.com

7   * Shawn A. Williams
      shawnw@rgrdlaw.com, e_file_sd@rgrdlaw.com, e_file_sf@rgrdlaw.com

8

9                              **VIA MAIL**

10
11   Mark L. Knutson
     Finkelstein & Krinsk LLP
12   501 West Broadway Suite 1250
     San Diego, CA 92101-3593
13
14   C. Michael Plavi
     Finkelstein & Krinsk LLP
15   501 West Broadway Suite 1250
     San Diego, CA 92101-3593
16
17   Patrick D. Robbins
     Shearman & Sterling LLP
18   525 Market Street Suite 1500
     San Francisco, CA 94105-2723
19

20

21

22

23

24

25

26

27

28