Stuart J. Baskin (admitted *pro hac vice*)
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, NY 10022
Telephone: (212) 848-4000
Facsimile: (212) 848-7179
Email: sbaskin@shearman.com

Patrick D. Robbins (State Bar No. 152288)
Jeffrey S. Facter (State Bar No. 123817)
SHEARMAN & STERLING LLP
525 Market Street, Suite 1500
San Francisco, CA 94105-2723
Telephone: (415) 616-1100
Facsimile: (415) 616-1199
Email: probbins@shearman.com
       jfacter@shearman.com

Kay E. Kochenderfer (State Bar No. 125847)
Gareth Evans (State Bar No. 138992)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
Email: kkochenderfer@gibsondunn.com
       gevans@gibsondunn.com

Attorneys for Defendants Toyota Motor
Corporation, Toyota Motor North America, Inc.,
Toyota Motor Sales, U.S.A., Inc., Yoshimi Inaba,
James E. Lentz III, Irving A. Miller, Robert S.
Carter and Robert C. Daly

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| IN RE TOYOTA MOTOR CORPORATION SECURITIES LITIGATION | CASE NO. CV-10-0922 DSF (AJWx) **NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** Hearing: May 23, 2011 Time: 1:30 p.m. Place: Courtroom 840 255 East Temple Street, Los Angeles, CA 90012 Judge: Hon. Dale S. Fischer |

## NOTICE OF MOTION AND MOTION TO DISMISS

TO ALL PARTIES AND TO THEIR RESPECTIVE ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on May 23, 2011, or as soon thereafter as the matter can be heard in the courtroom of the Honorable Dale S. Fischer, United States District Court, Central District of California, Western Division, Courtroom 840, 255 East Temple Street, Los Angeles, California, 90012, Defendants Toyota Motor Corporation ("TMC"), Toyota Motor North America, Inc., Toyota Motor Sales, U.S.A., Inc., Yoshimi Inaba, James E. Lentz III, Irving A. Miller, Robert S. Carter and Robert C. Daly (the "Defendants") will move the Court for an order dismissing in its entirety Plaintiffs' Consolidated Class Action Complaint.

The Defendants seek an order from the Court dismissing the First and Second Claims for alleged violations of Section 10(b) and Section 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b) and the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4.

Defendant TMC also seeks an order from the Court dismissing the Third Claim for alleged violations of Article 21-2 of Japan's Financial Instruments and Exchange Act, pursuant to Federal Rule of Civil Procedure 12(b)(1) and the doctrines of international comity and forum non conveniens.

This Motion is made following the conference of counsel required by Local Rule 7-3, which took place on January 14, 2011.

This Motion is based upon this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the accompanying Request for Judicial Notice ("RJN"), Declarations of Emily V. Griffen, Yusuke Nishimoto and Kunio Namekata in support of the Motion, all pleadings, prior briefing, exhibits, documents, and other

//

//

//

1

records and files in this action, and upon such other evidence or arguments as may be presented at the hearing in this matter.

DATED:  January 20, 2011          SHEARMAN & STERLING LLP


By:_____/s/ Stuart J. Baskin_____
              Stuart J. Baskin


GIBSON, DUNN & CRUTCHER LLP


By:_____/s/ Kay E. Kochenderfer_____
            Kay E. Kochenderfer

Attorneys for Defendants Toyota Motor Corporation, Toyota Motor North America, Inc., Toyota Motor Sales, U.S.A., Inc., Yoshimi Inaba, James E. Lentz III, Irving A. Miller, Robert S. Carter and Robert C. Daly

1

# **TABLE OF CONTENTS**

2

Page

3   MEMORANDUM OF POINTS AND AUTHORITIES ................................................. 1

4   I. INTRODUCTION ......................................................................................... 1

5   II. SUMMARY OF ALLEGED FACTS ........................................................... 4

6   III. ARGUMENT ............................................................................................... 9

7         A.    Twenty-Six Of The Thirty-Three Statements At Issue Fail To
    Satisfy The Essential Element Of A Materially False Or Misleading
8             Statement. ....................................................................................... 9

9             1.    The Statements Regarding Toyota's General Commitment to
    Vehicle Safety, Quality and Compliance with All Laws
10                  (App. Nos. 1, 3-7, 9-12, 14-19, 22-23, 25, 27 and 33) Are
    Not Actionable Because They Constitute "Puffery." ....................... 9

11

12            2.    Toyota's Financial Results and Cost Reduction Statements
    (App. Nos. 2, 8, 13 and 21) Are Not False or Misleading. ........... 11

13            3.    The Statements Discussed Above Are Also Not Actionable
    Because the Complaint Does Not Plead Facts Establishing
14                  Loss Causation. ............................................................................. 13

15            4.    The Statements Discussed Above Are Also Not Actionable
    Because the Complaint Does Not Plead Facts Establishing
16                  Scienter. ....................................................................................... 15

17        B.    The Remaining Seven Statements Are Not Actionable As To Any
    Defendant Because The Complaint Fails To Plead Facts Sufficient
18            To Establish The Element Of Scienter ............................................ 16

19            1.    The Complaint Fails to Plead That the Three Statements in
    the Articles Quoting Mr. Kwong (App. Nos. 20, 24, 26)
20                  Were Made with Scienter. ............................................................ 17

21            2.    The Complaint Fails to Plead That the Four Statements in
    Late 2009 Attributing Unintended Acceleration to Floor Mat
22                  Entrapment (App. Nos. 29-32) Were Made with Scienter. ........... 19

23                a.    The November 2, 2009 TMS Press Release (App.
    No. 29) Is Not Actionable ............................................... 19
24
                          i.    Mr. Inaba Did Not Make the Statement. ................. 20
25
                          ii.    Plaintiffs Fail to Plead Mr. Daly's Scienter. ............ 21
26
                          iii.    Mr. Lentz's Statement About Sticky Pedal
27                              Technical Reports in the U.S. in October 2009
    Does Not Give Rise to a Strong Inference of
28                              Scienter. ............................................................... 22

i

b.    Mr. Carter's Statements in the November 2, 2009 Conference Call (App. No. 30) Are Not Actionable. ..........24

c.    Mr. Miller's November 25 and December 5, 2009 Statements (App. Nos. 31-32) Are Not Actionable.............24

3.    Viewing the Scienter Allegations as a Whole, the More Compelling Inference Is That at the Time of Their Statements, the Individual Defendants Had Not Yet Learned about the "Sticky Pedal" Issue.......................................27

C.    The Section 20(A) Claim Is Not Actionable Because There Is No Primary Liability Under Section 10(B) And Control Is Not Pled With The Requisite Particularity............................................28

D.    Plaintiffs May Not Pursue The Third Claim Arising Under Japanese Law.......................................................................29

1.    There Is No Federal Jurisdiction over Plaintiffs' Japanese Law Claim.................................................................29

2.    Principles of International Comity Compel Dismissal of the Japanese Law Claim. ..............................................32

3.    Alternatively, this Court Should Dismiss the Japanese Law Claim on the Basis of Forum Non Conveniens. ..........36

a.    Japan Provides an Adequate Alternative Forum for the Japanese Law Claim. ..............................................37

b.    The Public and Private Interest Factors Relevant to the Forum Non Conveniens Inquiry Weigh Heavily in Favor of Dismissal.......................................................38

i.    The Public Interest Factors Strongly Favor Dismissal .............................................................39

ii.    The Private Interest Factors Also Favor Dismissal .............................................................39

IV. CONCLUSION.................................................................40

## TABLE OF AUTHORITIES

Page

### Cases

*Allison v. Brooktree Corp.,*
  999 F. Supp. 1342 (S.D. Cal. 1998) ........................................................ 10

*Basic Inc. v. Levinson,*
  485 U.S. 224, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988) ....................... 13, 35

*Boston Telecomms. Group, Inc. v. Wood,*
  588 F.3d 1201 (9th Cir. 2009) ........................................................... 38, 39

*Brodsky v. Yahoo! Inc.,*
  630 F. Supp. 2d 1104 (N.D. Cal. 2009) ................................................... 10

*Brody v. Transitional Hosps. Corp.,*
  280 F.3d 997 (9th Cir. 2002) ............................................................. 12, 13

*Cal. Dep't of Water Res. v. Powerex Corp.,*
  533 F.3d 1087 (9th Cir. 2008) ................................................................ 31

*Carijano v. Occidental Petroleum Corp.,*
  Case No. 08-56187 (9th Cir. Dec. 6, 2010) ............................................. 38

*Chateau des Charmes Wines Ltd. v. Sabate USA, Inc.,*
  No. C-01-4203-MMC, 2003 U.S. Dist. LEXIS 20337 (N.D. Cal. Nov.
  12, 2003) ............................................................................................... 40

*Cornwell v. Credit Suisse Group,*
  – F. Supp. 2d – , 2010 WL 3069597 (S.D.N.Y. July 27, 2010) ........................ 6, 33

*De Asencio v. Tyson Foods, Inc.,*
  342 F.3d 301 (3d Cir. 2003) ................................................................... 31

*Del Monte Corp. v. Everett Steamship Corp.,*
  402 F. Supp. 237 (N.D. Cal. 1973) ......................................................... 38

*Detroit Gen. Ret. Sys. v. Medtronic, Inc.,*
  621 F.3d 800 (8th Cir. 2010) ........................................................... 23, 27

*DeYoung v. Beddome,*
  707 F. Supp. 132 (S.D.N.Y. 1989) .......................................................... 37

*Dura Pharms., Inc. v. Broudo,*
  544 U.S. 336 (2005) ...................................................................... 13, 14, 35

*Ernst & Ernst v. Hochfelder,*
  425 U.S. 185, 96 S. Ct. 1375, 47 L. Ed. 2d 668 (1976) ....................... 16, 35

*Exec. Software N. Am., Inc. v. United States Dist. Court,*
  24 F.3d 1545 (9th Cir. 1994) .................................................................. 31

*Ford v. Brown,*
  319 F.3d 1302 (11th Cir. 2003) ........................................................ 35, 39

*Gates Learjet Corp. v. Jensen,*
  743 F.2d 1325 (9th Cir. 1984) ................................................................ 40

*German Free State of Bavaria v. Toyobo Co. Ltd.,*
  480 F. Supp. 2d 948 (W.D. Mich. 2007) ................................................. 39

*Glazer Capital Mgmt., LP v. Magistri,*
  549 F.3d 736 (9th Cir. 2008) ................................................................. 17, 18, 27

*Hilton v. Guyot,*
  159 U.S. 113, 16 S. Ct. 139, 40 L. Ed. 95 (1895) ...................................... 33

*Howard v. Everex Sys., Inc.,*
  228 F.3d 1057 (9th Cir. 2000) ................................................................. 20

*Howard v. Hui,*
  No. C 92-3742-CRB, 2001 WL 1159780 (N.D. Cal. Sept. 24, 2001) ................... 29

*In re Action Performance Cos. Sec. Litig.,*
  No. 05-2512-PHX-DGC, 2007 WL 496770 (D. Ariz. Feb. 13, 2007).................. 13

*In re Air Cargo Shipping Servs. Antitrust Litig.,*
  No. MD 06-1775(JG)(VVP), 2008 WL 5958061 (E.D.N.Y. Sept. 26,
  2008) ......................................................................... 33, 34, 35, 36, 37, 38

*In re Air Cargo Shipping Servs. Antitrust Litig.,*
  No. MD 06-1775(JG)(VVP), 2009 WL 3443405 (E.D.N.Y. Aug. 21,
  2009) .................................................................................................. 34

*In re Alstom SA Sec. Litig.,*
  No. 03 Civ. 06595, – F. Supp. 2d – , 2010 WL 3718863 (S.D.N.Y. Sept.
  14, 2010) ........................................................................................ 6, 30, 33

*In re Apple Computer, Inc. Sec. Litig.,*
  243 F. Supp. 2d 1012 (N.D. Cal. 2002) ...................................................... 22

*In re Banco Santander Securities-Optimal Litig.,*
  – F. Supp. 2d – , 2010 WL 3036990 (S.D. Fla. July 30, 2010) ............................ 34

*In re Bus. Objects S.A. Sec. Litig.,*
  No. C 04-2401 MJJ, 2005 WL 1787860 (N.D. Cal. July 27, 2005) ...................... 26

*In re Cutera Sec. Litig.,*
  610 F.3d 1103 (9th Cir. 2010) ................................................................. 10

*In re Cylink Sec. Litig.,*
  178 F. Supp. 2d 1077 (N.D. Cal. 2001) ...................................................... 20

*In re Daou Sys., Inc.,*
  411 F.3d 1006 (9th Cir. 2005) ................................................................. 9, 16

*In re Ford Motor Co. Sec. Litig.,*
  381 F.3d 563 (6th Cir. 2004) ................................................................... 11

*In re Foundry Networks, Inc. Sec. Litig.,*
  *No. C 00-4823 MMC, 2003 WL 22077729 (N.D. Cal. Aug. 29, 2003)* ............ 10, 27

*In re FoxHollow Techs., Inc., Sec. Litig.,*
  No. C 06-4595 PJH, 2008 WL 2220600 (N.D. Cal. May 27, 2008)...................... 13

*In re Gupta Corp. Sec. Litig.,*
  900 F. Supp. 1217 (N.D. Cal. 1994)........................................................... 29

*In re Hansen Natural Corp. Sec. Litig.,*
  527 F. Supp. 2d 1142 (C.D. Cal. 2007) ...................................................... 21

