BERNSTEIN LITOWITZ BERGER
     & GROSSMANN LLP
BLAIR A. NICHOLAS  (Bar No. 178428)
(blairn@blbglaw.com)
DAVID R. STICKNEY  (Bar No. 188574)
(davids@blbglaw.com)
BENJAMIN GALDSTON (Bar No. 211114)
(beng@blbglaw.com)
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:   (858) 793-0070
Fax:   (858) 793-0323

*Counsel for Lead Plaintiff Maryland State
Retirement and Pension System and Lead Counsel
for the Class*

FAIRBANK & VINCENT
ROBERT H. FAIRBANK
(Bar No. 76359)
(rfairbank@fairbankvincent.com)
DIRK L. VINCENT
(Bar No. 157961)
(dvincent@fairbankvincent.com)
444 S. Flower Street, Suite 3860
Los Angeles, CA 90071
Tel:   (213) 891-9010
Fax:   (213) 891-9011

*Liaison Counsel for the Class*

(Additional Counsel listed on signature page)

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE TOYOTA MOTOR CORPORATION SECURITIES LITIGATION | Master File No. CV 10-922 DSF (AJWx) |
| | **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT** |
| | Date:        June 6, 2011 |
| | Time:        1:30 p.m. |
| | Courtroom: 840 |
| | Judge:       Dale S. Fischer |

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................ iii

TABLE OF DEFINED TERMS .................................................................. xii

I.    INTRODUCTION ................................................................................1

II.   SUMMARY OF THE ALLEGATIONS .............................................5

III.  THE COMPLAINT STATES CLAIMS FOR DEFENDANTS'
      VIOLATIONS OF THE EXCHANGE ACT ......................................8

      A.    The Complaint Alleges Claims Under Section
            10(b) ........................................................................................8

            1.    Defendants' Materially False Statements And
                  Omissions .......................................................................9

                  a)    Defendants' Repeated Assurances Of
                        Safety, Quality And Legal Compliance
                        Were Materially False And Misleading ................9

                  b)    Defendants Misleadingly Attributed
                        "Record" Results To Cost Reduction Efforts
                        Without Disclosing Quality And Safety
                        Lapses .................................................................14

                  c)    Defendants Falsely Denied Toyota's
                        Unintended Acceleration Problems ...................15

            2.    The Complaint Raises A Strong Inference Of
                  Scienter As To Each Defendant ....................................16

                  a)    Defendants' Admissions And Internal
                        Documents Support Scienter ............................17

                  b)    Defendants' Cover-Up Of Unintended
                        Acceleration Problems Supports A Strong
                        Inference Of Scienter ........................................18

                  c)    The Complaint Alleges Toyota's Corporate
                        Scienter ...............................................................23

            3.    Loss Causation Is Adequately Pled ...........................26

      B.    The Complaint Adequately Pleads Control Person
            Liability Under Section 20(a) ................................................28

IV.   THE COMPLAINT STATES CLAIMS UNDER JAPANESE
      SECURITIES LAW THAT SHOULD BE TRIED WITH THE
      EXCHANGE ACT CLAIMS ............................................................29

      A.    The Court Has Original Jurisdiction Over The
            Japanese Law Claims Under CAFA .......................................29

B.  Supplemental Jurisdiction Is Appropriate Because The Japanese Law Claims Form Part Of The Same Case Or Controversy As The Exchange Act Claims...............................................................30

1.  The Japanese Law Claims Present No Novel Or Complex Issues ....................................................32

2.  The Japanese Law Claims Do Not Substantially Predominate Over the Exchange Act Claims .........................33

3.  No Exceptional Circumstance Exists To Prevent Supplemental Jurisdiction.........................................34

C.  Adjudication Of The Japanese Law Claims Does Not Offend International Comity .......................................36

D.  This District Is An Appropriate Forum ..............................38

V.  CONCLUSION.............................................................40

# TABLE OF AUTHORITIES

<u>Cases</u>                                                                <u>Page(s)</u>

*Acri v. Varian Assocs., Inc.,*
    114 F.3d 999 (9th Cir. 1997) ...............................................................34

*In re Action Performance Cos. Sec. Litig.,*
    2007 WL 496770 (D. Ariz. Feb. 13, 2007) ........................................15

*In re Adaptive Broadband Sec. Litig.,*
    2002 WL 989478 (N.D. Cal. Apr. 2, 2002)................................18, 29

*Aldridge v. A.T. Cross Corp.,*
    284 F.3d 72 (1st Cir. 2002)................................................................17

*Allison v. Brooktree Corp.,*
    999 F. Supp. 1342 (S.D. Cal. 1998)............................................12, 14

*Allstate Life Ins. Co. v. Robert W. Baird & Co., Inc.,*
    2010 WL 4581242 (D. Ariz. Nov. 4, 2010) ......................................24

*In re Alstom SA Sec. Litig.,*
    741 F. Supp. 2d 469 (S.D.N.Y. 2010) ...............................................31

*In re Apple Computer, Inc. Sec. Litig.,*
    243 F. Supp. 2d 1012 (N.D. Cal. 2002).......................................21, 22

*In re Apple Computer, Inc. Sec. Litig.,*
    886 F.2d 1109 (9th Cir. 1989) .............................................................9

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.,*
    324 F. Supp. 2d 474 (S.D.N.Y. 2004) ...............................................21

*Atlas v. Accredited Home Lenders Holding Co.,*
    556 F. Supp. 2d 1142 (S.D. Cal. 2008) ..................................10, 11, 22

*Basic, Inc. v. Levinson,*
    485 U.S. 224 (1988)......................................................................9, 33

*Beck v. Pace Int'l Union,*
    427 F.3d 668 (9th Cir. 2005) .............................................................30

*Berson v. Applied Signal Tech., Inc.,*
    527 F.3d 982 (9th Cir. 2008) ......................................................passim

*Borough of W. Mifflin v. Lancaster*,
   45 F.3d 780 (3d Cir. 1995) .......................................................................34

*Boston Telecommc'ns Grp. v. Wood*,
   588 F.3d 1201 (9th Cir. 2009) ...................................................................39

*Brodsky v. Yahoo! Inc.*,
   630 F. Supp. 2d 1104 (N.D. Cal. 2009)......................................................12

*Brody v. Transitional Hosps. Corp.*,
   280 F.3d 997 (9th Cir. 2002) .....................................................................15

*In re Cadence Design Sys., Inc. Sec. Litig.*,
   654 F. Supp. 2d 1037 (N.D. Cal. 2009)......................................................24

*In re Cadence Design Sys., Inc. Sec. Litig.*,
   692 F. Supp. 2d 1181 (N.D. Cal. 2010)......................................................29

*Cariajano v. Occidental Petroleum Corp.*,
   626 F.3d 1137 (9th Cir. 2010) .........................................................38, 39, 40

*Casella v. Webb*,
   883 F.2d 805 (9th Cir. 1989) .....................................................................10

*In re Cell Therapeutics, Inc. Class Action Litig.*,
   2011 WL 444676 (W.D. Wash. Feb. 4, 2011)............................................26

*Chamberlain v. Reddy Ice Holdings, Inc.*,
   2010 WL 5056184 (E.D. Mich. Dec. 6, 2010) ...........................................19

*Commc'ns Workers of Am. v. CSK Auto Corp.*,
   525 F. Supp. 2d 1116 (D. Ariz. 2007) ..........................................................8

*In re Connetics Corp. Sec. Litig.*,
   542 F. Supp. 2d 996 (N.D. Cal. 2008)........................................................14

*In re Countrywide Fin. Corp. Deriv. Litig.*,
   542 F. Supp. 2d 1160 (C.D. Cal. 2008) ......................................................11

*Creative Tech. Ltd., v. Aztech Sys. PTE, Ltd.*,
   61 F.3d 696 (9th Cir. 1995) .......................................................................31

*In re Cutera Sec. Litig.*,
   610 F.3d 1103 (9th Cir. 2010) ...................................................................12

*In re CV Therapeutics, Inc. Sec. Litig.*,
   2004 WL 1753251 (N.D. Cal. Aug. 5, 2004) ....................................................24

*CYBERsitter, LLC v. People's Republic of China*,
   2010 WL 4909958 (C.D. Cal. Nov. 18, 2010) ..................................................38

*In re Daou Sys., Inc.*,
   411 F.3d 1006 (9th Cir. 2005) .......................................................21, 26, 27

*DiRienzo v. Philip Servs. Corp.*,
   294 F.3d 21 (2d Cir. 2002) .............................................................31, 39

*Dura Pharms. Inc. v. Broudo*,
   544 U.S. 336 (2005)......................................................................3, 26

*E. & J. Gallo Winery v. Proximo Spirits, Inc.*,
   2010 WL 4070643 (E.D. Cal. Oct. 18, 2010)...................................................24

*Edwards v. Marin Park, Inc.*,
   356 F.3d 1058 (9th Cir. 2004) ...............................................................9

*In re Entropin, Inc. Sec. Litig.*,
   487 F. Supp. 2d 1141 (C.D. Cal. 2007) .......................................................24

*Exec. Software N. Am., Inc. v. U.S. Dist. Ct.*,
   24 F.3d 1545 (9th Cir. 1994) ..............................................................32

*In re Ford Motor Co. Sec. Litig.*,
   381 F.3d 563 (6th Cir. 2004) ..............................................................13

*Fouad v. Isilon Sys., Inc.*,
   2008 WL 5412397 (W.D. Wash. Dec. 29, 2008) ...............................................18

*In re Foundry Networks, Inc. Sec. Litig.*,
   2003 WL 22077729 (N.D. Cal. Aug. 29, 2003) ................................................12

*In re FoxHollow Techs., Inc., Sec. Litig.*,
   2008 WL 2220600 (N.D. Cal. May 27, 2008)...................................................15

*In re Gilead Scis. Sec. Litig.*,
   536 F.3d 1049 (9th Cir. 2008) ............................................................26

*Glazer Capital Mgmt., LP v. Magistri*,
   549 F.3d 736 (9th Cir. 2008) ..........................................................23, 24

*Hanon v. Dataproducts Corp.*,
   976 F.2d 497 (9th Cir. 1992) .......................................................10, 12

*Hartford Fire Ins. Co. v. Calif.*,
   509 U.S. 764 (1993)............................................................................36

*Hodges v. Akeena Solar, Inc.*,
   2010 WL 3705345 (N.D. Cal. May 20, 2010)....................................27

*In re Honda Am. Motor Co.*,
   168 F.R.D. 535 (D. Md. 1996) ...........................................................37

*Howard v. Everex Sys.*,
   228 F.3d 1057 (9th Cir. 2000) ............................................................28

*In re Hypercom Corp. Sec. Litig.*,
   2006 WL 726791 (D. Ariz. Jan. 25, 2006) .........................................21

*In re Immune Response Sec. Litig.*,
   375 F. Supp. 2d 983 (S.D. Cal. 2005)................................................22

*In re Impac Mortg. Holdings, Inc. Sec. Litig.*,
   554 F. Supp. 2d 1083 (C.D. Cal. 2008) .............................................12

*In re Impax Labs., Inc. Sec. Litig.*,
   2007 WL 7022753 (N.D. Cal. July 18, 2007) ....................................18

*Iragorri v. United Techs. Corp.*,
   274 F.3d 65 (2d Cir. 2001) .................................................................39

*ITSI T.V. Prods., Inc. v. Calif. Auth. of Racing Fairs*,
   785 F. Supp. 854 (E.D. Cal. 1992) ....................................................31

*Johnson v. Aljian*,
   394 F. Supp. 2d 1184 (C.D. Cal. 2004) .............................................12

*In re Juniper Networks, Inc. Sec. Litig.*,
   542 F. Supp. 2d 1037 (N.D. Cal. 2008)..............................................16

*Kane v. Madge Networks N.V.*,
   2000 WL 33208116 (N.D. Cal. May 26, 2000)...................................12

*Kaplan v. Rose*,
   49 F.3d 1363 (9th Cir. 1994) ..............................................................28

*Krish v. Balasubramaniam,*
  2007 WL 1219281 (E.D. Cal. Apr. 25, 2007) ....................................40

*Kuehbeck v. Genesis Microchip Inc.,*
  2005 WL 1787426 (N.D. Cal. July 27, 2005) ....................................28

*LaSala v. Bordier et Cie,*
  519 F.3d 121 (3rd Cir. 2008) ..............................................30

*In re Lattice Semiconductor Corp. Sec. Litig.,*
  2006 WL 538756 (D. Or. Jan. 3, 2006) ............................................23

*Lindsay v. Gov't Emps. Ins. Co.,*
  448 F.3d 416 (D.C. Cir. 2006)..............................................30

*Litwin v. Blackstone Gr., L.P.,*
  --- F.3d ---, 2011 WL 447050 (2d Cir. Feb. 10, 2011) .......................14

*Lormand v. US Unwired, Inc.,*
  565 F.3d 228 (5th Cir. 2009) ......................................17, 26

*In re Lucent Techs., Inc. Sec. Litig.,*
  217 F. Supp. 2d 529 (D.N.J. 2002)..............................................26

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.,*
  513 F.3d 702 (7th Cir. 2008) .....................................20, 24

