UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

# MEMORANDUM

| | | | |
|---|---|---|---|
| Case No. | CV 10-922 DSF (AJWx) | Date | 7/ 7 /11 |
| Title | In re Toyota Motor Corp. Securities Litig. | | |

| | |
|---|---|
| Present: The Honorable | DALE S. FISCHER, United States District Judge |

| Debra Plato | Not Present |
|---|---|
| Deputy Clerk | Court Reporter |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| Not Present | Not Present |

**Proceedings:** (In Chambers) Order GRANTING IN PART and DENYING IN PART Motion to Dismiss (Docket No. 180, 193, 201)

## I. BACKGROUND

This suit under the Private Securities Litigation Reform Act ("PSLRA") arises out of statements by employees of Defendants Toyota Motor Corporation, Toyota Motor North America, Inc., and Toyota Motor Sales, U.S.A., Inc. made against a background of allegations of defects in Toyota vehicles.

In around 2000, Toyota received the first of what would eventually be thousands of reports of unintended acceleration in several models of both the Toyota and Lexus brand vehicles. These reports continued through the last decade and were the subject of at least eight investigations by the National Highway Traffic and Safety Administration ("NHTSA") between 2003 and 2010. Toyota identified driver error and non-standard or misaligned floor mats as the source of the problem.

In the meantime, Toyota began acquiring internal evidence that the unintended acceleration might have been due to a more serious mechanical or electrical defect in the design of the cars themselves. Toyota technicians were able to reproduce unintended acceleration not related to floor mat placement on several occasions. (Compl. ¶¶ 73, 87.) In early 2010, in the face of increasing reports of accidents related to unintended acceleration, Toyota was forced to admit that many of its vehicles were subject to several design defects. It instituted recalls at an estimated cost of ¥380 billion (~$4 billion).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## MEMORANDUM

(Compl. ¶ 141.)  By the end of a wave of revelations, Toyota's stock price had dropped at least 11%.  (See Compl. ¶¶ 180-187.)  The size and severity of the defects prompted both a NHTSA investigation and investigations by Congress.  On April 19, 2010, the NHTSA fined Toyota $16.4 million for failure to comply with regulations regarding defect disclosure.  (Compl. ¶ 139.)

Numerous securities fraud suits followed, many of which are consolidated in this action.  Defendants now move to dismiss the consolidated complaint.

## II.  LEGAL STANDARD

Liability under § 10(b) of the Securities Exchange Act of 1934 and Securities and Exchange Commission Rule 10b-5 requires a showing that the defendants (1) made a material misrepresentation (or omission), (2) with scienter, (3) in connection with the purchase or sale of a security, (4) reliance by the plaintiff, (5) economic loss, and (6) "loss causation."  Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005).

To plead falsity, a securities fraud plaintiff is required to "specify each statement alleged to have been misleading" and provide "the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1).

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193-94 & n.12 (1976).  In a typical fraud case, knowledge and intent can be alleged generally.  See Fed. R. Civ. P. 9(b).  However, allegations of scienter must meet a higher standard under the PSLRA.  In such cases, a plaintiff is required to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  An inference of scienter is "strong" if "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 324 (2007).  The inference "need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the most plausible of competing inferences."  Id. (internal quotation marks omitted).  In determining whether the inference of scienter is strong, courts are to accept all factual allegations in the complaint as true and examine the allegations in their entirety.  Id. at 322.  "The inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  Id. at 322-23.  In evaluating a pleading of scienter, a court "must take into account plausible opposing inferences."  Id. at 323.
The strength of an inference cannot be decided in a vacuum. The inquiry is

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**MEMORANDUM**

inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts? To determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff.

Id. at 323-24.

Loss causation requires "that the defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss." Dura Pharms., 544 U.S. at 346. "[T]he plaintiff must demonstrate a causal connection between the deceptive acts that form the basis for the claim of securities fraud and the injury suffered by the plaintiff." In re Daou Systems, Inc., 411 F.3d 1006, 1025 (9th Cir. 2005). "The misrepresentation need not be the sole reason for the decline in value of the securities, but it must be a 'substantial cause.'" In re Gilead Sciences Securities Litig., 536 F.3d 1049, 1055 (9th Cir. 2008).

