# EXHIBIT 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

In re:  TOYOTA MOTOR
CORPORATION SECURITIES
LITIGATION

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Master File. No CV 10-922 DSF
(AJWx)

**DISCOVERY MATTER**

**REPORT AND RULINGS OF
SPECIAL MASTER LAYN R.
PHILLIPS REGARDING LEAD
PLAINTIFF'S MOTION TO
COMPEL THE PRODUCTION OF
DOCUMENTS FROM
DEFENDANTS**

Special Master:  Hon. Layn R. Phillips

Report and Rulings of Special Master Layn R. Phillips
re Lead Plaintiff's Motion to Compel the Production of
Documents From Defendants

2603335

Now before the Special Master[1] is Lead Plaintiff's ("Plaintiff") Motion to Compel Production of Documents (the "Motion") (Dkt. 240) from all defendants.  Having carefully considered the arguments presented, the Plaintiff's Motion is **GRANTED** in part and **DENIED** in part, subject to certain modifications concerning the scope of the production as to certain of the Document Requests.

## BACKGROUND

This is a securities fraud class action against Toyota Motor Corporation ("TMC"), Toyota Motor North American, Inc., and Toyota Motor Sales, U.S.A., Inc. (collectively, "Toyota" or the "Company" or the "Corporate Defendants") and seven Toyota officers and/or directors of one or more of the Corporate Defendants (the "Individual Defendants"). The putative class consists of all those who purchased or otherwise acquired Toyota American Depositary Shares ("ADSs") between April 7, 2008 and February 2, 2010, inclusive (the "Class Period").

The Complaint (the "Complaint") alleges that defendants made a number of false and misleading public statements, both before and during the Class Period, relating to the nature, causes, and severity of "unintended acceleration" in certain automobiles manufactured by Toyota.  As the Court summarized in its July 7, 2011 Order (Dkt. 213) (the "Order") at 1-2:

> In around 2000, Toyota received the first of what would eventually be thousands of reports of unintended acceleration in several models of both the Toyota and Lexus brand vehicles.  These reports continued through the last decade and were the subject of at least eight investigations by the National Highway Traffic and Safety Administration ("NHTSA") between 2003 and 2010.  Toyota identified driver error and non-standard or misaligned floor mats as the source of the problem.

> In the meantime, Toyota began acquiring internal evidence that the unintended acceleration might have been due to a more serious mechanical or electrical defect in the design of the cars themselves.  Toyota technicians were able to reproduce unintended acceleration not related to floor mat placement on several occasions.  (Compl. ¶¶ 73, 87.)  In early 2010, in the face of increasing reports of accidents related to unintended acceleration, Toyota was forced to admit that many of its vehicles were subject to several design defects.  It instituted recalls at an estimated cost of ¥380 billion (~$4 billion). (Compl. ¶ 141.)  By the end of a wave of revelations, Toyota's stock price had dropped at least 11%.  (See Compl. ¶¶ 180-187.)  The size and severity of the defects prompted both a NHTSA investigation and investigations by Congress.  On April 19, 2010, the NHTSA fined Toyota $16.4 million for failure to comply with regulations regarding defect disclosure.  (Compl. ¶ 139.)

The Court held that Plaintiff had not adequately alleged scienter as to Statements 1, 3-7, 9-12, 14-17, 22, 23, 25, 27, and 33, relating to Toyota's legal and regulatory compliance.  Order at 3-4.[2]  The Court also held that certain statements (2, 8, 13, 18, 19, and 21) involving financial disclosures were not sufficiently alleged to be false, and that

---

[1]   The Court's November 16, 2011 Stipulated Order Appointing Special Master (Dkt. 239) states that I am authorized to rule on discovery disputes in this matter, subject to and consistent with Fed. R. Civ. P. 53(a)(1)(A).

[2]   The Court referred to the allegedly false statements by the number they were given in the appendix to the Complaint.  Order at 1, n.1.

Report and Rulings of Special Master Layn R. Phillips re Lead Plaintiff's Motion to Compel the Production of Documents From Defendants

2603335                                        - 2 -

Plaintiff also failed to adequately allege falsity and loss causation as to two statements (18 and 19) that "may be referring to issues unrelated to the unintended acceleration problems that were the basis of Toyota's later troubles."  Order at 5 and n.5.

The Court denied the motion to dismiss as to Statements 20, 24, 26 and 29-32 (the "Actionable Statements").  As discussed below, defendants' opposition is predicated in large part on the contention that, as a consequence of the Court's holding, the relevant time period, discoverable issues, and relevant custodians have been, for discovery purposes, substantially narrowed.

Plaintiff served 55 Requests for the Production of Documents on each of the defendants; each set of requests were in substance identical. The parties met and conferred regarding their respective positions via correspondence and telephonic discussions. Unable to resolve their differences, Plaintiff moved to compel production on 28 requests as to all defendants.

Broadly speaking, Plaintiff seeks documents grouped in the following topics:  (1) the Actionable Statements (Req. Nos. 2-7); (2) the causes of unintended acceleration ("UA") in cars manufactured by Toyota (Req. Nos. 12 and 48); (3) potential remedies for UA and quality control communications (Req. Nos. 14 -15); (4) government oversight of UA and reporting for defects (Req. Nos. 19, 21-31); (5) price declines in Toyota securities related to UA, recalls, or the quality or safety of Toyota vehicles (Req. No. 9); (6) documents concerning the "Toyota Way," Toyota's highly-centralized management and reporting structure (Req. No. 37); (7) documents relating to Toyota Motor Corporation's responsibility or authority for defect determinations or decisions to conduct recalls in the United States, including the scope of any recall, the remedy, and related public disclosures (Req. No. 16); and (8) custodial files of all Toyota "Senior Management" and its Board of Directors concerning an enumerated list of 26 topics (Req. Nos. 41-43).[3]

Defendants raise three General Objections concerning the scope of the production, in addition to specific objections relating to certain categories of the documents sought by Plaintiff.  These General Objections concern (1) the applicable time period covered by all discovery requests; (2) whether the scope of discovery should be limited to defendants' knowledge of the "sticky pedal" issue with respect to Statements 29-32; and (3) whether discovery should "focus" on the Individual Defendants who made the seven Actionable Statements.

Briefing was completed on January 30, 2012, following receipt of Plaintiff's Reply papers on that date.  On February 22, 2012, I issued a Tentative Report and Rulings (the "Tentative Rulings"), and the parties provided written comments to me on February 28, 2012.  I thereafter, held telephonic oral argument on February 29, 2012.

---

[3]    Plaintiff did not file a Notice of Motion setting forth the relief sought.  Instead, Plaintiff filed a memorandum of points of authorities, styled as a "Motion", which identified the discovery requests at issue.  The Motion was accompanied by a proposed order which identified 27 – not 28 – document requests at issue.  The proposed order did not reference Document Request No. 37; nonetheless, and for purposes of this Report and Rulings, I shall assume that the parties understand this document request (relating to the so-called "Toyota Way") is a subject of dispute, and therefore ripe for consideration.

Report and Rulings of Special Master Layn R. Phillips
re Lead Plaintiff's Motion to Compel the Production of
Documents From Defendants

2603335                          - 3 -

# RULINGS

A.     The Applicable Time Period for Discovery.

1.     Ruling.

I conclude that Plaintiff's proposed applicable time period for discovery preceding and through the Class Period (January 1, 2004 through February 2, 2010) is reasonable. Fed. R. Civ. P. 26(b)(1).  With regard to *post*-Class Period discovery, I conclude that Plaintiff's proposal – which is to compel defendants to locate and produce documents "through the date of production" -- is not reasonably supported.  Rather, the discovery cut-off date should be through April 19, 2010, the date on which the NHTSA announced Toyota Motor Corporation's agreement to pay a $16.375 million fine for failing to notify the NHTSA "of a dangerous pedal defect for almost four months." (*See* Compl. ¶ 139). *See* April 19, 2010 "Statement from U.S. Department of Transportation Secretary Ray LaHood on Toyota's Agreement to Pay Maximum Civil Penalty," found at http://www.nhtsa.gov/PR/DOT-71-10.

Accordingly, as to this General Objection, the Motion is **GRANTED** in part and **DENIED** in Part.

2.     The Parties' Contentions.

Defendants argue that Plaintiff's proposed time period for discovery – from January 1, 2004 to the date of production -- is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.  Defendants concede that the Order references alleged facts pre-dating 2008 in its analysis of the "core operations inference" as to the Actionable Statements.  Defendants nonetheless contend that this "does not mean that Plaintiffs should therefore be entitled to take burdensome discovery for the entire period."  Opp. at 10.

Defendants argue that "[t]he Court's analysis was limited to whether Plaintiffs had satisfied the underlying requirements of a pleading doctrine," Opp. at 10-11; having "drastically limited" the Actionable Statements at issue, *id.* at 11, defendants contend that the scope of discovery must therefore be centered on proof that "Defendants *actually knew* that the seven specific statements remaining in the case were false, or that Defendants were deliberately reckless as to their truth or falsity at the time they made them."  *Id.* Defendants also suggest that in light of the Order, discovery should focus on the "sticky pedal" defect disclosed in late January 2010 (and not, more generally, on other defects or possible causes of the UA condition) (*See* §B *infra*).[4]  Defendants' position can be summed up as follows:  "If Plaintiffs cannot discover facts demonstrating the speakers' scienter within two years of [the actionable] statements, then the likelihood of discovering probative evidence from years earlier that proves the speakers' much later state of mind is exceedingly remote."  Opp. at 9.

Defendants proposed a 26-month discovery period (from January 1, 2008 to February 28, 2010) which, they submit, is reasonable in light of what Plaintiff currently contends is the putative class period (from April 7, 2008 to February 2, 2010).[5]  Following

---

[4]     For reasons discussed below, I do not conclude that it is reasonable to limit discovery to what defendants refer to as the "sticky pedal" defect.

[5]     Defendants brought a Motion for Partial Judgment on the Pleadings ("MPJOP") (Dkt. 243) to seek dismissal of Statements 20, 24, and 26, which were made, respectively, on April 7, 2008 (Compl. ¶ 161), June 10, 2008 (*Id.* ¶ 163), and April 23, 2009 (*Id.* ¶ 166). Opp. at 7.  Defendants suggested that "[b]ecause the Court's ruling on that motion will

Report and Rulings of Special Master Layn R. Phillips re Lead Plaintiff's Motion to Compel the Production of Documents From Defendants

2603335                                        - 4 -

receipt of the Tentative Rulings and the denial of their MPJOP, defendants suggested that "discovery first focus on the period from January 1, 2006 to April 19, 2010." February 28, 2012 Defendants' Comments on the Special Master's Tentative Report and Rulings" ("Defendants' Comments") at ¶ 3.[6]

Plaintiff contends that its proposed time period is relevant to its claims and defendants' 51 affirmative defenses, and that the time frame is "rationally tied" to key UA events alleged in the Complaint, including events specifically referenced in the Court's July 7 Order. Reply at 3. Plaintiff specifically takes issue with defendants' contention that the Court's reference to pre-2008 facts bears only on whether Plaintiff has satisfied the

---

likely have a substantial impact on the scope of discovery in this case," *id.*, I should defer my ruling until after the Court's ruling on the MPJOP. The Court denied that motion on February 21, 2012. (Dkt. 253).