*In re Impac Mortg. Holdings, Inc. Sec. Litig.,*
  *554 F. Supp. 2d 1083 (C.D. Cal. 2008)* ...................................................... 10

*In re Impax Labs., Inc. Sec. Litig.,*
  No. C 04-04802 JW, 2007 WL 5076983 (N.D. Cal. Jan. 3, 2007) ...................... 14

iv

*In re Infonet Servs. Corp. Sec. Litig.*,
310 F. Supp. 2d 1080 (C.D. Cal. 2003) ................................................................. 26

*In re Lockheed Martin Corp. Sec. Litig.*,
272 F. Supp. 2d 928 (C.D. Cal. 2002) ................................................................... 21

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*,
613 F. Supp. 2d 437 (S.D.N.Y. 2009) .................................................................... 31

*In re Metro. Sec. Litig.*,
532 F. Supp. 2d 1260 (E.D. Wash. 2007) .............................................................. 29

*In re New Century*,
588 F. Supp. 2d 1206 (C.D. Cal. 2008) ................................................................. 21

*In re NVIDIA Corp. Sec. Litig.*,
No. 08-CV-04260-RS, 2010 WL 4117561 (N.D. Cal. Oct. 19, 2010) ........ 15, 19, 23

*In re Oracle Corp. Sec. Litig.*,
627 F.3d 376 (9th Cir. 2010) ................................................................................. 14

*In re REMEC Inc. Sec. Litig.*,
702 F. Supp. 2d 1202 (S.D. Cal. 2010) ............................................................ 10, 19

*In re Silicon Graphics Inc. Sec. Litig.*,
183 F.3d 970 (9th Cir. 1999) ................................................................................. 16

*In re Société Générale Sec. Litig.*,
No. 08 Civ. 2495, 2010 WL 3910286 (S.D.N.Y. Sept. 29, 2010) ........................... 6

*In re Syntex Corp. Sec. Litig.*,
855 F. Supp. 1086 (N.D. Cal. 1994), *aff'd*, 95 F.3d 922 (9th Cir. 1996) .............. 10

*In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales
Practices, & Prods. Liab. Litig.*,
Master Docket No. 8:10-ml-02151-JVS-FMO (C.D. Cal) ....................................... 7

*In re Urethane Antitrust Litig.*,
683 F. Supp. 2d 1214 (D. Kan. 2010) ........................................................ 30, 31, 33

*In re VeriFone Sec. Litig.*,
784 F. Supp. 1471 (N.D. Cal. 1992), *aff'd*, 11 F.3d 865 (9th Cir. 1993) ......... 10, 12

*Info. Res., Inc. v. Dun & Bradstreet Corp.*,
127 F. Supp. 2d 411 (S.D.N.Y. 2000) .................................................................... 30

*ITSI T.V. Prods., Inc. v. Cal. Auth. of Racing Fairs*,
785 F. Supp. 854 (E.D. Cal. 1992) *rev'd in part on other grounds*, 3 F.3d
1289 (9th Cir. 1993) .............................................................................................. 30

*Kane v. Zisapel*,
32 Fed. Appx. 905 (9th Cir. Mar. 27, 2002) .......................................................... 10

*Koster v. (Am.) Lumbermens Mut. Cas. Co.*,
330 U.S. 518 (1947) .............................................................................................. 37

*Kuehbeck v. Genesis Microchip Inc.*,
No. C 02-05344 JSW, 2005 WL 1787426 (N.D. Cal. July 27, 2005) .................... 28

*Lentell v. Merrill Lynch & Co.*,
396 F.3d 161 (2d Cir. 2005) .................................................................................. 14

*Lockman Found. v. Evangelical Alliance Mission*,
930 F.2d 764 (9th Cir. 1991) .......................................................................... 37, 38

*Loya v. Starwood Hotels & Resorts Worldwide, Inc.*,
    583 F.3d 656 (9th Cir. 2009) .......................................................................... 37, 38

*Magnin v. Teledyne Cont'l Motors*,
    91 F.3d 1424 (11th Cir. 2002) .............................................................................. 35

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
    513 F.3d 702 (7th Cir. 2008) ................................................................................ 18

*Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*,
    576 F.3d 172 (4th Cir. 2009) .......................................................................... 23, 27

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
    540 F.3d 1049 (9th Cir. 2008) .............................................................................. 14

*Morrison v. National Australia Bank Ltd.*,
    561 U.S. __, 130 S. Ct. 2869, 177 L. Ed. 2d 535 (June 24, 2010) .......... 1, 33, 34, 35

*Nordstrom, Inc. v. Chubb & Son, Inc.*,
    54 F.3d 1424 (9th Cir. 1995) ................................................................................ 17

*Osher v. JNI Corp.*,
    308 F. Supp. 2d 1168 (S.D. Cal. 2004) ........................................................... 13, 26

*Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*,
    96 F.3d 1151 (9th Cir. 1996) ................................................................................ 13

*Penwest Dev. Corp. Ltd. v. Dow Chem. Co.*,
    667 F. Supp. 436 (E.D. Mich. 1987) ..................................................................... 39

*Phil. Packing Corp. v. Maritime Co. of the Phil.*,
    519 F.2d 811 (9th Cir. 1975) ................................................................................ 38

*Piper Aircraft Co. v. Reyno*,
    454 U.S. 235, 102 S. Ct. 242, 70 L. Ed. 2d 419 (1981) ................................... 37, 38

*Romero v. Drummond Co.*,
    552 F.3d 1303 (11th Cir. 2008) ............................................................................ 30

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001) .......................................................................... 26, 27

*Shaw v. Digital Equip. Corp.*,
    82 F.3d 1194 (1st Cir. 1996) ................................................................................ 11

*Sigalas v. Lido Maritime, Inc.*,
    776 F.2d 1512 (11th Cir. 1985) ............................................................................ 39

*Taylor v. Tesco Corp. (US)*,
    No. 09-3404, 2010 WL 4539394 (E.D. La. Nov. 3, 2010) ................................... 39

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007) .............................. 16, 35

*Ungaro-Benages v. Dresdner Bank AG*,
    379 F.3d 1227 (11th Cir. 2004) ............................................................................ 32

*Voda v. Cordis Corp.*,
    476 F.3d 887 (Fed. Cir. 2007) .............................................................................. 31

*Yourish v. Cal. Amplifier*,
    191 F.3d 983 (9th Cir. 1999) .......................................................................... 26, 27

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) .............................................................. 16, 23, 28, 29

1

2

## Statutes

3    15 U.S.C. § 77r(b)(1)(A) ........................................................................... 29

     15 U.S.C. § 78u-4(b)(2) ............................................................................ 16
4
     15 U.S.C. § 78u-4(b)(4) ............................................................................ 14
5    15 U.S.C. 78bb(f)(5)(E) ............................................................................ 29

6    28 U.S.C. § 1332(d)(2) ............................................................................... 3

     28 U.S.C. § 1332(d)(9) ............................................................................. 29
7
     28 U.S.C. § 1367 ......................................................................................... 4
8    28 U.S.C. § 1367(c) ..................................................................... 4, 29, 30, 31

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

This class action is an attempt by Plaintiffs to mutate product liability, consumer and automotive industry regulatory claims into securities fraud.  The Consolidated Class Action Complaint ("Complaint" or "Compl.") broadly alleges that Toyota sold certain vehicles without telling purchasers or the National Highway Traffic Safety Administration ("NHTSA"), the federal agency charged with regulating automobile safety, that some drivers of those models had experienced an alleged phenomenon referred to as "unintended acceleration."

These allegations are being appropriately addressed in proceedings before NHTSA and in various product liability and consumer suits throughout the United States, including in federal multidistrict litigation in this District.  They are simply not the province of the federal securities laws, which are the basis of the First and Second Claims in the Complaint.

Additionally, the Third Claim, brought solely under Japanese law, represents a transparent attempt by Plaintiffs' counsel, purportedly on behalf of all purchasers worldwide of Toyota common stock during a five-year time period, to make an end-run around the Supreme Court's decision in *Morrison v. National Australia Bank Ltd.*, 561 U.S. __, 130 S. Ct. 2869, 177 L. Ed. 2d 535 (June 24, 2010).

### A.    The U.S. Securities Claims

As an ostensible securities action, the Complaint is more remarkable for what it does not allege than for what it does.  The Complaint does not contain any of the hallmarks that one ordinarily finds in a securities fraud case:

- There is no contention that any hard numbers Toyota reported to investors and on which the securities markets rely—that is, sales and profit figures—were in any way inaccurate.
- There has been no restatement of any financial statements issued to investors, even after Toyota announced the recalls of various models.
- There is no allegation that Toyota hyped its securities by releasing to investors any inappropriate projection, forecast or other forward-looking statement.

- There is no contention that any Toyota executive engaged in any insider trading or selling.
- There is no claim that Toyota itself, or anyone at Toyota, derived any concrete benefit by allegedly defrauding investors into purchasing Toyota securities (or had any discernible motive to defraud Toyota investors).

Instead of making these types of allegations, the Complaint in essence asserts that when a public company releases (here, accurate) financial information or publicly states that it is proud of its products or business—as every public company does—and thereafter faces a product recall and consumer litigation, a claim for securities fraud necessarily follows in their wake. These assertions are plainly wrong and constitute the crux of a Complaint that fails to state a claim under the securities laws for two primary reasons:

First, twenty-six of the thirty-three Toyota statements alleged in the Complaint as a matter of law were not materially misleading. Most are highly generalized statements about the quality and safety of Toyota vehicles. The cases uniformly hold that such statements, which are common to all companies and upon which the securities markets do not rely, constitute so-called "puffery" and are not actionable.

Second, as to the remaining seven allegedly false or misleading statements, the Complaint fails to plead facts creating a strong inference of scienter. Each of these seven statements allegedly commented on a purported cause or causes of unintended acceleration in Toyota vehicles. For example, the Complaint alleges that during a period of only one month in the putative five-year class period, *i.e.*, between November 2 and December 5, 2009, Toyota spokespeople said that the unintended acceleration problems were attributable to accelerators being trapped by floor mats. Plaintiffs allege that in fact some cases of unintended acceleration were attributable to the accelerator pedals themselves becoming "stuck" (the "sticky pedal" issue).

To plead scienter, however, a plaintiff must identify the person who made the statement and plead *particularized facts* creating *a strong inference that the speaker knew*—or was deliberately reckless in not knowing—that the statement was false or misleading. The Complaint fails to plead such particularized facts with respect to any

2

of the persons who made those seven statements.

The Complaint also fails to plead scienter with respect to Toyota. To plead corporate scienter, a complaint must establish that the employee who made the statement on behalf of the corporation did so with scienter. Plaintiffs' fundamental problem is that the Court of Appeals for the Ninth Circuit does not accept collective pleading or broad brush averments of scienter. In this Circuit, pleading that an employee other than the person who made the statement knew that the statement was false or misleading does not plead corporate scienter.

Critically, this securities class action even ignores the most compelling inference to be drawn from the Complaint's allegations, *i.e.*, that the individuals named as defendants in this litigation (who were at the highest level of Toyota's senior management) had not yet learned, at the time of their statements, of the issue involving "sticky pedals," a technical engineering issue, that ultimately led to the January 21, 2010 recall. This more compelling inference, along with the Ninth Circuit's rejection of "collective scienter," is fatal to Plaintiffs' securities claims.

Because the Complaint does not plead a false or misleading statement made by any defendant with particularized facts creating a strong inference of scienter, the Exchange Act claims fail to state a claim and should be dismissed.

**B.**      **The Japanese Law Claim**

In their effort to avoid the bar under *Morrison* against pursuing Section 10(b) claims based on securities traded on a foreign exchange (here, Toyota's common stock), Plaintiffs have asserted a novel third purported claim for alleged violations of Article 21-2 of Japan's Financial Instruments and Exchange Act (the "Japanese Law Claim"). None of the plaintiffs in these consolidated actions asserted claims under Japanese law in their original complaints, all of which pre-dated *Morrison*. There are three independently dispositive grounds for dismissing this claim.

<u>First</u>, this Court lacks jurisdiction over the Japanese Law Claim. Plaintiffs allege subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C.

3

1  § 1332(d)(2) ("CAFA"), and the federal supplemental jurisdiction statute, *id.* § 1367.

2  Neither statute confers jurisdiction over the claims arising under Japan's Financial

3  Instruments and Exchange Act.  CAFA expressly carves out class actions "concerning

4  covered securities," and the securities at issue here fall within that category.  The Court

5  should decline to exercise supplemental jurisdiction over this claim for at least three

6  reasons:  (1) the Japanese Law Claim "raises a novel or complex issue of State law,"

7  (which has been interpreted to include foreign law); (2) it "substantially predominates"

8  over the claims over which the Court has original jurisdiction; and (3) "exceptional

9  circumstances," including comity, judicial economy, convenience, and fairness

10  "present compelling reasons for declining jurisdiction."  28 U.S.C. § 1367(c).

11      <u>Second</u>, even if this Court determines that it has jurisdiction over the Japanese

12  Law Claim, it should decline to adjudicate it pursuant to the doctrine of international

13  comity.  The Japanese statute at issue was only enacted relatively recently, and Japan's

14  highest court has not yet had an opportunity to interpret it.  No U.S. court has

15  considered or applied it either, so this Court would be on uncharted and unfamiliar

16  ground, and would have to make novel determinations of Japanese law on many

17  securities law issues that have required decades of careful development under U.S.