*In re MCI Worldcom, Inc. Sec. Litig.,*
  93 F. Supp. 2d 276 (E.D.N.Y. 2000) ............................................25

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit,*
  547 U.S. 71 (2006)..............................................29, 30

*In re Metro. Sec. Litig.,*
  532 F. Supp. 2d 1260 (E.D. Wash. 2007).............................................30

*Middlesex Ret. Sys. v. Quest Software, Inc.,*
  527 F. Supp. 2d 1164 (C.D. Cal. 2007) ............................................16

*Miss. Pub. Emps. Ret. Sys. v. Boston Scientific Corp.,*
  523 F. 3d 75 (1st Cir. 2008)..............................................21

*Morgan v. AXT, Inc.,*
  2005 WL 2347125 (N.D. Cal. Sept. 23, 2005) ....................................10

*Morrison v. Nat. Austl. Bank Ltd.*,
  130 S. Ct. 2869 (2010)...................................................................3, 37

*Mujica v. Occidental Petroleum Corp.*,
  381 F. Supp. 2d 1134 (C.D. Cal. 2005) .......................................36, 39

*Neuralstem, Inc. v. ReNeuron, Ltd.*,
  365 Fed. Appx. 770 (9th Cir. 2010)..................................................40

*In re New Century*,
  588 F. Supp. 2d 1206 (C.D. Cal. 2008) .......................................11, 26

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W.*
  *Holding Corp.*,
  320 F.3d 920 (9th Cir. 2003) .......................................................12, 21

*Nordstrom, Inc. v. Chubb & Son, Inc.*,
  54 F.3d 1424 (9th Cir. 1995) ..............................................................24

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
  380 F.3d 1226 (9th Cir. 2004) ............................................................21

*Osher v. JNI Corp.*,
  308 F. Supp. 2d 1168 (S.D. Cal. 2004) ..............................................15

*Paracor Fin., Inc. v. G.E. Capital Corp.*,
  96 F.3d 1151 (9th Cir. 1996) ..............................................................28

*Piper Aircraft Co. v. Reyno*,
  454 U.S. 235 (1981)............................................................................40

*Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys., Inc.*,
  411 F. Supp. 2d 1172 (N.D. Cal. 2005)..............................................27

*Plumbers Union Local No. 12 Pension Fund v. Ambassador's Grp.*,
  717 F. Supp. 2d 1170 (E.D. Wash. 2010)...........................................21

*Plumbers Union Local No. 12 Pension Fund v. Swiss Reinsurance Co.*,
  2010 WL 3860397 (S.D.N.Y. Oct. 4, 2010)..........................................3

*In re PMI Grp., Inc. Sec. Litig.*,
  2009 WL 3681669 (N.D. Cal. Nov. 2, 2009) ......................................22

*Proctor v. Vishay Intertechnology Inc.*,
  584 F.3d 1208 (9th Cir. 2009) ............................................................29

*In re Ramp Networks, Inc. Sec. Litig.*,
  201 F. Supp. 2d 1051 (N.D. Cal. 2002)............................................................28

*In re REMEC Inc. Sec. Litig.*,
  702 F. Supp. 2d 1202 (S.D. Cal. 2010) ............................................................11

*Rosado v. Wyman*,
  397 U.S. 397 (1970)...........................................................................................34

*In re Royal Ahold N.V. Sec. & ERISA Litig.*,
  351 F. Supp. 2d 334 (D. Md. 2004)...................................................................38

*S. Ferry LP, No. 2 v. Killinger*,
  542 F.3d 776 (9th Cir. 2008) .....................................................................16, 20

*Scritchfield v. Paolo*,
  274 F. Supp. 2d 163 (D.R.I. 2003) ...................................................................10

*SEC v. Fehn*,
  97 F.3d 1276 (9th Cir. 1996) ............................................................................14

*SEC v. Phan*,
  500 F.3d 895 (9th Cir. 2007) ..............................................................................9

*Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*,
  130 S. Ct. 1431 (2010).......................................................................................37

*In re Silicon Graphics Inc. Sec. Litig.*,
  183 F.3d 970 (9th Cir. 1999) ............................................................................16

*Silverman v. Smithkline Beecham Corp.*,
  2007 WL 3072274 (C.D. Cal. Oct. 16, 2007) (Fischer, J.) .........................30, 32

*In re Simon*,
  153 F.3d 991 (9th Cir. 1998) .......................................................................36, 37

*Stackhouse v. Toyota Motor Co.*,
  2010 WL 3377409 (C.D. Cal. July 16, 2010).......................................................3

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
  552 U.S. 148 (2008).............................................................................................8

*In re Syncor Int'l Corp. Sec. Litig.*,
  239 Fed. Appx. 318 (9th Cir. 2007)...................................................................15

*In re Syntex Corp. Sec. Litig.*,
   855 F. Supp. 1086 (N.D. Cal. 1994)......................................................12

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap., Inc.*,
   531 F.3d 190 (2d Cir. 2008) ................................................................24

*Teamsters Local 617 Pension & Welfare Funds v. Apollo Grp., Inc.*,
   690 F. Supp. 2d 959 (D. Ariz. 2010) ..............................................28, 29

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)...................................................................passim

*TSC Indus., Inc. v. Northway, Inc.*,
   426 U.S. 438 (1976)..............................................................2, 9, 10

*Twinde v. Threshold Pharms., Inc.*,
   2009 WL 928132 (N.D. Cal. Apr. 3, 2009).......................................14

*United Mine Workers of Am. v. Gibbs*,
   383 U.S. 715 (1966)........................................................30, 33, 34

*In re Valence Tech. Sec. Litig.*,
   1995 WL 274343 (N.D. Cal. May 8, 1995)........................................25

*In re ValuJet, Inc. Sec. Litig.*,
   984 F. Supp. 1472 (N.D. Ga. 1997)..................................................12

*In re Vantive Corp. Sec. Litig.*,
   283 F.3d 1079 (9th Cir. 2002) ....................................................21, 23

*In re VeriFone Sec. Litig.*,
   784 F. Supp. 1471 (N.D. Cal. 1992)......................................12, 13, 15

*In re Viropharma, Inc. Sec. Litig.*,
   2003 WL 1824914 (E.D. Pa. Apr. 7, 2003).........................................2

*Warshaw v. Xoma Corp.*,
   74 F.3d 955 (9th Cir. 1996) .......................................................10, 13

*X17, Inc. v. Hollywood.TV, Inc.*,
   2008 WL 4527865 (C.D. Cal. June 24, 2008).....................................31

**STATUTES, RULES & REGULATIONS**

15 U.S.C.
   § 77r ..................................................................................30

§ 78aa ....................................................................................37

§ 78t(a) ..................................................................................28

§ 78u-4(b)(1) ...........................................................................9

28 U.S.C.

§ 1332(d)(2) ..........................................................................29

§ 1367(a) ..........................................................................passim

§ 1367(b) and (c) ...................................................................32

§ 1367(c)(1) ..........................................................................32

Federal Rules of Civil Procedure

Rule 8(a)...................................................................8, 26, 28

Rule 9(b) .......................................................................9

Rule 10b-5...................................................................8, 14, 15

Rule 12(b)(6)...............................................................8, 26

Rule 15(a)...........................................................................40

Rule 44.1 .....................................................................31, 40

## TABLE OF DEFINED TERMS

| ABBREVIATION | DESCRIPTION |
|---|---|
| ADSs | American Depositary Shares. |
| App. | The Appendix attached to the Complaint. |
| Article 21-2 | Article 21-2 of the FIEA. |
| CAFA | The Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). |
| Carter | Robert S. Carter, Toyota USA Group Vice President and General Manager for the Toyota Division.  ¶47. |
| Cho | Fujio Cho, Toyota Chairman and Representative Director. ¶42. |
| Class | With respect to Plaintiffs' Exchange Act claims, (a) all persons and entities who purchased or otherwise acquired Toyota ADSs during the Class Period, and (b) all persons and entities who purchased or otherwise acquired Toyota common stock in domestic transactions during the Class Period; and with respect to Plaintiffs' Japanese law claims, all persons and entities who purchased or otherwise acquired Toyota common stock during the Class Period.  ¶191. |
| Class Period | May 10, 2005 through February 2, 2010, inclusive.  ¶191. |
| Company | Toyota.  ¶¶34-36. |
| Complaint | Plaintiffs' Consolidated Class Action Complaint, filed Oct. 4, 2010 [ECF No. 174]. |
| Corporate Defendants | Toyota, Toyota NA and Toyota USA.  ¶¶34-40. |
| Daly | Robert C. Daly, Toyota USA Senior Vice President and Executive Committee Member.  ¶48. |
| Defendants | Toyota, Toyota NA, Toyota USA, Carter, Cho, Daly, Inaba, Kinoshita, Lentz, Miller, and Watanabe. |
| FIEA | Financial Instruments and Exchange Act of Japan. |
| Inaba | Yoshimi Inaba, Toyota NA President and Chief Operating Officer, Toyota USA Chairman and CEO, and Toyota Director.  ¶44. |
| Individual Defendants | Carter, Cho, Daly, Inaba, Kinoshita, Lentz, Miller, and Watanabe.  ¶¶41-49. |
| Kinoshita | Mitsuo Kinoshita, Toyota Executive Vice President and Director.  ¶43. |

| ABBREVIATION | DESCRIPTION |
|---|---|
| LaHood | Raymond LaHood, U.S. Transportation Secretary. |
| Lead Plaintiff | The Maryland State Retirement and Pension System. ¶31. |
| Lentz | James E. Lentz III, Toyota USA President and Chief Operating Officer and Toyota Managing Officer. ¶45. |
| MDL action | *In re Toyota Motor Corp. Unintended Acceleration, Marketing, and Sales Practices Litigation*, MDL No. 2151-JVS (FMOx) (C.D. Cal.). |
| Miller | Irving A. Miller, Toyota USA Group Vice President of Environmental and Public Affairs until Feb. 1, 2010. ¶46. |
| Motion or Mot. | The Defendants' Notice Of Motion And Motion To Dismiss The Consolidated Class Action Complaint; Memorandum Of Points And Authorities In Support Thereof [ECF No. 180]. |
| Namekata Decl. | The Declaration Of Kunio Namekata In Support Of Motion To Dismiss Plaintiffs' Consolidated Class Action Complaint [ECF No. 182]. |
| NHTSA | The National Highway Traffic Safety Administration. |
| ¶ | Paragraphs in the Complaint, unless otherwise noted. |
| Plaintiffs | The Lead Plaintiff, Fresno County Employees' Retirement Association, and Robert M. Moss. ¶¶31-33. |
| PSLRA | The Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4. |
| Running Changes | Mid-production design changes to correct defects, often without disclosure to NHTSA, customers or investors. ¶62. |
| Tokumoto Decl. | The Joint Declaration Of Professor Minoru Tokumoto And Eiji Masuda In Support Of Plaintiffs' Opposition To Defendants' Motion To Dismiss The Consolidated Class Action Complaint. |
| Toyota | Toyota Motor Corporation. ¶¶34-36, 39-40. |
| Toyota NA | Toyota Motor North America, Inc. ¶37. |
| Toyota USA | Toyota Motor Sales, U.S.A., Inc. ¶38. |
| Watanabe | Katsuaki Watanabe, Toyota Vice Chairman and Representative Director. ¶41. |
| Wilson Decl. | The Declaration Of Professor Matthew J. Wilson In Support Of Plaintiffs' Opposition To Defendants' Motion To Dismiss The Consolidated Class Action Complaint. |

Plaintiffs respectfully submit this memorandum of law in opposition to Defendants' motion to dismiss the Complaint.[1]

## I.   __INTRODUCTION__

This is a securities class action on behalf of purchasers of Toyota securities, asserting claims pursuant to § 10(b) the Securities Exchange Act and Article 21-2 of Japan's FIEA.  As explained below, the Complaint is a well-pleaded document that fully complies with Supreme Court and Ninth Circuit precedent, and the PSLRA's pleading requirements.  By contrast, Defendants' Motion mischaracterizes the Complaint's allegations, attempts to spin the facts and ignores or glosses over allegations explaining Defendants' materially false and misleading statements and scienter.

As alleged in the Complaint, Defendants repeatedly assured investors, regulators and consumers that Toyota vehicles were "safe" and of the "highest quality," and that Toyota "complied with all laws."  Promoting its reputation for quality and safety, Toyota surpassed General Motors Corporation in 2008 to become the world's largest automaker.  Defendants, however, knew that drastic cost-cutting measures had undercut quality and that serious, undisclosed problems affected nearly every model in Toyota's line-up.  Rather than immediately notifying investors and regulators and properly undertaking recalls as required by law, Defendants deliberately covered up the truth by misleading NHTSA, denying defects and publicly reiterating Toyota's "strong commitment" to superior quality and safety.  Ultimately, when unintended acceleration problems became known, Toyota was forced to issue the largest, costliest vehicle recalls in history, suspend production of its best-selling models and pay record fines to NHTSA.  In total, over $30 billion of market capitalization – more than one-fifth of Toyota's value – was wiped out when Toyota finally began to reveal the truth.

---

[1] Plaintiffs respectfully refer the Court to the Table of Defined Terms at pp. xii-xiii for definitions of terms used throughout this Opposition.