### III. DISCUSSION

**A. Scienter is Not Adequately Alleged for Statements 1, 3-7, 9-12, 14-17, 22, 23, 25, 27, and 33[1]**

Plaintiffs allege that numerous statements about Toyota's legal and regulatory compliance were false because Toyota was not, in fact, living up to its statutory and regulatory duties. Plaintiffs have not adequately alleged scienter as to these statements because it is more plausible – based on the limited facts in the complaint – that Defendants believed their responses to the NHTSA were within the scope of an aggressive defense under the law, rather than an intentional violation of the law. Plaintiffs simply do not allege any facts that show Defendants were knowingly violating laws or regulations.

Plaintiffs also fail to allege scienter adequately as to the generalized quality and safety statements. Nothing in the complaint permits a strong inference that any of the Defendants intentionally misled investors about Toyota's corporate strategy with regard to quality and safety. Viewing the complaint in its totality, it is much more plausible that Defendants believed Toyota could maintain high quality and safety while cutting costs, or

---

[1] The Court, like the parties, refers to allegedly false statements by the number they are given in the appendix to the complaint.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## MEMORANDUM

that any small quality reductions would have no appreciable impact on Toyota's position in the market. Further, it is not necessarily inconsistent to assert that quality is stable or even increasing on the whole, while being aware of a potentially significant defect. There are many aspects of quality, and those could have been improving even though occasional defects – even substantial defects – were discovered.[2]

Statement 33 is a response to a Los Angeles Times article about the potential unintended acceleration defect. Defendant Irving Miller, Vice President of Environmental and Public Affairs at Toyota USA, stated that the article "unfairly attack[ed] Toyota's integrity and reputation" and that "Toyota has a well-earned reputation for integrity." (Compl. ¶ 176.) It appears that at least some of the article's criticism was well-founded and that Miller may have been aware of that foundation. But that does not support a strong inference that Miller either made an untrue statement or spoke with scienter when he stated the article was unfair to Toyota. An article can raise some legitimate points – or even generally raise true and legitimate points – while still being written in a tone that is unfair.[3]

While the Court does not reach the issues of falsity and loss causation as to these statements, there is serious doubt as to whether these elements are pleaded sufficiently. Therefore, Plaintiffs should expand on the falsity and loss causation allegations pertaining to these statements, if possible, if Plaintiffs amend their complaint.

### B.    Statements 2, 8, 13, 18, 19, and 21 are Not Sufficiently Alleged to Be False

Statements 2, 8, 13, and 21 involve financial disclosures. These disclosures are not alleged to be literally false. Instead, Plaintiffs claim that the financial disclosures were misleading because they did not disclose that the positive financial results came at the expense of declines in safety and quality. This theory fails because the statements made no mention of safety and quality at all. The accurate financial data did nothing to "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exist[ed]." Brody v. Transitional Hosps. Corp., 280 F.3d 997, 1006 (9th Cir. 2002). And even if Plaintiffs' theory of falsity were accepted, Plaintiffs have failed to allege scienter adequately for the reasons previously stated – nothing in the

---

[2] For this reason, Plaintiffs have also arguably failed to plead falsity adequately for the generalized quality and safety statements.

[3] As with the generalized quality and safety statements, Plaintiffs have arguably not adequately pleaded that Miller's statements in response to the article were actually false.

complaint suggests that Defendants were knowingly trading quality and safety for financial results. At most the complaint pleads that Defendants knew they had a potentially serious defect in many of their cars; but there is no allegation that ties that defect to any cost cutting.[4]

Statements 18 and 19 are not adequately alleged to be false because it appears from the face of the complaint that they may be referring to issues unrelated to the unintended acceleration problems that were the basis of Toyota's later troubles.[5] In other words, on the face of the complaint it appears that Plaintiffs may have taken the statements out of context. Plaintiffs provided reasons for the falsity of statements 18 and 19, but those reasons do not address the context of the statements.

**C.     Statements 20, 24, 26, and 29-32 are Adequately Pleaded**

Defendants argue that the claims related to statements 20, 24, 26, and 29-32 should be dismissed for failure to meet the PSLRA's scienter requirement.