.
[6]   Defendants concede in their response to the Tentative Rulings that documents pre-dating their initial proposed time period cutoff of January 1, 2008 are at least potentially relevant to the Actionable Statements remaining in the case. Defendants' Comments at ¶ 3 ("Defendants can represent that floor mat entrapment issues . . . became the subject of a NHTSA investigation in 2007"). Nonetheless, defendants contend (as they did in their opposition) that a discovery period extending back to January 1, 2004 "will inevitably increase significantly the number of documents Defendants must review and produce – with little likely additional probative value." *Id.* While asserting in oral argument that "lines have to be drawn somewhere" for purposes of discovery cutoff, defendants do not advance arguments as to why a January 1, 2004 discovery cut-off is not rationally related to the allegations set forth in the Complaint (or address Plaintiff's contention that this cut-off is relatively "conservative", given that Plaintiff has alleged a "ten year" history of concealments and misrepresentations relating to the causes of unintended acceleration), other than to say that such documents predating January 1, 2006 will have "little likely additional probative value."

Instead, defendants suggest that discovery be limited (or possibly staged) with respect to both time period and subject matter, with the subject matter focus on "sticky pedal" and "floor mat entrapment", and the time period beginning on January 1, 2006, with the proviso that "[i]f Plaintiffs subsequently believe that a longer discovery period is necessary, then Defendants suggest that the parties meet and confer and if necessary return to the Special Master for guidance at that time." Defendants' Comments at ¶ 3. I do not believe that defendants' suggestion to limit the time period or to focus discovery as to certain causes of unintended acceleration is an appropriate or workable solution, nor one justified by any evidentiary showing of burden, lack of relevance, or the Court's rulings. *See* pp. 14-15 & n.21 *infra.* Such a proposal would likely lead to further delay, serial productions, collateral disputes over whether the subject matter search was unduly narrow, and the potential for seriatim depositions of the same witnesses. At oral argument, Plaintiff noted that fact discovery closes in one year, and that (to date), defendants have produced approximately 80,000 pages (of which roughly 55,000 pages were produced after defendants received the Tentative Rulings), notwithstanding the fact that the Court issued its Order nearly eight months ago. Plaintiff also contended at oral argument that defendants have already gathered or produced "millions of documents" in connection with other litigations and governmental investigations, many of which are responsive to the issues in this litigation. Finally, Plaintiff noted that, to date, defendants have not produced any documents from the files of the Individual Defendants, and have not produced transcripts of all of the Rule 30(b)(6) depositions taken in the MDL proceedings, some of which would bear on the issue of document custodians. I am therefore concerned that any staging of discovery will add to the cost, burden, and likely further delay of these proceedings and, accordingly, reject such an approach in this matter.

Report and Rulings of Special Master Layn R. Phillips re Lead Plaintiff's Motion to Compel the Production of Documents From Defendants

2603335                                    - 5 -

underlying requirements of the pleading doctrine.  Plaintiff further argues that post-Class Period documents are discoverable, as they bear on relevant issues, such as the NHTSA's 2010 investigation into the timeliness of Toyota's UA recalls, the failure to timely report known safety problems, the subsequent settlement with the NHTSA, and defendants' knowledge regarding the nature, scope, and severity of the UA problems at the time such Actionable Statements were made.  More generally, Plaintiff points out that the liberal standards governing production of documents "reasonably calculated to lead to the discovery of admissible evidence", Fed. R. Civ. P. 26(b)(1), and that "discovery is not limited to issues raised by the pleadings, for discovery itself is designed to help define and clarify the issues." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978).

### 3.   Discussion and Analysis.

Federal Rule of Civil Procedure 26(b)(1) states that "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." Additionally, courts should limit discovery of relevant material only if the "burden or expense of the proposed discovery outweighs its likely benefit."  Fed. R. Civ. P. 26(b)(2)(C)(iii).

"With respect to issues of relevancy of discovery, discovery rules are to be accorded a broad and liberal treatment." *Upton v. McKerrow*, 1996 WL 193807, at *3 (N.D. Ga. Feb. 20, 1996) (quotations and cites omitted).  *See also* Fed. R. Civ. P. 26(b)(1) ("Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.").  Discovery requests are "relevant if there is any possibility that the information sought is relevant to any issue in the case and should ordinarily be allowed, unless it is clear that the information sought can have no possible bearing on the subject matter of the action." *E.E.O.C. v. Woodmen of World Life Ins. Soc.*, 2007 WL 649298, at *1 (D. Neb. 2007) (citations omitted). "Relevancy" is defined to include both directly relevant material and material likely to lead to the discovery of admissible evidence. *Oppenheimer Fund, Inc.*, 437 U.S. at 351. Thus, for purposes of discovery, relevancy is to be interpreted very broadly. *Id*. at 351, n. 12.

It is also beyond dispute that discovery is not limited to the class period. *See In re Seagate Tech. II Sec. Litig.*, 1993 WL 293008, at *1-2 (N.D. Cal. June 10, 1993) (finding that defendants' attempt to confine discovery to a period beginning three months before the start of the class period and ending three weeks after the class period is "artificial, arbitrary and designed to avoid the production of relevant documents").[7]  Courts in this circuit have

---

[7]   Plaintiff cites *Seagate* to support its position that, particularly in securities fraud litigation, courts recognize that pre- and post-class period events "are relevant and discoverable on the core issues of falsity, scienter, and materiality."  Motion at 7 & n.5. Defendants suggest that the *Seagate* Court, which found that a 16-month period for discovery was reasonable, was shorter than the 26-month period defendants propose.  The class period in *Seagate* was substantially shorter than in this matter – six months.  The requests at issue in *Seagate* dealt with the reasonableness of the applicable time period as it related to a *third party subpoena* – not party discovery.

Plaintiff cites cases which permitted discovery for periods of time substantially before and after the class period. *See* Motion at 7, n.5.  The determination of what constitutes a "reasonable" length of time for pre- and post-class period discovery is, of necessity, dependent upon the nature of the allegations, *Upton v. McKerrow*, 1996 WL 19308, at *3-4 ("relevant documents may have been created substantially prior to or after the proposed class period"), and is (in this case) informed by the Court's Order.  *See also In re SupportSoft, Inc. Sec. Litig.*, 2006 WL 2403577, at *1 (N.D. Cal. Aug. 18, 2006) (granting motion to compel production of documents three years prior to commencement

Report and Rulings of Special Master Layn R. Phillips re Lead Plaintiff's Motion to Compel the Production of Documents From Defendants

2603335                                     - 6 -

repeatedly stated that the class period "does not determine the period of relevancy for discovery purposes. There are numerous instances in securities fraud litigation where post-offering statements, documents, or conduct have been treated as admissible evidence on the issue of scienter, intent, and knowledge." *Seagate*, 1993 WL 293008, *2. *See also Zamora v. D'Arrigo Bros. Co. of Cal.*, 2007 WL 806518, at *1 (N.D. Cal. March 15, 2007) (overruling relevance objection as to "discovery dating back to January 1, 1998, while defendant's potential liability only dates back to July 5, 2001," because "[i]f information can be admissible evidence, it certainly clears the lower hurdle of relevance at the discovery stage"); *Nairobi Holdings v. Brown Bros. Harriman & Co.*, 2005 WL 742617, at *3 (S.D.N.Y. Mar. 18, 2005) (permitting discovery relating to alleged September 2000 misrepresentation from January 1, 1997 as a "sufficiently broad" time frame for discovering defendants' knowledge of facts at issue).

"The proposed class period dates function only to define the plaintiff class, not to restrict the universe of relevant or actionable facts in this case." *Zelman v. JDS Uniphase Corp.*, 376 F. Supp. 956, 970 (N.D. Cal. 2005) (allegations of facts relating to scienter dating from before the proposed class period relevant to the state of mind accompanying misstatements forbidden by Section 10(b)). As the *Zelman* Court explained, "common sense" dictates that facts relevant to scienter "will ordinarily date from before any alleged misrepresentations" because the "circumstances preceding the statements . . . would be among those knowable at the time of the statements." *Id.* at 971. Thus, facts predating the class period are relevant to establish that statements made during the class period were materially false. *In re Scholastic Corp. Sec. Litig.*, 252 F. 3d 63, 72 (2d Cir.), *cert. denied*, 534 U.S. 1071 (2001). Likewise, post-class period facts may be relied upon "to confirm what a defendant should have known during the class period." *Id.* In short, "[a]ny information that sheds light on whether class period statements were false or materially misleading is relevant." *Id.*

It is also axiomatic that determining whether a request is "relevant" under Rule 26(b)(1) "depends upon the nature of the claims or defenses at issue in a given case." *Nairobi Holdings*, 2005 WL 742617 at *2. Plaintiff contends that a January 1, 2004 date for the applicable discovery period is, in light of the allegations, reasonable and not arbitrary. Reply at 3, n. 3. I agree.

The Complaint alleges that Toyota made materially false and misleading statements about a dangerous unintended acceleration condition that affected many of Toyota's best selling vehicles. Plaintiff asserts that despite years of reports of unintended acceleration and Toyota's own internal investigations into the causes and remedies for this condition, (*see, e.g.*, Compl. ¶¶ 73, 87), defendants initially denied the existence of *any* vehicle-based cause of UA, and blamed the UA reports on "driver error" or complaints "inspired by publicity". (Compl. ¶ 163). As the Court noted in its Order, "Plaintiffs have pleaded that Toyota was specifically aware that widespread unintended acceleration recalls would have been very costly for the company and celebrated avoidance of potential NHTSA mandated recalls." Order at 6 (*citing* Compl. ¶ 101, and Compl. ¶ 117).[8] These allegations

---

of class period as such documents are "directly related to plaintiffs' allegations, and may be highly relevant to this case").