18  law.  Further, litigating the Japanese Law Claim in the U.S. would undercut Japan's

19  interest in developing its own securities laws, and undermine the U.S.'s interest in

20  allowing foreign countries to develop their own jurisprudence.

21      <u>Third</u>, for much the same reasons cited above, the Court should dismiss this

22  claim on the alternate basis that the U.S. courts are an inconvenient forum for

23  adjudicating novel and unsettled issues of Japanese securities laws.  Japan provides an

24  adequate alternative forum for litigation of this claim, and the public and private

25  interest factors relevant to analyzing whether to dismiss on the basis of forum non

26  conveniens strongly support dismissal.

## II. SUMMARY OF ALLEGED FACTS

28      On October 4, 2010, the court-appointed Lead Plaintiff Maryland State

4

1   Retirement and Pension System (along with plaintiffs Fresno County Employees'

2   Retirement Association and Robert M. Moss) (collectively, "Plaintiffs") filed the

3   Consolidated Class Action Complaint against Toyota Motor Corporation ("TMC"),

4   Toyota Motor North America, Inc. ("TMA"), Toyota Motor Sales, U.S.A., Inc.

5   ("TMS") (together, "Toyota"), Yoshimi Inaba, James E. Lentz III, Irving A. Miller,

6   Robert S. Carter and Robert C. Daly (the "Individual Defendants" and collectively

7   with Toyota, "Defendants").[1]  (Compl. ¶¶ 34, 37-49.)  Toyota is the world's largest

8   automaker and the top-selling automotive brand in the U.S.  (*Id.* ¶ 35.)  It has invested

9   more than $18 billion in plants and facilities, and it directly employs nearly 30,000

10  people in the U.S.  (*Id.* ¶ 36.)

11      The Complaint asserts three claims against various Toyota companies and

12  employees regarding claimed losses in TMC's American Depository Shares (which are

13  traded in the U.S.) and common shares (which are not).  The First Claim alleges that

14  all defendants violated Section 10(b) of the Securities Exchange Act of 1934 (the

15  "Exchange Act") and Rule 10b-5.  Plaintiffs assert this claim on behalf of a putative

16  class consisting of "(a) all persons and entities who purchased or otherwise acquired

17  Toyota American Depositary Shares (ADSs) between May 10, 2005, and February 2,

18  2010 . . . and (b) all persons and entities who purchased or otherwise acquired Toyota

19  common stock in domestic transactions during the Class Period."  (Compl. at 1 &

20  ¶¶ 204-13.)  The Second Claim alleges a violation of Section 20(a) of the Exchange

21  Act against the Individual Defendants and on behalf of the same class members as the

22  First Claim.  (*Id.* at 1 & ¶¶ 214-18.)[2]

23  _____

24  [1]  The Complaint also names as defendants Japanese residents Katsuaki Watanabe, Fujio Cho, and Mitsuo Kinoshita, who are not yet required to respond.  All facts

25  alleged in the Complaint are presumed to be true solely for the purposes of this motion to dismiss.  Defendants strongly dispute many of the factual allegations in the

26  Complaint.

27  [2]  TMC common stock is traded on foreign exchanges and not on any U.S. exchange. Plaintiffs have failed to plead any facts demonstrating any purchases of TMC

28  common stock in a purported "domestic transaction."  To the extent Plaintiffs are claiming the right to pursue Exchange Act claims on behalf of U.S. purchasers of

[Footnote continued on next page]

5

The Third Claim alleges violations of Article 21-2 of Japan's Financial Instruments and Exchange Act on behalf of all purchasers of TMC common stock during the Class Period. (*Id.* at 1 & ¶¶ 219-28.)[3]  Plaintiffs assert this claim only against TMC, Katsuake Watanabe, and Fujio Cho. (*Id.* ¶ 220.)

This case arises out of reports of an alleged phenomenon referred to as "unintended acceleration" in various Toyota vehicle models and multiple automobile recalls initiated by Toyota in late 2009 and early 2010. (*See id.* ¶ 24.)  The first of these recalls occurred in late September 2009, when Toyota announced it would recall approximately 3.8 million vehicles to inspect and replace floor mats in certain models that, if not properly secured, could slip and become trapped under or over the accelerator pedal (the "floor mat" recall).  (*Id.* ¶¶ 9, 114.)  On November 25, 2009 and January 26, 2010, Toyota announced the specific remedy for the floor mat recall (to implement a vehicle-based fix to the shape of the accelerator pedal and, in some cases, the underlying floor), and added a number of covered automobile models to the recall. (*Id.* ¶¶ 11, 15.)  Toyota initiated a separate recall on January 21, 2010 to address a mechanical defect present in certain Toyota models that could cause the accelerator pedal to become harder to depress, slower to return, or mechanically stuck in a partially depressed position (the "sticky pedal" recall).  (*Id.* ¶ 14.)[4]

---

[Footnote continued from previous page]

TMC common stock traded on foreign exchanges (*see* Compl. ¶ 191), the Court has already ruled, preliminarily, that that position is inconsistent with *Morrison*, and there is no reason to reconsider the issue since all subsequent courts have concurred.  *See, e.g., Cornwell v. Credit Suisse Group*, – F. Supp. 2d – , 2010 WL 3069597 (S.D.N.Y. July 27, 2010) (dismissing Section 10(b) claims asserted by U.S. investors who purchased foreign securities on a foreign exchange); *In re Alstom SA Sec. Litig.*, No. 03 Civ. 06595, – F. Supp. 2d – , 2010 WL 3718863 (S.D.N.Y. Sept. 14, 2010) (same); *In re Société Générale Sec. Litig.*, No. 08 Civ. 2495, 2010 WL 3910286 (S.D.N.Y. Sept. 29, 2010) (same).

[3]  *See also* Compl. at 11 n.4, citing translation of Financial Instruments and Exchange Act, www.japaneselawtranslation.go.jp/law/detail/?id=1911&vm=02&re=02.)  Exhibit D to the Declaration of Kunio Namekata includes a full translated version of Article 21-2, as it appears on the website cited in the Complaint.

[4]  Toyota is addressing the alleged product liability and consumer class action claims arising from the floor mat and sticky pedal recalls in various actions throughout the

[Footnote continued on next page]

6

This securities lawsuit is based upon allegations that Defendants made material misstatements and omissions regarding the safety and quality of Toyota vehicles while purportedly knowing that they had serious, undisclosed problems with unintended acceleration.  (*Id.* ¶ 1.)  The purported thirty-three material misstatements and omissions that form the basis for Plaintiffs' securities law claims are set forth in the Appendix to the Complaint.  (*See* Appendix ("App.") at 105-137, Statements ("Nos.") 1-33.)  Plaintiffs assert that these alleged misstatements and omissions inflated Toyota's stock price while Defendants had knowledge of and concealed systemic, undisclosed problems with unintended acceleration in various Toyota models.  (Compl. ¶ 179.)  These allegedly material misstatements and omissions generally fall into four categories.

The <u>first category</u> consists of statements made in SEC filings regarding the general safety and quality of Toyota vehicles, and Toyota's commitment to comply with laws.  (Compl. ¶¶ 142-45, 147, 149-52, 154, 156, 158-59, 162, 164, 167; App. Nos. 1, 3-7, 9-12, 14-19, 22-23, 25, 27, and 33.)  Plaintiffs allege that various statements—such as "Toyota continues to focus on the development of vehicle safety technologies," Toyota "maintain[s] the world's highest levels of quality," and "we reaffirm our commitment to corporate ethics, including strict compliance with laws and regulations"—made in SEC filings dating back to May 10, 2005, were materially false and misleading because Toyota vehicles allegedly "were experiencing serious and potentially catastrophic problems with unintended acceleration."  (*See, e.g.*, Compl. ¶ 146(a); App. No. 1 (listing examples).)

The <u>second category</u> consists of statements made in SEC filings attributing Toyota's record revenues and increases in Toyota's operating income to "cost

---

[Footnote continued from previous page]
nation, including an MDL proceeding presently ongoing in this district.  *See In re: Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, & Prods. Liab. Litig.*, Master Docket No. 8:10-ml-02151-JVS-FMO (C.D. Cal).

reduction efforts."  (Compl. ¶¶ 142, 149, 152, 162; App. Nos. 2, 8, 13 and 21.)
Plaintiffs do not allege that the revenue and operating income data were untrue or that
such "cost reduction efforts" did not in fact occur.  Rather, Plaintiffs allege that these
cost reduction statements in SEC filings dating back to May 10, 2005 were materially
false and misleading because:  (1) the cost reductions allegedly resulted in safety
problems, such as unintended acceleration, and (2) the reported results and cost
reductions were only achieved because Toyota allegedly had not disclosed problems
with unintended acceleration.  (Compl. ¶ 153; App. Nos. 2, 8, 13 and 21.)[5]

The <u>third category</u> consists of statements made primarily by Toyota
spokesperson Bill Kwong in 2008 and early 2009, which generally attributed issues of
unintended acceleration to driver error and denied that there was any unintended
acceleration due to a safety-related defect.  (*See* Compl. ¶¶ 161, 163, 166; App. Nos.
20, 24 and 26.)  In these statements, Toyota allegedly asserted that there were "no
flaws in the trucks and that many reports [of unintended acceleration] were 'inspired
by publicity,'" and Mr. Kwong stated that unintended acceleration could possibly be
attributed to "a misapplication of the pedals by the driver" or "not stepping on the
brake."  (Compl. ¶¶ 161, 163, 166; App. Nos. 20, 24, 26.)  Plaintiffs assert these
statements were materially false and misleading because, among other reasons,
Defendants allegedly knew or were reckless in not knowing that the Tacoma (to which
Mr. Kwong referred in two of the statements) had a history of unintended acceleration;
that driver error could not explain the mounting number of unintended acceleration
incidents; and that problems such as floor mat entrapment and sticky accelerator pedals
could cause unintended acceleration.  (Compl. ¶¶ 87, 165, 168; App. Nos. 20, 24, 26.)

The <u>fourth category</u> consists of statements made to the press between November

---

[5]  A statement made to the press in September 2009 regarding the cause of the Saylor
accident (App. No. 28) is also addressed as part of this category.  (*See* Section
III.A.2., *infra*.)  Like the "cost reduction efforts" statements, Plaintiffs do not allege
that any of the statements in the press release about the cause of the accident or the
dangers of incorrectly installed floor mats are untrue, only that it did not discuss other
possible causes of unintended acceleration.

8

2, 2009 and December 5, 2009, generally attributing unintended acceleration problems
to entrapped floor mats and expressing Toyota's confidence that unintended
acceleration problems had been addressed, as well as stating that NHTSA had
concluded that the only defect trend related to vehicle speed control was related to out-
of-position or inappropriate floor mats.  (Compl. ¶¶ 171-72, 174-75; App Nos. 29-32.)
Plaintiffs allege that these statements were materially false and misleading because:
(1) Toyota continued to receive reports regarding unintended acceleration problems,
(2) Defendants purportedly had knowledge at this time that floor mats could not
account for all reported unintended acceleration incidents, and (3) NHTSA had not
concluded that floor mats were the only defect trend related to vehicle speed control.
(Compl. ¶¶ 173, 177; App. Nos. 29-32.)

## III. ARGUMENT

### A. Twenty-Six Of The Thirty-Three Statements At Issue Fail To Satisfy The Essential Element Of A Materially False Or Misleading Statement.

To state a claim under Section 10(b) and Rule 10b-5 thereunder, a plaintiff must
allege:  "(1) a material misrepresentation or omission of fact, (2) scienter, (3) a
connection with the purchase or sale of a security, (4) transaction and loss causation,
and (5) economic loss."  *In re Daou Sys., Inc.*, 411 F.3d 1006, 1014 (9th Cir. 2005).
With respect to the first element, 26 out of the 33 Toyota statements identified by
Plaintiffs do not meet the legal test for an actionable false or misleading statement.