In their motion, Defendants characterize 26 of their false statements as "immaterial." Materiality, however, is a question for the jury and ordinarily not decided on a motion to dismiss. *See TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976). If, after the record is developed, Defendants wish to argue at trial that facts about the quality and safety of Toyota vehicles did not alter the "total mix" of information available to investors, they may do so. At this stage, however, the Complaint amply explains the materiality of Defendants' misstatements. Defendants' representations about safety and quality went to the heart of Toyota's reputation and consumer appeal. As Judge Selna found when denying in part defendants' motion to dismiss the MDL action: "The Court is convinced that a safety consideration as fundamental as whether a car is able to stop when the brakes are applied is material."[2] Because safety considerations are material to Toyota customers, such facts affect sales and are *a fortiori* material to investors. As one court explained in a similar context, "it would be [a] sad day when a court could determine that misstatements about whether a company's primary product worked did not alter the 'total mix' of information available in the market."[3]

The Complaint also raises a strong inference of scienter. Defendants simply ignore key allegations, including admissions that the Company's cost cutting caused quality and safety problems when Toyota "became insensitive to vehicle failings and defects." ¶21. Moreover, allegations of deliberate concealment,

---

[2] MDL Action, Nov. 30, 2010 Order Granting In Part And Denying In Part Defendants' Motion To Dismiss And Motion To Strike [ECF No. 510] at 42, 83. In another products liability class action pending in this District, Judge Carney largely denied Toyota's and Toyota USA's motion to dismiss, finding that defendants' failure to disclose a defect related to vehicle braking "was material . . . because Plaintiffs alleged that the undisclosed defect posed and poses a safety risk," which was inconsistent with Toyota's claims of safety and functionality. *In re Toyota Motor Corp. Hybrid Brake Mktg., etc.*, No. 10-2172-CJC (RNBx), Order Granting In Part And Denying In Part Defendants' Motion To Dismiss [ECF No. 27] at 6-7.

[3] *In re Viropharma, Inc. Sec. Litig.*, 2003 WL 1824914, at *6 (E.D. Pa. Apr. 7, 2003).

---

including deceiving regulators and other surreptitious "countermeasures," such as mid-production "running changes" and "good will" repairs, also support the strong inference of scienter. Indeed, Toyota executives internally boasted of saving more than $100 million by convincing NHTSA to limit or resolve safety investigations. ¶7. Under these circumstances, and given that the extensive problems affected Toyota's core business, it is incredible for Defendants to suggest that Toyota's executives did not know about the undisclosed problems. The inference is particularly compelling here because Toyota publicly promoted its "Toyota Way" management structure as a means of keeping management thoroughly informed to assure quality. ¶¶54, 162.

As for loss causation, the Complaint provides, as required, "some indication of the loss and the causal connection" to the misstatements. *Dura Pharms. Inc. v. Broudo*, 544 U.S. 336, 337 (2005). Throughout the Class Period, the price of Toyota's ADSs and common stock was artificially inflated as a direct result of Defendants' material misrepresentations and omissions regarding the safety and quality of Toyota vehicles and their concealment of the unintended acceleration problem.[4] When the truth about Toyota's unintended acceleration problems became known through a series of partial disclosures between September 14, 2009,

---

[4] ¶179. Defendants do not dispute that the Exchange Act applies to Toyota ADSs. Instead, Defendants wrongly contend that *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869 (2010) bars Toyota common stock investors' § 10(b) claims. Under *Morrison* § 10(b) applies to "domestic transactions in other securities" (*id*. at 2884), which this Court previously noted likely "means purchases and sales of securities explicitly solicited by the issuer within the United States." *Stackhouse v. Toyota Motor Co.*, 2010 WL 3377409, at *1 (C.D. Cal. July 16, 2010); *cf. Plumbers Union Local No. 12 Pension Fund v. Swiss Reinsurance Co.*, 2010 WL 3860397, at *8-9 (S.D.N.Y. Oct. 4, 2010) ("[t]here may be unique circumstances in which an issuer's conduct takes a sale or purchase outside [*Morrison's*] rule."). Plaintiffs allege such explicit solicitation here. ¶¶41-43, 203, 210. Accordingly, the Class is properly pled to include investors who purchased or acquired Toyota common stock in domestic transactions.

and February 3, 2010, the price of Toyota securities declined significantly as the inflation was removed.  ¶¶178-187.

In addition to stating claims pursuant to the Exchange Act, the Complaint also alleges violations of Article 21-2 of Japan's FIEA on behalf of Toyota common stock purchasers.  The Court has both diversity jurisdiction over these claims under CAFA, and supplemental jurisdiction because the claims form part of the same case or controversy as the Exchange Act claims.  *See* 28 U.S.C. § 1367(a).

Defendants mistakenly contend that Toyota common stock is a "covered security" and excluded under CAFA.  This exclusion, however, applies only to securities that are listed *for trading* on a national exchange, which Toyota common stock is not.  Defendants also urge the Court to refuse supplemental jurisdiction based on Defendants' contrived speculation.  As demonstrated below and in the accompanying declarations, the Japanese law claims do not require the Court to decide any "novel or complex issue" nor do they substantially predominate over the Exchange Act claims.  Article 21-2 is modeled after and is very similar to § 10(b), with the notable absence of any scienter requirement under the Japanese statute.  Moreover, no "exceptional circumstances" or "compelling reasons" favor declining supplemental jurisdiction.   Among other things, judicial economy strongly favors resolution of the Japanese law claims concurrently with the federal securities law claims, and any judgment would likely be enforceable by either party both in the United States and Japan.  Defendants' comity and *forum non conveniens* arguments also fail as Defendants can point to no real conflict of laws.  In addition, Toyota previously advocated venue in this District for the related MDL products liability cases based on convenience and Toyota's substantial U.S. presence.[5]

---

[5] *See* MDL action, Mar. 1, 2010, Toyota Defendants' Response In Support Of Transfer Of Actions To The Central District Of California [ECF No. 37], at 18.

## II.   SUMMARY OF THE ALLEGATIONS

Toyota is the world's largest automaker and the number one selling automotive brand in America.  ¶35.  During the Class Period, Toyota aggressively sought to become, and in 2008 succeeded in becoming, the top automaker by relentlessly assuring investors, regulators and consumers that its cars were safe and of the highest quality.  ¶50.  Beginning in 2000, however, Toyota drastically cut costs and expanded manufacturing capacity to increase market share and profitability.  ¶52.  While not disclosed, these cost-cutting measures caused significant deterioration in product quality, including unintended acceleration problems.  ¶¶53, 83.

Beginning around 2002, the Company received increasing complaints of unintended acceleration from Toyota owners.  ¶69.  Between September 2003 and March 2004, these complaints continued to increase, including eight reported deaths.  ¶76.  Unintended acceleration incidents were also documented through internal Field Technical Reports, including warnings of the "extremely dangerous problem."  ¶73.  By mid-2004, Toyota had received more than 100 consumer complaints relating to unintended acceleration, and complaints from Toyota dealers that unintended acceleration was a "*franchise threatening*" problem.  ¶80.

In 2006, Toyota factory workers in Japan warned Defendant Watanabe of the safety problems caused by Toyota's cost-cutting.  ¶84.  Because Toyota combined many vehicle platforms and parts across its entire model line, the workers warned that declining quality and safety problems "*involve the company's survival.*"  *Id.*  Despite their knowledge and reckless disregard of declining quality, Defendants claimed in 2007 "that quality is in fact getting better" (¶158) and that "none of our internal indicators indicated any problems" with Toyota models criticized by Consumer Reports.  ¶159.  By 2010, NHTSA had received over 3,000 Toyota unintended acceleration complaints, including reported accidents resulting in nearly 40 deaths.  ¶53.

Rather than disclose the truth, Defendants deliberately hid the problem by misleading NHTSA.  ¶61.  According to an internal email, Company executives privately boasted in 2007 that Toyota had saved more than $100 million by persuading NHTSA to *limit* the scope of investigations and *not* order a costly recall to prevent unintended acceleration.  ¶101.  This successful lobbying avoided, in Toyota's own words, "*catastrophic*" consequences to Toyota, both in terms of "*much bigger issues (and costs)*."  *Id*.  Defendants engaged in other surreptitious "countermeasures" to avoid recalls, including undisclosed "running changes" on assembly lines to address the problem in new vehicles – but without notifying owners of vehicles already on the road.  ¶62.  Toyota also issued numerous "technical service bulletins" to dealers to correct problems when cars were presented for service – often without informing owners or NHTSA.  *Id*.

When questioned about mounting reports of unintended acceleration in 2008, Toyota spokesman Bill Kwong denied the existence of any defects, claiming drivers were to blame for "not stepping on the brake" (¶166) or were "inspired by publicity."  ¶163.  Not until the deaths of a California Highway Patrolman and his family in September 2009 did Toyota finally recall approximately 3.8 million vehicles at NHTSA's request to replace defective floor mats that could "entrap" the gas pedal.  ¶114.  On news of the recall, the price of Toyota ADSs dropped to $82.46 and Toyota common stock fell to ¥3,710.  ¶180.

Toyota USA, however, persisted in claiming that the only defect involved floor mats.  ¶118.  NHTSA denounced these statements as "inaccurate and misleading."  *Id*.  On November 25, 2009, Toyota admitted for the first time that unintended acceleration was caused by a vehicle-based defect.  ¶120.  Specifically, the Company announced a new recall to correct defects related to the design of the accelerator pedal and the underlying floor surface.  *Id*.

In January 2010, Toyota announced yet another unintended acceleration recall – this time to fix a so-called "sticking" accelerator problem in 2.3 million

vehicles.  *Id.*  Toyota also halted the production and sale of eight of its most popular models for one week to correct the problem.  ¶126.  On this disclosure, the price of Toyota ADSs fell $2.25 to close at $88.17, and the price of Toyota common stock fell from ¥4,190 to ¥4,055.  ¶181.

In truth, the Defendants had known of or recklessly disregarded the unintended acceleration problems for years while repeatedly promoting Toyota's purported commitment to safety and quality.  ¶54.  Information about the unintended acceleration problems in Toyota vehicles was collected within Toyota and communicated to top executives, including the Individual Defendants, in several ways.  ¶55.  For example, Toyota's headquarters in Japan was regularly informed of problems through customer complaints, internal reports, and NHTSA investigations.  ¶56.  The "Toyota Way" – a highly centralized management structure – *required* Toyota's Japanese headquarters and senior managers to be informed about all important issues, including the quality and safety of Toyota vehicles.  *Id.*  Indeed, Toyota's Japanese leaders exercised an "iron grip" over global operations by shadowing American managers in their own offices with Japanese "coordinators," who reported to Toyota officials in Japan.  ¶40.  Toyota also maintained secret "Books of Knowledge" that included information about unintended acceleration and "countermeasures" to avoid disclosure.  ¶63.  In January 2010, Toyota executives revealed to NHTSA that the Company had known about accelerator pedal problems for more than one year.  ¶123.  Defendant Lentz also admitted on national television that the Company had been investigating unintended acceleration "for a long time" and had known of the accelerator pedal defect since at least October 2009.  ¶130.

In April 2010, NHTSA fined Toyota $16.4 million – the largest possible civil penalty and the largest in NHTSA's history – for failing to timely inform the public of safety problems, as required by law.  ¶139.  In announcing the fine, Secretary LaHood said: "We now have *proof* that Toyota *failed to live up to its*

*legal obligations* . . . . Worse yet, they *knowingly hid a dangerous defect* . . . from U.S. officials and did not take action to protect millions of drivers and their families." *Id.* According to NHTSA, Toyota "put consumers at risk" by "failing to report known safety problems." ¶22.

As of the filing of the Complaint, more than *10 million* Toyota vehicles (equal to nearly one-quarter of the vehicles Toyota sold worldwide during the Class Period) had been recalled to correct unintended acceleration-related defects, at a total cost estimated to exceed $5 billion.   ¶24.   Toyota's unintended acceleration recalls are the largest and most expensive recalls in automotive history.  *Id.*  As a result of Defendants' misconduct, over $30 billion of market capitalization – or one-fifth of Toyota's value – was erased.  *Id.*

## III.   THE COMPLAINT STATES CLAIMS FOR DEFENDANTS' VIOLATIONS OF THE EXCHANGE ACT

In assessing a Rule 12(b)(6) motion under the PSLRA, courts must consider the complaint in its entirety, "accept all factual allegations . . . as true," and construe them in the light most favorable to plaintiff. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *see also Commc'ns Workers of Am. v. CSK Auto Corp.*, 525 F. Supp. 2d 1116, 1120 (D. Ariz. 2007) (under *Tellabs*, "a tie [in competing inferences] goes to the Plaintiff").

### A.   The Complaint Alleges Claims Under Section 10(b)

To allege violations of § 10(b) and Rule 10b-5, a plaintiff must plead: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.  *See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).   The PSLRA's heightened pleading standard applies only to scienter.  All other elements of a § 10(b) claim are governed by Fed. R. Civ. P. 8(a) or 9(b) pleading standards.  *See Tellabs*, 551 U.S. at 314.