While a "smoking gun" is not required for a sufficient pleading of scienter, Defendant Miller appears to have admitted in an e-mail that Toyota had been covering up the true nature and severity of the unintended acceleration defects. "I hate to break this to you but WE HAVE a tendency for MECHANICAL failure in accelerator pedals of certain manufacturer [sic] on certain models. We are not protecting our customers by keeping this quiet. The time to hide this one is over. We need to come clean . . . ." (Compl. ¶ 122.) Defendants try to downplay this revelation by arguing it does not give rise to a strong inference that allegedly false statements made two or three months earlier were made with scienter. While it might turn out that the cover-up referred to in the e-mail was of extremely short duration, this is not the only possible inference, or even the most likely inference to be drawn. It is at least as likely that Defendant Miller was referring to a cover-up that encompassed at least some of the false statements alleged in

---

[4] The only contention that touches on this refers to a 2006 letter from certain Toyota factory workers to Defendant Katsuaki Watanabe that asserts that the workers were seeing quality declines due to cost cutting. (Compl. ¶ 84.) However, no facts in the complaint, if true, demonstrate that the workers' assertion was actually true or that any Defendants believed it to be true.

[5] Alternatively, Plaintiffs have not adequately alleged loss causation for these statements because the only significant drop in Toyota's stock price alleged in the complaint related to the unintended acceleration problems.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## MEMORANDUM

the complaint, and possibly covered several of the previous NHTSA investigations.

Relying on the "core operations" inference, Plaintiffs have pleaded numerous additional facts that create a strong inference of Defendants' scienter. The core operations inference arises where the particular facts at issue were so important to the company that it is "absurd" to suggest that the individual defendants would not have had "contemporaneous knowledge" of them. See Berson v. Applied Signal Tech., Inc., 527 F.3d 982, 987-89 (9th Cir. 2008).[6]

The defects at issue were simply too significant for it to be plausible that top Toyota management was not aware of the possible ramifications of the problem by the time the statements at issue were made, especially given that Toyota is known for – and publicizes – a highly involved management style – the so-called "Toyota Way." Plaintiffs plead that Toyota undertook non-floor mat related steps in Europe to address the unintended acceleration problem, (see Compl. ¶¶ 111), which shows management's awareness of the problems and potential reasons for them.[7] Further, the NHTSA instituted no fewer than eight investigations into unintended acceleration between 2003 and 2010, which would almost certainly have brought the matter to upper management's attention.[8] (See Compl. ¶ 61.) And, contrary to Defendants' assertions, Plaintiffs have pleaded that Toyota was specifically aware that widespread unintended acceleration recalls would have been very costly for the company and celebrated avoidance of potential NHTSA mandated recalls. (See Compl. ¶ 101; see also Compl. ¶ 117 (analysts noting that floor mat issue would have less impact on company than mechanical issue).) Finally, Toyota's unintended acceleration issues were drawing enough media scrutiny, (see Compl. ¶¶ 98, 161, 163, 166), that it is unlikely that management would not have

---

[6] At least one subsequent Ninth Circuit case describes the core operations inference as being an inference of scienter based on the obviousness of the falsity of the statement at issue. See Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 1001 (9th Cir. 2009). However Berson's holding only relied on the prominence of the issues involved. See Berson, 527 F.3d at 988 & n.5, 989.

[7] Recall decisions are alleged to have been made by Toyota management in Japan. (Compl. ¶¶ 55-56.)

[8] Also, the NHTSA has found that Toyota obstructed its investigations into the problem. While this is not direct evidence of Defendants' scienter and the Court does not rely on it, it strongly suggests that other evidence of Defendants' scienter exists, but is not currently known to Plaintiffs.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## MEMORANDUM

been informed of the issues involved.

Defendants counter these allegations through a divide-and-conquer strategy that ignores the Supreme Court's directive. These allegations, if taken individually and in isolation, might not suffice to establish scienter; but it does not follow that the allegations are irrelevant to the scienter analysis. For example, while the mere existence of the "Toyota Way" might not be a sufficient allegation to support scienter for a relatively minor issue, it is obviously relevant in determining the likelihood that top executives knew about a major issue. Many other allegations can be similarly discounted when viewed individually, but when assessed "holistically" they create a strong interference of scienter. See Tellabs, 551 U.S. at 326.