[8] Paragraph 101 quotes from a September 14, 2007 email that was forwarded to senior Toyota executives, including Defendants Carter and Lentz, which stated "Of note, NHTSA was beginning to look at vehicle design parameters as being a culprit, focusing on the accelerator pedal geometry couple[d] with the push button 'off' switch. We estimate that had the agency instead pushed hard for recall of the throttle pedal assembly (for instance), we would be looking at upwards of $100M+ . . . ."). Paragraph 117 quotes analyst reports noting that the floor mat issue would have less impact on Toyota than mechanical issues.

Report and Rulings of Special Master Layn R. Phillips re Lead Plaintiff's Motion to Compel the Production of Documents From Defendants

2603335                                    - 7 -

comprise a mosaic of facts concerning the history of unintended acceleration problems known within Toyota, defendants' awareness and responses to eight separate NHTSA investigations, Toyota's various internal efforts to document and address these issues, the apparent escalation of unintended acceleration problems over time, and the "intense" government and media scrutiny that followed. While defendants argue that the defects or conditions precipitating the recall and suspension of production of millions of Toyota vehicles in early 2010 were not related to prior NHTSA investigations, recalls, or to prior incidents of unintended acceleration (including those which may not have been reported to regulators), *see, e.g.*, Opp. at 16, Plaintiff is entitled to test this claim through discovery. Moreover, Plaintiff is entitled to inquire as to whether the defects which led to the 2010 recall could have been (or were) discovered in connection with earlier investigations or reports of prior incidents of unintended acceleration.

In its Order, the Court explicitly referenced numerous allegations which concern mounting unintended acceleration problems in the years preceding the Class Period. Order at 1.[9]  The first page of the Order cites to two such pre-2008 issues. *See* Order at 1 (citing Compl. ¶ ¶ 73, 87).[10]

These allegations assert that Toyota was aware of possible unintended acceleration issues, well before the commencement of the Class Period which could not be ascribed to driver error or a misplaced floor mat, as was later contended by defendants (*see, e.g.*, Compl. ¶ ¶ 161, 163), and that "Toyota's unintended acceleration issues were drawing enough media scrutiny" both before and during the putative class period that "it is unlikely that management would not have been informed of the issues involved."[11]  While Toyota identified driver error and non-standard or misaligned floor mats as the source of the problem, Order at 7-8, Toyota had "began acquiring internal evidence that the unintended acceleration might have been due to a more serious mechanical or electrical defect in the

---

[9]    The Complaint and the Order reference events which precede the proposed January 1, 2004 cut-off, beginning in 2000, when Toyota received the first of what would ultimately be thousands of reports of unintended acceleration in its vehicles. *See, e.g.*, Compl. ¶ ¶ 66-81 (detailing pre-2004 events relating to defendants' knowledge of unintended acceleration problems).

[10]    Paragraph 73 refers to an internal Toyota Field Technical Report, dated May 5, 2003, in which Toyota documented unintended acceleration problems relating to "mis-synchronism between engine speeds and throttle position movement," and requested immediate action to address the "extremely dangerous problem." Compl. ¶ 73.  Plaintiff alleges that "Toyota did not issue a safety recall or make any public disclosure regarding this problem.  Instead, the Company issued another TSB [Technical Safety Bulletin] to its dealers warning of engine "surging" in the 2003 Camry.  Moreover, Toyota did not report the incident to NHTSA until five years later, and even then only after the agency had made a blanket information request." *Id.*

Paragraph 87 alleges that Toyota replicated an unintended acceleration condition (even when the brakes were applied) in a Toyota Tacoma driven by a Toyota field technical specialist in 2005 or 2006.  Plaintiff alleges that this incident was reported to Toyota, but that defendants failed to disclose that Toyota had replicated this condition. (Compl. ¶ 87).  Whether or not these specific engineering defects were the topic of corrective disclosures in 2010, discovery as to the failure to disclose such problems is potentially relevant to Plaintiff's claim that Toyota engaged in a practice of concealing problems before and during the Class Period.

[11]    Order at 6-7 (*citing* Compl. ¶98) (August 15, 2007 *Detroit Free Press* article and August 16, 2007 *Wall Street Journal* article regarding NHTSA investigation "into the 2007 Lexus ES350 sedan after at least 12 people were injured when the vehicle accelerated without warning").

Report and Rulings of Special Master Layn R. Phillips
re Lead Plaintiff's Motion to Compel the Production of
Documents From Defendants

2603335                                              - 8 -

design of the cars themselves." *Id.* at 1. In finding that Plaintiff adequately pled the required "strong inference" of scienter, the Court noted: "The defects at issue were simply too significant for it to be plausible that top Toyota management was not aware of the possible ramifications of the problem by the time the statements at issue were made". Order at 6. The Complaint asserts (and the Court references) allegations that the issue was a matter of on-going "intense" regulatory scrutiny and investigations of Toyota vehicles by the NHTSA. Thus, the potentially significant financial and business ramifications associated with a recall or other business disruptions due to the disclosure and remediation of unintended acceleration problems, and Toyota's centralized and highly involved management style – the so-called "Toyota Way" – are, as the Court noted, "obviously relevant in determining the likelihood that top executives knew about a major issue." Order at 7.

In fact, the Court noted that the numerous NHTSA investigations (both before and during the Class Period) permitted the inference that, "[g]iven the gravity of the issue, it is at least as likely to be true that Defendants were aware of the competing possibility of a serious mechanical design flaw in their vehicles as it is that they remained blissfully unaware of the mounting evidence produced by Toyota engineers and service technicians, as well as the accumulating reports of unintended acceleration that probably could not all be attributed to misaligned floor mats." Order at 8. As the Court noted: "Toyota did not claim to be uncertain; it affirmatively pointed the finger at floor mat placement and driver error. Therefore, it was – at the very least – deliberately reckless to mislead investors into believing that Toyota had definitively identified the source of the unintended acceleration problem." *Id.*

The Court referenced other pre-Class Period allegations, *i.e.*, that Toyota was "specifically aware that widespread unintended acceleration recalls would have been very costly for the company and celebrated avoidance of potential NHTSA mandated recalls" in September 2007, Order at 6 (*citing* Compl. ¶ 101); and that the NHTSA found that Toyota obstructed its investigations into the problem. Order at 6, n.8. Although noting that the NHTSA's finding of obstruction is not "direct evidence" of scienter, the Court observed that "it strongly suggests that other evidence of Defendants' scienter exists, but is not currently known to Plaintiffs." *Id.* Likewise, the Order referenced other allegations concerning events occurring during the Class Period, such as that Toyota had started phasing out potentially faulty accelerator pedals from its European manufacturing lines beginning in August 2009 (but failed to report to NHTSA the incidents or the change in European production). Order at 6 (*citing* Compl. ¶ 111). Discovery as to the circumstances surrounding these alleged decisions and omissions is not bounded the Class Period.

While not specifically referencing each of the Complaint's various pre-Class Period allegations, such as those relating to internal reports bearing on unintended acceleration issues, the timeliness of reporting problems to the NHTSA, the use of "running changes" and "technical service bulletins" to address defects or to replace parts when cars arrived for servicing (Compl. ¶ 6), the Court nonetheless noted that there are "numerous additional facts [alleged in the Complaint] that create a strong inference of scienter", Order at 6, and that "[m]any other allegations can be similarly discounted when viewed individually, but when assessed 'holistically' they create a strong inference of scienter." *Id.* at 7, *citing Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 326 (2007). It is therefore difficult to conclude that the factual allegations bearing on the "mounting evidence produced by Toyota engineers and service technicians, as well as accumulating reports of unintended acceleration," *id.* at 8, alleged to have been created between January 1, 2004 and January 1, 2008, are not at least relevant to the discovery of potentially admissible evidence of scienter, falsity, materiality and loss causation. Such discovery is, in other words, "relevant to the claims and defenses of the parties" regarding defendants' awareness

Report and Rulings of Special Master Layn R. Phillips re Lead Plaintiff's Motion to Compel the Production of Documents From Defendants

- 9 -

2603335

and understanding of the causes of unintended acceleration at the time the Actionable Statements were made, as well as any alleged concealment of these causes.

Indeed, in its discussion of Defendant Miller's January 16, 2010 email (Compl. ¶ 122), the Court noted that this communication may refer "to a cover-up that encompassed at least some of the false statements alleged in the complaint, and possibly covered several of the previous NHTSA investigations." Order at 5-6.[12]   These investigations – eight in all – date back to 2003.  These events may be of great relevance to the Actionable Statements, and may be directly probative of the truthfulness of defendants' statements denying any vehicle-based UA defects, and defendants' awareness and understanding of the UA condition and its causes.

Plaintiff contends that the proposed commencement date of January 1, 2004 is reasonably calculated to lead to the discovery, given that this was a "threshold" year for unintended acceleration issues at Toyota.  Reply at 3, n.3 (*citing* Compl. ¶¶ 74-82).  Plaintiff argues that by the end of 2003, "increasing regulatory pressure" on Toyota had grown as a result of a "'strong recent trend of [unintended acceleration] incidents' involving the 2002-2003 Toyota Camry".  Compl. ¶ 74.  By mid-2004, Plaintiff alleges that "Toyota itself had received more than 100 consumer complaints relating to unintended acceleration", Compl. ¶ 78, and that in a June 4, 2004 letter to the NHTSA, Toyota reported that it had received at least 114 unique consumer complaints "'that may relate to the alleged defect'", but "did not report numerous other unintended acceleration incidents to NHTSA, such as 'long duration' incidents, which Toyota disingenuously categorized as unrelated to the alleged defect, including over 60,000 reports of 'surging' in the Camry in 2004 alone."  Compl. ¶ 78.[13]

Defendants contend that the proposed eight year period is "highly unreasonable".  Opp. at 9.  A party resisting discovery "has the burden to show discovery should not be allowed, and has the burden of clarifying, explaining, and supporting its objections." *Sullivan v. Prudential Ins. Co. of Am.*, 233 F.R.D. 573, 575 (C.D. Cal. 2005) (citation omitted).  *Accord Duran v. Cisco Sys., Inc.,* 258 F.R.D. 375, 380 (C.D. Cal. 2009) ("unexplained and unsupported boilerplate objections are improper").  While arguing that the January 1, 2008 cut-off is "more than reasonable" to adduce evidence of scienter as to the Actionable Statements, Opp. at 9, defendants do not meaningfully respond to Plaintiff's argument that, under the liberal standard for determining the scope of discovery, and given the nature of the claims and defenses, January 1, 2004 is an appropriate starting point for the production of relevant documents.  They make no showing, based on declarations or affidavits, to suggest that the requested discovery is overbroad or unduly burdensome. *See,*

---

[12]   The January 16, 2010 Miller email states (in part):  "I hate to break this to you but WE HAVE a tendency for MECHANICAL failure in accelerator pedals of certain manufacturer [sic] on certain models.  We are not protecting our customers by keeping this quiet.  The time to hide this one is over.  We need to come clean. . . ." (Compl. ¶ 122).