**1. The Statements Regarding Toyota's General Commitment to Vehicle Safety, Quality and Compliance with All Laws (App. Nos. 1, 3-7, 9-12, 14-19, 22-23, 25, 27 and 33) Are Not Actionable Because They Constitute "Puffery."**

Twenty-one of the statements alleged to be false or misleading in the Complaint
are generalized, vague statements about Toyota's commitment to vehicle safety,
quality or compliance with laws.  For example:

- "The 'Guiding Principles' at Toyota Motor Corporation are as follows: . . . 'Dedicate ourselves to providing . . . safe products'" (App. Nos. 1, 5, 7, and 14); "Honor the . . . spirit of the law of every nation" (App. Nos. 3, 6, 9 and 15)

9

- "Toyota . . . continues to focus on the development of vehicle safety technologies" and "maintaining the world's highest levels of quality"  (App. Nos. 1, 5, 7, 11, 14 and 22)

- "Toyota believes that its preeminence in the Japanese automotive industry . . . and its overall position as the world's third largest automobile producer have resulted from [products that incorporate] safety technologies [and] its continuing focus on high quality and low-cost manufacturing"; "Toyota actively invests in technologies designed to increase the safety of its vehicles"; "Toyota's work in the area of vehicle safety is focused on the development of technologies designed to prevent accidents in the first instance."  (App. Nos. 4, 10 and 17)

- "Quality is Toyota's lifeline. . . .  There will be no growth without quality."  (App. No. 16)

- "[W]e reaffirm our commitment to corporate ethics, including strict compliance with laws and regulations"  (App. Nos. 3, 6, 9, 12, 15 and 23)

The Ninth Circuit has recognized that such general, "feel good monikers," the type of "vague statements of optimism" made by all public companies, "have been held to be non-actionable puffing."  *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010).  Courts in this Circuit have noted that "[p]rofessional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives . . . ."  *In re VeriFone Sec. Litig.*, 784 F. Supp. 1471, 1481 (N.D. Cal. 1992), *aff'd*, 11 F.3d 865 (9th Cir. 1993).[6]

The Sixth Circuit, in a securities fraud case very much like this one involving vehicle safety defects (the Firestone tire/Ford Explorer recall), held that a series of

---

[6] *See also In re Impac Mortg. Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083, 1096 (C.D. Cal. 2008) (acknowledging that "[v]arious circuit courts, including the Ninth Circuit, have held that vague, generalized assertions of corporate optimism or statements of 'mere puffing' are not actionable material misrepresentations under federal securities laws") (collecting cases).  This principle has been widely followed by courts in this Circuit.  *See, e.g., In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1229 (S.D. Cal. 2010); *Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1113 (N.D. Cal. 2009); *In re Foundry Networks, Inc. Sec. Litig.*, No. C 00-4823 MMC, 2003 WL 22077729, at *15-16 (N.D. Cal. Aug. 29, 2003); *Kane v. Madge Networks N.V.*, No. C-96-20652-RMW, 2000 WL 33208116, at *1, *3-4 (N.D. Cal. May 26, 2000), *aff'd sub nom. Kane v. Zisapel*, 32 Fed. App'x 905 (9th Cir. Mar. 27, 2002); *Allison v. Brooktree Corp.*, 999 F. Supp. 1342 (S.D. Cal. 1998); *In re Syntex Corp. Sec. Litig.*, 855 F. Supp. 1086, 1095 (N.D. Cal. 1994), aff'd, 95 F.3d 922 (9th Cir. 1996).

statements almost identical to those alleged here constituted non-actionable puffery. *See In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563 (6th Cir. 2004).  There, plaintiffs alleged that Ford made "many misleading statements regarding its commitment to quality, safety, and corporate citizenship," including the following:  "Ford has its best quality ever";  Ford has made "quality a top priority"; "Ford is a worldwide leader in automotive safety"; Ford "want[s] to make customers' lives . . . safer"; Ford has "dedicated . . . [itself] to finding even better ways of delivering . . . safer vehicles to [the] consumer"; Ford "want[s] to be clear leaders in corporate citizenship"; and Ford "is going to lead in corporate social responsibility."  *Id*. at 570.

The Sixth Circuit affirmed dismissal of the claims, holding that "[s]uch statements are either mere corporate puffery or hyperbole that a reasonable investor would not view as significantly changing the general gist of available information, and thus, are not material, even if they were misleading."  *Id*. at 570.[7]  As the Sixth Circuit explained:

> All public companies praise their products and their objectives.  Courts everywhere "have demonstrated a willingness to find immaterial as a matter of law a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace - loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available."

*Id*. at 570-71 (quoting *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1217 (1st Cir. 1996) and citing cases).  These same statements should be dismissed as puffery here.

### 2. Toyota's Financial Results and Cost Reduction Statements (App. Nos. 2, 8, 13 and 21) Are Not False or Misleading.

Plaintiffs allege that in four separate SEC filings, TMC made false or misleading statements regarding its "cost reduction efforts" and the record financial results it achieved due in part to such efforts—*e.g.*, that Toyota achieved "record high net

---

[7] When the Court examines the *Ford* case, it will see the striking similarities between the statements held to be puffery in *Ford* and those alleged here.  *Compare Ford*, 381 F.3d at 570-71 *with* App. Nos. 1, 3-7, 9-12, 14-19, 22-23, 25, 27 and 33.

11

1    revenues, operating income and net income . . . mainly due to[, among other things,]

2    cost reduction efforts." (Compl. ¶¶ 142, 149, 152, 162; App. Nos. 2, 8, 13, 21.)

3        Plaintiffs nowhere allege that these statements were not entirely truthful and

4    accurate.  Notably, there is no allegation in the Complaint either that Toyota did not in

5    fact achieve "record high net revenues, operating income and net income," or that

6    those financial results were not in fact due, in part, to cost reduction efforts.  Nor do

7    Plaintiffs suggest that any aspect of Toyota's financial results ever have been restated

8    or amended in any way to date.

9        Nonetheless, Plaintiffs assert that Toyota should have qualified this truthful

10   financial data by volunteering a negative consequence of successful cost reduction

11   efforts—*i.e.*, that, as a result of the cost reduction efforts, Toyota allegedly had

12   "undisclosed serious and potentially catastrophic safety and quality problems in

13   Toyota's vehicles, including unintended acceleration." (App. No. 2.)  Plaintiffs also

14   assert that Toyota should have volunteered a reason for the success of cost reduction—

15   *i.e.*,  that the record results and cost reduction efforts allegedly "were achieved only

16   because Toyota had not disclosed that its vehicles were experiencing serious problems

17   with unintended acceleration."  (*Id.*)

18       These assertions are incorrect.  As a matter of law, the disclosure of accurate

19   financial data, a requirement in securities filings, is entirely unobjectionable.  *See, e.g.*,

20   *Verifone*, 784 F. Supp. at 1481 (accurately reported historical information, such as

21   sales and profit data, is not actionable because it "is rarely subject to

22   misinterpretation").  Moreover, as the Ninth Circuit has repeatedly held, "Rule 10b-5

23   [prohibits] only misleading and untrue statements, not statements that are

24   incomplete. . . .  Often, a statement will not mislead even if it is incomplete or does not

25   include all relevant facts."  *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006

26   (9th Cir. 2002).  Thus, "[t]o be actionable under the securities laws, an omission must

27   be misleading; in other words *it must affirmatively create an impression of a state of*

28

12

*affairs that differs in a material way from the one that actually exists.*"  *Id.* (emphasis added).[8]

Here, Toyota's statements as to its record financial results and cost reduction efforts stated absolutely nothing about the subject matters of unintended acceleration, sticky pedals, or even safety or quality issues generally.  Any failure to supplement these statements to discuss unintended acceleration did not render them incomplete, let alone misleading.  *Id.*[9]  Thus, under *Brody*, Plaintiffs' claims based on these statements must be dismissed.[10]

### 3. The Statements Discussed Above Are Also Not Actionable Because the Complaint Does Not Plead Facts Establishing Loss Causation.

Loss causation is another requisite element of a Section 10(b) claim.  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 338 (2005).  To establish loss causation, a plaintiff must plead and prove "that the defendant's misrepresentation (or other

---

[8]  This is because not all omissions of material fact are actionable.  There is no general duty to disclose under Rule 10b-5.  *Basic Inc. v. Levinson*, 485 U.S. 224, 239, 108 S. Ct. 978, 99 L. Ed. 2d 194 & n.17 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5."); *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1157 (9th Cir. 1996) ("Rule 10b-5 is violated by nondisclosure only when there is a duty to disclose.") (citation omitted).

[9]  *See, e.g., In re FoxHollow Techs., Inc., Sec. Litig.*, No. C 06-4595 PJH, 2008 WL 2220600, at *22-23 (N.D. Cal. May 27, 2008) (holding, in reliance on *Brody*, that where company knew it planned to ask certain executives to resign, statements regarding "strong management team" and similar "public statements acknowledging the efforts of FoxHollow's employees, and emphasizing that 'people' were an important piece of FoxHollow's infrastructure," did not mislead investors); *In re Action Performance Cos. Sec. Litig.*, No. 05-2512-PHX-DGC, 2007 WL 496770, at *7 (D. Ariz. Feb. 13, 2007) ("statement that track-side sales increased does not address what method Action would use to ship future track-side inventory - the allegedly misleading aspect of the statement," and is therefore not misleading under *Brody*); *Osher v. JNI Corp.*, 308 F. Supp. 2d 1168, 1181 (S.D. Cal. 2004) ("Plaintiffs do not explain how failing to disclose the existence of the Office of the President 'affirmatively create[d] an impression of a state of affairs that differs in a material way from the one that actually exist[ed].'") (quoting *Brody*).

[10]  The same is true for the September 14, 2009 TMS press release regarding the Saylor accident (Statement 28), which accurately stated that law enforcement investigators had preliminarily determined that the cause of the accident was an improperly installed floor mat, and warned about the dangers of incorrectly installed floor mats. (Compl. ¶ 169; App. No. 28.)  Plaintiffs have not pleaded that any of the statements in that press release are untrue, and none of Plaintiffs' purported reasons why they are misleading passes the Ninth Circuit's *Brody* test.

13

fraudulent conduct) proximately caused the plaintiff's economic loss." *Id.* at 346.

Loss causation must be shown by a drop in stock price when the alleged truth was

disclosed. *See Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1063

(9th Cir. 2008) ("[T]he complaint must allege that the practices that the plaintiff

contends are fraudulent were revealed to the market and caused the resulting losses.");

*In re Impax Labs., Inc. Sec. Litig.*, No. C 04-04802 JW, 2007 WL 5076983, at *3

(N.D. Cal. Jan. 3, 2007) ("To plead loss causation adequately, a plaintiff must allege

[that] . . . the 'misstatement or omission concealed something from the market that,

when disclosed, negatively affected the value of the security.'") (quoting *Lentell v.*

*Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005)) (citing 15 U.S.C. § 78u-

4(b)(4)).[11]

Plaintiffs allege that disclosure of the "sticky pedal" problem was what caused

investors' losses. (Compl. ¶ 124 (alleging loss was result of Toyota's announcements

in late January 2010 of "recall of 2.3 million vehicles in the United States to correct

defective accelerator pedals that could 'mechanically stick' even absent floor mats.").)

According to the Complaint, the stock price dropped because the sticky pedal

announcement signified a mechanical issue of sufficient potential magnitude to

warrant a recall and to suspend manufacturing of certain models. (*See* Compl. ¶ 126

(sticky pedal recall announcement and January 26, 2010 announcement that Toyota

---

[11] In *Metzler*, where the purported fraud was the manipulation of student enrollment figures at a college, the Ninth Circuit held that loss causation is not adequately pled unless a plaintiff alleges that the market learned of and reacted to the practices the plaintiff contends are fraudulent, as opposed to merely reports of the defendant's poor financial health generally. *See* 540 F.3d at 1063. Recently, the Ninth Circuit reaffirmed its holding in *Metzler* and dismissed a case it found analogous to *Metzler*, rejecting the assertion that plaintiffs "should be able to prove loss causation by showing that the market reacted to the purported 'impact' of the alleged fraud – the earnings miss – rather than to the fraudulent acts themselves." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 392 (9th Cir. 2010) ("Loss causation is established if the market learns of a defendant's fraudulent act or practice, the market reacts to the fraudulent act or practice, and a plaintiff suffers a loss as a result of the market's reaction.") (no loss causation due to stock drop after earnings miss announced where alleged fraud consisted of statements related to quality and success of Oracle's Suite 11i product).

14

"was suspending U.S. sales of eight models involved in the recall for sticking accelerator pedals" and "would halt production for the first week of February" "prompted a sell-off in Toyota shares").)  It is only these announcements related to the sticky pedal recall and the associated production halt in late January and February 2010 that the Complaint alleges caused harm to Plaintiffs by triggering a decline in the stock price.  (*See id*. ¶¶ 124-33, 181-87.)[12]

Because the Complaint does not allege that the omission of the "sticky pedal problem" was the reason why *any* of the statements addressed above were false or misleading, Plaintiffs have failed to satisfy the element of loss causation regarding those statements, and for this separate reason, they are not actionable.

### 4.  The Statements Discussed Above Are Also Not Actionable Because the Complaint Does Not Plead Facts Establishing Scienter.

In addition, scienter is not sufficiently alleged regarding the above twenty-six statements.  There is no allegation in the Complaint that identifies any individual at Toyota who learned about the sticky pedal problem before the above statements were made, much less an individual who made an allegedly false or misleading statement, as required to state a Section 10(b) claim.  *See In re NVIDIA Corp. Sec. Litig.*, No. 08-CV-04260-RS, 2010 WL 4117561, at *5 (N.D. Cal. Oct. 19, 2010) (securities fraud claims must specify the "who, what, where, when, and how").  Thus, the Complaint fails to establish that any of the above statements was knowingly false or misleading when made by virtue of omission of the sticky pedal problem.  *See also* Section B, *infra*.

---

[12] Plaintiffs allege that certain statements were misleading because they failed to disclose, for example, that "Toyota did not have fail-safe mechanisms in its vehicles necessary to prevent unintended acceleration," that "Toyota recalled vehicles in the U.K. in 2000 and Canada in 2003 to replace floor mats that could interfere with the accelerator pedal," or that "[i]n April 2003, Toyota engineers discovered that a trim panel could come loose in the Sienna minivan and cause the gas pedal to stick." (*See* Compl. ¶¶ 93, 67, 71; App. No. 1.)  The failure to disclose these supposed "facts" did not under any reading of the Complaint cause Plaintiffs' alleged loss; those "facts" were not disclosed in announcements that precipitated a drop in the price of Toyota securities.