In compliance with the PSLRA and the Federal Rules, the Complaint and its Appendix identify 33 materially false and misleading statements and omissions, when and where each statement was made, the speaker, why each statement was false and misleading when made, and facts supporting a strong inference of scienter as to each Defendant.   ¶¶142-177; App. Nos. 1-33.   Nothing more is required.  *See* 15 U.S.C. § 78u-4(b)(1); *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1066 (9th Cir. 2004) (stating Rule 9(b) pleading requirements).

### 1.   Defendants' Materially False Statements And Omissions

#### a)   Defendants' Repeated Assurances Of Safety, Quality And Legal Compliance Were Materially False And Misleading

Defendants repeatedly assured investors during the Class Period that while Toyota was cutting costs and greatly increasing sales, it remained "dedicated to providing "safe products"; was "maintaining the world's highest levels of quality"; held a "strategic advantage" due to its research and focus on "vehicle safety"; was committed to "strict compliance with laws and regulations"; and emphasized that "Toyota's work in the area of vehicle safety is focused on the development of technologies designed to prevent accidents."  App. Nos. 1, 3-7, 9-12, 14-17, 22-23, 25, 27.  Defendant Watanabe was adamant: "Quality is Toyota's lifeline . . . . There will be no growth without quality."  App. No. 16.

Defendants characterize their statements as "immaterial."  Mot., 9-11.  A statement is material, however, if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (quoting *TSC Indus.*, 426 U.S. at 449).   The jury ordinarily decides materiality because the question is contextual and fact intensive.  *See SEC v. Phan*, 500 F.3d 895, 908 (9th Cir. 2007) (quoting *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1113 (9th Cir. 1989)).  As the Supreme Court explained, "[t]he question of materiality . . . is an objective

one, involving the significance of an omitted or misrepresented fact to a reasonable investor." *TSC Indus.*, 426 U.S. at 445.  Dismissal for immateriality is only appropriate where a statement is so obviously unimportant to an investor that "reasonable minds cannot differ on the question of materiality." *Id.* at 450; *see also Morgan v. AXT, Inc.*, 2005 WL 2347125, at *10 (N.D. Cal. Sept. 23, 2005) (whether defendants' "quality statements" are material "would require the Court to make factual findings," which are inappropriate at the motion to dismiss stage).

First, Defendants ask the Court to consider their statements separately and *in isolation*, devoid of their context.  Mot., 9-11.  The Ninth Circuit rejects this myopic approach.  *See*, *e.g.*, *Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989) ("What might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation.").  Even general statements of optimism, "when taken in context, may form a basis for a securities fraud claim."  *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996); *see also Hanon v. Dataproducts Corp.*, 976 F.2d 497, 502 (9th Cir. 1992).

Taken in context, the number, repetition, and subject matter of Defendants' statements about Toyota's core competitive advantages of quality and safety easily satisfy the materiality standard.  Such "quality" statements may be actionable where emphasized as a competitive advantage.  *See*, *e.g.*, *Scritchfield v. Paolo*, 274 F. Supp. 2d 163, 175 (D.R.I. 2003) (statement that company was the "'premier provider of high-speed DSL services in the Northeast corridor' . . . is much more than mere puffery; it is a statement of [the company's] present status and capabilities, and connotes that [it] is comparatively superior"); *Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1155 (S.D. Cal. 2008) (frequency of defendants' statements shows they are "among the most important information looked to by investors").  Since Toyota began selling cars in the U.S. during the 1950s, it steadily gained market share by repeatedly assuring Americans

that Toyota made the safest and highest-quality automobiles.  ¶¶50-51.  Toyota relentlessly sought to become and succeeded in replacing General Motors as the largest automaker in the world (¶53) during the Class Period, with U.S. sales accounting for approximately two-thirds of Toyota's profits (¶36).  Just as Toyota benefited from its reputation for quality and safety, its securities traded at a significant premium.

A reasonable investor would view Toyota's omitted facts leading to the world's largest auto recall as significant in the mix of information.  At the time that Defendants were touting Toyota's superior quality, safety and legal compliance, Toyota and the Individual Defendants were aware of and recklessly disregarded serious safety and quality problems, including unintended acceleration problems that affected nearly every Toyota model, as well as their own efforts to stymie NHTSA investigations, refusal to adopt brake override technology, and "countermeasures" to avoid costly recalls.  ¶¶63, 88-111; *see*, *e.g.*, *In re New Century*, 588 F. Supp. 2d 1206, 1225 (C.D. Cal. 2008) (statements about loan quality actionable where contradicted by contemporaneous undisclosed information) (citing *In re Countrywide Fin. Corp. Deriv. Litig.*, 542 F. Supp. 2d 1160 (C.D. Cal. 2008), and *Atlas*, 556 F. Supp. 2d at 1149).

Defendants' own cases acknowledge the point that even "soft" statements may be material when, as here, the statements concern critical aspects of the company's business and are at odds with information known or available to the defendants.  *See*, *e.g.*, *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1229-30 (S.D. Cal. 2010) (optimistic "soft" statements about future results were material where contradicted by internal forecasts of large losses).  Similarly, Defendants' repeated statements that Toyota strictly complied with all laws (App. Nos. 3, 6, 9, 12, 15, 23) were demonstrably false because Defendants were aware of and

directed violations of NHTSA reporting requirements (¶¶67, 71, 78, 88), for which NHTSA later excoriated Toyota and the Company paid huge fines.[6]

Defendants' remaining cases are easily distinguished.  Their cases, unlike the well-pled Complaint here, involve no detailed allegations of contemporaneous facts demonstrating falsity.[7]  Moreover, none of Defendants' cases involves the largest recalls and civil fines in history in a highly-regulated industry where defendants relentlessly promoted their safety, quality and regulatory compliance.

Second, materiality is demonstrated by the market's reaction to revelations about Toyota unintended acceleration.  Following the disclosures between September 14, 2009, and February 3, 2010, the market price for Toyota securities declined significantly, and Moody's downgraded Toyota's credit rating with a negative outlook, citing "product quality and recall challenges."[8]  Analysts also

---

[6] *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) ("[A] statement is misleading if it would give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists.'"); *Hanon*, 976 F.2d at 502 (statements emphasizing superior quality were material because "a reasonable jury could conclude that [the company] publicly released optimistic statements . . . when it knew [its products] could not be built reliably."); *In re ValuJet, Inc. Sec. Litig.*, 984 F. Supp. 1472, 1477-78 (N.D. Ga. 1997) (statement touting company's safety record as "among the very best" was material).

[7] Defendants' cases are inapposite because, unlike here, in each of Defendants' cases, plaintiffs either: (i) failed to allege falsity (*see In re Cutera Sec. Litig.*, 610 F.3d 1103, 1110 (9th Cir. 2010); *In re Impac Mortg. Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083, 1096-98 (C.D. Cal. 2008); *Kane v. Madge Networks N.V.*, 2000 WL 33208116, at *2-3 (N.D. Cal. May 26, 2000)); or (ii) failed to allege undisclosed contemporaneous adverse facts (*see Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1113-14 (N.D. Cal. 2009); *In re Syntex Corp. Sec. Litig.*, 855 F. Supp. 1086, 1096 (N.D. Cal. 1994); *In re Foundry Networks, Inc. Sec. Litig.*, 2003 WL 22077729, at *15-16 (N.D. Cal. Aug. 29, 2003); *Allison v. Brooktree Corp.*, 999 F. Supp. 1342, 1348 (S.D. Cal. 1998); *In re VeriFone Sec. Litig.*, 784 F. Supp. 1471, 1484-85 (N.D. Cal. 1992), *aff'd*, 11 F.3d 865 (9th Cir. 1993)).

[8] ¶¶141, 178-186; *see No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 935 (9th Cir. 2003) ("*Am. W. Holding*") (stock price decline following corrective announcement can support a finding of materiality); *Johnson v. Aljian*, 394 F. Supp. 2d 1184, 1201 (C.D. Cal. 2004) (same).

linked the unintended acceleration problems to Toyota's prior quality and safety statements, which further supports materiality.  ¶¶117, 126-129, 131, 133; *see Warshaw*, 74 F.3d at 959 (third-party analyst statements are relevant to show materiality).

Third, materiality is demonstrated by the impact of the safety and quality problems on Toyota's sales and reputation.  *See*, *e.g.*, *VeriFone*, 784 F. Supp. at 1479 (securities prices reflect expected future cash flows).  Following disclosure of the problems, Toyota suspended production of its best-selling models (¶126) and reported four consecutive quarterly sales declines of as much as 45%.  ¶136. *Consumer Reports* withdrew its recommendations on eight Toyota models (¶126), and Avis and Enterprise pulled Toyota vehicles from their rental fleets and announced they would seek compensation.  *Id.*  Defendants had represented that Toyota automobiles complied with government regulations and that Toyota promptly notified NHTSA of any safety problems and carried out recalls where necessary – important facts for investors when valuing a company that manufactures and sells cars.  Toyota's regulatory violations were material in that their disclosure required the recall of 10 million automobiles across Toyota's entire model line and record fines, further damaging the Company's reputation.  ¶¶24, 139.

Finally, Defendants' reliance on *In re Ford Motor Co. Securities Litigation*, 381 F.3d 563 (6th Cir. 2004), is misplaced.  In *Ford*, broad statements about the quality and safety of *all* Ford cars were not materially false where plaintiffs alleged that defendants failed to disclose a defective *third-party* component affecting *a single* Ford model.   Plaintiffs here allege *Toyota* defects, and unintended acceleration problems that affected nearly *every model* sold because of common parts and technologies shared across Toyota models.  Indeed, Defendants were warned of this Company-wide quality and safety "catastrophe" by Toyota's own factory workers.  ¶¶1, 84.

**b)      Defendants Misleadingly Attributed "Record" Results To Cost Reduction Efforts Without Disclosing Quality And Safety Lapses**

Rule 10b-5 prohibits the omission of any "material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." Defendants challenge the falsity of four statements in SEC filings that attribute Toyota's sales growth and "record" results to cost reduction efforts. App. Nos. 2, 8, 13, 21. These statements were materially false and misleading when made because Toyota omitted that the cost cutting undermined vehicle safety and quality, as Toyota executives have since admitted. Moreover the statements omitted facts *fundamental* to Toyota's business – "whether the car is able to stop when the brakes are applied" (*see* n.2, *supra*) – and the potential adverse impact if the unintended acceleration problems became known.[9]

At a minimum, falsity is adequately alleged because the statements, measured against the omissions, create false overall impressions and raise questions of fact that could mislead investors. *See Allison*, 999 F. Supp. at 1348-49 (statements of historical fact can be actionable where defendants fail to disclose known defects). Defendants' contention that they had no duty to disclose information about the unintended acceleration problems is without merit. Mot., 13 n.8. A legal duty to disclose arises whenever a statement would be misleading in the absence of additional material facts. *See In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1009 (N.D. Cal. 2008) (quoting *Tellabs*, 551 U.S. at 318, and *SEC v. Fehn*, 97 F.3d 1276, 1289 (9th Cir. 1996)). The Complaint adequately alleges that the undisclosed safety and quality problems, including the unintended acceleration problems, were material and directly related to Defendants' claims of "record" results due to cost reductions. *See Twinde v. Threshold Pharms., Inc.*,

---

[9] *See Litwin v. Blackstone Gr., L.P.,* --- F.3d ---, 2011 WL 447050, at *9 (2d Cir. Feb. 10, 2011) (falsity alleged where defendants omitted potential future impact of known trend, event, or uncertainty in market on issuer's revenues and financial strength).

2009 WL 928132, at *11 (N.D. Cal. Apr. 3, 2009) (statements touting completion of drug trials misleading where defendants omitted known adverse facts).

Defendants contend that because Plaintiffs do not allege that Toyota reported *inaccurate* financial statements, the accompanying false statements that purport to explain the "record" financial results are not actionable.  Mot., 12. Defendants misconstrue the law.  Under Rule 10b-5, Defendants' statements are actionable because they omitted material facts necessary to make the representations not misleading under the circumstances.  *See In re Syncor Int'l Corp. Sec. Litig.*, 239 Fed. Appx. 318, 320 (9th Cir. 2007) ("[i]ncomplete statements are misleading if they 'affirmatively create an impression of a state of affairs which differs in a material way from the one that actually exists'"). Defendants' cases only reinforce this point.[10]

### c)   Defendants Falsely Denied Toyota's Unintended Acceleration Problems

As public attention to Toyota unintended acceleration increased, Defendants made a series of false and misleading statements and omissions: (i) denying the existence of unintended acceleration problems and blaming drivers (App. No. 26); (ii) claiming unintended acceleration was caused only by "floor mat interference" when Defendants knew or recklessly disregarded other causes (App. Nos. 28, 30, 31, 32); and (iii) denying the existence of *any* defect (App. Nos. 29, 31). Defendants do not challenge the falsity or materiality of these statements.  Rather, Defendants contend only that they were in the dark about the problems while

---

[10] Mot., 12 (citing *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (a literally true statement can be actionable where it "create[s] an impression of a state of affairs that differs in a material way from the one that actually exists"); *Verifone*, 784 F. Supp. at 1481 (same); *Osher v. JNI Corp.*, 308 F. Supp. 2d 1168, 1179-80 (S.D. Cal. 2004) (same) (quoting *Brody*, 280 F.3d at 1006); *In re Action Performance Cos. Sec. Litig.*, 2007 WL 496770, at *8 (D. Ariz. Feb. 13, 2007) (statements not actionable absent facts showing falsity); *In re FoxHollow Techs., Inc., Sec. Litig.*, 2008 WL 2220600, at *17-18 (N.D. Cal. May 27, 2008) (same)).

speaking publicly about them.    Mot., 16-28.    As demonstrated below, the Complaint raises a strong inference of scienter.