Defendants' attempt to downplay the core operations inference as applied to this case is unconvincing. Certainly the inference should not be applied excessively, see South Ferry LP, #2 v. Killinger, 542 F.3d 776, 785 n.3 (9th Cir. 2008), but most securities lawsuits do not involve operational problems nearly as extreme as the unintended acceleration defect. There was substantial media coverage of the issue. The magnitude of the problem was overwhelming, both in its potential catastrophic results and the number of vehicles involved. The likely cost was extraordinary; the resultant financial impact was admittedly significant; and the regulatory scrutiny was intense. Toyota's carefully cultivated reputation for quality and safety and its market credibility were clearly at risk. It was undoubtedly predictable that the unintended acceleration defect would have an enormous impact on Toyota's business and was likely to continue to do so for the foreseeable future - through lawsuits and adversely impacted reputation. This was admittedly an issue with "global ramifications." Defendants' claim that this case is nothing like Berson or No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp., 320 F.3d 920 (9th Cir. 2003) ("America West"), where the core operations inference was upheld, is simply wrong.

A "strong inference" of scienter is one that is as compelling as other competing inferences. Tellabs, 551 U.S. at 324. The Court, then, must look to see if it is as reasonable to believe that Defendants were aware of the falsity of their statements as it is to believe that they were not. While neither party focuses on the alternative state of mind that could have been held by Defendants, the Supreme Court has noted that "[t]he strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts?" Tellabs, 551 U.S. at 323. Here, the alternative conclusion is apparently that Defendants honestly believed that thousands of reported unintended acceleration problems were caused by misaligned floor mats or drivers who could not tell

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## MEMORANDUM

when they were pressing the brake and when they were pressing the accelerator **and** were unaware that floor mats might not be the cause of the problems. Given the gravity of the issue, it is at least as likely to be true that Defendants were aware of the competing possibility of a serious mechanical design flaw in their vehicles as it is that they remained blissfully unaware of the mounting evidence produced by Toyota engineers and service technicians, as well as the accumulating reports of unintended acceleration that probably could not all be attributed to misaligned floor mats. Toyota did not claim to be uncertain; it affirmatively pointed the finger at floor mat placement and driver error. Therefore, it was – at the very least – deliberately reckless to mislead investors into believing that Toyota had definitively identified the source of the unintended acceleration problem.

**D. Claims Against Individual Defendants**

    1. <u>Control Person Liability</u>

An individual defendant can be liable under section 20(a) of the Securities Exchange Act as a control person if "the defendant exercised actual power or control over the primary violator." <u>America West</u>, 320 F.3d at 945. The allegations in the complaint do not sufficiently establish that Mitsuo Kinoshita, Irving Miller, and Robert Daly had "actual power or control" over any of the individuals that made any of the statements that survive the motion to dismiss. Kinoshita holds and held positions that appear to have some relationship to safety and recalls, but there is nothing in the complaint that suggests that he had any actual supervisory role over any of the individual defendants that made allegedly fraudulent statements. Miller and Daly made statements that survive the motion to dismiss, but their roles do not suggest that they had any supervisory power or control over any of the other actors that made allegedly fraudulent statements.

    2. <u>Direct Liability under Rule 10(b)-5</u>

As discussed above, only statements 20, 24, 26, and 29-32 survive the motion to dismiss. Therefore, Defendants Katsuaki Watanabe, Fujio Cho, Mitsuo Kinoshita, and James Lentz are not directly liable for securities fraud as individuals because none of the surviving statements are attributed to those Defendants.

**E. The Court Does Not Have Original Jurisdiction over the Japanese Law Claims and Declines to Exercise Supplemental Jurisdiction**

Plaintiffs argue that this Court has original jurisdiction over the Japanese law claims under the Class Action Fairness Act ("CAFA"). The Court disagrees. Because