[13]   *See also* Compl. ¶ 78 (noting 114 "unique consumer complaints" that Toyota reported may relate to the alleged defect), and Compl. ¶ 74 (NHTSA noted that unintended acceleration complaints for the Camry were more than three times the number reported for a competing Honda model); Compl. ¶ 75 (Toyota "misled [NHTSA] into believing that the incidents [of "surging"] were caused by driver error or driver-caused floor mat interference with accelerator pedals instead of defects requiring the redesign or modification of the vehicles or floor mat"); Compl. ¶ 76 ("from September 2003 to March 2004, unintended acceleration incidents continued to increase"); Compl. ¶ 80 ("By July 2004, unintended acceleration problems were frequently observed by Toyota dealers", and "[m]inutes from an August 2004 technical service meeting also indicate how pervasive the defect was and how seriously the complaints were viewed by dealers").

Report and Rulings of Special Master Layn R. Phillips
re Lead Plaintiff's Motion to Compel the Production of
Documents From Defendants

2603335                                    - 10 -

*e.g.. A. Farber & Ptnrs., Inc., v. Garber*, 234 F.R.D. 186, 188 (C.D. Cal. 2006) (collecting cases).[14]

Instead, defendants attempt to diminish the import of the Court's reference to pre-2008 events as at all relevant to what should be the appropriate discovery period.  Thus, defendants suggest that probative evidence of scienter is not likely to be found more than two years before the last Actionable Statement, made at the end of 2009.  Setting aside that discovery in any Section 10(b) claim is not limited solely to the state of mind of the speaker of an actionable statement, defendants ignore the fact that information known to Toyota – whether or not shared with the speaker of the Actionable Statements – is relevant for discovery purposes as it bears on a range of issues, including but not limited to scienter. Such discovery also is relevant to defendants' affirmative defenses.[15]  Whatever may be the quantum of evidence required at summary judgment or trial, the requirements of pleading, or proof, do not bound the scope of discovery.[16]

_____

[14]  Plaintiff notes that as the date of its Reply, defendants have produced fewer than 25,000 pages in this action.  On the other hand, "Defendants acknowledge that they have already collected and produced the bulk of the subject discovery in other proceedings, including millions of pages in the MDL and other proceedings."  Reply at 4.  Whatever may be the burden to defendants in responding to the Plaintiff's discovery requests, they do not mention that, in all likelihood, some (if not much) of what Plaintiff seeks has already been provided to other parties in other investigations and litigations relating to the unintended acceleration condition.  *See* Gladston Decl. in support of Motion (Ex. O) (sworn declaration from counsel to Toyota that defendants and outside counsel have preserved "a complete set of the documents produced" to Congressional committees investigating reports of sudden unintended acceleration related issues).  Even if defendants could make an appropriate showing of hardship, they must also show that hardship overcomes the relevance of the materials to both Plaintiff's claims and defendants' defenses.  *See Cromwell v. Sprint Communications Co. L.P.*, 2000 WL 726339, at *5 (D.Kan. 2000) ("even where the production of documents would cause great labor and expense or even considerable hardship and the possibility of injury to its business, [defendant] must still establish that the hardship would be *undue* and disproportionate to the benefits Plaintiff would gain from the document production") (emphasis original).

[15]  Defendants argue that, in light of the Court's Order, discovery as to their affirmative defenses – such as that defendants acted in good faith "at all times mentioned in the Complaint" or that "at no time were aware of facts" indicating that their statements were materially incorrect" – relate solely "to the claims as limited by the Court's ruling on the Motion to Dismiss – *e.g.*, the seven statements at issue – and do not broaden the scope or time period of this case or appropriate discovery."  Opp. at 11.  This position is not tenable, particularly in light of the Court's reference to pre-2008 documents and events in sustaining the Actionable Statements.

[16]  Defendants attempt to minimize the relevance of the Court's own reliance on pre-2008 allegations, which it referenced in finding that Plaintiff had satisfied the "core operations inference" for alleging a strong inference of scienter.  As defendants correctly note, the core operations inference is a pleading doctrine; but this does not mean that the Court's reliance of such allegations is not relevant to the scope of discovery.  And, while the Court may have limited the number of actionable statements for purposes of pleading securities fraud, this does not mean that it has limited discovery as to only those statements, or eliminated any inquiry into allegations which precede the Class Period but which nonetheless bear on defendants' state of mind, or the materiality or falsity of the statements made.  Thus, it is not tenable to suggest – as defendants argue – that it is "more than reasonable" to preclude discovery prior to January 2008, notwithstanding the fact that the first of the Actionable Statements was made in April 2008.  That statement claimed that the unintended acceleration condition reported in the Toyota Tacoma was not due to "an issue with the vehicle," but rather in most cases is "a misapplication of the pedals by

Report and Rulings of Special Master Layn R. Phillips
re Lead Plaintiff's Motion to Compel the Production of
Documents From Defendants

2603335                                          - 11 -

While Plaintiff has demonstrated that the proposed pre-Class Period discovery period is reasonable, it offers little explanation as to why discovery should run through the date of production.  While I acknowledge that post-Class Period discovery may be relevant to the Actionable Statements (including, for example, admissions relating to prior conduct), Plaintiff has not persuaded me that defendants should be obligated to search for and produce documents created well after the Class Period.  It is reasonable to believe that documents created after the Class Period and through April 19, 2010 – the date that the NHTSA announced Toyota's agreement to pay a fine of $16.375 million – may lead to the discovery of potentially admissible evidence.  I therefore conclude that the applicable time period for post-Class discovery is through and including April 19, 2010.

B.   Whether the Scope of Discovery "Should be Limited to Evidence Relevant to the Seven Actionable Statements."

1.   Ruling.

I conclude that discovery should not be limited to the failure of the Actionable Statements to disclose the "sticky pedal" defect.  Defendants argue that this disclosure led to the drop in Toyota's stock.  Therefore, Plaintiff must demonstrate scienter and loss causation with regard to these statements, and that discovery as to other, unknown or "speculative" causes of unintended acceleration are not relevant.

While discovery will obviously focus on the alleged material falsity of these statements, whether the speakers acted with scienter, and loss causation and damages associated with these alleged misrepresentations, neither these statements nor the failure to disclose the "sticky pedal" defect bounds the limits of discovery.  Defendants' proposed limitation on discovery is based, in large part, on the contention that Plaintiff will not be able to prove loss causation as to other, undisclosed causes of unintended acceleration.  These arguments may gain some traction at the summary judgment or at trial; they are not relevant for purposes of limiting discovery, and defendants offer no authority to suggest otherwise.

Accordingly, as to this General Objection, the Motion is **GRANTED**.

2.   The Parties' Contentions.

Defendants contend that the subject matter of discovery should be limited to defendants' knowledge of the "sticky pedal" issue with respect to four of the remaining

the driver."  Compl. ¶ 161.  As already discussed, Plaintiff alleges that defendants were aware, certainly no later than 2004, of NHTSA investigations, internal reports, and numerous and growing customer complaints and injuries relating to unintended acceleration.  Plaintiff is entitled to test, through discovery, whether this statement – as well as other statements made prior to the Class Period -- was, in fact, misleading.  Defendants cite no authority to suggest that the Court's reliance on "core operations" allegations is irrelevant for purposes of discovery.  If anything, that reliance supports Plaintiff's position, particularly in light of the Court's observation that the issue of unintended acceleration implicated operational problems of such an "extreme" nature to have "global ramifications" to Toyota.   As the Court noted, "[t]he core operations inference arises where the particular facts at issue were so important to the company that it is 'absurd' to suggest that the individual defendants would not have 'contemporaneous knowledge' of them."  Order at 6.  It is no less tenable to suggest that discovery bearing on the same facts and issues are not appropriate subjects for discovery, as to any element of the claims or defenses in this action.

Report and Rulings of Special Master Layn R. Phillips
re Lead Plaintiff's Motion to Compel the Production of
Documents From Defendants

2603335                                          - 12 -

Actionable Statements in the case (29-32).[17]  Opp. at 11-13.  Defendants argue that these statements involved steps that Toyota was taking to address the possibility that a floor mat could entrap the accelerator pedal in certain vehicle models, and that Toyota had concluded that (other than "pedal misapplication") potential floor mat entrapment was the cause of unintended acceleration.  Defendants characterize Plaintiff's complaint as alleging that these statements were false or misleading for failing to reveal the "sticky pedal" issue.  Thus, defendants suggest, as these statements can only be actionable for allegedly failing to disclose the "sticky pedal" defect, "discovery must necessarily focus on these issues."

Plaintiff argues that this case is about defendants' "cover-up of a dangerous UA condition," that involves not only the so-called "sticky pedal" issue but other defects, including defective floor mats, defects in the shape of the gas pedal and the driver's side foot-well, and a mechanical defect in the gas pedal.  Motion at 11.  Plaintiff points out that the Order does not refer to the "sticky pedal" defect, but rather discusses the unintended acceleration "problems" and "defects in Toyota vehicles," often using terms in the plural.  *See, e.g.,* Order at 7 ("most securities lawsuits do not involve operational problems nearly as extreme as the unintended acceleration defect").  Plaintiff also argues that the Order referenced not only false statements alleged in the Complaint, but several of the previous NHTSA investigations dating back to 2003.  Further amplifying this point, Plaintiff argues that discovery as to the dismissed statements, as well as to the other "causes" of unintended acceleration, is relevant to a number of issues, including Toyota's legal and regulatory compliance, its failure to report known safety flaws, and Toyota's knowledge or reckless disregard of causes of unintended acceleration other than "driver error" or misplaced floor mats, and hence bears on subjects that may be relevant not only to scienter, but to other elements of the claims and defenses in the action.[18]

### 3.   Discussion and Analysis.

A request for discovery "should be considered relevant if there is *any possibility* that information sought may be relevant to any claim or defense of any party."  *Breon v. Coca-Cola Bottling Co.*, 232 F.R.D. 49, 52 (D. Conn. 2005) (emphasis original).  Defendants' suggestion that discovery should be limited to discrete issues bearing on the remaining Actionable Statements is inconsistent with the liberal policies governing discovery, the allegations in the Complaint, and the Court's Order.  While discovery will doubtless focus on the claims and defenses relating to those statements, the Actionable Statements do not bound the limits of relevant or potentially relevant information.  As already discussed, the allegations and statements referenced in the Complaint bear directly on, and are relevant to, the falsity, materiality, and loss causation issues implicated by the Actionable Statements, including events and statements made well before the Actionable Statements were made or corrected.  Apart from the impracticality of attempting to limit discovery to a discrete cause of "unintended acceleration," such a restriction would impede

---

[17]  As noted, *see* note 5 *supra*, the Court denied defendants' MPJOP as to Actionable Statements 20, 24, and 26.  Should the Court deny this motion, defendants contended that "discovery would be appropriately limited to Mr. Kwong's knowledge (or lack thereof) of the allegedly false or misleading nature of his statements, which were made in April and June 2008, and April 2009.  Mr. Kwong is identified in these statements, published in various news stories, as a Toyota "spokesman."  For reasons discussed below, *infra* at § C, this position is not tenable.  The defendants' knowledge of falsity of statements made by Toyota spokesmen is a relevant subject for discovery.