15

**B. The Remaining Seven Statements Are Not Actionable As To Any Defendant Because The Complaint Fails To Plead Facts Sufficient To Establish The Element Of Scienter.**

Allegations raising merely a plausible or reasonable inference of scienter will not suffice under the Private Securities Litigation Reform Act (the "PSLRA"). Rather, the PSLRA requires a complaint to "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2) (emphasis added), *i.e.*, an intent "to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194, 96 S. Ct. 1375, 47 L. Ed. 2d 668, & n.12 (1976)). In this Circuit, a complaint must "allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1014-15 (9th Cir. 2005) (citing *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999)). The Ninth Circuit views "deliberate recklessness" "as a form of *intentional* or *knowing* misconduct." *Silicon Graphics*, 183 F.3d at 976 (emphasis added).

Only facts pleaded "in great detail" will establish a strong inference of scienter. *Id*. at 974. A court must view scienter allegations as a whole, and in "determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Tellabs*, 551 U.S. at 322-23. Courts in this Circuit are to "conduct a dual inquiry: first, [the court] will determine whether any of the plaintiff's allegations, standing alone, are sufficient to create a strong inference of scienter; second, if no individual allegations are sufficient, [the court] will conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 992 (9th Cir. 2009).

Separately, the PSLRA requires that the scienter analysis be performed statement by statement and defendant by defendant. 15 U.S.C. 78u-4(b)(2) ("the

16

complaint shall, *with respect to each act or omission alleged to violate this chapter*, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind") (emphasis added).  Notably, the Court's August 2, 2010 Order also mandated that Plaintiffs satisfy this requirement.  Plaintiffs have failed to do so.

**1.  The Complaint Fails to Plead That the Three Statements in the Articles Quoting Mr. Kwong (App. Nos. 20, 24, 26) Were Made with Scienter.**

Plaintiffs label as false or misleading statements that appeared in two *Detroit Free Press* articles in April and June 2008.  These articles contained statements that Toyota had "found no problems with the Tacoma that would explain the complaints [about sudden acceleration]," and that "Toyota believes that it is likely that many of the consumer complaints about the general issue of unwanted acceleration . . . were inspired by publicity."  (*See* App. Nos. 20, 24.)  As the underlying articles show, the former statement (No. 20) was made by Toyota spokesman Bill Kwong; the latter statement is not attributed to any individual.  (*See* Griffen Decl., Exs. A & B; RJN at 1-2.)  The Complaint also alleges that another statement made by Mr. Kwong (this time in a *Westword* article about the Prius in April 2009)—specifically, that some "customers that say, 'I stood on the brake with all my might and the car just kept on accelerating'" may in fact "not [have been] stepping on the brake"—was misleading. (App. No. 26.)

This Circuit has rejected plaintiffs' attempts to allege that a corporation made statements with scienter without pleading facts showing that the particular individual within the corporation who actually made the statements did so with scienter.  *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 744-45 (9th Cir. 2008).  Indeed, the Ninth Circuit has never embraced the doctrine of "collective scienter."  *Id*. at 744 ("there is no case law supporting an independent 'collective scienter' theory.") (quoting *Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1435 (9th Cir. 1995)).

Under *Glazer*, the unattributed statement (App. No. 24) is plainly not actionable against Toyota because the Complaint neither identifies a person who made the statement nor pleads facts demonstrating that that individual acted with scienter. Similarly, under *Glazer*, the two statements made by Mr. Kwong are not actionable against Toyota because the Complaint does not set forth any scienter allegations whatsoever directed to Mr. Kwong, who is not even a defendant in this case.

*Glazer* did leave open the possibility of a limited exception to the rule that a plaintiff cannot plead collective scienter in the Ninth Circuit. *See Glazer*, 549 F.3d at 744. The Court did not describe exactly what that possible exception could be, but gave one example—a hypothetical posed in *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008), supposing that "General Motors announced that it had sold one million SUVs in 2006, *and the actual number was zero*." *Glazer*, 549 F.3d at 743-44 (quoting *Makor*) (emphasis added). The Ninth Circuit observed that, "as outlined in [this] hypothetical . . . , there could be circumstances in which a company's public statements were so important and so dramatically false" that some form of collective scienter pleading might be adequate. *Id*. (citing *Makor*, 513 F.3d at 710). Even then, the Ninth Circuit went on to say, however, that "[w]e need not decide whether we agree with *Makor*." *Id*.

Mr. Kwong's statements are vastly different from the GM hypothetical, assuming it would ultimately be adopted in this Circuit. The GM statement is so central to the core of the company's business (sales) and so "dramatically false" (zero vehicles sold, versus one million) that it might be presumed that whoever made the statement had to know its falsity. None of the three statements—that "they found no problems with the Tacoma that would explain the complaints" (App. No. 20), that "many of the complaints" about unintended acceleration were likely "inspired by publicity" (App. No. 24), and Mr. Kwong's April 2009 statement that reports of unintended acceleration in the Prius may have resulted from driver error (App. No. 26) —is comparable and went to the core of Toyota's business.

18

Nor were these three statements "so dramatically false." In fact, neither the Tacoma nor the Prius was one of the models included in the sticky pedal recall at all. (*See* Griffen Decl., Ex. C (Jan. 21, 2010 TMS press release) ("not affected are Toyota Prius, Tacoma [and certain other models]"); *see* RJN at 1-2.)[13] As a result, there is no basis to conclude that the Tacoma or the Prius even had a sticky pedal problem in April 2008 or April 2009 and, as such, Statements 20 and 26 cannot be "dramatically false." Statement 24, attributing some unintended acceleration complaints to publicity rather than mechanical problems, was on its face opinion and speculation, not a statement that could be "dramatically false." So, too, driver error (drivers "not stepping on the brake") unquestionably occurs and is not "dramatically false."

Therefore, as was true in the other cases to consider the issue following *Glazer*,[14] the GM hypothetical does not apply. As Plaintiffs have failed to plead individual scienter as to any speaker with respect to Statements 20, 24 and 26, those statements cannot be actionable as to any Defendant.

### 2. The Complaint Fails to Plead That the Four Statements in Late 2009 Attributing Unintended Acceleration to Floor Mat Entrapment (App. Nos. 29-32) Were Made with Scienter.

#### a. The November 2, 2009 TMS Press Release (App. No. 29) Is Not Actionable.

Plaintiffs label as false or misleading a substantial portion of TMS's press release dated November 2, 2009 announcing that it had "begun mailing letters to owners . . . " including the statement that "the letter . . . confirms that no defect exists in vehicles in which the driver's floor mat is compatible with the vehicle and properly

---

[13] For that reason, Statements 20 and 26 should also be dismissed for lack of loss causation.

[14] *See, e.g., NVIDIA*, 2010 WL 4117561, at *10 n.10 (rejecting applicability of GM hypothetical exception because "plaintiffs fail to allege any such statements that could be considered 'so important and so dramatically false.'"); *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1259 n.41 (S.D. Cal. 2010) (dismissing the corporation from the case because none of the extraordinary circumstances mentioned in *Glazer* and *Makor* were present).

secured." (App. No. 29.)[15]  Plaintiffs attribute the statements in the press release to only two individual speakers—Defendants Robert Daly and Yoshimi Inaba. (*See* App. at 131 (Column 2).)  The Complaint fails to plead facts showing either that Inaba was the person who made these statements or that Daly, who was the speaker, spoke with the requisite scienter.[16]

### i.   Mr. Inaba Did Not Make the Statement.

As to Mr. Inaba, Plaintiffs cannot transform him into a "speaker" of this statement simply by claiming that it is so.  Mr. Inaba is not quoted anywhere in the press release, and the press release does not otherwise attribute any of the statements to him.  Because Plaintiffs do not allege that Mr. Inaba actually made any of the allegedly misleading statements, the statements therein cannot be attributed to him unless he substantially participated or was intricately involved in their preparation.  *See Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061 n.5 (9th Cir. 2000).  *See also In re Cylink Sec. Litig.*, 178 F. Supp. 2d 1077, 1084-85 (N.D. Cal. 2001) (statement could not be attributed to officer who did not sign the financial statements at issue and as to whom

---

[15] The Complaint concedes that within two days of Toyota making these statements, NHTSA "refuted" them by publicly stating that the unintended acceleration matter "is not closed until Toyota has effectively addressed the defect by providing a vehicle based solution." (Compl. ¶ 119.)  According to the Complaint, NHTSA issued this public statement "to correct inaccurate and misleading information from the automaker." (*Id.*)  Within hours of NHTSA's rebuke, Toyota issued another press release agreeing with NHTSA's corrections. (Griffen Decl., Ex. D; *see* RJN at 2-3). Based on these concessions in the Complaint and the judicially noticed facts, Statements 29 and 30 are not actionable under the securities laws and should be dismissed for the separate reason of lack of loss causation.

[16] More fundamentally, it is not even clear that the late 2009 statements were false or misleading when made.  Those statements addressed the floor mat recall (and rumors of flaws in Toyota's electronic throttle control system allegedly causing unintended acceleration), and did not address the sticky pedal issue at all.  The statements were not literally false, and could only be misleading for failure to address the sticky pedal issue if sticky pedals were related in some way to the floor mat and electronic throttle issues being addressed at the time.  It was not misleading for Toyota to fail to address the sticky pedal issue (even if known) when speaking about the wholly unrelated issues of floor mat entrapment and rumors related to the electronic throttle control system.

1    plaintiffs had failed to allege that he had "substantially participated or was intricately

2    involved in preparing the statements").  Plaintiffs have failed to make such a showing.

3         Moreover, any attempt to attribute the statements in the press release to

4    Mr. Inaba under "the group pleading doctrine" (a presumption that "group-published"

5    statements such as company filings and press releases are the collective work of those

6    individuals with direct involvement in the day-to-day affairs of the company) also

7    cannot succeed.  District courts in the Ninth Circuit have noted that "[a]ll of the Circuit

8    courts that have expressly considered whether group pleading is compatible with the

9    PSLRA have concluded that it is not," and have consistently held "that group pleading

10   is *no longer viable* under the PSLRA."  *See, e.g.*, *In re New Century*, 588 F. Supp. 2d

11   1206, 1223-24 (C.D. Cal. 2008) (emphasis added).[17]

12                    **ii.    Plaintiffs Fail to Plead Mr. Daly's Scienter.**

13        Mr. Daly, by contrast, is quoted in the press release as saying the following:

14   "The question of unintended acceleration involving Toyota and Lexus vehicles has

15   been repeatedly and thoroughly investigated by NHTSA, without any finding of defect

16   other than the risk from an unsecured or incompatible driver's floor mat." (Compl.

17   ¶ 171.)  There is nothing in Mr. Daly's characterization of NHTSA's investigations in

18   the press release that Plaintiffs specifically identify as false or misleading.  Plaintiffs

19   merely make the generalized allegation that the statement is false without providing

20   any basis for their contention.  Furthermore, Plaintiffs have failed to provide a detailed

21   statement of facts particularized to Mr. Daly supposedly giving rise to a strong

22   inference of scienter on Mr. Daly's part when he provided this account of his

---

[17] *See also In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1154 (C.D. Cal. 2007) ("the group pleading doctrine can no longer be used in pleading cases under the PSLRA"); *In re Lockheed Martin Corp. Sec. Litig.*, 272 F. Supp. 2d 928, 936 (C.D. Cal. 2002) ("The group-published information doctrine is inconsistent with the PSLRA because it requires courts to accept a plaintiff's belief regarding the individual liability of a corporate officer even when the belief is based on the officer's job title alone.  The doctrine is essentially a mechanism for pleading an officer's involvement in the issuance of a corporate statement based on information and belief.  The PSLRA permits pleading on information and belief, but only if the complaint states with particularity all facts on which the belief is formed.").

understanding of prior NHTSA findings.  In fact, Plaintiffs do not even allege that Mr. Daly acted with scienter at all, as none of the scienter allegations purportedly relating to this statement or the rest of the press release are directed to Mr. Daly.  (*See* App. at 131 (Column 5)).  Mr. Daly's statement simply is not actionable because of Plaintiffs' failure to plead scienter and failure to make a particularized "who, what, where, when and how" allegation showing Mr. Daly's supposed personal knowledge that his statement was allegedly false or misleading at the time he made it.[18]

In the absence of such allegations, Plaintiffs' conclusory, generalized allegation that Mr. Daly, as an "Insider Defendant," "had access to the adverse undisclosed information about Toyota's business, operations and practices" does not comply with the PSLRA's requirement of particularity.  *See In re Apple Computer, Inc. Sec. Litig.*, 243 F. Supp. 2d 1012, 1026-27 (N.D. Cal. 2002) ("Mere access to data is insufficient to support a securities claim under the PSLRA.").  Allegations that the Individual Defendants such as Mr. Daly were "kept abreast of, received, and had access to adverse information concerning Toyota's vehicle quality and safety, including unintended acceleration problems," because of the "'Toyota Way' – a highly centralized management structure," are similarly unavailing.  (Compl. ¶ 54.)  *See Apple Computer*, 243 F. Supp. 2d at 1026 ("Similarly, general allegations about a 'hands-on' management style are insufficient.") (citation omitted).

### iii.   Mr. Lentz's Statement About Sticky Pedal Technical Reports in the U.S. in October 2009 Does Not Give Rise to a Strong Inference of Scienter.

Plaintiffs rely heavily on a portion of a statement made in an interview with the NBC Today Show by Defendant James Lentz as an admission that all Defendants knew of a sticky pedal problem as early as October 2009.  Mr. Lentz's actual statement

---

[18] Such particularized allegations regarding Mr. Inaba's scienter are similarly lacking, and thus the statements in the press release are not actionable against Mr. Inaba for this additional, independent reason.