### 2.    The Complaint Raises A Strong Inference Of Scienter As To Each Defendant

To plead scienter, a plaintiff must "'state with particularity facts giving rise to a strong inference' that defendants acted with the intent to deceive or with deliberate recklessness as to the possibility of misleading investors." *Berson*, 527 F.3d at 987.  "In the Ninth Circuit, recklessness (as a form of intentional conduct) has long sufficed to establish scienter for § 10(b) purposes."  *In re Juniper Networks, Inc. Sec. Litig.*, 542 F. Supp. 2d 1037, 1046 (N.D. Cal. 2008). Recklessness is an "'extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers that is either known to the defendant or so obvious that the actor must have been aware of it.'"  *Middlesex Ret. Sys. v. Quest Software, Inc.*, 527 F. Supp. 2d 1164, 1179 (C.D. Cal. 2007) (quoting *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 977 (9th Cir. 1999)).

"The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'"  *Tellabs*, 551 U.S. at 324.  A complaint survives if, "[w]hen the allegations are accepted as true and taken collectively," a reasonable person would "deem the inference of scienter *at least as strong* as any opposing inference."  *Id.* at 326.  The Court should "consider the totality of circumstances, rather than to develop separately rules of thumb for each type of scienter allegation."  *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008).

Defendants ask the Court to scrutinize the Complaint's allegations in isolation, which *Tellabs* prohibits.  *Tellabs*, 551 U.S. at 322-23 (the inquiry is whether "all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets

that standard.").  Viewed as a whole, the same facts that persuasively show falsity support a strong inference of each Defendant's scienter.

a)  **Defendants' Admissions And
Internal Documents Support Scienter**

Defendants Lentz, Miller and Toyota admit to facts that contradict prior statements during the Class Period.  For example, Lentz admitted on national television in February 2010 that Toyota had "been investigating this [unintended acceleration] for a long time" and had known about the accelerator pedal mechanical defect since at least October 2009.  ¶130.  Likewise, Toyota revealed to NHTSA in January 2010 that it had known of accelerator pedal problems for more than one year.  ¶123.  Comparing such admissions to prior inconsistent statements made after January 2009 – such as "no defect exists" (App. No. 29), "absolutely no evidence" of any defect other than floor mats (App. No. 30), Toyota is "very, very confident that we have addressed this issue . . . [which is] pedal misapplication or pedal entrapment" (App. No. 31), and "the root cause of unwanted acceleration [is] the entrapment of the accelerator pedal" (App. No. 32) – raises a strong inference of scienter.  *See Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 81-82 (1st Cir. 2002) (post-class period admissions relevant); *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 254 (5th Cir. 2009).

Similarly, Toyota's President Akio Toyoda admits that the Company's priorities "became confused" in its quest to become the number one carmaker, and the Company has admitted it did a "poor job" communicating with customers and regulators during the Class Period.  ¶¶137-138.  President Toyoda also admits that the Company "slacked in . . . attention to the basics of manufacturing," which caused the safety problems and recalls, as Toyota "became insensitive to vehicle failings and defects in the market."  ¶¶21, 140.  Such admissions belie Class Period statements that Toyota maintained "the world's highest levels of quality" and sold

"safe" and defect-free products.  App. Nos.  1, 5, 7, 11, 14, 17, 20, 22, 24-27, 29-32.

Internal Toyota documents also support a strong inference that Defendants knew and recklessly disregarded the unintended acceleration problems.  Despite Defendants' adamant public denials of any mechanical failures (¶¶161, 163, 166, 169, 171-172, 174-175), Defendant Miller admitted in a January 2010 internal email that "WE HAVE a tendency for MECHANICAL failure . . . ."  ¶122.  Similarly, internal documents confirm that Toyota headquarters directed the "countermeasures" designed to thwart NHTSA investigations.  ¶¶88-109.

The circumstances and timing of Toyota's management changes further support a strong inference of scienter as to all Defendants, particularly for the Corporate Defendants.  *See Fouad v. Isilon Sys., Inc.*, 2008 WL 5412397, at *11 (W.D. Wash. Dec. 29, 2008).  Toyota replaced nearly its entire management team, including Defendant Watanabe, in June 2009, just three months before Toyota's unintended acceleration problems began to be revealed, and Defendant Miller "retired" in February 2010, shortly after Toyota's unintended acceleration problems became known.  ¶¶41, 46, 108; *see In re Impax Labs., Inc. Sec. Litig.*, 2007 WL 7022753, at *9 (N.D. Cal. July 18, 2007) ("particularly when such 'corporate reshuffling' occurs in tandem with [corrective disclosures], these changes 'add one more piece to the scienter puzzle.'"); *In re Adaptive Broadband Sec. Litig.*, 2002 WL 989478, at *14 (N.D. Cal. Apr. 2, 2002) (management changes near the time of a corrective disclosure support scienter).  Toyota admits that the 2009 management changes were in response to deteriorating quality and safety.  ¶108.

**b)    Defendants' Cover-Up Of Unintended Acceleration Problems Supports A Strong Inference Of Scienter**

Cover-ups do not happen "by accident."  Throughout the Class Period, Defendants violated U.S. law not only by failing to report unintended acceleration

problems and defects to NHTSA and consumers, but by deliberately misleading NHTSA through former top regulators hired by Toyota as lobbyists to negotiate with their former colleagues in order to avoid or limit investigations into unintended acceleration.  ¶¶60-65.  Allegations of deliberate, illegal conduct are highly probative of scienter.  *See*, *e.g.*, *Chamberlain v. Reddy Ice Holdings, Inc.*, 2010 WL 5056184, at *23 (E.D. Mich. Dec. 6, 2010) (collecting cases).

The Complaint alleges in detail how Toyota directed efforts to stonewall NHTSA.  As Defendant Lentz admitted to Congress, all information regarding U.S. regulatory affairs is reported to Toyota headquarters in Japan, which makes all decisions regarding recalls.  ¶¶40, 54, 56-57, 90.  Unintended acceleration was the subject of many meetings and internal documents among executives at Toyota and Toyota USA.  ¶59.  During the Class Period, Defendants knew that NHTSA opened eight investigations into Toyota unintended acceleration.  ¶61.  Toyota's lobbying was so successful that internal Toyota emails – received by Defendants Lentz and Carter, as well as Japanese executives – boasted of saving more than $100 million by avoiding a throttle assembly recall, which would have resulted in "much bigger issues (and costs)."  ¶101.  Similarly, Toyota deliberately prevented a key engineer from attending a NHTSA demonstration in 2007 to avoid NHTSA asking "a bunch of questions."  ¶92.  Another Toyota engineer advised in January 2010 against disclosing to NHTSA that Toyota knew of a mechanical failure in its accelerator pedal.  ¶122.  Defendants deployed additional "countermeasures" throughout the Class Period to avoid disclosing and addressing unintended acceleration problems, including making undisclosed "good will" repairs or "running changes" and issuing recalls abroad to address unintended acceleration problems without notifying NHTSA.  ¶¶62-63, 111.

The unprecedented fines and statements from NHTSA also support scienter.  In connection with its investigation into unintended acceleration problems with Toyota vehicles, Congress "'found evidence that Toyota deliberately withheld

electronic records' regarding defects in Toyota vehicles, and that Toyota had engaged in a 'systematic disregard for the law.'"  ¶65.  Similarly, Japan's Transport Minister stated that "there is a high possibility that Toyota has not firmly revealed . . . information" about possible defects.  ¶134.  Secretary LaHood also declared in announcing the first of several fines against Toyota:  "We now have proof that Toyota failed to live up to its legal obligations . . . . *Worse yet, they knowingly hid a dangerous defect*."[11]

Moreover, knowledge of facts critical to a business's "core operations" is imputed to individual corporate officers.  *S. Ferry*, 542 F.3d at 782.  Alleged knowledge of corporate operations raises a scienter inference where: (a) "the allegations may be used in any form along with other allegations that, when read together, raise an inference of scienter that is 'cogent and compelling, thus strong in light of other explanations'"; (b) "such allegations may independently satisfy the PSLRA where they are particular and suggest that defendants had actual access to disputed information"; *or* (c) "it would be 'absurd' to suggest that management was without knowledge of the matter."  *Id*. at 785-86.  The Complaint in this case satisfies all three scenarios.

In *Berson*, the Ninth Circuit found that management's role in the business – even standing alone – could adequately support scienter where the events were so significant to the business's present and future revenues that it would be "absurd" to suggest that management was unaware of them.  527 F.3d at 987-88.  Toyota became the number one carmaker during the Class Period by promoting its superior quality, safety, and regulatory compliance.  ¶¶50-51.  Moreover, the unintended acceleration problems affected nearly every Toyota model.[12]  The

---

[11] ¶139 (emphasis added throughout unless otherwise noted).

[12] ¶¶1-2, 24; *see Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 709 (7th Cir. 2008) ("That no member of the company's senior management who was involved in authorizing or making public statements about the demand for the [company's key

massive scale of the recalls further supports scienter because it demonstrates that the problems were pervasive and systemic at Toyota.  *See In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005) (quoting *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1091 (9th Cir. 2002)).  Because the auto industry is highly regulated, Defendants constantly monitor adverse safety and quality information, particularly reports of defects, injury or death.  *See Miss. Pub. Emps. Ret. Sys. v. Boston Scientific Corp.*, 523 F. 3d 75, 91 (1st Cir. 2008); *see also Plumbers Union Local No. 12 Pension Fund v. Ambassador's Grp.*, 717 F. Supp. 2d 1170 (E.D. Wash. 2010) (management's "exposure" to facts within the company support scienter).

A defendant's high-level position and involvement in day-to-day operations provides additional circumstantial evidence of scienter.[13]  This inference is particularly compelling here because Toyota's unique management structure (the "Toyota Way") *requires* executives to be informed about Company-critical issues, and all quality and safety issues were communicated to Toyota's headquarters, which had sole authority over recall decisions.  ¶¶39-40, 54; *compare In re Hypercom Corp. Sec. Litig.*, 2006 WL 726791, at *9 (D. Ariz. Jan. 25, 2006) ("A detail-oriented management style may be considered for the purpose of determining whether scienter has been pled with particularity."); *Daou*, 411 F.3d at 1022-23 (admissions of access to adverse information supports scienter); *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230-31 (9th Cir. 2004) (same); *with In re Apple Computer, Inc. Sec. Litig.*, 243 F. Supp. 2d 1012, 1026 (N.D. Cal. 2002) ("Mere access to data" and "generalized allegations about a

products] knew that they were false is very hard to credit . . . ."); *Am. W. Holding*, 320 F.3d at 942-43 ("patently incredible" to suggest that executive management was unaware of significant, pervasive problems affecting a company's core product or service).

[13] *See Berson*, 527 F.3d at 985.  Additionally, high-level corporate officers who sign public filings are presumed to be familiar with the core operations that underlie facts reported in those filings.  *See In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 491 (S.D.N.Y. 2004).

'hands-on' management style are insufficient"). Centralized control was so ingrained at Toyota that its Japanese leaders employed Japanese "coordinators" to *shadow American managers in their own offices*, who then reported back to Toyota officials in Japan. ¶40. "At Toyota, all information flows to headquarters." *Id.*

Defendants' access to adverse information – especially concerning critical quality and safety problems affecting the Company's only product – contributes to a strong inference of scienter. *See In re PMI Grp., Inc. Sec. Litig.*, 2009 WL 3681669, at *3 (N.D. Cal. Nov. 2, 2009) (scienter shown by access to negative internal reports about matters touted as critical to company's success); *Atlas*, 556 F. Supp. 2d at 1156 (same); *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1022 (S.D. Cal. 2005) (same). The Complaint identifies numerous internal reports about declining safety and quality affecting almost the entire product line of Toyota, including unintended acceleration problems before and during the Class Period that were actually received by or available to Defendants. ¶¶53, 56, 63, 66-71, 73, 76, 78, 80, 84-86, 91. Former Toyota employees confirm that this information was known or available to the Defendants. ¶¶40, 55, 57-58, 62, 83, 87, 107. Moreover, Toyota maintained "Books of Knowledge" containing information related to defects, including unintended acceleration, and the countermeasures taken by the Company to correct those defects without disclosure. ¶63.

Defendants' motion ignores these allegations, which support a strong inference of scienter both independently and when read together with Defendants' admissions and internal documents. In addition, as in *Berson*, *Tellabs*, and *America West*, it is "absurd" to suggest that Toyota management was unaware of quality and safety issues affecting nearly all the vehicles Toyota makes, especially given the detailed allegations documenting Toyota's highly-centralized, information-intensive business structure and practices.