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## MEMORANDUM

the claims relate to "covered securities," they are exempted from CAFA. 28 U.S.C. § 1332(d)(9). "Covered securities" include securities "listed, or authorized for listing, on the New York Stock Exchange." 15 U.S.C. § 77r(b)(1)(A). The complaint explicitly alleges that the Toyota common stock at issue is listed on the New York Stock Exchange ("NYSE"), (Compl. ¶ 197), and – despite some confusing wording in the Opposition – Plaintiffs do not now claim otherwise, (Opp. 30 ("Toyota common shares are listed on the NYSE . . ..")). In an attempt to escape the obvious conclusion that the common stock is a covered security, Plaintiffs argue that the stock must actually be traded to qualify. Plaintiffs cite Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit, 547 U.S. 71, 83 (2006) and Proctor v. Vishay Intertechnology Inc., 584 F.3d 1208, 1217, 1221-22 (9th Cir. 2009) as alleged support for this position. In both cases, however, the parties agreed that the securities were "covered," and neither court purported to address the issue raised here. Certainly neither holds that a listed stock is not "covered" unless it is also traded on the exchange. To the contrary, in a footnote, the Supreme Court clarified that "covered security" is defined "to include securities traded on a national exchange." Dabit, 547 U.S. at 83 n.9 (emphasis added). This Court declines to impose such a requirement, as to do so would ignore the plain language of the statute. Indeed, according to the statute, a stock need not even be listed to be "covered"; it need only be "authorized for listing." 15 U.S.C. § 77r(b)(1)(A).[9]

The Court has supplemental jurisdiction, because the Japanese law claims form part of the same case or controversy and arise from a common nucleus of operative facts as the American securities fraud claims.[10] See 28 U.S.C. § 1367(c). Nevertheless, the Court declines to exercise its jurisdiction.

> The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if –
> (1) the claim raises a novel or complex issue of State law,
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
> (3) the district court has dismissed all claims over which it has original jurisdiction, or

---

[9] Because there is no ambiguity in the section, the Court finds no reason to look to its heading for clarification.

[10] Defendants filed objections to both Japanese law expert declarations filed by Plaintiffs. As the Court's supplemental jurisdiction ruling does not rely on the existence of novel or complex issues of Japanese law, the Court declines to address those objections.

    (4)    in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).

The Japanese law claims substantially predominate over the American law claims. The vast majority of the members of the currently pleaded class are common stock holders who purchased their stock on foreign exchanges and, therefore, have only a Japanese law claim. It follows that the damages analysis would focus overwhelmingly on these claims. In addition, even the few aspects of the claims that are admitted by both sides to differ from the American law claims are extraordinarily significant in the context of this particular litigation. Under these circumstances, the Japanese law claims unquestionably would dominate the litigation.

The exceptional circumstance of comity to the Japanese courts also strongly argues against the exercise of supplemental jurisdiction. The clear underlying rationale of the Supreme Court's decision in <u>Morrison v. Nat'l Australia Bk., Ltd.</u>, 561 U.S. __, 130 S.Ct. 2869 (2010), is that foreign governments have the right to decide how to regulate their own securities markets. This respect for foreign law would be completely subverted if foreign claims were allowed to be piggybacked into virtually every American securities fraud case, imposing American procedures, requirements, and interpretations likely never contemplated by the drafters of the foreign law.[11] While there may be instances where it is appropriate to exercise supplemental jurisdiction over foreign securities fraud claims, any reasonable reading of <u>Morrison</u> suggests that those instances will be rare.

## IV. CONCLUSION

The motion is GRANTED IN PART and DENIED IN PART consistent with this order. Plaintiffs are granted leave to amend their complaint as to the non-Japanese law claims by July 28, 2011. If Plaintiffs fail to amend by that date, Defendants' answer will

---

[11] Several of the issues that the Supreme Court was concerned with in <u>Morrison</u> were procedural and would apply with equal force to supplemental jurisdiction over foreign claims. <u>See</u> 130 S.Ct. at 2885 ("And the regulation of other countries often differs from ours as to what constitutes fraud, what disclosures must be made, what damages are recoverable, <u>what discovery is available in litigation</u>, <u>what individuals actions may be joined in a single suit</u>, what attorney's fees are recoverable, and many other matters.") (emphasis added); <u>id.</u> at 2886 ("[S]ome [in other countries] fear that [the United States] has become the Shangri-La of class-action litigation for lawyers representing those allegedly cheated in foreign securities markets.").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## MEMORANDUM

be due on August 19, 2011.

    IT IS SO ORDERED.