[18]  Plaintiff also notes that defendants have not limited their discovery requests to the "sticky pedal" defect, demanding instead that Plaintiff produce "All documents concerning Toyota" and "All documents that refer or relate to an unintended acceleration problem in any Toyota vehicle" – requests, Plaintiff contends, that are "exactly the type of discovery Defendants argue is out of bound for Plaintiff."  Motion at 14.

Plaintiff's ability to discovery potentially admissible evidence, including for example prior NHTSA investigations (in which, for example, the issue of throttle control systems or accelerator pedal was raised), or internal investigations, technical reports, and other measures, in which Toyota allegedly failed to address (or concealed) unintended acceleration conditions of the type which eventually led to the 2010 recall.  The Complaint alleged numerous instances in which Toyota limited or avoided NHTSA investigations notwithstanding the evidence of mounting instances of "unintended acceleration".[19] Defendants are free to argue that the "sticky pedal" defect was the specific and unique reason for its 2010 recall.  Plaintiff will doubtless attempt to show that the issues revealed to the public in early 2010 were known, or discoverable, well before that time.

First, Plaintiff points out that the disclosures made after defendants' publication of the Actionable Statements relate to more than the "sticky pedal" defect.[20]  *See, e.g.,* Compl. ¶ 120 (November 25, 2009 disclosure that unintended acceleration caused by design defect in addition to the defective accessory floor mat, and that Toyota would "reconfigure the shape of the accelerator pedal and the shape of the floor surface underneath the pedal in certain models").  Second, the Court rejected defendant's attempt at the pleading stage to use a "divide-and-conquer strategy," Order at 7, to view allegations in isolation, emphasizing instead a "holistic" approach endorsed in *Tellabs*, 551 U.S. at 326.  That approach is no less pertinent in the context of discovery, given particularly the Court's observation that this action arises out of statements made against "a background of allegations of defects in Toyota vehicles," and a "cover up" of unintended acceleration "problem/s" or "defect/s" that were "simply too significant for it to be plausible that top

---

[19]   *See, e.g.*, Compl. ¶ 101 (quoting a September 14, 2007 internal Toyota email) ("'[o]f note, NHTSA was beginning to look at vehicle design parameters as being the culprit'").  The following day, this message was forwarded to two Individual Defendants, stating "'Thought you would be interested in the outcome – and the avoidance of much bigger issues (and costs).'"  *Id.*  Plaintiff should be permitted to inquire as to whether the "culprit" identified in the email relates in any way to problems disclosed as the reasons for the recall of Toyota vehicles in early 2010, and whether defendants effectively steered the NHTSA away from a deeper examination of Toyota's throttle control systems.  At minimum, such an inquiry may be potentially relevant to the discovery of Toyota's knowledge, or reckless disregard, that pedal entrapment or the stick pedal defect were potential causes for concern.

[20]   I note that in its February 2011"Technical Assessment of Toyota Electronic Throttle Control (ETC) Systems" Report, http://www.nhtsa.gov/staticfiles/nvs/pdf/ NHTSA-UA_report.pdf, the NHTSA identified two types of vehicle-based defects as causes of UA which prompted Toyota's recall of more than seven million vehicles -- pedal entrapment and "sticky pedal."  Report at vii.  As used in the Report, "unintended acceleration" is defined as "a very broad term that encompasses sudden acceleration as well as incidents at higher speeds and incidents where brakes were partially or fully effective, including occurrences such as pedal entrapment by floor mats at full throttle and high speeds and incidents of lesser throttle openings at various speeds."  Report at vi.  The Court's Order begins by noting that "[i]n around 2000, Toyota received the first of what would eventually be thousands of reports of unintended acceleration in several models of both the Toyota and Lexus brand vehicles," which were the subject of at least eight NHTSA investigations between 2003 and 2010.  Order at 1.  The Court noted that the "operational problems" relating to the "unintended acceleration defect" was of an "extreme" nature, *id.* at 7, and that it is at least as likely that Defendants were aware, based on "the accumulating reports of unintended acceleration," that not all of these incidents could be attributed to misaligned floor mats."  *Id.* at 8.  Nothing in the Court's Order suggests that, for discovery purposes, the "sticky pedal" defect is the only appropriate topic of inquiry.

Report and Rulings of Special Master Layn R. Phillips re Lead Plaintiff's Motion to Compel the Production of Documents From Defendants

2603335                                               - 14 -

Toyota management was not aware of the possible ramifications of the [unintended acceleration] problem by the time the statements were made."  Order at 7.

Defendants argue that discovery regarding all potential causes for unintended acceleration other than floor mat entrapment and "sticky pedal" is "irrelevant", claiming that "speculation" about other alleged "undisclosed" causes of unintended acceleration is "not a proper subject of discovery following *Dura* [*Pharmaceuticals, Inc. v. Brouda*, 544 U.S. 336, 347 (2005)], "because there were no related corrective disclosures resulting in a significant decline in ADS prices."  Opp. at 13.  *Dura* addressed the pleading and proof requirements for loss causation, not the scope of discovery in a Section 10(b) case.  (Doubtless Plaintiff will argue that the losses associated with the disclosure of the recall and suspension of manufacturing went beyond the disclosure of the "sticky pedal", but implicated doubts as to Toyota's heretofore much-publicized reputation for safety and reliability.  *See* Motion at 23.)  Defendant does not cite any authority to suggest that these considerations may be used to limit, or foreclose discovery, especially where, as here, the allegations relating to other causes of unintended acceleration are relevant to aspects of the claims and defenses in addition to loss causation.  *See Upton v. McKerrow*, 1996 WL 193807 at *2-4 (compelling production of documents relating to dismissed statements and associated allegations because "all the documents could contain, or could lead to the discovery" of information directly relating to issues remaining in the case).[21]

---

[21]    Defendants argue that the Tentative Ruling "is in error in dismissing Defendants' citation to the Supreme Court's opinion" in *Dura*.  Defendants' Comments at ¶ 2.  Defendants argue that "[p]ursuant to *Dura*, plaintiffs only have an actionable claim to the extent that they plead and prove a corrective disclosure that is associated with a significant decline in the price of the security at issue.  *See Dura*, 544 U.S. at 342-43."  *Id.*  As a consequence, defendants contend that only floor mat entrapment and "sticky pedal" issues "are properly at issue in the litigation because those are the only corrective disclosures in the Complaint," *id.*, and that discovery as to other causes of unintended acceleration which (they contend) do not relate to a corrective disclosure would be a "futile effort".

These arguments were, in substance, made by defendants and rejected by the Court in its prior rulings on the Motion to Dismiss and the MPJOP.  In the MPJOP, defendants sought to dismiss three statements which did not specifically address "sticky pedal" or floor mat entrapment.  *See* Defendants' Motion for Partial Judgment on the Pleadings (Dkt. 243) at 6; Lead Plaintiff's Opposition to Defendants' Motion for Partial Judgment on the Pleadings (Dkt. 246) at 11-12.  The Court considered – and rejected – defendants' loss causation and scienter arguments, and they fare no better in the context of determining the scope of discovery.

Plaintiff noted at oral argument (as it did in its opposition briefs to defendants' MPJOP) that its complaint alleges that these statements (which concern automobiles other than those recalled in 2010) were materially misleading for omitting to disclose, among other things, serious defects and problems – what it terms a "dangerous unintended acceleration condition" – that Toyota knew existed in numerous other models and "wiped out over $30 billion in shareholder value" when the extent of the problems were revealed to the market.  Motion at 11.  It argues that it should be entitled to explore, through discovery, its theories of loss causation, including as they relate to "Toyota's carefully cultivated reputation for quality and safety and its market credibility", Order at 7, which "were clearly at risk", *id.*, and that it should not be constrained based on defendants' own, competing theory of loss causation.  As already noted, such discovery applies not only to loss causation (an inherently fact-intensive inquiry), but bears on other elements of a Section 10(b) claim – defendants' "futility" argument does not address the potentially probative value of discovery as to scienter and falsity of any other Actionable Statements, whether or not they explicitly addressed "sticky pedal".  And, while *Dura* addresses both the pleading and proof requirements for loss causation, the salient point, for purposes of

Report and Rulings of Special Master Layn R. Phillips re Lead Plaintiff's Motion to Compel the Production of Documents From Defendants

2603335                                         - 15 -

C.   Whether Discovery Should be Limited "to the Knowledge of the Speakers Who Made the Statements at Issue".

    1.   Ruling.

I conclude that discovery should not be limited to the knowledge (or lack thereof) of the speakers of the seven Actionable Statements. Defendants suggest that documents "demonstrating the knowledge (if any) of others [concerning the falsity of the statements] – uncommunicated to any of the Individual Defendants – would not" be relevant to the knowledge of the speakers who made the statements at issue. This is an inappropriate restriction, and not consistent with a variety of issues expressly referenced in the Complaint and the Order, including the Court's observation that "[t]he defects at issue were simply too significant for it to be plausible that top Toyota management was not aware of the possible ramifications of the problem by the time the statements at issue were made, especially given that Toyota is known for – and publicizes – a highly involved management style – the so-called "Toyota Way." Order at 6.

Accordingly, as to this General Objection, the Motion is **GRANTED.**

    2.   The Parties' Contentions.

Defendants contend that discovery should be limited to testing the knowledge of the individuals who actually made the Actionable Statements. While conceding that discovery as to internal communications to and from these individuals is legitimate, they contend that the "scienter inquiry must focus on those individuals who actually made the false statements", as "a defendant corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter." Opp. at 15 (citations and internal quotations omitted).

Plaintiff argues that defendants' refusal to search files of employees other than the speakers of the Actionable Statements would ignore highly relevant documents in the custody of other Toyota employees (whether or not shared with the speakers of the Actionable Statements), as these documents would relate to the scienter of the Corporate Defendants, the scienter of the Individual Defendants, and a variety of core issues beyond scienter, such as motive, falsity, materiality, and the affirmative defenses raised by defendants.