1    cannot be read so broadly.  Nor does it give rise to a strong inference of scienter on the

2    part of Mr. Daly when he made his statement in the November 2 press release.

3         First, although Plaintiffs claim that Mr. Lentz "admitted that Toyota had known

4    about the 'sticky' accelerator pedal defect since at least October 2009" (Compl. ¶ 130;

5    App. No. 29), that is not at all what Mr. Lentz said.  In response to a question asking

6    when either the "company," "you personally," or "other officials at your company"

7    knew about the sticky pedal problem, Mr. Lentz responded that "the *first technical*

8    *report* that we had that we could duplicate the issue was in late October of last year

9    [2009]."  (Griffen Decl., Ex. E at 3 (Tr. of Feb. 1, 2010 NBC Today Show interview

10   incorporated by reference in Compl. ¶¶ 17 & 130) (emphasis added); *see* RJN at 1-2.)

11        The most that can be inferred from Mr. Lentz's statement on the Today Show is

12   that *someone* at Toyota (it is unclear from his statement who) was aware of technical

13   reports about a *possible* sticky pedal issue in the U.S. in late October 2009, at the time

14   of the "first technical report."  That inference does not lead to the conclusion that there

15   was knowledge of a determined sticky pedal safety *defect* that would require a recall

16   and halt production of several Toyota vehicle models, the revelation that allegedly

17   caused Plaintiffs' loss.

18        A district court in this Circuit was recently faced with similar facts.  That case

19   presented the issue whether the internal statement "We've been working on this

20   problem [with graphics chips] with customers for well over a year" supported a strong

21   inference of scienter as of that early date.  There, the Court held that the "statement is

22   simply an acknowledgement that the Company was *working . . . to uncover the*

23   *problem, and not an admission that it knew the cause, scope or nature* of the chip

24   problem . . . ."  *NVIDIA*, 2010 WL 4117561, at *8 (emphasis added).[19]  This reasoning

25   is equally applicable here.

26

27   [19] *See also Detroit Gen. Ret. Sys. v. Medtronic, Inc.*, 621 F.3d 800, 809 (8th Cir. 2010);
     *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1001 (9th Cir. 2009); *Matrix*
28   *Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 188 (4th Cir. 2009).

23

Second, Mr. Lentz's statement cannot be read as an admission that any of the Individual Defendants who are alleged to have made false or misleading statements in November and December 2009—*i.e.*, Messrs. Daly, Inaba, Carter or Miller— possessed the requisite scienter at the time those statements were made.  Mr. Lentz said nothing as to the knowledge of these individuals at the time, and there is no factual basis alleged for inferring that these high-level executives had knowledge of the "technical report" received in October 2009 referred to by Mr. Lentz.  And Mr. Lentz himself is not alleged to have made any false or misleading statement (other than a puffing statement about quality in 2007, App. No. 18).  Thus, Mr. Lentz's statement cannot give rise to a strong inference of any Individual Defendant's scienter.

### b.   Mr. Carter's Statements in the November 2, 2009 Conference Call (App. No. 30) Are Not Actionable.

Plaintiffs allege as false or misleading statements made by Defendant Robert Carter on a November 2, 2009 conference call with media representatives, including his statements that "there is no evidence to support" speculation in the media (which in fact related to the electronic throttle control system—*see supra* note 16) that it's "not just the floormat."  (App. No. 30.)  These statements are not actionable for the same reasons that Mr. Daly's quoted statement in the November 2, 2009 press release is not.  The scienter allegations for Statement 30 are identical to those for Statement 29.  (*Compare* App. at 133 (Column 5) with *id*. at 131 (Column 5).)  They are too vague and generalized to give rise to a strong inference of scienter on the part of anyone, and more directly, cannot give rise to such an inference as to Mr. Carter, since, contrary to the PSLRA, they fail to address him personally.

### c.   Mr. Miller's November 25 and December 5, 2009 Statements (App. Nos. 31-32) Are Not Actionable.

In late November and early December 2009, Defendant Irving Miller made public statements in connection with Toyota's announcement of the floor mat recall.  As reported in a November 29, 2009 *New York Times* article, Mr. Miller reportedly stated at a November 25, 2009 press conference:  "We are very, very confident that we

24

have addressed this issue.  We can come up with no indication whatsoever that there is a throttle or electronic control system malfunction."  Mr. Miller allegedly further stated:  "We have come to the conclusion this is pedal misapplication or pedal entrapment.  We continue to find no reason to believe that there is a problem with the electronic control systems."  (Compl. ¶ 174; App. No. 31.)  Mr. Miller also wrote a letter published in the December 9, 2009 *Los Angeles Times*, stating in part:  "we are highly confident that we have addressed the root cause of unwanted acceleration – the entrapment of the accelerator pedal."  (Compl. ¶ 175; App. No. 32.)

Plaintiffs allege that these statements are misleading for failure to disclose the sticky pedal problem, even though the first two statements dealt with a different and narrower issue—whether there was a problem with the electronic throttle control in Toyota vehicles.  (*See supra* note 16.)  But even reading the three statements as do Plaintiffs, the Complaint has failed to allege facts giving rise to a strong inference that Mr. Miller knew of the sticky pedal problem at the time these statements were made.

Plaintiffs base their allegation that Mr. Miller knew, when he made these statements in late November and early December 2009, about the sticky pedal problem on a single fact:  an internal email Mr. Miller wrote on January 16, 2010, more than a month later, stating "I hate to break this to you but WE HAVE a tendency for MECHANICAL failure in accelerator pedals of certain manufacturer [sic] on certain models.  We are not protecting our customers by keeping this quiet.  The time to hide this one is over.  We need to come clean."  (Compl. ¶¶ 12, 122.)  Just three days after this email, on January 19, 2010, Toyota informed NHTSA that a defect existed in the accelerator pedals of certain Toyota models, resulting in the sticky pedal recall announced two days later on January 21, 2010.  (*See* Compl. ¶¶ 13-14, 123-24.)

Mr. Miller's awareness of an issue involving a "sticky" accelerator pedal on January 16, 2010 does not give rise to a strong inference that he knew about the issue more than a month earlier on November 25 and December 5, 2009, when he made the allegedly misleading statements.  Notably, the January 16 email is the only allegation

25

of scienter with respect to Mr. Miller in the entire 100-page Complaint.  Ninth Circuit law recognizes that knowledge necessarily evolves over time and thus a mere allegation of temporal proximity between an allegedly false or misleading statement and a later indicator of knowledge is not sufficient to give rise to a strong inference of scienter.  *See Yourish v. Cal. Amplifier*, 191 F.3d 983, 997 (9th Cir. 1999) (finding "that the temporal proximity of the August disclosure to the June and July statements, without more, is insufficient to satisfy Rule 9(b)" and holding that "[i]t is clearly insufficient for plaintiffs to say that a later, sobering revelation makes an earlier, cheerier statement a falsehood"); *Ronconi v. Larkin*, 253 F.3d 423, 437 (9th Cir. 2001) (holding that "the five week period between the optimistic statements and the below-expectation earnings report is not enough to sustain the complaint").

A district court case in this Circuit illustrated the same point.  *See Osher v. JNI Corp.*, 256 F. Supp. 2d 1144 (S.D. Cal. 2003).  *Osher* addressed whether an internal email contradicting a public statement made less than two weeks earlier could give rise to a strong inference of scienter.  A defendant allegedly sent a "late October 2000" email stating that the quarter was "not looking so great," after making certain allegedly contradictory misleading public statements earlier in an October 16, 2000 conference call.  The court noted that "[t]his allegation does raise an inference that Purdy knew sometime in 'late October 2000' that the fourth quarter 2000 was 'not looking so great.'"  *Id*. at 1159.  The court continued, however, stating that the email "falls short of raising a strong inference that Purdy uttered false statements with scienter," explaining that "Purdy allegedly made false statements during the conference call on October 16, 2000.  It seems, however, that the . . . *email was circulated after the alleged false statements*.  Thus, the email does not necessarily establish that the fourth quarter was 'not looking so great' on October 16, 2000."  *Id*. (emphasis added).[20]

---

[20] *See also In re Bus. Objects S.A. Sec. Litig.*, No. C 04-2401 MJJ, 2005 WL 1787860, at *8 (N.D. Cal. July 27, 2005) (rejecting plaintiffs' argument "that the close proximity between Defendants' misrepresentations and the disclosure of the truth helps bolster a strong inference of scienter," relying on *Yourish* and *Ronconi*); *In re*

[Footnote continued on next page]

26

1    Thus, the January 16 email does not give rise to a strong inference of

2    Mr. Miller's scienter, and Plaintiffs have provided no other basis for it.  The claims

3    against Mr. Miller based on these statements must be dismissed.[21]

### 3. Viewing the Scienter Allegations as a Whole, the More Compelling Inference Is That at the Time of Their Statements, the Individual Defendants Had Not Yet Learned about the "Sticky Pedal" Issue.

6    As shown above, the Complaint lacks any particularized allegations creating a

7    strong inference that any of the Individual Defendants knew that they were making

8    false or misleading statements at the time those statements were made.  Moreover,

9    even if the scienter allegations are viewed as a whole, the more cogent and compelling

10   competing inference is that the Individual Defendants, all senior executives in a

11   massive corporation, did not know about the technical, engineering "sticky pedal"

12   issue when they made the statements at issue.

13   Several Circuit Courts have found the existence of similar or even less

14   compelling opposing inferences to require dismissal of securities class actions on

15   scienter grounds.  *See, e.g., Matrix Capital*, 576 F.3d at 188 ("conclud[ing] that the

16   inference of scienter is not as compelling as competing non-culpable inferences"

17   because "BearingPoint officers may not have had reason to know that [internal

18   financial reporting software] problems and other internal control deficiencies existed

19   and were sufficiently severe so as to threaten the reliability of financial reporting.").

20   *See also Detroit Gen. Ret. Sys.*, 621 F.3d at 809 (holding that even though Medtronic

21

---

22   [Footnote continued from previous page]
     *Infonet Servs. Corp. Sec. Litig.*, 310 F. Supp. 2d 1080, 1097 n.13 (C.D. Cal. 2003)
23   ("This acknowledgment, at a later date, of the number of customers at the time of the
     IPO does not establish what Defendants knew at the time of the IPO.") (citing
24   *Yourish*); *In re Foundry Networks, Inc. Sec. Litig.*, No. C 00-4823 MMC, 2003 WL
     22077729, at *13 (N.D. Cal. Aug. 29, 2003) ("Assuming events separated by an
25   interval of nearly two months can be characterized as 'proximate,' such proximity
     may only serve to 'bolster' a complaint; proximity alone is not sufficient to satisfy the
26   requirements of the PSLRA.") (citing *Ronconi*).
27   [21] Furthermore, no Toyota entity is liable for any of these four statements (App.
     Nos. 29-32) because Plaintiffs have failed to plead that any of the November or
     December 2009 statements were made by an individual with scienter. *See Glazer*,
28   549 F.3d at 744-45; Section III.B.1., *supra*.

27

had in its possession data indicating there was a problem with its product at time it was still reassuring doctors that product was viable, "mere possession of uncollected data does not indicate Medtronic was aware of the implications of that data"); *Zucco Partners*, 552 F.3d at 1001 (affirming dismissal on scienter grounds because there was "no indication" that particular stage of a software project "would be operationally visible to executives not intimately connected with the development process").

To give just one example here, and as discussed above, Plaintiffs rely upon public statements made by Mr. Lentz that included the disclosure that the first technical report in which Toyota was able to duplicate the sticky pedal issue occurred in late October 2009. (Compl. ¶ 130; Griffen Decl., Ex. E at 3; *see* RJN at 1-2.)  The Complaint does not, however, plead any particularized facts regarding whether, when, or how the Individual Defendants reviewed this technical report or their awareness of the implications of this data at that time. (*See also* Section B.2.a.iii., *supra*.)

Thus, even if viewed holistically, the Complaint's allegations of scienter collectively fail to overcome the more compelling inference that the Defendants did not act with scienter because they did not know about sticky pedals at the time of their statements.

**C.**  **The Section 20(A) Claim Is Not Actionable Because There Is No Primary Liability Under Section 10(B) And Control Is Not Pled With The Requisite Particularity.**

To state a claim for control person liability under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), Plaintiffs must show:  (1) a primary violation of federal securities laws, and (2) that the defendant exercised actual power or control over the primary violators.  *See Zucco Partners*, 552 F.3d at 990.  Claims brought pursuant to Section 20(a) must be pled against each defendant with particularity.  *See Kuehbeck v. Genesis Microchip Inc.*, No. C 02-05344 JSW, 2005 WL 1787426, at *3 (N.D. Cal. July 27, 2005).

Because the Section 10(b) claim must be dismissed for failure to meet the required pleading elements, the Section 20(a) claim must be dismissed as well.  *See*

*Zucco Partners*, 552 F.3d at 990.  Additionally, Plaintiffs have failed to allege facts showing that any of the Individual Defendants qualifies as a control person.  That the Individual Defendants were high-ranking officers of Toyota is not in and of itself sufficient to create a presumption of power to control or influence the primary actors.  *In re Gupta Corp. Sec. Litig.*, 900 F. Supp. 1217, 1243 (N.D. Cal. 1994); *Howard v. Hui*, No. C 92-3742-CRB, 2001 WL 1159780, at *3 (N.D. Cal. Sept. 24, 2001).  The Complaint contains no factual allegations showing that any Individual Defendant participated in the day-to-day affairs of any Toyota entity, was involved in the preparation of the statements at issue, or had authority over those at Toyota who prepared the allegedly misleading statements.  Thus, the Complaint's control person liability claims under Section 20(a) necessarily fail.