Defendants contend that Plaintiffs fail to allege any "discernible motive" for Defendants' fraud.  Mot., 2.  While Plaintiffs need not allege any motive, *see Tellabs*, 551 U.S. at 325, the Complaint does so:  Defendants' motive was to relentlessly cut costs, as President Toyoda later admitted, and to avoid the pain of costly recalls.  ¶¶21, 82.  Obviously, disclosing the truth about quality and safety problems would adversely affect future sales, which is exactly what happened. Comments from one Toyota executive shed light on why Toyota resisted issuing recalls: "In the past, we have seen sales drop by 20 percent after a recall, but with this [floor mat] recall, we are worried that the sales drop will be bigger than that." ¶132.  These allegations of motive, including the motive generally to benefit the Company financially, provide additional support for scienter.  *See Tellabs*, 551 U.S. at 325; *Vantive*, 283 F.3d at 1097; *In re Lattice Semiconductor Corp. Sec. Litig.*, 2006 WL 538756, at *19-20 (D. Or. Jan. 3, 2006).

### c)   The Complaint Alleges Toyota's Corporate Scienter

Defendants' motion challenges corporate scienter for only three statements. Mot., 17-19.  Defendants do not dispute that these statements are attributable to the Corporate Defendants.  Instead, Defendants argue, without any support, that a corporate defendant may avoid liability for securities fraud by making a statement that is not attributed to a specific person (App. No. 24) or by speaking through an official spokesman.  App. Nos. 20, 26.  This is not the law.

The Ninth Circuit recognizes corporate scienter.  *See Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736 (9th Cir. 2008).  To raise an inference of scienter as to a corporate defendant, a complaint generally pleads: (1) scienter as to the company's individual executives or directors; or (2) "facts indicating that the company's 'named officers' are 'directly responsible . . . for day-to-day operations' and that the subject-matter of the alleged statements is, 'by its nature, the type of transaction of which it would be hard to believe senior officials were

---

unaware.'"   *Allstate Life Ins. Co. v. Robert W. Baird & Co., Inc.*, 2010 WL 4581242, at *22 (D. Ariz. Nov. 4, 2010) (quoting *Glazer*, 549 F.3d at 743, 745).

Here, the Complaint pleads both scienter as to the Individual Defendants and that senior officials were aware of the undisclosed facts.  As scienter is adequately alleged for the Individual Defendants, it is adequately alleged for the Corporate Defendants.[14]  Additionally, as explained above, the Complaint identifies material statements that were "so dramatically false" that they create a strong inference that at least some corporate official knew of the falsity.[15]

Defendants mischaracterize *Glazer*.  Mot., 17.  *Glazer* did not "reject" collective scienter, as Defendants claim.  Indeed, *Glazer* explicitly recognized that "some form of collective scienter pleading might be appropriate."  549 F.3d at 744. The Ninth Circuit gave *one* such example where, as here, "a company's public statements [are] so important and so dramatically false," they create "a strong inference that at least *some* corporate officials knew of the falsity."  *Id.* (explaining *Makor*, 513 F.3d at 710) (emphasis in original); *see also E. & J. Gallo Winery v. Proximo Spirits, Inc.*, 2010 WL 4070643, at *2 (E.D. Cal. Oct. 18, 2010) (noting that "corporate scienter may be founded upon the collective knowledge of the corporation's officers if it is coupled with an officer's wrongful intent") (citing *Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1435 (9th Cir. 1995)); *In re Cadence Design Sys., Inc. Sec. Litig.*, 654 F. Supp. 2d 1037, 1046 n.7 (N.D. Cal. 2009) (same) (citing *Glazer*, 549 F.3d at 744-45).

Defendants also mischaracterize the misleading statements.  Contrary to Defendants' spin, the misstatements are not limited to the Toyota Tacoma or Prius.

---

[14] *In re Entropin, Inc. Sec. Litig.*, 487 F. Supp. 2d 1141, 1153 (C.D. Cal. 2007) (company's scienter established through individual defendants' scienter); *In re CV Therapeutics, Inc. Sec. Litig.*, 2004 WL 1753251 at *10 (N.D. Cal. Aug. 5, 2004) (same).

[15] Other circuits hold that corporate scienter may be inferred without reference to the scienter of any particular individual.  *See, e.g.*, *Makor*, 513 F.3d at 710; *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap., Inc.*, 531 F.3d 190, 195-96 (2d Cir. 2008).

Mot., 18-19.  The *Detroit Free Press* and *Westword* articles quote Toyota blaming drivers and disclaiming defects in response to complaints about Toyota unintended acceleration problems *generally*.  On April 7, 2008, Toyota claimed that regulators had determined that consumer complaints of unintended acceleration "*in most cases*" were due to "misapplication of the pedals by the driver."  App. No. 20.  Similarly, on June 10, 2008, Toyota claimed that "many of the consumer complaints *about the general issue of unwanted acceleration* . . . were inspired by publicity" and "are not indicative of a safety-related defect" (App. No. 24), and on April 23, 2009, Toyota asserted that drivers complaining of unintended acceleration were "not stepping on the brake."  App. No. 26.  These are not statements of "opinion or speculation" but are assertions of fact that Toyota claimed were based on information that Toyota received from or provided to NHTSA.  Moreover, to the extent the statements include references to the Tacoma or Prius, the Complaint alleges that Defendants received numerous unintended acceleration complaints for these models and even recalled the Prius to correct brake defects.[16]

Finally, the Corporate Defendants are liable for the statements made by Toyota's official spokesman Bill Kwong irrespective of whether Plaintiffs separately allege Kwong's scienter.  Courts hold that a company is even liable for *third-party* opinions and statements where the company endorses or sufficiently entangles itself with the statements.  *See*, *e.g.*, *In re Valence Tech. Sec. Litig.*, 1995 WL 274343, at *11 (N.D. Cal. May 8, 1995).  Futher, Kwong was deliberately reckless, at least, to assert that drivers and not defective Toyota vehicles were to blame for complaints of unintended acceleration.  *See In re MCI Worldcom, Inc.*

---

[16] ¶¶85-87, 102, 110, 175, 186.  Further, it does not matter whether the Prius or Tacoma models were ultimately recalled or whether the recall was limited to "sticking" gas pedals.  The salient inquiry is Toyota's knowledge of the apparent *condition* of unintended acceleration in its vehicles, not whether Toyota had been able to identify the particular causes.

*Sec. Litig.*, 93 F. Supp. 2d 276, 283 (E.D.N.Y. 2000) (reasonable to assume at the pleading stage that corporate spokesperson knows about subject of statements and recognizing it is a "factual dispute for discovery"); *see also In re Lucent Techs., Inc. Sec. Litig.*, 217 F. Supp. 2d 529, 558 (D.N.J. 2002) (sustaining claims against company for spokesperson's statement based on individual defendants' scienter).

### 3.    Loss Causation Is Adequately Pled

The pleading rules for loss causation are "not meant to impose a great burden upon a plaintiff," and a plaintiff need only plead "a short and plain statement," pursuant to Rule 8(a)(2), that provides "some indication of the loss and the causal connection that the plaintiff has in mind." *Dura*, 544 U.S. at 346-47. No heightened standard for pleading loss causation exists. *See In re Cell Therapeutics, Inc. Class Action Litig.*, 2011 WL 444676, at *5 (W.D. Wash. Feb. 4, 2011) (Rule 8 applies to pleading loss causation). As a highly fact-specific issue, determination of loss causation is "generally inappropriate on a motion to dismiss." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1056-57 (9th Cir. 2008), *cert. denied*, 129 S. Ct. 1993 (2009). "[S]o long as the plaintiff alleges facts to support a theory that is not facially implausible . . . a Rule 12(b)(6) dismissal is inappropriate." *Id.* at 1057.

To adequately plead loss causation, a plaintiff must allege some "causal connection between the deceptive acts that form the basis for the claim of securities fraud and the injury suffered by the plaintiff." *Id.* (quoting *Daou*, 411 F.3d at 1025). Under *Dura*, a corrective disclosure does not need to be a "mirror image" of the false statement, tantamount to a confession of fraud. Thus, the *"relevant truth"* required under *Dura* is *not that a fraud was committed per se*, but that the "truth" about the underlying circumstances, when revealed, causes the "economic loss." Further, partial disclosures, like here, can establish loss causation. *See Dura,* 544 U.S. at 342 (loss causation met where shares sold after "the relevant truth begins to leak out"); *Lormand*, 565 F.3d at 263; *New Century*,

588 F. Supp. 2d at 1236 ("The truth need not be revealed to the market through a single, complete disclosure.").

Defendants attempt to challenge loss causation for 26 of the 33 statements at issue.  Mot., 13-15.  Yet Defendants provide no analysis and simply mischaracterize Plaintiffs' claims and loss causation theory as confined to Toyota's "sticking pedal" defect.[17]  In fact, Plaintiffs allege a common-sense connection between the misstatements, the revelations of unintended acceleration problems affecting nearly Toyota's entire product line, and the resulting loss of reputation for quality and safety with consequent price declines.  ¶¶178-187.  The Complaint alleges that Defendants falsely assured investors that Toyota vehicles were safe and of high quality, thereby inflating the market price for Toyota securities.  *See Hodges v. Akeena Solar, Inc.*, 2010 WL 3705345, at *5 (N.D. Cal. May 20, 2010) (loss causation alleged by identifying statements that cause stock price "to become artificially inflated and eventually, to decline").

The Complaint further alleges that the disclosures between September 14, 2009, and February 3, 2010, revealed that these statements were false and misleading; *i.e.*, that Toyota automobiles were *not* safe or defect-free, and the Company did *not* comply with all laws.  Risks that were previously concealed by Defendants materialized, including reputational damage, government investigations and fines, litigation, production stoppage, sales declines, recalls, and other costly consequences.  ¶¶114-141.  Following each revelation, the market price for Toyota securities dropped significantly, as artificial inflation based on Toyota's intentional misstatements and omissions was removed.  ¶¶180-187; *see Daou*, 411 F.3d at 1026-27 (stock price decline following an alleged corrective disclosure provides the necessary "causal connection" at the pleading stage); *Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys., Inc.*, 411 F. Supp.

---

[17] Mot., 14-15.  Defendants also raise factual disputes that are inappropriate on a motion to dismiss.  *See*, *e.g.*, Mot., 20 n.15, 25-26.

2d 1172, 1177-78 (N.D. Cal. 2005) (same).  Accordingly, the Complaint satisfies the pleading standard for loss causation.

**B.    The Complaint Adequately Pleads Control Person Liability Under Section 20(a)**

To allege a § 20(a) violation, a plaintiff must state (1) a primary violation of § 10(b) and (2) that the defendant was in a position of control over the primary violator.  *See* 15 U.S.C. § 78t(a); *Howard v. Everex Sys.*, 228 F.3d 1057, 1065 (9th Cir. 2000).  Rule 8 applies to control person claims; there is no heightened pleading standard, as Defendants contend.[18]  *Kuehbeck v. Genesis Microchip Inc.*, 2005 WL 1787426 (N.D. Cal. July 27, 2005), cited by Defendants, does not hold otherwise.  The court there noted only that § 20(a) liability is derivative of § 10(b) liability.  *Id.* at *3 (citing *In re Ramp Networks, Inc. Sec. Litig.*, 201 F. Supp. 2d 1051, 1063 (N.D. Cal. 2002)).

It is not necessary to allege senior executives' "actual participation or the exercise of actual power."  Rather, a plaintiff need only show that defendants were in a position of control.  *Howard*, 228 F.3d at 1065; *accord Apollo*, 690 F. Supp. 2d at 971.  Plaintiffs sufficiently allege here that the Individual Defendants had the ability to control the Corporate Defendants by virtue of their high-level executive positions and because of Toyota's unique management structure.[19]  "Although status as an officer or director does not alone create a presumption of control . . . this allegation carries considerable weight at the pleading stage."  *Petrie*, 2011 WL 165402, at *6 (citing *Paracor Fin., Inc. v. G.E. Capital Corp.*, 96 F.3d 1151, 1163 (9th Cir. 1996)).  While unnecessary at the pleading stage, the additional

---

[18] Mot., 28-29; *see Teamsters Local 617 Pension & Welfare Funds v. Apollo Grp., Inc.*, 690 F. Supp. 2d 959, 970 (D. Ariz. 2010) ("*Apollo*").  Whether the defendant is a "controlling person" is an "'intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions.'"  *Howard*, 228 F.3d at 1065 (quoting *Kaplan v. Rose*, 49 F.3d 1363, 1382 (9th Cir. 1994)).

[19] ¶¶34-49, 54-56, 88, 101, 104, 109, 115, 122, 130, 137, 140, 216-217.

---

allegations of the Individual Defendants' actual control confirm that § 20(a) liability is more than sufficiently alleged.[20]

## IV.  THE COMPLAINT STATES CLAIMS UNDER JAPANESE SECURITIES LAW THAT SHOULD BE TRIED WITH THE EXCHANGE ACT CLAIMS

The elements of an Article 21-2 claim are:  (i) a misstatement or omission; (ii) of a material matter; (iii) in certain securities-related documents; (iv) causation; and (v) damages.  Tokumoto Decl., ¶29.  Defendants do not dispute that Plaintiffs have adequately alleged a claim under Article 21-2.  Defendants only challenge the Court's jurisdiction over Plaintiffs' Japanese law claims and whether this is a proper forum.