    3.   Discussion and Analysis.

Defendants' arguments are predicated on citation to case law relating to the pleading requirements under the "collective scienter" doctrine, an argument which, as Plaintiff correctly notes, was not the basis for the Court's Order. Opp. at 14-15. These cases have no bearing on the appropriate scope of discovery, and defendants do not cite any authority that would permit such a severe limitation on the production of relevant or potentially relevant documents. The contrary is true.

First, as already noted, the Court referenced Toyota's highly-involved management style – the so-called "Toyota Way – make it not "plausible" for "top Toyota management" not to be aware of the possible ramifications of the unintended acceleration problem at the time the Actionable Statements were made. The knowledge of the Corporate Defendants,

---

this Ruling, is that *Dura* does not prescribe limits as to the scope of discovery as to statements for which loss causation has been adequately pleaded, and defendants do not suggest otherwise.

Report and Rulings of Special Master Layn R. Phillips re Lead Plaintiff's Motion to Compel the Production of Documents From Defendants

2603335                                      - 16 -

as well as key Toyota executives, is doubtless a relevant area of inquiry.[22]  *Cf. Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1435-36 (9th Cir. 1995) ("[C]orporate scienter relies heavily on the awareness of the directors and officers, who – unlike the public relations . . . departments – are necessarily aware of the requirements of SEC regulations . . . and of the danger of misleading buyers and sellers."); *Petrie v. Electronic Game Card, Inc.*, 2011 WL 165402, at *6 (C.D. Cal. Jan. 12. 2011) (viable allegations of individual defendants' scienter may be imputed to corporate defendant) (*citing Nordstrom, Inc.*, 54 F.3d 1424 at 1433-35); *In re Entropin, Inc. Sec. Litig.*, 487 F. Supp. 2d 1141, 1153 (C.D. Cal. 2007) (same).  Defendants are free to press such arguments at summary judgment or at trial, but for purposes of discovery it is highly relevant to inquire as to whether other officers, directors, employees, or agents of Toyota, as well as the Corporate Defendants – charged with the knowledge of its directors, officers, and agents – were aware of, or recklessly disregarded, information that would contradict the statements its officers and spokespersons made.  *Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2302 (2011) (holding that "for purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its contend and whether and how to communicate it").

Second, discovery of custodial files of other Company officials, as well as its internal files, would still be relevant and reasonably calculated to lead to the discovery of circumstantial evidence of defendants' scienter, and in order to test whether they "remained blissfully unaware of the mounting evidence produced by Toyota engineers and service technicians, as well as the accumulating reports of unintended acceleration that probably could not all be attributed to misaligned floor mats."  Order at 8.

Third, obligations under the Federal Rules require a responding party to produce documents in its "possession, custody or control."  Fed. R. Civ. P. 34.  This creates an affirmative obligation to conduct a reasonable search of documents in the possession of their employees, agents, subsidiaries, and others who are subject to their control.  *See United States v. Int'l Union of Petroleum & Indus. Workers*, 870 F.2d 1450, 1452 (9th Cir. 1989) ("A corporation must produce documents possessed by a subsidiary that the parent corporation owns or wholly controls."); *Meeks v. Parsons*, 2009 WL 3003718, at *4 (E.D. Cal. Sept. 18, 2009) (a party is "under an affirmative duty to seek that information reasonably available to [it] . . . from [its] employees, agents, or others subject to its control") (quotation omitted).

In response to the Tentative Rulings, defendants stated that they are working on identifying custodians whose files would likely have relevant information, and propose that the parties meet and confer regarding appropriate custodians.  Defendants' Comments at ¶ 1.  At oral argument, defendants suggested that they provide Plaintiff with a list of custodians identified in the MDL proceedings, and use that as a "bench mark" for Plaintiff to review as the "only practical way to operationalize" the Rulings regarding the identification of custodians.  Plaintiff argues that it is defendants' obligation to make the determination as to who are the relevant custodians, based on the input already provided in the Order, the allegations in the Complaint, and Plaintiff's initial disclosures (which identify 62 individuals who may be in possession of potentially responsive documents).  I agree with Plaintiff that the appropriate way to proceed is for defendants to make such a

---

[22]  *See* Order Denying Motion for Partial Judgment on the Pleadings (Dkt. 253) at 1-2, n. 2 ("The law is unclear as to what must be pleaded as to an official corporate spokesperson's scienter, especially in a case where the district court has found the core operations inference to be applicable.  Whatever the precise rule that should be applied, it is unlikely that the law allows corporations to shield themselves from securities fraud liability by funneling fraudulent statements through an 'ignorant' spokesperson with no way for the public to know who, specifically, prepared the spokesperson's statements.")

Report and Rulings of Special Master Layn R. Phillips re Lead Plaintiff's Motion to Compel the Production of Documents From Defendants

2603335                                              - 17 -

determination, given their substantially greater familiarity with the documents, and the custodians within their control who may have relevant documents, to identify the custodians from whose files documents will be produced, and to make the production. Plaintiff will then be able to test the sufficiency of such a search through Rule 30(b)(6) depositions.

       D.    Specific Document Requests.

      Based on the recommendations set forth above, and as discussed below, I believe that defendants should produce documents pursuant to the following specific, disputed requests, subject to the qualifications identified with respect to each particular request.

       1.    Documents Related to the Actionable Statements (Requests Nos. 2-7).

      Requests 2-7 seek documents relevant to the Actionable Statements.  The parties agree that there is no dispute that the Motion should be granted.  *See* Opp. at 15-16; Reply at 7.

       2.    Documents Concerning the Causes of Unintended Acceleration and Related Internal Investigations (Request Nos. 12, 18, 48).

      These requests seek documents relating to (1) causes or potential causes of unintended acceleration in Toyota vehicles; (2) any internal investigation conducted by or at the direction of the Company; (3) communications by Toyota quality control representatives concerning unintended acceleration.

      Regarding Request No. 12 ("All documents relating to any cause or potential cause of unintended acceleration in Toyota vehicles"), defendants argue that in addition to burden and overbreadth, these requests exceed the permissible scope of discovery to the extent that this request seeks (a) documents on subject matters other than the "sticky pedal" phenomenon and (b) documents earlier in time than January 1, 2008.  Defendants raise these identical subject matter and temporal limits objections to all other requests discussed below, unless otherwise noted.   Defendants objected to this request, without agreeing to conduct a reasonable search or to produce documents.

      Regarding Document Request 18 ("All documents relating to communications by Toyota quality control representatives concerning unintended acceleration in Toyota vehicles, including but not limited to communications with Toyota Motor Company quality control representatives assigned to the United States."), defendants agree to conduct a "reasonable search within the records of the Individual Defendants" and produce, on a rolling basis, as these documents are located or processed.

      Regarding Document Request No. 48 ("All documents relating to unintended acceleration or the subject matter of the Complaint that You provided, received, or generated relating to any internal investigation initiated or conducted by or at the direction of the Company."), defendants raise the same subject matter objections and temporal limitations as above, and additionally object in so far as the request "does not specifically describe or reasonable particularize the category of documents sought."

      These requests relate directly to Plaintiff's allegations, and may be highly relevant to this case.  Given that defendants have agreed to produce documents relating to any internal investigations by Toyota relating to unintended acceleration in Toyota vehicles (*see* Opp. at 17), the gist of the disagreement turns on whether "operational level" documents should be required to be produced.

Report and Rulings of Special Master Layn R. Phillips re Lead Plaintiff's Motion to Compel the Production of Documents From Defendants

2603335          - 18 -

Defendants argue that it is burdensome to require them to produce such "operational level" documents "that never reached the attention of the speakers of the challenged statements and that otherwise are irrelevant to the remaining statements at issue." Opp. at 16. Setting aside the unsupported assertion that these documents did not "reach the attention" of the individuals who made the Actionable Statements (or were not otherwise available to them), this cannot be the test for relevance or properly delimit the scope of production. *See In re SupportSoft, Inc. Sec. Litig.*, 2006 WL 2403577, *2 (rejecting burden and immateriality arguments and compelling production of all "documents relating to customer complaints that software licensed by the customer from [defendant] was not performing properly"). To the extent that such documents were created and circulated within Toyota, they bear on relevant issues, including Toyota's scienter, particularly if these documents (or the information contained therein) was available to or known to Toyota's executives who directed the Company, or oversaw (or had ultimate responsibility for) its public statements.

Having said that, none of the parties addresses what I believe is the pertinent inquiry, *i.e.*, the <u>scope</u> of the production to these requests. Plaintiffs seek all documents relating to the cause(s) or potential cause(s) of unintended acceleration, all communications relating to unintended acceleration, as well as any underlying documents bearing on any internal investigation relating to unintended acceleration. They contend that this information was "meticulously collected and communicated" within Toyota, and reported through senior management to Toyota's Japan headquarters. Compl. ¶¶ 55, 59. Read literally, Requests 12 and 18 would require defendants to gather every customer complaint or inquiry, all shop or repair records, all defect and recall records, and any communications within the Company which related or responded to any one of the allegedly tens of thousands of reports of unintended acceleration (Plaintiff notes that there were over 60,000 reports of engine surging in the Camry in 2004 alone, Reply at 7, and recalls of over 26,000 Siennas after April 7, 2008. *Id.*). This is a potentially overwhelming and highly burdensome request; certainly Plaintiff need not obtain every shop record, invoice, or other document bearing on each incident of unintended acceleration. At some point, this evidence becomes cumulative and duplicative.

The parties should meet and confer to discuss categories of documents which focus on the causes or potential causes of unintended acceleration, as well as communications relating to such causes or potential causes made to Toyota management level employees. Whether or not these materials were "meticulously collected and communicated" within the Company, there needs to be drawn some boundaries as to what are the relevant categories of documents. Specifically, the parties are to discuss the communication of such information within the Company, and specifically to the operational headquarters of Toyota in Japan and the United States, in order to ascertain the manner in which such information was communicated, to whom it was communicated, and how and to what extent it was reviewed by Toyota quality assurance engineers, Toyota managers, and those employees responsible for interacting with the NHTSA (or other governmental regulators) on the issues relating to unintended acceleration.

With regard to Request No. 48 – "documents relating to unintended acceleration or the subject matter of the Complaint that You provided, received, or generated relating to any internal investigation initiated or conducted by or at the direction of the Company" – this seems largely duplicative of Request No. 11, which seeks all "documents relating to any internal investigations by the Company relating to unintended acceleration in Toyota vehicles." As noted, defendants have agreed to produce such documents as they relate to internal investigations conducted by Toyota relating to unintended acceleration. This would, presumably, include any communications to senior management or employees with responsibilities for quality assurance or interactions with the NHTSA (or other governmental regulators). Documents reviewed or received in connection with such investigations are relevant, and therefore should be produced.