**D. <u>Plaintiffs May Not Pursue The Third Claim Arising Under Japanese Law.</u>**

### 1. There Is No Federal Jurisdiction over Plaintiffs' Japanese Law Claim.

This Court should dismiss the Third Claim pursuant to Federal Rule of Civil Procedure 12(b)(1) because it lacks jurisdiction to adjudicate it.  Although Plaintiffs rely upon the Exchange Act as a basis for their First and Second Claims (Compl. ¶¶ 25-26), that Act does not confer jurisdiction over claims arising under foreign law.  Plaintiffs claim that this Court has original jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) ("CAFA"), and the federal supplemental jurisdiction statute, *id.* § 1367(c) (*see* Compl. ¶¶ 27-28), but neither supplies a basis for federal jurisdiction over the Japanese Law Claim.

CAFA expressly carves out class actions "concerning covered securities" as defined under Section 28(f)(5)(E) of the Exchange Act, 15 U.S.C. § 78bb(f)(5)(E).  28 U.S.C. § 1332(d)(9).  That section of the Exchange Act in turn refers to the definition of a "covered security" found in 15 U.S.C. § 77r(b)(1), which defines "covered security" as (among other things) a security that is "listed, or authorized for listing, on the New York Stock Exchange."  15 U.S.C. § 77r(b)(1)(A).  *See also In re Metro. Sec.*

1    *Litig.*, 532 F. Supp. 2d 1260 (E.D. Wash. 2007).  Here, the Complaint specifically

2    alleges that "Toyota's common stock was listed on the NYSE" at all relevant times.

3    (Compl. ¶ 197.)  Thus, Plaintiffs have pled the CAFA exception.  There is no original

4    federal jurisdiction over the Japanese Law Claim.

5        Additionally, the Court should decline Plaintiffs' request (*id*. ¶ 28) to exercise

6    supplemental jurisdiction over this claim pursuant to the supplemental jurisdiction

7    statute for at least three reasons:

8        First, the Japanese Law Claim "raises a novel or complex issue of State law," 28

9    U.S.C. § 1367(c), which courts have construed to encompass foreign law.  *See*, *e.g.*,

10   *Info. Res.*, *Inc. v. Dun & Bradstreet Corp.*, 127 F. Supp. 2d 411, 417 (S.D.N.Y. 2000)

11   (declining to exercise Section 1367 supplemental jurisdiction over foreign claim that

12   would have required the court to adjudicate novel and complex issues involving

13   Article 82 of the Treaty of Rome).  District courts thus have properly declined to

14   exercise supplemental jurisdiction over claims that would have required the

15   adjudication of novel and complex legal issues arising under foreign law.  *See id.*; *In re*

16   *Alstom SA Sec. Litig.*, – F. Supp. 2d – , 2010 WL 3718863, at *3 (S.D.N.Y. Sept. 14,

17   2010) (declining supplemental jurisdiction over French-law securities claims); *In re*

18   *Urethane Antitrust Litig.*, 683 F. Supp. 2d 1214, 1221-22 (D. Kan. 2010) (declining to

19   exercise supplemental jurisdiction over EU competition law claims).[22]

20       This Court should reach the same conclusion, because the Japanese law at issue

21   is only a few years old and has not been construed by Japan's highest court.  (*See*

---

22   [22] *See also Romero v. Drummond Co.*, 552 F.3d 1303, 1318 (11th Cir. 2008) (affirming
23   district court's denial of supplemental jurisdiction over Columbian wrongful death
     claim because claim raised novel or complex issue of state law where lower court was
24   unable to reconcile conflicting translations of Colombian legal precedents, navigate
     complexities of parties' submissions or discern Colombian law requisites for
25   wrongful death claim); *ITSI T.V. Prods., Inc. v. Cal. Auth. of Racing Fairs*, 785 F.
     Supp. 854, 866-67 (E.D. Cal. 1992), *rev'd in part on other grounds*, 3 F.3d 1289 (9th
26   Cir. 1993) ("American courts should be reluctant to enter the bramble bush of
     ascertaining and applying foreign law without an urgent reason to do so.  No such
27   reason has been tendered in this case and, as a matter of common sense and judicial
     self-restraint, I think it appropriate to decline plaintiff's invitation.") (declining leave
28   to amend to state claim under Mexican copyright law).

30

Declaration of Kunio Namekata ("Namekata Decl.") ¶¶ 6a, 19.)  Litigation of this claim would require this Court to adjudicate many novel and important legal issues without the benefit of guidance from the Japanese courts.  (*See* Section D.2., *infra*.)

Second, the Japanese Law Claim "substantially predominates" over the claims over which the court has original jurisdiction. 28 U.S.C. § 1367(c).  *See also De Asencio v. Tyson Foods, Inc.*, 342 F.3d 301, 311-12 (3d Cir. 2003) (examining the following factors to determine whether a state law claim "substantially predominates": "the scope of the state and federal issues, the terms of proof required by each type of claim, the comprehensiveness of the remedies, and the ability to dismiss the state claims without prejudice"); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 613 F. Supp. 2d 437, 442 n.24 (S.D.N.Y. 2009).  The number of investors that would be included in the putative Japanese law class of claimants greatly exceeds the number of investors under the Exchange Act claims.  In fact, the Toyota common stock class is vastly larger than the ADS holder class, since the latter U.S. class represents less than 3% of the common stock outstanding.  (Griffen Decl., Ex. F at 1, 80 (TMC 3/31/09 Form 20-F incorporated by reference in Compl. ¶ 167) (*see* RJN at 1-2) (as of March 31, 2009, Toyota had 3.1 billion shares of common stock outstanding, only 85 million shares of which trade as ADRs).)  Accordingly, the Japanese Law Claim would overwhelmingly predominate.

Third, "exceptional circumstances," including comity, judicial economy, convenience, and fairness "present compelling reasons for declining jurisdiction."  28 U.S.C. § 1367(c).  *See also Exec. Software N. Am., Inc. v. United States Dist. Court*, 24 F.3d 1545, 1556 (9th Cir. 1994), *overruled on other grounds by Cal. Dep't of Water Res. v. Powerex Corp.*, 533 F.3d 1087 (9th Cir. 2008); *Urethane Antitrust*, 683 F. Supp. 2d at 1223-24.  "Exceptional circumstances" present here include Japan's interest in regulating its own securities, the novelty of the Japanese law at issue, and the increased court resources that adjudicating unfamiliar foreign claims would consume.  (*See* Namekata Decl. ¶¶ 17-23.)  *See, e.g.*, *Voda v. Cordis Corp.*, 476 F.3d

31

887, 903 (Fed. Cir. 2007) ("Because of our lack of institutional competence in the foreign patent regimes at issue in this case, more judicial resources could be consumed by the district court than the courts of the foreign patent grants."). (*See* Section D.2., *infra*.)

Moreover, the enforceability in Japan of any judgment that would be rendered by this Court, and whether prevailing defendants would be at all protected by doctrines of *res judicata* and collateral estoppel, are seriously in doubt. (Namekata Decl. ¶¶ 29-30, 32.)  This alone presents an exceptional issue of unfairness in proceeding with the Japanese Law Claim.  Japan and the U.S. have no treaty addressing the recognition and enforcement of judgments (*see id*. ¶ 25), and no Japanese court has ever addressed whether a U.S. opt-out class action applying Japan's Financial Instruments and Exchange Act even would be recognized and enforced.  (*Id*. ¶ 29.)  Japanese civil procedure itself does not authorize U.S.-style class actions or provide for class action notice.  (*Id*. ¶¶ 15, 28.)

Many countries—including Japan—consider a U.S. Rule 23 class action that automatically binds all who do not affirmatively opt out to be inconsistent with due process, and it is highly likely that the Japanese courts likewise would not bind class members to any judgment rendered in this case.  (*Id*. ¶¶ 29-30, 32.)  Thus, Defendants could prevail or seek to settle this action and thereafter still find themselves exposed to entirely duplicative litigation in Japan by shareholders representing 97% of the public float.  A more striking example of unfairness is difficult to imagine.

## 2. Principles of International Comity Compel Dismissal of the Japanese Law Claim.

Even if the Court concluded that it had subject matter jurisdiction, the doctrine of international comity provides an independent basis for dismissal.  *See, e.g., Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227, 1237 (11th Cir. 2004).  That doctrine embodies "the extent to which the law of one nation, as put in force within its territory, whether by executive order, by legislative act, or by judicial decree, shall be allowed to

operate within the dominion of another nation." *Hilton v. Guyot*, 159 U.S. 113, 163,

16 S. Ct. 139, 40 L. Ed. 95 (1895).  The Supreme Court recently recognized the

importance of respecting available foreign procedures and remedies in *Morrison*:

> [W]e reject the notion that the Exchange Act reaches conduct in this country affecting exchanges or transactions abroad . . . :  The probability of incompatibility with the applicable laws of other countries is so obvious that if Congress intended such foreign application "it would have addressed the subject of conflicts with foreign laws and procedures."  *Like the United States, foreign countries regulate their domestic securities exchanges and securities transactions occurring within their territorial jurisdiction.  And the regulation of other countries often differs from ours as to what constitutes fraud, what disclosures must be made, what damages are recoverable, what discovery is available in litigation, what individual actions may be joined in a single suit, what attorney's fees are recoverable, and many other matters.*

130 S. Ct. at 2885 (emphasis added; citation omitted).  Notably, where *Morrison*

addressed a "foreign-cubed" scenario (foreign shareholders, suing foreign issuers,

based on transactions in foreign countries), Plaintiffs here are seeking to proceed under

a "foreign-to-the-fourth-power" scenario (*i.e.*, adding foreign law to the "foreign-

cubed" scenario).

    District courts appropriately have since rejected attempts to circumvent

*Morrison* by invoking foreign law.  *See Alstom SA*, 2010 WL 3718863, at *3

(declining to allow plaintiffs to plead French-law securities claims after *Morrison*

because it would entail "obtaining evidence abroad potentially under a different set of

rules, and deciding the merits of this aspect of the case under an entirely different,

complex, and foreign code"); *see also Cornwell v. Credit Suisse Group*, – F. Supp. 2d

– , 2010 WL 3069597, at *6 (S.D.N.Y. July 27, 2010) (citing *Morrison* and

emphasizing its "concern over the prospect of incompatibility of American securities

rules with applicable laws and procedures of foreign countries which also regulate

securities exchanges and transactions that occur within their territory").[23]

---

[23] Several other courts have reached similar results and refused to adjudicate claims arising under the laws of foreign jurisdictions on the grounds of international comity.  *See, e.g.*, *In re Urethane Antitrust Litig.*, 683 F. Supp. 2d 1214, 1222-23 (D. Kan. 2010) (citing *Air Cargo* and declining to exercise jurisdiction over plaintiff's

[Footnote continued on next page]

Here, the doctrine of international comity compels dismissal of the Japanese Law Claim for at least two separate reasons.  <u>First</u>, as noted above, the law is relatively new, and the scope of Japanese law is largely unsettled.  *See In re Air Cargo Shipping Servs. Antitrust Litig.*, No. MD 06-1775(JG)(VVP), 2008 WL 5958061, at *31 (E.D.N.Y. Sept. 26, 2008) (applying doctrine of international comity "where the adjudication of claims involves the application of unsettled foreign law") (citation omitted), *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. MD 06-1775(JG)(VVP), 2009 WL 3443405 (E.D.N.Y. Aug. 21, 2009) (adopting the Magistrate's Report and Recommendation and describing it as "thorough, well-reasoned" and containing "skillful analyses of the issues" relating to international comity and forum non conveniens).

There is not a single binding Japanese court decision interpreting the Japanese law at issue.  (Namekata Decl. ¶¶ 19-22.)  And the text of Article 21-2 facially leaves open numerous decisive legal questions.  For example, the statute prohibits making "fake" statements in certain enumerated documents.  What standard should be applied to determine the "importance" of a "fake" statement?  Is there a materiality threshold, and if so, are vague statements of "puffery" actionable (unlike in the U.S.)?  What is the necessary threshold to determine whether a government filing "lack[s] a statement on important matters . . . or [a statement] on a material fact that is necessary for avoiding misunderstanding"?  How should the damages remedy set forth in Article 21-2(2) be applied, and what factors should the Court consider in determining the reduction in damages pursuant to Article 21-2(5)?  How can a defendant rebut the

---

[Footnote continued from previous page]
European law claims on comity grounds because these claims "would raise novel and complex issues of European law" and "[g]iven the state of European antitrust law, the Court has little doubt that such law would be more ably interpreted and applied in Europe"); *In re Banco Santander Securities-Optimal Litig.*, – F. Supp. 2d – , 2010 WL 3036990, at *30 (S.D. Fla. July 30, 2010) (citing *Morrison* and concluding that "principles of comity dictate that the United States should not apply its laws to this foreign dispute").

34

presumption of loss causation and damages?  When and how is an allegedly false statement "announced to the public" for purposes of the statute—on the day of the company's official announcement, a press report, or by some other method—and who may bind the company with such announcements?  May a defendant assert a comparative negligence defense?  Can those who acquired shares by private placement or organizational restructuring (such as a merger) claim damages under Article 21-2? These unsettled legal issues are the subject of debate in Japan. (Namekata Decl. ¶¶ 20, 22.)