### A.  The Court Has Original Jurisdiction Over The Japanese Law Claims Under CAFA

The Court has diversity jurisdiction over the Japanese law claims under CAFA because:  (1) the class exceeds 100 members; (2) the amount in controversy exceeds $5 million; and (3) there is minimal diversity.  *See* 28 U.S.C. § 1332(d)(2).  CAFA's carve-out for "any class action that solely involves a claim . . . concerning a covered security" is inapplicable.

Contrary to Defendants' contention, Toyota common stock is not a "covered security" under CAFA because it neither trades nor is listed for trading on a national exchange.  *See Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 83 (2006) (interpreting "covered security" as "one traded nationally and listed on a regulated national exchange"); *Proctor v. Vishay Intertechnology Inc., 584 F.3d 1208, 1217, 1221-22 (9th Cir. 2009) (covered securities are "nationally traded and listed on a national securities exchange").  Toyota common shares are

---

[20] *Id.*; *see also In re Cadence Design Sys., Inc. Sec. Litig.*, 692 F. Supp. 2d 1181, 1188 (N.D. Cal. 2010); *Adaptive*, 2002 WL 989478, at *18-19.  Each Individual Defendant bears § 20(a) liability for any Corporate Defendant's violation of § 10(b), regardless of the Individual Defendant's scienter.  *See Apollo*, 690 F. Supp. 2d at 963-64, 967 (§ 20(a) does not require that the controlling person be primarily liable under § 10(b)).

listed on the NYSE but Toyota's SEC filings make clear that this is only to satisfy a technical requirement of the ADS program and "[n]ot for trading."[21]

## B. Supplemental Jurisdiction Is Appropriate Because The Japanese Law Claims Form Part Of The Same Case Or Controversy As The Exchange Act Claims

The Court also has supplemental jurisdiction over the Japanese law claims because they form part of the same "case or controversy" as the Exchange Act claims. 28 U.S.C. § 1367(a). District courts should "entertain[] the broadest possible scope of action consistent with fairness to the parties," *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 724 (1966), in order to effectuate Congress's intent that "'supplemental jurisdiction at least in the first instance . . . *go to the constitutional limit.*'" *Silverman v. Smithkline Beecham Corp.*, 2007 WL 3072274, at *2 (C.D. Cal. Oct. 16, 2007) (Fischer, J.) (quoting *Lindsay v. Gov't Emps. Ins. Co.*, 448 F.3d 416, 424 (D.C. Cir. 2006)). The Japanese law and U.S. federal securities claims indisputably are derived from a common nucleus of facts, and thus this Court has the power to hear all the claims in a single action. *See Gibbs*, 383 U.S. at 725. The Court's authority to decide the Japanese law claims is explained in more detail in the accompanying joint declaration of Professor Minoru

---

[21] *See* Toyota's Annual Report on Form 20-F filed with the SEC on June 24, 2009, Griffen Declaration, Ex. F at 19. [ECF No. 181]. Any attempt to read a trading requirement out of the definition of "covered security" would ignore SLUSA's purpose, *cf. LaSala v. Bordier et Cie*, 519 F.3d 121, 138-39 (3rd Cir. 2008) (SLUSA's purpose was not to preempt foreign law claims), the Supreme Court's interpretation of "covered security" (*see Dabit*, 547 U.S. at 83), and the statutory definition of a "covered security," which contains the heading: "Exclusive Federal registration of nationally traded securities." 15 U.S.C. § 77r; *see Beck v. Pace Int'l Union*, 427 F.3d 668, 675 (9th Cir. 2005) (headings "clarify the meaning of statutory text"), *rev'd on other grounds*, 551 U.S. 96 (2007). While one case cited by Defendants did not require a listed security to be traded to be a "covered security," that matter did not involve foreign securities, and the domestic securities there were listed on two exchanges "for the express purpose of achieving preemption" of state securities laws and to evade state regulatory investigations. *In re Metro. Sec. Litig.*, 532 F. Supp. 2d 1260, 1273 (E.D. Wash. 2007).

---

Tokumoto and Eiji Masuda, LL.M. and the declaration of Professor Matthew J. Wilson.[22]

      Federal courts have long had the authority to resolve disputes under foreign law, and Rule 44.1 provides a uniform and effective procedural mechanism for determining foreign law.   Wilson Decl., ¶¶10, 15-17.   Numerous courts have exercised supplemental jurisdiction over foreign law claims, including Japanese law claims.   *Id*., ¶¶11-13 (collecting cases).   In particular, courts in the Ninth Circuit often decide Japanese law issues.   *Id*., ¶13.   Significantly, the Second Circuit has stated that where, as here, a securities class action encompasses purchases on both domestic and foreign exchanges, the district court may apply § 10(b) to purchasers on the U.S. exchange, and foreign securities laws to purchasers on the foreign exchange.   *See DiRienzo v. Philip Servs. Corp*., 294 F.3d 21, 31 (2d Cir. 2002).   Defendants' reliance on *In re Alstom SA Securities Litigation*, 741 F. Supp. 2d 469 (S.D.N.Y. 2010), is misplaced.   There, plaintiffs sought to add a foreign law claim after seven years of litigation.   Not surprisingly, the court refused to add the claim because it would require "essentially restart[ing] substantial portions of this seven-year old litigation."   *Id*.   Such concerns are absent here.[23]

---

[22] Professor Tokumoto teaches securities (including the FIEA), corporate and commercial law at the University of Tsukuba, Japan.   Mr. Masuda is the founder of Masuda & Partners, a Tokyo law firm specializing in international and corporate law, and has also taught international litigation and securities law.   Professor Wilson teaches international law at the University of Wyoming and has served as an expert in Japanese law.   Messrs. Tokumoto, Masuda and Wilson have all studied and instructed law in both the United States and Japan, and are familiar with both legal systems.

[23] Similarly misplaced is Defendants' reliance on *ITSI T.V. Products, Inc. v. California Authority of Racing Fairs*, 785 F. Supp. 854, 866-67 (E.D. Cal. 1992), as "numerous courts have recognized the propriety of exercising subject matter jurisdiction over foreign copyright causes of action."   *X17, Inc. v. Hollywood.TV, Inc.*, 2008 WL 4527865, at *4 (C.D. Cal. June 24, 2008); *see also Creative Tech. Ltd., v. Aztech Sys. PTE, Ltd.*, 61 F.3d 696, 702 (9th Cir. 1995) (U.S. federal courts may hear actions under foreign copyright laws).

As the Japanese law claims easily meet the "same case or controversy" requirement of § 1367(a), the Court must exercise its supplemental jurisdiction unless one of the conditions in § 1367(c) is established.  *See Exec. Software N. Am., Inc. v. U.S. Dist. Ct.,* 24 F.3d 1545, 1555-56 (9th Cir. 1994); *Silverman*, 2007 WL 3072274, at *2 ("28 U.S.C. §1367(b) and (c) provide the only justification for declining supplemental jurisdiction when it would otherwise be appropriate."). None of the four conditions enumerated in § 1367(c) is met.

### 1.    The Japanese Law Claims Present No Novel Or Complex Issues

The Japanese law claims present no "novel or complex" issues of Japanese law.  *See* 28 U.S.C. § 1367(c)(1); Tokumoto Decl., ¶15(a)-(b).  The Japanese law claims involve substantially the same facts, elements, and proofs as the § 10(b) claim.  *Id.*, ¶28.  Both claims involve substantially the same false statements about Toyota quality, safety, regulatory compliance, and undisclosed unintended acceleration problems.  Both claims also contain the overlapping elements of (i) a material misstatement or omission, (ii) causation, and (iii) damages.  *Id.*, ¶¶23-24.  Consequently, the Japanese law claims would require little, if any, proof beyond that required for the § 10(b) claims.  *Id.*, ¶29; Wilson Decl., ¶¶8(b), 25.  Further simplifying matters, under Japanese law, (i) proof of scienter is *not* required, (ii) causation and damages are presumed for a large swath of class members, and (iii) damages are calculated according to a clear and succinct method spelled out in the statute.  Tokumoto Decl., ¶30.

Defendants' argument that Article 21-2 "is only a few years old" is superficial and irrelevant.  Mot., 30-31.  Japan's main securities law was enacted in 1948 and modeled on U.S. securities laws, particularly, the Exchange Act. Tokumoto Decl., ¶¶15(b), 18.  Recent amendments changed the statute's title to the FIEA, but not its fundamental provisions.  *Id.*, ¶21.  The FIEA remains the principal Japanese securities law, which mirrors U.S. securities laws in many ways.

*Id.*, ¶26.  The recent amendments *enhanced* investors' ability to bring private civil actions for fraud.  *Id.*, ¶¶16, 22.

Likewise, Defendants' argument that there is little case law and no case by the Japanese Supreme Court interpreting several purportedly "important" issues under Article 21-2 (Mot., 30-31) ignores that (1) Japan is a civil law country without a strict doctrine of *stare decisis*, and thus courts apply statutes to each dispute without needing to analyze and synthesize judicial decisions (which are not binding on future lawsuits); and (2) the Supreme Court of Japan traditionally hears cases involving constitutional matters, serious procedural errors, or important legal issues, and rarely hears private civil actions under Japan's securities laws.[24]

### 2.   The Japanese Law Claims Do Not Substantially Predominate Over the Exchange Act Claims

In *Gibbs*, the Supreme Court held that whether a claim "substantially predominate[s]" depends on (1) the necessary evidence, (2) the comprehensiveness of the remedy sought, and (3) the scope of the issues.  383 U.S. at 726.  The greater number of Toyota common shares outstanding than ADSs does not mean, as Defendants contend, that the Japanese law claims will substantially predominate over the § 10(b) claims.  In truth, the Exchange Act and Japanese law claims are largely coextensive.  The claims are based on common facts (the only distinctive facts being "where" the false statement occurred), with the proofs relevant to the Article 21-2 claim largely subsumed by the § 10(b) claim.  Tokumoto Decl., ¶¶15(b), 29-30; Wilson Decl., ¶8(b), 25.  Consequently, both the first and third *Gibbs* factors favor exercising supplemental jurisdiction.

---

[24] *Id.*, ¶¶31-33.  The Namekata declaration summarizes several opinions of Japanese trial and appellate courts applying Article 21-2.  Namekata Decl., ¶19.  With respect to fundamental concepts such as materiality, the cases are in accord and apply a materiality standard that is very similar to the U.S. standard under *TSC Industries* and *Basic*.  Tokumoto Decl., ¶34.  The only notable difference from U.S. standards in the Japanese cases involves damages, particularly, the court's discretion to reduce damages where causation is difficult to assess.  *Id.*, ¶¶25, 34.

The remaining *Gibbs* factor is whether refusal to hear the foreign claim would expose a defendant to duplicative liability. *See Gibbs*, 383 U.S. at 726; *Borough of W. Mifflin v. Lancaster*, 45 F.3d 780, 789 (3d Cir. 1995) ("[T]he difficulty of avoiding duplicative recoveries is a factor tending to weigh against litigating related . . . claims in different fora."). The Exchange Act and Japanese law claims both seek to remedy essentially the same harm – losses in the value of Toyota common stock or ADSs caused by Defendants' materially false statements regarding the safety of Toyota cars. Further, the classes overlap, both including persons who purchased Toyota common stock in domestic transactions. These facts militate toward the Japanese law claims being heard in this case.

### 3.   No Exceptional Circumstance Exists To Prevent Supplemental Jurisdiction

When deciding whether there are other compelling reasons to decline supplemental jurisdiction, courts consider the *Gibbs* factors of judicial economy, convenience, fairness to parties, and whether all of the claims would be expected to be tried together. *See Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1001 (9th Cir. 1997). These factors favor supplemental jurisdiction in this case.

Judicial economy would not be served by dismissing the Japanese law claims. Supplemental jurisdiction serves to conserve judicial energy and avoid multiplicity of litigation. *See Rosado v. Wyman*, 397 U.S. 397, 405 (1970). Here, the claims are based on common facts and legal standards, and would be expected to be tried together. Additional efficiencies may be gained by coordinating with the MDL pending in this District. A separate litigation in Japan provides no such benefit and would needlessly burden the parties and the Court.

Defendants claim – without any analysis – that "Japan's interest in regulating its own securities" provides a reason for declining jurisdiction. Mot., 31-32. However, litigation of the Japanese law claims would not interfere with that interest because the Court would not pass on the validity of official acts of

Japan.    Instead,  the  Court  would  simply  adjudicate  whether  Defendants fraudulently deceived Toyota shareholders in violation of Article 21-2.  Tokumoto Decl., ¶¶15(c), 43.  By comparison, courts often decline jurisdiction over foreign patent claims, which require passing on the validity of acts of state in granting the patents.    Conversely,  U.S.  courts  routinely  exercise  jurisdiction  over  foreign copyright claims, which involve no such interference with official government acts.  *See* 4 Nimmer On Copyright § 17.03 (2008) ("under virtually all foreign copyright laws, there are no administrative formalities that must be satisfied in order to create or to perfect a copyright.").