Report and Rulings of Special Master Layn R. Phillips re Lead Plaintiff's Motion to Compel the Production of Documents From Defendants

2603335                                              - 19 -

Accordingly Plaintiff's Motion as to Request No. 48 is **GRANTED.**

Regarding Request Nos. 12 and 18, **the parties are instructed to meet and confer** within seven (7) days of receipt of this Report and Rulings to discuss the appropriate parameters and categories for the production of documents, based on the guidance set forth above. Within seven (7) days thereafter, the parties shall report to me concerning whether they have resolved this dispute. To the extent that they have not, the parties are directed to file at that time a letter brief (not to exceed ten (10) single-spaced pages) setting forth their respective positions and the remaining areas of disagreement.

3.   Documents Concerning Remedies for Unintended Acceleration and Related Quality Control Communications (Request Nos. 14 and 15).

These requests relate to "any actual or potential remedy for unintended acceleration," including "good will" repairs, "running changes," and Technical Service Bulletins (Request No. 14), and all "technical services bulletins, documents concerning such technical service bulletins, and minutes of 'technical service Meetings'" relating to unintended acceleration (Request No. 15).

Defendants concede the relevance of these requests, and agree to produce any non-privileged documents reviewed, received, generated, or created by the Individual Defendants. Nonetheless, defendants object as to the burden, overbreadth, and relevance of these documents. Separately, defendants object based on Plaintiff's failure to particularize the categories of items to be produced.

As with the previous categories of documents sought, these requests implicate a potentially enormous, and cumulative, production of documents. While documents relating to the issuance of technical service bulletins, minutes of "technical service Meetings," and other internal directives relating to the institution of "good will" repairs, or "running changes" relating to unintended acceleration issues are both relevant and likely to be confined to a reasonable number of documents, it does not follow that "all" documents relating to repairs, changes, or other remedies for unintended acceleration issues (*e.g.*, customer service documents relating to floor mat replacements) is appropriate.

**The parties are instructed to meet and confer to discuss** appropriate parameters regarding the scope of production, consistent with the time frame for such discussions, as set forth in section D.2 (above). Defendants are correct that such overbroad requests are more appropriate to a products liability litigation than one involving securities fraud. The meet and confer discussions should focus on identifying the core documents bearing on policies or other actions relevant to these repairs or bulletins, as well as communications to Toyota management (and not just the Individual Defendants or the individuals who made the Actionable Statements), quality assurance personnel and the NHTSA (as well as internal discussions as to whether to inform the NHTSA as to these proposed remedies to address unintended acceleration issues) as they relate to problems or defects related to unintended acceleration.

4.   Documents Concerning Government Oversight or Investigations Relating to Unintended Acceleration (Requests Nos. 19, 21-31).

These requests seek, in broad terms, all documents relating to any potential or ongoing regulatory oversight or investigation by any "Government" relating to unintended acceleration. With certain qualifications, these requests may lead to the discovery of relevant information, and accordingly they should be produced.

Report and Rulings of Special Master Layn R. Phillips re Lead Plaintiff's Motion to Compel the Production of Documents From Defendants

2603335                                            - 20 -

a.    <u>Request No. 19</u>.  This request seeks all documents concerning "potential or ongoing regulatory oversight or investigations concerning reporting for defects or potential defects."  This goes too far.  The allegations in the Complaint, and the Court's Order, focus on the causes (and concealment) of defects relating to unintended acceleration.  To the extent that Toyota has been the subject of any other "potential" or "ongoing" regulatory oversight not related to unintended acceleration, its relevance is, at best, questionable, and Plaintiff does not argue otherwise.

Accordingly, as to Request No. 19, the Motion is **GRANTED** in part and **DENIED** in part, subject to the subject matter limitations set forth above.

b.    <u>Request No. 21</u>.  This seeks all documents provided to any "Government" regarding unintended acceleration.  Defendants have agreed to produce documents relevant to this litigation that they have produced to the U.S. Attorney for the Southern District of New York, Congress, NHTSA, state attorneys general and the SEC.  It is unstated (though I assume) that defendants do not object to the production of any documents provided to the NHTSA relating to that agency's prior investigations (2003 through 2010) into unintended acceleration, as well as any documents provided to the NHTSA relating to its February 2011 Report.

I do not, however, find persuasive defendants' contention that documents provided to foreign government agencies are irrelevant "because the U.S. is the relevant forum." Opp. at 19.  Documents relating to governmental oversight, investigations, and fines for the same unintended acceleration conditions alleged in the Complaint are relevant to materiality, scienter, and falsity.  *See* Compl. ¶ 134 (Toyota subject to governmental investigations in Canada and Japan).  For example, the Complaint alleges that Toyota issued recalls for unintended acceleration defects in some countries but not others (Compl. ¶¶ 111-112); and that the Company concealed the nature and scope of its unintended acceleration problems from some government regulators (Compl. ¶¶ 61, 67, 69, 71-79, 85, 88-111, 123).  The Order expressly references that between 2003 and 2010 Toyota was under growing and "intense" regulatory scrutiny, Order at 7, and that the Company had started phasing out potentially faulty accelerator pedals from its European manufacturing lines beginning in August 2009 (but failed to report to NHTSA the incidents or the change in European production).  Order at 6 (*citing* Compl. ¶ 111).  As such, any investigations or oversight relating to the reporting of matters relating to unintended acceleration, as well as recall decisions, are alleged to have been directed under the supervision of Toyota's senior management in Japan (Order at 6, n.7 (*citing* Compl. ¶¶ 55-56)).  Given the "global ramifications" of this issue, Order at 7, documents bearing on Toyota's responses to overseas regulatory investigation or oversight as it relates to unintended acceleration are relevant.

Accordingly, as to Request No. 21, the Motion is **GRANTED**.

c.    <u>Requests Nos. 22-24, 27</u>.

These requests seek all documents relating to any investigation by any "Government" (Req. No. 22), "Meetings" (Req. No. 23) or "communications" (Req. No. 24) with any Government relating to unintended acceleration, or any recall or potential recall of Toyota vehicles relating to unintended acceleration (Req. No. 27).  Defendants concede the relevance of these documents, subject to its objections concerning (a) the relevance of producing documents relating to non-U.S. entities and (b) the limitation of producing only those documents in the custody of the Individual Defendants.  For the reasons discussed above (*see* section D.4(b) *supra*), these documents are relevant to the allegations of the Complaint and the Court's Order and, accordingly, should be produced.

Accordingly, as to Requests Nos. 22-24, and 27, the Motion is **GRANTED**.

Report and Rulings of Special Master Layn R. Phillips re Lead Plaintiff's Motion to Compel the Production of Documents From Defendants

2603335               - 21 -

    d.    <u>Request Nos. 28 and 31</u>.

Request No. 28 seeks documents "*identified by any Government* in any correspondence, discussions, Meetings, or conversations with Toyota as actual, potential or purported evidence of unintended acceleration in Toyota vehicles or any attempt by Toyota to conceal such matters from others." (emphasis added).  Request No. 31 seeks all "documents relating to any effort by Toyota to limit any Government investigation of any defect in Toyota vehicles or unintended acceleration in Toyota vehicles." *Id*.  In essence, these requests seek documents that may bear on Toyota's efforts to conceal or diminish the issues relating to unintended acceleration in its interactions with regulators, whether internal or identified by regulators.  Request No. 31, however, goes beyond the subject matter of unintended acceleration, and seeks any documents relating to any effort to limit Government investigation into any defect in Toyota vehicles.  Defendants concede the relevance of these documents, asserting the same objections as set forth above.

For the reasons discussed above (*see* section D.4(a) *supra*), these documents are relevant and should be produced, subject to the limitation that the request relates only to issues concerning unintended acceleration.

Accordingly, as to Request Nos. 28, the Motion is **GRANTED**.  As to Request No. 31, the Motion is **GRANTED** in part and **DENIED** in part, subject to the subject matter limitations set forth above.

    e.    <u>Request Nos. 25-26, 30</u>.

These requests seek all documents regarding any fine paid to any "Government" regarding unintended acceleration (Req. No. 25), all documents relating to any "investigation or penalty for failure to timely notify the public about safety defects " (Req. No. 26), and all documents regarding any actual or potential "Government" criminal or civil penalty against Toyota or members of its senior management or board (Req. No. 30).

Defendants argue their agreement to produce the April 2010 Settlement Agreement with the NHTSA is appropriate; otherwise, these requests are overbroad and seek irrelevant information.

While I agree that Requests Nos. 26 and 30 are overbroad, as they are not limited to unintended acceleration issues, these requests do seek information that may be highly relevant to the case, including other settlement agreements or admissions with respect to other governmental investigations.   Subject to the limitation that these requests relate solely to unintended acceleration (*see* section D.4(a) *supra*), responsive documents should be produced.[23]

---

[23]   Plaintiff argues that the Tentative Rulings' limitation on scope as to Request 26 is too narrow.  Plaintiff's Comments on the Tentative Order ("Plaintiff's Comments"), at 3.  As with Request No. 9, Plaintiff contends that it should be entitled to conduct discovery as to any government investigation of Toyota safety defects, regardless as to subject matter.  While contending that the concealment of unintended acceleration defects was part of a "larger pattern and practice of concealing known safety problems," *id*. at 3, its citations to the Complaint in support of these arguments relate to the concealment of unintended acceleration issues.  *See, e.g*., Compl. ¶¶ 61, 65.  For the reasons set forth below, *see* n. 24 *infra*, I do not believe that Plaintiff may be permitted to engage in broad discovery as to investigations wholly unrelated to the subject matter upon which it focuses its allegations – the so-called "unintended acceleration condition".

Report and Rulings of Special Master Layn R. Phillips
re Lead Plaintiff's Motion to Compel the Production of
Documents From Defendants

2603335                      - 22 -

Accordingly, as to Request Nos. 26 and 30, the Motion is **GRANTED** in part and **DENIED** in part, subject to the subject matter limitations set forth above.  The Motion as to Request No. 25 is **GRANTED**.

f.   <u>Request No. 29</u>.

Request No. 29 seeks all documents regarding testimony provided to any Government by any member of Senior Management or the Board.  I agree with defendants that this request is overbroad (or seeks documents otherwise publicly available).  The request, fairly read, would include any testimony, including sworn testimony, given in any judicial, administrative, or quasi-judicial proceeding, regardless as to subject matter.  Subject to the limitation that the subject matter be limited to unintended acceleration issues, such testimony should be produced, including drafts of testimony prepared for senior Toyota officials, as well as any communications relating to the testimony, subject to applicable privileges and the work product doctrine.