These are not minor interstitial issues.  They are fundamental to creating a regime of securities laws and necessitated decades of legal development by our courts in interpreting the 1933 Securities Act and 1934 Exchange Act.[24]  This Court would be obliged to answer these questions from scratch with no authoritative guidance from Japan.  As in the *Air Cargo* case, "[t]his court would be forced to fly blind on these unsettled issues," and the Court "does not have a mechanism by which to obtain an opinion from the [the highest court with responsibility for the foreign law] on an unresolved issue."  2008 WL 5958061, at *33.  *See also Ford v. Brown*, 319 F.3d 1302, 1307 (11th Cir. 2003) (emphasizing that "it is 'far better that the case be tried in [a foreign country] by one or more jurists as familiar with [foreign] law as we are unfamiliar with it'") (quoting *Magnin v. Teledyne Cont'l Motors*, 91 F.3d 1424, 1430 (11th Cir. 2002) (alterations in original)).

Second, litigating the Japanese Law Claim in the U.S. would undermine both Japan's interest in the development of its own securities laws, and the U.S.'s interest in promoting the development of strong securities laws abroad.  *See*, *e.g.*, *Morrison*, 130 S. Ct. at 2886 (noting "some fear [the U.S.] has become the Shangri-La of class-action

---

[24] For additional recent examples of over 70 years of legal development, see *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) (scienter); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976) (scienter); *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 125 S. Ct. 1627, 161 L. Ed. 577 (2005) (loss causation and damages); and *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) (materiality and class damages).

litigation for lawyers representing those allegedly cheated in foreign securities markets"); *Air Cargo*, 2008 WL 5958061, at *34 ("The availability of United States courts to adjudicate issues of EU antitrust law would not only crowd them with claims that are not connected to the United States, but would also inhibit the development of jurisprudence within the European Union.").  Japan also has a regulatory enforcement interest, as it has a system of administrative monetary penalties.  (*See* Namekata Decl. ¶¶ 8-9.)  Adjudicating the Japanese Law Claim here would encroach upon Japan's exercise of its sovereign right to adjudicate claims involving securities transactions on its own exchanges through its own laws, regulations, and enforcement regime.[25]  (*Id.* ¶ 23.)  *See also Air Cargo*, 2008 WL 5958061, at *34 (noting that a dismissal of foreign claims on comity grounds would further the United States' "interest in promoting the development of strong antitrust regulations" in Europe).  Moreover, because Plaintiffs' claim is brought solely under Japanese law (on behalf of overseas purchasers of Toyota common stock, which does not trade in the U.S.), the U.S. would suffer no prejudice if the Japanese Law Claim were dismissed and Plaintiffs had to pursue that claim in Japan.  For all of these reasons, considerations of comity also compel dismissal of the Japanese Law Claim.

### 3.  Alternatively, this Court Should Dismiss the Japanese Law Claim on the Basis of Forum Non Conveniens.

For many of the same reasons discussed above, the doctrine of forum non conveniens provides an alternative basis for dismissing the Japanese Law Claim.  Pursuant to this doctrine, a court has discretion to dismiss an action "when an alternative forum has jurisdiction to hear the case, and when trial in the chosen forum would 'establish . . . oppressiveness and vexation to the defendant . . . out of all

---

[25] The SEC and Japan's Financial Services Agency have established terms of reference for increased cooperation and collaboration on cross-border enforcement matters through a high-level bilateral dialogue.  (*See* Griffen Decl., Exs. G & H; *see* RJN at 3-4).  This initiative further illustrates the delicate considerations of international comity presented by this claim.

36

1   proportion to plaintiff's convenience,' or when the 'chosen forum [is] inappropriate

2   because of considerations affecting the court's own administrative and legal

3   problems.'" *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241, 102 S. Ct. 242, 70 L. Ed.

4   2d 419 (1981) (citations omitted).

5        A party seeking dismissal on the basis of forum non conveniens "must show two

6   things:  (1) the existence of an adequate alternative forum, and (2) that the balance of

7   private and public interest factors favors dismissal." *Loya v. Starwood Hotels &*

8   *Resorts Worldwide, Inc.*, 583 F.3d 656, 664 (9th Cir. 2009).  These factors support

9   dismissal here.

10                  **a.     Japan Provides an Adequate Alternative Forum for the**
                       **Japanese Law Claim.**

11

12        Japan is an adequate—and indeed, preferable—forum for prosecution of

13   Japanese legal claims asserted against Japanese resident defendants.  Differences in

     access to pretrial discovery, the lack of jury trials, different standards of appellate

14   review, and even the possibility of an unfavorable change in law or a less favorable

15   remedy do not render an alternative forum inadequate.  *See Lockman Found. v.*

16   *Evangelical Alliance Mission*, 930 F.2d 764, 768 (9th Cir. 1991); *Loya*, 583 F.3d

17   at 666 ("A foreign forum must only provide the plaintiff with '*some*' remedy in order

18   for the alternative forum to be adequate.") (emphasis added).  In this case in particular,

19   Plaintiffs' choice of forum is entitled to little deference,[26] and courts in the Ninth

20

21   ─────────────────────

22   [26] Here, while the Lead Plaintiff is a United States citizen, the class that it seeks to
     represent on the Japanese Law Claim will largely constitute foreign plaintiffs, and
     indeed Lead Plaintiff has represented to this Court that approximately 85% of TMC's

23   common stock is held by non-U.S. investors.  (Joint Stip. of Lead Plaintiff Movants,
     Docket No. 98 (filed May 24, 2010), at 35 (citing TMC June 24, 2009 Form 20-F,

24   Griffen Decl., Ex. F; *see* RJN at 1-2).)  For this reason, the Court should accord little
     or no weight to Plaintiffs' choice of a domestic forum.  *See, e.g., Koster v. (Am.)*

25   *Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 524 (1947) ("[If] there are hundreds of
     potential plaintiffs, . . . all of whom could with equal show of right go into their many

26   home courts, the claim of any one plaintiff that a forum is appropriate merely because
     it is his home forum is considerably weakened."); *Air Cargo*, 2008 WL 5958061,

27   at *25 (considering whether a subclass consisting of primarily foreign plaintiffs is
     entitled to less deference in its choice of a domestic forum); *DeYoung v. Beddome*,

28   707 F. Supp. 132, 138 (S.D.N.Y. 1989) ("[A] plaintiff's choice of forum weighs far

                                                      [Footnote continued on next page]

Circuit and elsewhere have "consistently found that Japan provides an adequate alternative forum to litigation in the United States." *Lockman*, 930 F.2d at 769 n.3; *see also Phil. Packing Corp. v. Maritime Co. of the Phil.*, 519 F.2d 811, 812 (9th Cir. 1975) (affirming dismissal of admiralty claims that would have required application of Japanese law); *Del Monte Corp. v. Everett Steamship Corp.*, 402 F. Supp. 237, 244 (N.D. Cal. 1973) (dismissing admiralty claims in part on forum non conveniens grounds, where Japan provided an adequate alternative forum).[27]  In addition, the requirement of an adequate alternative forum is satisfied "when the defendant is 'amenable to process' in the other jurisdiction." *Piper Aircraft*, 454 U.S. at 254 n.22 (citation omitted).  This is unquestionably the case here.

### b.   The Public and Private Interest Factors Relevant to the Forum Non Conveniens Inquiry Weigh Heavily in Favor of Dismissal.

Because Japan provides an adequate alternative forum, the next step in the forum non conveniens analysis is to determine whether "the balance of private and public interest factors favors dismissal." *Loya*, 583 F.3d at 664.  It is not necessary for TMC to establish that *all* of the public and private interest factors weigh in favor of dismissal.  Courts consider all "relevant" factors to determine whether, on balance, dismissal is required.  *See*, *e.g.*, *Boston Telecomms. Group, Inc. v. Wood*, 588 F.3d 1201, 1206 (9th Cir. 2009); *Air Cargo*, 2008 WL 5958061, at *27 (adopting a "totality of the circumstances approach").

---

[Footnote continued from previous page]
less heavily in a case . . . where plaintiffs sue strictly in a representative or derivative capacity.").

[27] A recent Ninth Circuit case, *Carijano v. Occidental Petroleum Corp.*, Case No. 08-56187 (9th Cir. Dec. 6, 2010), reversing a district court's dismissal on forum non conveniens grounds, is distinguishable because it did not involve the application of foreign law.  Furthermore, the appellate court found that the district court had not properly ensured that an adequate forum existed because of concerns that foreign plaintiffs' claims were time-barred in Peru, noted particular difficulties facing isolated indigenous tribe members in Peru, and held that there might be difficulty in enforcing a judgment by a Peruvian court against a defendant that had removed most of its assets from that jurisdiction.  None of these factors exist with respect to this case.

### i.  The Public Interest Factors Strongly Favor Dismissal

The same considerations discussed in Sections D.1. and 2. above—the unsettled nature of Japanese law, Japan's overriding interest in enforcing and developing its own securities laws, the cost and complexities of asking this Court to expend resources in determining multiple crucial legal issues of first impression—also constitute powerful public interest factors in favor of dismissal.  *See Boston Telecomms.*, 588 F.3d at 1211 (identifying the following "public interest" factors:  "(1) the local interest in the lawsuit, (2) the court's familiarity with the governing law, (3) the burden on local courts and juries, (4) congestion in the court, and (5) the costs of resolving a dispute unrelated to a particular forum.").  And when the public interest factors are as clear-cut as here, they alone are sufficient to invoke forum non conveniens dismissal.[28]

### ii.  The Private Interest Factors Also Favor Dismissal

The "private interest" factors include: "(1) the residence of the parties and the witnesses; (2) the forum's convenience to the litigants; (3) access to physical evidence and other sources of proof; (4) whether unwilling witnesses can be compelled to testify; (5) the cost of bringing witnesses to trial; (6) the enforceability of the judgment; and (7) all other practical problems that make trial of a case easy, expeditious and inexpensive."  *Boston Telecomms.*, 588 F.3d at 1206-07 (citation omitted).

Here, the residence and convenience of the parties and witnesses strongly weigh

---

[28] *See, e.g., Taylor v. Tesco Corp. (US)*, No. 09-3404, 2010 WL 4539394, at *6 (E.D. La. Nov. 3, 2010) ("Dismissal may be appropriate in light of the public factors even if the private factors do not favor dismissal."); *German Free State of Bavaria v. Toyobo Co. Ltd.*, 480 F. Supp. 2d 948, 957 (W.D. Mich. 2007) ("[T]he *Gilbert* private interest factors weigh slightly in the favor of retaining the case. [But] [t]he determining factors are the public interest factors where Germany has a strong local interest in this action and . . . German law would apply."); *Penwest Dev. Corp. Ltd. v. Dow Chem. Co.*, 667 F. Supp. 436, 443 (E.D. Mich. 1987) (same).  *See also Ford*, 319 F.3d at 1310 & n.24 (noting that a foreign rule of decision is a "very important factor" and holding that "the foreign country is ordinarily the best place to litigate a dispute revolving around a foreign rule of decision"); *Sigalas v. Lido Maritime, Inc.*, 776 F.2d 1512, 1520 (11th Cir. 1985) ("[T]he Supreme Court has suggested firmly that, unless there is some idiosyncrasy in the facts of a case to be resolved under foreign law, it should ordinarily be dismissed in favor of a foreign tribunal.").

in favor of dismissal because the parties and many pertinent witnesses reside in the alternative forum. *See, e.g., Gates Learjet Corp. v. Jensen*, 743 F.2d 1325, 1335 (9th Cir. 1984) (focusing on the "materiality and importance of the anticipated witnesses' testimony" rather than "the number of witnesses in each location"); *Chateau des Charmes Wines Ltd. v. Sabate USA, Inc.*, No. C-01-4203-MMC, 2003 U.S. Dist. LEXIS 20337, at *16-19 (N.D. Cal. Nov. 12, 2003) (noting the foreign residences of parties and witnesses). Here, TMC is a Japanese corporation with its principal executive offices in Japan. (Compl. ¶ 34.) Messrs. Cho and Watanabe, the only individual defendants, are residents and citizens of Japan. (*See* Declaration of Yusuke Nishimoto ¶¶ 2-3.) As explained above, even the Japanese Law Claim class members themselves are overwhelmingly non-U.S. residents. (*See* Section D.1., *supra*.)

The likely unenforceability of any U.S. judgment also is a powerful private factor in favor of dismissal. (*See* Section D.1., *supra*.) And the remaining largely administrative private factors—the location of the individual named defendants in Japan and the need for translation of the Japanese-language documents—also favor Japan at least as much as trial in California.

## IV. CONCLUSION

For these and all of the foregoing reasons, Defendants respectfully request that the Court grant their motion to dismiss the Complaint in its entirety with prejudice.

DATED: January 20, 2011          SHEARMAN & STERLING LLP

By: _____/s/ Stuart J. Baskin_____
          Stuart J. Baskin

GIBSON, DUNN & CRUTCHER LLP

By: _____/s/ Kay E. Kochenderfer_____
          Kay E. Kochenderfer

Attorneys for Defendants Toyota Motor Corporation, Toyota Motor North America, Inc., Toyota Motor Sales, U.S.A., Inc., Yoshimi Inaba, James E. Lentz III, Irving A. Miller, Robert S. Carter and Robert C. Daly