Defendants' other arguments for "exceptional circumstances" are similarly misplaced.  As demonstrated above and in the accompanying declarations, Article 21-2 is not a novel or complex statute, and adjudicating the Japanese law claims will not consume an undue amount of court resources given that most of their proofs are subsumed by the § 10(b) claim.   Japan's Civil Code provides a straightforward mechanism for enforcing foreign judgments, and Japanese courts routinely recognize U.S. federal and state court judgments.  Tokumoto Decl., ¶¶49-50 (listing examples and noting that procedural differences do not stop Japanese courts from enforcing U.S. judgments).   Japan has *never* refused to recognize a U.S. class action judgment nor declared that class actions offend Japanese public policy.[25]    In  fact,  a  strong  argument  exists  that  Japanese  courts  would  give preclusive effect to a U.S. opt-out class action judgment.[26]

---

[25]  Tokumoto Decl., ¶48. Defendants offer no support for their assertions that Japan considers an opt-out class action "to be inconsistent with due process" and that "it is highly likely that the Japanese courts . . . would not bind class members to any judgment rendered in this case." Mot., 32. Defendants' own expert admits that it is "unsettled" whether a U.S. class action judgment is enforceable in Japan, and that there are no on-point cases. Namekata Decl., ¶¶29-30. Defendants' argument rests on the false assumption that actual notice will *never* be provided to class members. Tokumoto Decl., ¶52.

[26] Tokumoto Decl., ¶¶52-55.

### C.   Adjudication Of The Japanese Law Claims Does Not Offend International Comity

Defendants assert that exercise of jurisdiction over the Japanese law claims would offend "principles of international comity."  Mot., 32-36.  Defendants do not come close to carrying their burden of proof on this issue.  *See Mujica v. Occidental Petroleum Corp*., 381 F. Supp. 2d 1134, 1155 (C.D. Cal. 2005) (party asserting the applicability of the comity doctrine bears the burden of proof).

First, Defendants cannot meet the "threshold requirement" of showing a true conflict between domestic and foreign laws.  *See In re Simon*, 153 F.3d 991, 999 (9th Cir. 1998) (application of international comity "is limited to cases in which 'there is in fact a true conflict between domestic and foreign law'") (quoting *Hartford Fire Ins. Co. v. Calif.*, 509 U.S. 764, 798 (1993)).  The claims here involve overlapping facts and legal standards.  Japan's securities laws are not "relatively new" as Defendants contend, and the lack of Japanese court decisions is a non-issue given Japan's Civil Code system.  *See id*.  Defendants' contention that "numerous decisive legal questions" are left open by Article 21-2 (Mot., 34-35) does not withstand scrutiny.  The statutes' similarities far outweigh any differences and the purported "decisive" differences cited by Defendants, in reality, are either trifling or irrelevant.  For example, Japan applies a materiality standard that is very similar to the U.S. standard and Article 21-2 provides a clear and succinct method of calculating damages.  Similarly, Article 21-2's comparative negligence defense and recovery for shares acquired in a private placement are not at issue here.  Tokumoto Decl., ¶¶24, 30, 34.

Second, Defendants' claim that litigating the Japanese law claims in the United States would undermine "both Japan's interest in the development of its own securities laws, and the U.S.'s interest in promoting the development of strong securities laws abroad" makes little sense.  Mot., 35-36.  Japan is a global financial power, and its securities law has existed for over 60 years and is well developed.

Tokumoto Decl., ¶40.  No provision in the FIEA indicates that the Japanese courts or any governmental agency has exclusive jurisdiction over Article 21-2 claims, and no Japanese court or regulatory authority has objected to foreign courts adjudicating claims under the FIEA.  *Id*., ¶¶37-38; *see In re Honda Am. Motor Co*., 168 F.R.D. 535, 538 (D. Md. 1996) ("The failure of the Japanese government to weigh in as *amicus curie* on this matter is further evidence that its sovereignty is not implicated by taking depositions of the named individuals").   Moreover, Defendants cannot point to any civil or governmental proceeding pending in Japan with which this case could interfere.  *Id*.; *see also Simon*, 153 F.3d at 999 (rejecting international comity argument where there was "no proceeding pending" abroad).  In these circumstances, exercise of supplemental jurisdiction would *promote* the application and development of Article 21-2.[27]

In *Morrison*, the Supreme Court addressed the substantive scope of § 10(b).  *Morrison* did not hold that international comity prevents a district court, in an appropriate case, from hearing a foreign securities claim.   To the contrary, *Morrison* recognized that extraterritorial application of the federal securities laws could comport with international comity under prevailing standards.  *Id*., at 2883, 2887.  Further, § 929Y of the Dodd-Frank Act, enacted in response to *Morrison*, expressly reaffirms federal courts' ability to hear actions involving transnational securities fraud.   *See* 15 U.S.C. § 78aa (conferring jurisdiction for SEC enforcement actions based on conduct abroad).  The class device also does not offend international comity because, as the Supreme Court recently reiterated, it is a procedural device and not a matter of substantive law.[28]

---

[27] Any potential future administrative action initiated by Japan under the FIEA would be complementary to this private civil action.  Tokumoto Decl., ¶41.

[28] *See Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 130 S. Ct. 1431, 1442-43 (2010).  Japan also allows certain representative actions.  Tokumoto Decl., ¶¶53-54.

Defendants' claim that "the U.S. would suffer no prejudice if the Japanese law claim was dismissed and Plaintiffs had to pursue that claim in Japan" (Mot., 36) is also without merit.  Both the United States and this forum have a strong interest in redressing harms arising from this fraud.  *See*, *e.g.*, *CYBERsitter, LLC v. People's Republic of China*, 2010 WL 4909958, at *8 (C.D. Cal. Nov. 18, 2010) ("Because Solid Oak's principal place of business is in the Central District of California and it alleges harms committed by foreign defendants, this Court has a particular interest in adjudicating the matter.").   There is nothing unfair or unreasonable about permitting investors to sue Toyota in the United States while also giving Toyota the benefits of its home law.   Toyota has a giant U.S. manufacturing and sales presence, including several million vehicles produced and sold each year in the United States, and U.S. sales account for approximately two-thirds of Toyota's profits.  ¶¶35-36.  This case also has a strong connection to the United States, as the underlying wrongful conduct largely occurred in this country and particularly in California, and many of the witnesses and much of the relevant evidence are located here.[29]

### D.  This District Is An Appropriate Forum

The doctrine of *forum non conveniens* does not require dismissal simply because a defendant prefers a different forum. The Ninth Circuit recently reaffirmed that the doctrine is a "drastic" and "exceptional tool to be employed sparingly."  *Cariajano v. Occidental Petroleum Corp.*, 626 F.3d 1137, 1144 (9th Cir. 2010).  The *forum non conveniens* analysis begins with a strong presumption in favor of the plaintiff's choice of forum, even if a U.S. plaintiff is joined by foreign plaintiffs.   *Id*. at 1150-51.   The defendant bears the burden of

---

[29] *See*, *e.g.*, ¶¶5-22, 29, 31-33, 35-38, 41-42, 44-48, 50-51, 53-65, 68-107, 109-177, 180-188, 197-203; *see also In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 334, 357-58 (D. Md. 2004) (rejecting international comity argument where United States had significant interest in foreign purchasers' claims given defendant's substantial U.S sales, operations, and fraudulent conduct).

demonstrating an adequate alternative forum, and that the balance of private and public interest factors favors dismissal.  *Id*.  The defendant must "'mak[e] a clear showing of facts which establish such oppression and vexation of the defendant as to be out of all proportion to plaintiff's convenience.'"[30]

Defendants cannot seriously argue that this forum is inconvenient.  Toyota is already litigating hundreds of related cases in the United States, particularly in Los Angeles.  Moreover, great deference must be given to the Plaintiffs' chosen forum because it is their home forum and has significant links to this action.  *See Cariajano*, 626 F.3d at 1148, 1150; *Mujica*, 381 F. Supp. 2d at 1141.  Plaintiffs are U.S. citizens; whether a majority of class members may be foreign is irrelevant. *See Cariajano*, 626 F.3d at 1149; *DiRienzo*, 294 F.3d at 28.

Moreover, as Toyota successfully argued in the MDL product liability cases to keep them in Los Angeles:  (1) Toyota USA is headquartered in this District; (2) many documents and witnesses are located here; (3) Los Angeles is "easily accessible to parties and witnesses" from Japan; and (4) this District can devote sufficient resources to complex actions.  *See* Toyota Defendants' Response In Support Of Transfer Of Actions To The Central District Of California, MDL No. 2151 (Mar. 1, 2010) [ECF No. 37] at 1-2, 5, 8-11, 14-18.  If anything, it is the Defendants who are forum shopping by seeking dismissal in favor of an inconvenient forum for Plaintiffs.[31]

---

[30]  *Id*. at 1157 (quoting *Boston Telecommc'ns Grp. v. Wood*, 588 F.3d 1201, 1212 (9th Cir. 2009)).  Defendants' attempt to distinguish *Cariajano* on the purported basis that it did not involve application of foreign law, and involved unique facts, is baseless.  The legal standards reaffirmed by the Ninth Circuit in *Cariajano* are well established and easily applied to this case.  *See Cariajano*, 626 F.3d at 1144-56 (citing a plethora of Supreme Court and Ninth Circuit cases).

[31]  *See Iragorri v. United Techs. Corp.*, 274 F.3d 65, 75 (2d Cir. 2001).  The inconvenience to Plaintiffs of bringing their witnesses and evidence to Japan is clear. Defendants offer nothing to suggest any disproportionate hardship to them from litigation here.  Defendants do not name any witness who would be unwilling to travel to Los Angeles.  *See Cariajano*, 626 F.3d at 1152.  Most or all documentary evidence located in

Defendants ignore the substantial local interest in this case, and that both Japanese courts and this District have similarly crowded dockets. Tokumoto Decl., ¶43; *see*, *e.g.*, *Cariajano*, 626 F.3d at 1155 (no abuse of discretion where court concluded that both forums' judiciaries are overburdened). While this District is realizing efficiencies from the MDL procedures, Japan offers no such advantages. Concentrating all Toyota unintended acceleration litigation here also eliminates the risk of inconsistent adjudications.

The Supreme Court recognizes that "the need to apply foreign law . . . is not [alone] sufficient to warrant dismissal when a balancing of all relevant factors shows that the plaintiff's chosen forum is appropriate." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 260 (1981). "Resort to forum non conveniens based on a need to ascertain and apply foreign law should not be the norm . . . . Given the enhanced procedures for handling foreign-law issues provided by Rule 44.1 and the ease of communicating about such matters and expanded learning about other legal systems, such issues usually should not be an obstacle to a federal court retaining jurisdiction." Wright & Miller, 9A Federal Practice & Procedure § 2444 (Rev. 2010); *see Krish v. Balasubramaniam*, 2007 WL 1219281, at *9 (E.D. Cal. Apr. 25, 2007) ("Federal courts routinely apply the law of other countries.").

## V. __CONCLUSION__

For the reasons discussed above, Defendants' motion to dismiss should be denied in its entirety. If the Court grants Defendants' motion in whole or in part, Plaintiffs respectfully request leave to amend under Rule 15(a).

Dated: March 21, 2011                     Respectfully submitted,

                                          BERNSTEIN LITOWITZ BERGER
                                              & GROSSMANN LLP

                                          ___/s/ David R. Stickney_____

---

Japan is within Defendants' control, "and thus can be brought to court wherever the forum." *Neuralstem, Inc. v. ReNeuron, Ltd.,* 365 Fed. Appx. 770, 772 (9th Cir. 2010).

BLAIR A. NICHOLAS
(blairn@blbglaw.com)
DAVID R. STICKNEY
(davids@blbglaw.com)
BENJAMIN GALDSTON
(beng@blbglaw.com)
DAVID KAPLAN
(davidk@blbglaw.com)
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:   (858) 793-0070
Fax:  (858) 793-0323
-and-
GERALD H. SILK
(jerry@blbglaw.com)
1285 Avenue of the Americas, 38th Floor
New York, NY 10019
Tel:   (212) 554-1400
Fax:  (212) 554-1444

*Counsel for Lead Plaintiff Maryland
State Retirement and Pension System and
Lead Counsel for the Class*

FAIRBANK & VINCENT
ROBERT H. FAIRBANK
(Bar No. 76359)
(rfairbank@fairbankvincent.com)
DIRK L. VINCENT
(Bar No. 157961)
(dvincent@fairbankvincent.com)
444 S. Flower Street. Suite 3860
Los Angeles. CA 90071
Tel:   (213) 891-9010
Fax:  (213) 891-9011

*Liaison Counsel for the Class*

DOUGLAS F. GANSLER
Attorney General of Maryland
CAMPBELL KILLEFER
Deputy Chief of the Civil
 Litigation Division
(ckillefer@oag.state.md.us)
JOHN J. KUCHNO
Assistant Attorney General
(jkuchno@oag.state.md.us)
MARYLAND OFFICE OF ATTORNEY
GENERAL
200 St. Paul Place. 20th Floor

1

2

Baltimore. MD 21202
Tel:   (410) 576-7291
Fax:  (410) 576-6955

*Counsel for Lead Plaintiff Maryland*
*State Retirement and Pension System*