Accordingly, as to Request No. 29, the Motion is **GRANTED** in part and **DENIED** in part, subject to the subject matter limitations set forth above (*see* section D.4(a) *supra*).

5.   <u>Documents Relating to "Quality and Safety" of Toyota Vehicles and any Price Decline of Toyota Securities During the Class Period" (Request No. 9)</u>.

This request seek "All documents relating to unintended acceleration defects, recalls, or the quality or safety of Toyota vehicles and any decline or potential decline in the price of Toyota securities during the Class Period."  Defendants objected to the request as vague, overbroad, compound, burdensome, and that it purportedly links two concepts that [defendants] assert[] are not connected."  Specifically, defendants argue that it is "unclear exactly what this Request seeks," and contend that issues relating to "quality or safety of Toyota vehicles" are no longer part of the action in light of the Court's Order.  Defendants, however, agree to produce documents relating to price declines in Toyota securities concerning unintended acceleration defects or recalls (all subject to the limitations described above) but not the quality or safety of Toyota vehicles.

Plaintiff contend that it is "hard to understand how [this request] could be clearer."  I disagree.  First, read literally, the request seeks all documents relating to "quality or safety" (itself a potentially overwhelming number of documents) and then asks that defendants somehow relate this vast universe of documents to any "decline" or "potential decline" in the price of Toyota securities for purposes of production.  Second, while the Court noted that adverse publicity or recalls relating to unintended acceleration put "Toyota's carefully cultivated reputation for quality and safety and its market credibility. . . clearly at risk," Order at 7, this does not grant to Plaintiff an unfettered right to conduct discovery as it relates to any "quality" or "safety" issue.  To the extent that issues relating to loss causation as it relates to the "'quality and safety' price premium in Toyota securities" are appropriate topics of discovery, Motion at 23, this may be explored in the context of documents relating to the relevant issues in this case – *i.e.*, the alleged failure to disclose and address the causes, conditions, and remedies for unintended acceleration.  *See* Order at 3-4 & n.2 (holding that Plaintiff failed to adequately allege scienter (and "arguably failed" to plead falsity) as to "generalized quality and safety statements").[24]

---

[24] Plaintiff argues that the Tentative Ruling limiting discovery relating to the "quality and safety" of Toyota vehicles as it relates to the decline or potential decline in the price of Toyota securities is "overly narrow".  Plaintiff's Comments at 2.  While the Court recognized the potential for "enormous impact on Toyota's business" and its "carefully cultivated reputation for quality and safety", it did so in reference to "unintended acceleration defect".  Order at 7.  Open-ended discovery into any defect, recall, or other "quality and safety" issue relating to "any decline or potential decline in the price of

Report and Rulings of Special Master Layn R. Phillips re Lead Plaintiff's Motion to Compel the Production of Documents From Defendants

2603335     - 23 -

Defendants also contend that discovery relating to price declines of Toyota securities should be limited to Toyota ADSs, and not Toyota securities traded on the Tokyo Stock Exchange.  (The Court declined to exercise supplemental jurisdiction over the Japanese law claims.  Order at 8-10.).  Plaintiff argues that Toyota common stock and the Toyota ADSs are "functional equivalents", Reply at 10 (*citing In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 521 (S.D.N.Y. 2011)), and that the ADSs trade in tandem with Toyota stock, such that price declines in ADSs mirror price declines in the common stock.  Plaintiff's Comments at 3.  Given that the trading volume of Toyota common stock is much more significant than the ADSs – Plaintiff points out that the ADSs represent a 2:1 interest in Toyota's common stock – Plaintiff argues that Toyota senior management would be at least as focused on common stock price declines relating to the public's perception of safety and reliability surrounding unintended acceleration issues.  Plaintiff argues that limiting discovery to price declines of Toyota ADSs could potentially exclude documents that refer solely to common stock declines in the context of discussing unintended acceleration.  I agree.  *See also* Order at 2 (referencing Compl. ¶¶ 180-187) (discussing drop in price for both Toyota common shares and ADSs).  Accordingly, discovery as to actual or potential declines in Toyota common stock (as well as its ADSs) is relevant, provided that such discovery is limited to issues relating to unintended acceleration.

Accordingly, as to Request No. 9, the Motion is **GRANTED** in part (as to discovery concerning Toyota common stock, subject to the subject matter limitations set forth above (*see* section D.4(a) *supra*)) and **DENIED** in part.

6.   Documents Relating to the "Toyota Way" (Request No. 37).

Request No. 37 seeks documents "prepared or distributed" by the Company relating to "Toyota Way."  Defendants agree to produce only documents "sufficient to describe" the Toyota Way and "sufficient to show" the Company's responsibility or authority for making recall decisions.  Defendants state that they have already produced publications in English and Japanese that describe the "Toyota Way" in significant detail; having to search for and produce "all documents" that Toyota "prepared or distributed" would be cumulative and unnecessary.  Opp. at 21.

I agree.  While Toyota's "highly involved management style", Order at 6, may well permeate the organization and operations of the Company and its subsidiaries, and is relevant to senior management's access to relevant information concerning unintended acceleration issues, its "awareness of the problems and potential reasons for them," *id.*, as well as to recall decisions allegedly made by Toyota management in Japan, *id.* at n.7, the salient inquiry for discovery purposes should be on what was communicated, or (pursuant to this management system) those policies and procedures which, Plaintiff alleges, "required" senior executives to be responsible for and informed about operations," Compl. ¶ 54, as opposed to a broad-based search for any documents that refer to, or embody, this

---

Toyota" stock poses the danger (if not the likelihood) of the hugely unwieldy and burdensome task of identifying documents unconnected in time or subject matter to the Actionable Statements at issue in this litigation.  Plaintiff essentially makes this point, by arguing that the Order does not "preclude discovery on the *sustained statements* regarding quality and safety issues."  Plaintiff's Comments at 2 (emphasis original).  These sustained statements relate to the alleged causes of unintended acceleration (or the alleged material omission of such causes).  Accordingly, discovery relating to quality and safety issues should bear some connection to the subject matter of these statements, and not become a fishing expedition for any document which relates to "quality and safety" and the trading price of Toyota securities.

Report and Rulings of Special Master Layn R. Phillips re Lead Plaintiff's Motion to Compel the Production of Documents From Defendants

2603335                                    - 24 -

management style or philosophy.  While I conclude that written policies or procedures that (for example) describe any alleged management practice to "regularly inform" "Tokyo's headquarters" of issues relating to unintended acceleration, such as customer complaints, Compl. ¶ 56; the assignment of quality control representatives from Japan to sales offices in the United States to report on such issues, Compl. ¶ 57; and defendants' access to such information that may be contained in databases, Field Technical Reports, or other documents which reflect how, and by what means, such information was to be reported, are relevant, it is sufficient, for purposes of responding to this request, that defendants be required to produce only those documents sufficient to describe these policies, procedures, and reporting practices.

Accordingly, as to Request No. 37, the Motion to Compel is **GRANTED** in part and **DENIED** in part.

7.    Documents Relating to TMC's Responsibility or Authority for Recall Decisions (Request No. 16).

Request No. 16 seeks all documents "relating to TMC's responsibility or authority for making defect" or recall decisions.  Toyota has agreed to produce documents "sufficient to show" such responsibility or authority; any additional documents would be cumulative and would likely include large quantities of documents reflecting the Company's involvement in every defect or recall decision in which is has been involved.

I agree.  For purposes of this request, defendants need only produce documents sufficient to show whether TMC has such responsibility or authority for recall or defect decisions.

Accordingly, as to Request No. 16, the Motion is **DENIED**.

8.    Custodial Files of the Board and Senior Management[25] Regarding Certain Topics (Request Nos. 41-43).

Request No. 41 seeks all documents "reviewed by, received by, or prepared by, for or at the instruction or request of any Senior Management, the Board, or any Board Committee" relating to 26 different categories of documents, ranging from unintended acceleration to "investor relations" and "Toyota's pursuit of growth and market share." Request No. 42 seeks all communications between, among, including, or involving these same parties, as well as to any Government, as to the identical 26 categories of documents. Request No. 43 seeks all "minutes or other records of any Meetings of the Board or any Board committee during the Class Period, and all documents reviewed or distributed relating to any such Meetings", relating to these same 26 categories of documents. Defendants object to these requests, notwithstanding the fact that they agree to produce certain responsive documents in response to other requests – a point which, as defendants point out in their Opposition, underscores the cumulative nature of certain of these requests.  Opp. at 22.

As to certain of the listed categories of documents, production of documents is warranted.  Specifically, Plaintiff is entitled to receive documents reflecting the Board's or Senior Management's awareness of, or familiarity with, issues pertinent to this litigation, and therefore the subcategories of documents set forth in Request Nos. 41-43 are relevant, but only to the extent that they pertain to, or have as their subject matter, issues relating to

--------------------------------------------------

[25]    "Senior Management" is defined in the Requests as the Individual Defendants and all officers of the Company, any employees reporting directly to these individuals, and any internal or external legal, financial, or regulatory advisors to Senior Management.

Report and Rulings of Special Master Layn R. Phillips re Lead Plaintiff's Motion to Compel the Production of Documents From Defendants

2603335                                    - 25 -

unintended acceleration.  Thus, while appropriate to seek documents relating to (*e.g.*) "throttles or throttle control software" (Request Nos. 41(d), 42(d), 43(d)), "Toyota's pursuit of growth and market share" (Request Nos. 41(f), 42(f), 43(f)), or "investor relations," (Request Nos. 41(k), 42(k), 43(k)), as they relate specifically to unintended acceleration, Plaintiff is not entitled to all documents bearing on any aspect of these enumerated topics, whether or not related to the issues in this litigation.

Plaintiff argues that notwithstanding this limitation, discovery as to the custodial files of Toyota's Board and Senior Management should be permitted as to "(1) Toyota's policies and practices relating to public disclosure to investors" and "(2) the purchase or sale of Toyota stock or stock options."  Plaintiff's Comments at 4.  I agree with Plaintiff that documents in either of these categories are relevant to issues of scienter and motive, regardless of whether they also pertain to unintended acceleration.  Accordingly, as to 41-43 subparts (l) & (s), discovery should be permitted.

Accordingly, as to Request Nos. 41-43 subparts (l) & (s), the Motion is **GRANTED.**  The Motion is **GRANTED** in part and **DENIED** in part as to the balance of Request Nos. 41-43.

IT IS SO ORDERED:

March 9, 2012

_____

Layn R. Phillips
Former U.S. District Judge

Report and Rulings of Special Master Layn R. Phillips
re Lead Plaintiff's Motion to Compel the Production of
Documents From Defendants

2603335

- 26 -