BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP
BLAIR A. NICHOLAS (Bar No. 178428)
(blairn@blbglaw.com)
BENJAMIN GALDSTON (Bar No. 211114)
(beng@blbglaw.com)
DAVID R. KAPLAN (Bar No. 230144)
(davidk@blbglaw.com)
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:   (858) 793-0070
Fax:   (858) 793-0323
      -and-
GERALD H. SILK (Admitted *Pro Hac Vice*)
(jerry@blbglaw.com)
1285 Avenue of the Americas
New York, NY 10019
Tel:   (212) 554-1400
Fax:   (212) 554-1444

*Counsel for Lead Plaintiff Maryland State Retirement and Pension System and Lead Counsel for the Class*

FAIRBANK & VINCENT
ROBERT H. FAIRBANK (Bar No. 76359)
(rfairbank@fairbankvincent.com)
DIRK L. VINCENT (Bar No. 157961)
(dvincent@fairbankvincent.com)
444 S. Flower Street, Suite 3860
Los Angeles, CA 90071
Tel:   (213) 891-9010
Fax:   (213) 891-9011

*Liaison Counsel for the Class*

*(Additional Counsel listed on signature page)*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE TOYOTA MOTOR CORPORATION SECURITIES LITIGATION | Master File No. CV 10-922 DSF (AJWx) <br><br> **REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF LEAD PLAINTIFF'S MOTION TO EXCLUDE EXPERT REPORT OF PAUL A. GOMPERS** <br><br> Date: Oct. 15, 2012 <br> Time: 1:30 p.m. <br> Courtroom: 840 <br> Judge: Hon. Dale S. Fischer |

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES .................................................................................. ii

I. INTRODUCTION .......................................................................................1

II. ARGUMENT ...............................................................................................3

    A. Professor Gompers' False Testimony Cannot Be Disregarded As Mere "Inadvertent Error" ..................................5

    B. Professor Gompers Failed To Address The Pertinent Legal Question ................................................................9

    C. Professor Gompers' Report Is Scientifically Unreliable .....................................................................................11

III. CONCLUSION ..........................................................................................13

# TABLE OF AUTHORITIES

Case                                                                                                                    Page

*In re Apollo Grp. Inc. Sec. Litig.*,
  509 F. Supp. 2d 837 (D. Ariz. 2007).................................................................................. 10

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ..................................................................................................... 1, 10

*Burns v. Bd. of Cnty. Comm'rs*,
  330 F.3d 1275 (10th Cir. 2003)...........................................................................................7

*In re Cendant Corp. Sec. Litig.*,
  109 F. Supp. 2d 235 (D.N.J. 2000) .................................................................................. 10

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993) ................................................................................................. passim

*Daubert v. Merrell Dow Pharms., Inc.*,
  43 F.3d 1311 (9th Cir. 1995)................................................................................... 3, 4, 12

*Dobbert v. Wainright*,
  468 U.S. 1231 (1984) ..........................................................................................................5

*Garcia v. Pueblo Country Club*,
  299 F.3d 1233 (10th Cir. 2002)...........................................................................................7

*Hambleton Bros. Lumber Co. v. Balkin Enters., Inc.*,
  397 F.3d 1217 (9th Cir. 2005)..............................................................................................7

*In re Initial Pub. Offering Sec. Litig.*,
  260 F.R.D. 81 (S.D.N.Y. 2009) ....................................................................................... 11

*In re Live Concert Antitrust Litig.*,
  2012 WL 1021081 (C.D. Cal. Mar. 23, 2012) ................................................................. 13

*Lumen v. Anderson*,
  280 F.R.D. 451 (W.D. Mo. 2012) .................................................................................... 11

*Lust v. Merrell Dow Pharms., Inc.*,
  89 F.3d 594 (9th Cir. 1996)............................................................................... 1, 3, 4, 12

*McNamara v. Bre-X Minerals, Ltd.*,
  2002 WL 32076175 (E.D. Tex. Sept. 30, 2002) .............................................................. 13

*Mformation Techs., Inc. v. Research in Motion Ltd.*,
  2011 WL 2940289 (N.D. Cal. July 20, 2011)......................................................................7

*Moody v. Dexter*,
    667 F. Supp. 2d 1167 (C.D. Cal. 2009)..................................................................................5

*Moro v. Shell Oil Co.*,
    91 F.3d 872 (7th Cir. 1996).....................................................................................................8

*Peterson v. Roe*,
    2006 WL 1455434 (E.D. Cal. May 25, 2006).........................................................................6

*Teleshuttle Techs. LLC v. Microsoft Corp.*,
    2005 WL 3259992 (N.D. Cal. Nov. 29, 2005).........................................................................7

*Thorn v. Sundstrand Aerospace Corp.*,
    207 F.3d 383 (7th Cir. 2000)...................................................................................................7

*In re TMI Litig. Cases Consol. II*,
    922 F. Supp. 1038 (M.D. Pa. 1996) .......................................................................................6

*In re Toys "R" Us – Del., Inc. FACTA Litig.*,
    2010 WL 5071073 (C.D. Cal. Aug. 17, 2010) ................................................................... 6, 7

*In re Vivendi Universal, S.A.*,
    242 F.R.D. 76 (S.D.N.Y. 2007) ........................................................................................... 11

*In re Williams Sec. Litig.*,
    496 F. Supp. 2d 1195 (N.D. Okla. 2007) ............................................................................ 10

*Zenith Elecs. Corp. v. WH-TV Broad. Corp.*,
    395 F.3d 416 (7th Cir. 2005), *reh'g denied* (Feb. 8, 2005)................................................. 10

**STATUTES, RULES & REGULATIONS**

Federal Rules of Evidence
    Rule 104 .................................................................................................................... 1, 3, 12
    Rule 702 ............................................................................................................... 1, 3, 10, 12

**SECONDARY AUTHORITIES**

Sanjai Bhagat & Roberta Romano, *Event Studies and the Law: Part I: Technique and
    Corporate Litigation* ........................................................................................................... 10

## I. INTRODUCTION

Lead Plaintiff's opening brief established that the expert report of Professor Paul A. Gompers in support of Defendants' opposition to class certification should be excluded for three reasons: (1) Professor Gompers lacks the credibility and candor required of an expert witness; (2) the Gompers Report fails to address the pertinent question of market efficiency; and (3) Professor Gompers' opinions are the product of bare speculation and flawed, unreliable, and fundamentally misleading methodologies. *See* Fed. R. Evid. 104, 702; *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 592-95 & n.10 (1993) ("*Daubert*").

Defendants' opposition fails to provide any cogent response. Instead, as predicted, Defendants attempt to minimize Professor Gompers' inexplicable wholesale recantation of at least 11 pages of sworn testimony by characterizing it as mere "inadvertent error" or an "honest mistake." However, Defendants' efforts to explain away Professor Gompers' opinions and *post-hac* "explanations" only raise more doubt about Professor Gompers' credibility and the reliability of his "expert" findings. The Court should exercise its gatekeeper function under *Daubert* and exclude the Gompers Report as "junk science." *Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 597 (9th Cir. 1996).

In addition to the serious credibility issues surrounding Professor Gompers, his "expert" opinions should be excluded because he applies an irrelevant standard of market efficiency. In particular, Gompers applies a "fundamental value" market efficiency standard that no court has ever required or accepted. Despite Professor Gompers' artful attempts to suggest otherwise, the language of his own report and deposition testimony confirm that he employs a "strong form" market efficiency test that goes far beyond the informational efficiency standard announced by the Supreme Court in *Basic Inc. v. Levinson*, 485 U.S. 224, 245-47 (1988). Contrary to more than 20 years of jurisprudence, Professor Gompers discards the first four of five *Cammer* factors as "irrelevant" to market efficiency, and performed no event study of his own to assess *Cammer* factor five. Indeed, rather than perform an independent assessment of informational efficiency,

Professor Gompers analyzed the bid-ask spreads for Toyota ADRs during the Class Period to identify so-called "instances of illiquidity." But, as Professor Gompers concedes, neither "illiquidity" nor a bid-ask spread analysis is a direct test of informational efficiency.

Moreover, Professor Gompers' opinions are based on a scientifically unsound methodology. Professor Gompers compared spreads among Toyota and certain industry peers only on an *absolute dollar* basis and not a *percentage* basis, and thus failed to control for widely divergent trading prices of the subject securities. Basic statistics and common sense dictate that when comparing securities of hugely disparate prices such as Toyota ADRs (which traded as high as $106.82 per share) and Ford (which traded as low as $1.01 per share), the only scientifically credible way to determine which security has a more "narrow" bid-ask spread is to control for that price difference by expressing the spread as a percentage of the trading price. Any comparison of spreads for Toyota ADRs and Ford during the Class Period is of little or no value here because, as Professor Gompers and Defendants recognize, "Ford's stock price was so low during the Class Period ($5.59 per share on average) that an 'overwhelming majority of Ford's spreads . . . were at or below'" the $0.01 minimum permissible spread.[1] In other words, ***more than 97%*** of Ford's spreads during the Class Period were at or below $0.01. The appropriate scientific response is not to reject the percentage spread analysis but to select more relevant and comparable securities. Professor Gompers' response firmly illustrates why his methodology is scientifically unsound and fundamentally deceptive.[2]

Defendants' opposition to class certification relies exclusively on Professor Gompers' analyses and conclusions to argue that the market for Toyota ADRs during the Class Period exhibited certain "anomalies" that they contend "cast serious doubt . . . that

---

[1] *See* Defendants' Opposition to Motion to Exclude Expert Report of Professor Paul A. Gompers, Ph.D. [ECF No. 292] ("Opp.") at 10:17-20 (quoting Gompers Rebuttal Report, ¶25).

[2] Far from an "apples to apples" comparison, Professor Gompers' bid-ask spread analysis was designed to manufacture or exaggerate "instances of illiquidity" in the market for Toyota ADRs.

the market priced Toyota ADSs efficiently."[3]  Specifically, Defendants claim that these "anomalies" consist of "(1) a much greater propensity than peer companies for unusually high effective 'bid-ask spreads'; (2) problems absorbing large trades (resulting in pricing disturbances [to the bid-ask spreads] during times of high volume); and (3) the fact that many ADS market participants bought and sold Toyota ADSs outside the local Toyota ADS market in the United States by converting common shares purchased in the Japanese market to ADSs (and vice versa)." *Id*. at 2:1-6.  Because Professor Gompers' bid-ask spread analysis is fundamentally flawed and deceptive, and because Professor Gompers has further admitted that he did nothing to independently investigate but only speculated as to why investors converted shares, Defendants' opposition to Class Certification lacks merit.

Accordingly, and for the additional reasons set forth in Lead Plaintiff's opening brief, Professor Gompers' Report is unreliable, irrelevant, and unhelpful to the trier of fact, and is therefore inadmissible under *Daubert* and the Federal Rules of Evidence.

## II.  ARGUMENT

As the proponents of "expert" testimony, Defendants must establish the admissibility of Professor Gompers' report.  *See* Fed. R. Evid. 104, 702; *Lust*, 89 F.3d at 598; *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995) ("*Daubert II*").  Defendants cannot meet their burden because Professor Gompers' Report is "junk science."  *See Lust*, 89 F.3d at 597 (district courts must act as gatekeepers to separate "inadmissible opinions based on junk science from admissible opinions developed by the scientific method").  Professor Gompers openly rejects the established standard for assessing market efficiency in securities fraud cases – a thorough and complete *Cammer* analysis, including an event study, the appropriate scientific tool for evaluating the "cause and effect" relationship of *Cammer* factor five.  Contrary to established law in this and every other Circuit to have addressed the issue, Professor

---

[3] *See* Defendants' Memorandum in Opposition to Lead Plaintiff's Motion for Class Certification [ECF No. 265], at 1:26-27.

Gompers dismisses the first four *Cammer* factors as "***irrelevant***," applies a "fundamental value" standard that has never been accepted by any court, and advocates for a novel "illiquidity" analysis that does not test informational efficiency. At bottom, Professor Gompers has not based his opinions on the relevant literature, but rather manufactured an irrelevant analysis expressly for the purposes of finding inefficiency. *See id.* ("'One very significant fact' [favoring exclusion] is whether the expert has 'developed [his] opinions expressly for purposes of testifying . . . .'") (quoting *Daubert II*, 43 F.3d at 1317).

Worse yet, when confronted with fundamental methodological flaws in his "illiquidity" analysis, Professor Gompers falsely testified that he had performed an alternative method of analyzing bid-ask spread (which formed the foundation for his illiquidity analysis) and that it, too, supported his conclusions. Professor Gompers subsequently admitted that he ***never*** performed a percentage bid-ask spread analysis and had "no idea" whether it supported his conclusions. *See* Gompers Decl., Ex. 1 to Galdston Decl. in Support of Motion to Exclude [ECF No. 284] ("Galdston Decl."). Professor Gompers' subsequent claims of "inadvertent" or "honest" mistake are not credible when measured against (i) the unequivocal and emphatic testimony he provided during his deposition;[4] (ii) the affirmative opinions regarding the results of the percentage bid-ask spread analysis in the Gompers Report; and (iii) Professor Gompers' extensive testifying experience.

In short, the only plausible explanation is that Professor Gompers attempted to explain away a fundamental flaw in his methodology through a passing reference in a footnote to his report and, when that flaw was exposed, he compounded his error by

---

[4] *See, e.g.,* Gompers Tr., Galdston Decl., Ex 2, at 141:15-142:1 (***"So I've also looked at the analysis as percentage spread, so – you're certainly asking about percentage spread. And the same general result holds***."); *id*. at 149:13-25 (When asked again, "you performed a percentage analysis, correct?" – Professor Gompers testified "***I have looked at and tabulated the distribution of percentage effective spreads . . . . I divided the dollar spreads by the stock price***."); *id*. at 150:5-7 (Professor Gompers further testified that he "***certainly looked at the distribution [of percentage spreads]. And the distribution looks qualitatively identical***."); *id*. at 153:4-7 ("Testifying again that he performed a percentage spread analysis, Professor Gompers stated "***I did look at what the percentage effective spreads look like***.").

giving false testimony that he also hoped would not be discredited. Now, only after being repeatedly questioned and confronted with demands to provide back-up for the test he repeatedly claimed to have performed, Professor Gompers finally admits that he had no basis for his testimony. Nevertheless, Defendants and Professor Gompers ask the Court to excuse Professor Gompers' long and costly trail of false testimony and accept his obviously flawed opinions. The Court should not tolerate such flagrant abuse. The Gompers Report should be excluded under *Daubert* and the Federal Rules of Evidence.

### A. Professor Gompers' False Testimony Cannot Be Disregarded As Mere "Inadvertent Error"

Professor Gompers' credibility is in serious doubt as a result of his admittedly false testimony both in his report and at deposition. The papers submitted by Defendants and Professor Gompers in opposition to this motion do nothing to restore his credibility but instead only raise more questions and cause deeper skepticism.

As an initial matter, Defendants do not dispute that courts view recantation testimony to be "highly suspicious." *Moody v. Dexter*, 667 F. Supp. 2d 1167, 1178 (C.D. Cal. 2009); *Dobbert v. Wainright*, 468 U.S. 1231, 1233 (1984) ("Recantation testimony is properly viewed with great suspicion."). As a witness **paid** to both prepare and deliver testimony, an expert like Professor Gompers is reasonably expected to testify correctly the first time. It is, therefore, understandably rare for an expert to recant substantive or extensive testimony; particularly testimony that concerns the underpinnings of the expert's methodology. Here, Professor Gompers' recantation testimony is particularly dubious because he has recanted not only a significant volume of testimony (at least 11 pages, by Defendants' count) but because the subject matter concerns the very heart of his bid-ask spread analysis and novel "illiquidity" methodology. *See In re TMI Litig. Cases Consol. II*, 922 F. Supp. 1038, 1051-52 (M.D. Pa. 1996) (court may exclude an expert when the expert recants a "significant portion" of sworn testimony). At a minimum, this renders Professor Gompers' opinions regarding "illiquidity" in the market for Toyota ADRs "inherently unreliable." *Peterson v. Roe*, 2006 WL 1455434, at *28

(E.D. Cal. May 25, 2006) ("Courts have consistently found that a recantation of trial testimony by a witness is inherently unreliable.") (citations omitted).

Defendants cite only one case to support their argument that the Gompers Report should be admitted notwithstanding his false testimony, but that case does not help them. *See* Opp. at 17-22 (citing *In re Toys "R" Us – Del., Inc. FACTA Litig.*, 2010 WL 5071073 (C.D. Cal. Aug. 17, 2010)). In *Toys "R" Us*, plaintiffs moved to strike the opinion of an expert concerning whether the printing of the first six digits of a credit card number, in addition to the permissible last four, would harm consumers in violation of the Fair and Accurate Credit Transactions Act (FACTA). 2010 WL 5071073, at *11 n.20. There, unlike here, the basis for motion to exclude was the expert's "memory of events unrelated to this litigation that occurred 26 years ago" – *i.e.*, whether the expert was admitted to the State Bar on the same day she was admitted to practice before the Supreme Court in a special ceremony. *Id.* Here, Professor Gompers' false testimony does not concern events that occurred decades ago, but rather contemporaneous tests he purportedly performed to reach his "expert" opinion in *this* litigation. Nor can Gompers' false testimony be marginalized and dismissed as some passing remark. The false testimony spans at least eleven pages and goes to the heart of the credibility of his opinions.[5]

Despite Defendants' arguments otherwise (Opp. at 21), the Ninth Circuit does not permit the wholesale retraction of pages of expert testimony or extensive contradictory "clarifications," whether by errata sheet *or* by declaration. *See Hambleton Bros. Lumber Co. v. Balkin Enters., Inc.*, 397 F.3d 1217, 1225-26 (9th Cir. 2005) ("We see no reason to treat Rule 30(e) corrections differently than affidavits.") (quoting *Burns v. Bd. of Cnty. Comm'rs*, 330 F.3d 1275, 1281-82 (10th Cir. 2003)). This is because "'[a] deposition is

---

[5] In *Toys "R" Us*, plaintiffs also complained that the expert "made inconsistent statements regarding when she began to draft her declaration." *Id.* Once again, however, the court found that the expert's "memory of events that did not occur in 2007 is of limited relevance." *Id.* Thus, whereas *Toys "R" Us* involved isolated, inconsistent statements about irrelevant, procedural matters that occurred years prior to the testimony, here the recantation concerns a large section of directly relevant material underlying Gompers' opinions.

not a take home examination.'" *Hambleton*, 397 F.3d at 1225 (quoting *Garcia v. Pueblo Country Club*, 299 F.3d 1233, 1242 n.5 (10th Cir. 2002). Defendants' offer "to have the correction made by way of an errata sheet" (Opp. at 21) incorrectly elevates form over substance and entirely misconstrues controlling Ninth Circuit law. *See id.* at 1225 ("a change of substance which actually contradicts the transcript is impermissible unless it can plausibly be represented as the correction of an error in transcription, such as dropping a 'not'") (quoting *Thorn v. Sundstrand Aerospace Corp.*, 207 F.3d 383, 389 (7th Cir. 2000)); *see also Teleshuttle Techs. LLC v. Microsoft Corp.*, 2005 WL 3259992, at *2-3 (N.D. Cal. Nov. 29, 2005) (striking expert's substantive and contradictory changes to deposition testimony); *Mformation Techs., Inc. v. Research in Motion Ltd.*, 2011 WL 2940289, at *1 (N.D. Cal. July 20, 2011) (striking errata sheet with "contradictory . . . not merely corrective" testimony).

Moreover, those few courts that have allowed *post-hoc* substantive changes to deposition testimony treat them with great skepticism and require a "plausible explanation for the contradictions." *Moro v. Shell Oil Co.*, 91 F.3d 872, 875 (7th Cir. 1996). Defendants' explanation is not remotely plausible. Defendants claim that Professor Gompers "was under the incorrect belief that he had reviewed a 'percentage' spread analysis in preparation for his deposition as a backup or second-level check to the analyses in his report." Opp. at 18 (citing Gompers Rebuttal Report, ¶¶38-42). Professor Gompers, however, claims that he was recalling some new "dollar quoted" spread analysis, and not the "percentage" spread analysis he described in detail during his testimony. *Id*. At best, Defendants' claim only begs the question why a highly-compensated and experienced expert would believe he had reviewed an analysis that he did not, in fact, perform; or mistake a completely different "dollar quoted" spread analysis for a percentage spread analysis that completely discredits his conclusions.

Professor Gompers' attempted explanation also is pure fiction. At no time during his deposition did Professor Gompers ever mention performing a "dollar quoted" spread analysis. In fact, Professor Gompers testified that there are only *two possible*

methodologies to performing a spread analysis: the "percentage spread" analysis and the "dollar spread" analysis. *See* Gompers Tr., Galdston Decl., Ex. 2 at 143:12-24 ("Let me be slow here. ***There's two ways to do this*** . . . If you want to control for the stock price and the level of the stock price, you do ***percentage spreads***, okay? If you think it's more appropriate – and I think it's more appropriate here – you do ***dollar spreads***. ***Those are your two choices, okay?***"). Having been caught testifying falsely, Gompers now apparently invents a third approach – a so-called "dollar quoted" spread analysis – that he claims to have performed. But it is simply not plausible that, after having supposedly performed such an analysis, he would have forgotten to even acknowledge that such an analysis exists and would have testified repeatedly and at length that he had performed a different analysis, which in fact he did not perform. There is absolutely no corroboration in Professor Gompers' own materials or Report that he ever performed any "dollar quoted" spread analysis, leaving the Court with only Professor Gompers' own self-serving explanation and an exhibit that was apparently ginned up after the fact.

This patent implausibility is underscored by Professor Gompers' own dissembling explanation: "a *percentage* effective spread depiction (what I mistakenly testified I had seen) would be a one dimension change from the *dollar* effective spreads analyzed in my Report – changing dollars to percentages – whereas the *quoted* spread check (what I actually saw) also changed a single, but different, dimension: it moved from dollar *effective* spreads to dollar *quoted* spreads." Opp. at 18 (quoting Gompers Rebuttal Report, ¶42). Professor Gompers asks the Court to accept that he "mistakenly" confused – not less than six times – a "robustness check" he claims he did perform for a "percentage analysis" he claims he did not perform simply because both change "a single, but different, dimension." Such a rudimentary error for an expert of Professor Gompers' experience under any circumstances is simply reckless and irresponsible. Here, the claimed error makes no sense as it fails to explain why Professor Gompers would be misremembering an analysis he ***never*** even performed.

Similarly unbelievable are Defendants' and Professor Gompers' attempts to disavow affirmative statements in the Gompers Report about the results of a percentage spread analysis. Defendants would now prefer that the Court understand footnote 95 of Professor Gompers' report as expressing Professor Gompers' *expectations* as to the results of a test he admits he never performed. Opp. at 20. Such speculation has absolutely no place in an expert report that – under the Federal Rules of Evidence and *Daubert* – must be based on the application of scientific principles, not bare speculation. Moreover, as explained in Mr. Coffman's Rebuttal Report, Professor Gompers' supposed musings about the results and applicability of a percentage spread analysis are not only wrong but, when properly performed, Professor Gompers' conclusions about the bid-ask spreads for Toyota ADRs are effectively *reversed*.

### B. Professor Gompers Failed To Address The Pertinent Legal Question

Professor Gompers' Report is also fundamentally flawed because he never addresses the pertinent question of market efficiency.[6] Defendants do not dispute that Professor Gompers fails to offer *any* evidence that directly addresses informational efficiency – or any of the other *Cammer* factors accepted by courts nationwide as reliable evidence of market efficiency entitling investors to a class-wide presumption of reliance under the Supreme Court's holding in *Basic*, 485 U.S. at 245-47. As a result, the Gompers Report is unhelpful to the trier of fact and not based on "reliable principles and methods" – in contravention of Rule 702 and *Daubert*. *See also Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419-20 (7th Cir. 2005), *reh'g denied* (Feb. 8, 2005) ("An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process.").

Professor Gompers performed no event study of his own or any other independent assessment of informational efficiency. Motion at 20-21. Defendants do not dispute that the daily event study used by Mr. Coffman is "standard in the securities class action

---

[6] Lead Plaintiff also addressed this issue in its Class Certification Reply [ECF No. 287] (at 3-4, 8-9) and *Daubert* Opposition [ECF No. 281] (at 2-3, 7-11).

context for purposes of examining market efficiency . . . consistent with the event study scholarship, including authorities cited by Professor Gompers." Coffman Rebuttal Report, ¶16, Ex. 1 to Galdston Decl. in Oppos. to Motion to Exclude Coffman Expert Testimony [ECF No. 282]; *see also In re Apollo Grp. Inc. Sec. Litig.*, 509 F. Supp. 2d 837, 844 (D. Ariz. 2007). Indeed, Defendants do not – and cannot – dispute that event studies have been widely used in law, economics, and academia for decades.[7] In contrast, Defendants cite no case where an intraday bid-ask spread or trading analysis has been accepted by any court to measure market efficiency.[8] While Defendants imply that Professor Gompers' intraday bid-ask spread and trading analysis is the "equivalent" of an event study (*see* Opp. at 13), Gompers did not perform any event study that "is 'generally accepted' as reliable in the relevant scientific community." *Daubert*, 509 U.S. at 584.[9]

In truth, Professor Gompers' methodology is a radical departure from prevailing accepted standards for determining market efficiency. The "illiquidity" analysis

---

[7] Defendants do not address the relevant authorities cited by Lead Plaintiff that establish the importance of event studies in evaluating information efficiency, which is the applicable legal test. *See In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195, 1272-1273 (N.D. Okla. 2007) (discussing pivotal role event studies play in securities litigation); *In re Cendant Corp. Sec. Litig.*, 109 F. Supp. 2d 235, 253-54 (D.N.J. 2000) (relying on plaintiffs' representation that event studies have been used by financial economists since 1969); Sanjai Bhagat & Roberta Romano, *Event Studies and the Law: Part I: Technique and Corporate Litigation*, 4 Am. L. & Econ. Rev. 141, 142 (2002) (event studies have been used in several hundred scholarly articles in leading academic finance journals).

[8] As noted by Lead Plaintiff (Motion at 18 n.10) and not disputed by Defendants, at least one court has already rejected Professor Gompers' arguments that "in a perfectly efficient market share prices would adjust instantaneously" because "the *Basic* presumption does not require a perfectly efficient market, only a market efficient enough to incorporate information into the share price with reasonable speed." *In re Initial Pub. Offering Sec. Litig.*, 260 F.R.D. 81, 102 (S.D.N.Y. 2009). Moreover, although Defendants go through great lengths to distinguish *Lumen v. Anderson*, 280 F.R.D. 451 (W.D. Mo. 2012), they do not dispute that Gompers' arguments have been repeatedly rejected by courts. In *Lumen*, the court dismissed Gompers' expert report as "not legally relevant" and as describing a "different conception of an efficient market than is used by the law." *Id.* at 460; *see also In re Vivendi Universal, S.A.*, 242 F.R.D. 76, 109 (S.D.N.Y. 2007) (rejecting Professor Gompers' arguments and finding "nothing in defendants' submission supports the proposition that such minor inefficiencies between the markets that may exist will have any impact on class-wide proof of the element of reliance.").

[9] Professor Gompers conceded at his deposition that he did not perform his own daily event study. Gompers Tr., Galdston Decl., Ex. 2 at 57:19-21. Professor Gompers offered no explanation why he did not perform a daily event study despite the fact that he has performed many in the past. *Id.* at 8:23-25, 9:1-9.

performed by Professor Gompers has never been accepted by any court as an appropriate or even useful analytical approach to assessing informational efficiency in the context of an open market securities fraud class action. Defendants concede the point, and merely argue that market liquidity is a relevant – but not dispositive – factor in assessing market efficiency. Opp. at 5-7. Similarly, Defendants fail to address Professor Gompers' dismissal of the first four *Cammer* factors as "***irrelevant***" and cite no decision supporting this view. Opp. at 8. While Defendants pretend that Professor Gompers' novel methodology considered the "semi-strong" form of market efficiency (*see* Opp. at 4-7), Defendants' disclaimers cannot remedy Professor Gompers' repeated assertions that Toyota ADRs did not reflect the "correct fundamental value" at all times during the Class Period, which he opines provides evidence of inefficiency. *See*, *e.g.*, Gompers Report, ¶¶8, 12, 81 (Ex. A to Gompers Decl. in Oppos. to Motion for Class Cert. [ECF No. 266]). As in *Lumen*, this Court should reject Professor Gompers' effort to impose a heightened standard for a class-wide presumption of reliance.

### C. Professor Gompers' Report Is Scientifically Unreliable

As set forth in Lead Plaintiff's opening brief, Professor Gompers' Report should also be excluded because his method is scientifically unreliable. *See* Motion at 18-25. Specifically, Professor Gompers (i) failed to address the correct legal standard for market efficiency in an open-market securities fraud case and, instead, applied an irrelevant "fundamental value" test; (ii) performed no event study of his own (the gold standard for assessing a cause-and-effect relationship) nor independently evaluated informational efficiency; and (iii) applied a novel and unreliable "illiquidity" methodology that has not been accepted by any court. Defendants fail to address Lead Plaintiff's arguments or otherwise meet their burden of establishing admissibility. *See Fed. R. Evid.* 104, 702; *Lust*, 89 F.3d at 598; *Daubert II*, 43 F.3d at 1316.

It bears emphasis that Professor Gompers' observations regarding "instances of illiquidity" and relative disturbances in the bid-ask spread for Toyota ADRs are predicated on a fundamentally unsound methodology. As explained in Lead Plaintiff's

opening papers and above, by using absolute dollar spreads instead of percentage spreads, Professor Gompers created or exaggerated comparative differences in the bid-ask spreads for Toyota and certain of its industry peers. When price disparities among securities are controlled – either by using percentages or selecting more appropriate peer securities that trade at comparable prices – Professor Gompers' conclusions are stripped of any support and actually reversed.[10] Defendants' opposition brief and Professor Gompers' rebuttal report do nothing to address this point.[11] Indeed, Defendants cite only one case where a court considered a bid-ask spread analysis presented on an absolute dollar basis as opposed to a percentage basis. Opp. at 11 n.10 (citing *McNamara v. Bre-X Minerals, Ltd.*, 2002 WL 32076175, at *5 (E.D. Tex. Sept. 30, 2002)). By comparison, Lead Plaintiff has cited numerous cases establishing that the percentage spread analysis is the prevailing method in securities litigation.[12]

---

[10] As Mr. Coffman explains, the "analysis of percentage bid-ask spreads effectively *reverses* Professor Gompers' conclusion about the distribution of bid-ask spreads." Rebuttal Report, Galdston Decl., Ex. 6, ¶106. "[A]fter appropriately controlling for price level, Professor Gompers's conclusion about the bid-ask spreads for Toyota ADRs is effectively ***reversed***. Ford common stock exhibits ***substantially*** higher bid-ask spreads and variation in spreads compared to Toyota ADRs . . . . [and] Toyota ADRs exhibit ***lower*** spreads than Nissan ADRs and similar spreads as Honda ADRs." *Id.* ¶105. As a result, a percentage bid-ask spread analysis "shows that Professor Gompers's conclusions are misleading and wrong because he uses the inappropriate measure." *Id.* ¶106.

[11] *In re Live Concert Antitrust Litig.*, 2012 WL 1021081 (C.D. Cal. Mar. 23, 2012), cited by Defendants (Opp. at 12 n.11), is of limited relevance here. *Id.* at *6 (evaluating the admissibility of antitrust expert analysis where "[t]he importance of accounting for the relevant 'major variables' has been recognized as particularly important in the context of antitrust litigation."). There, the court explained that an expert's analysis may be excluded where there is "some indication that the excluded variables would have impacted the results." *Id.* at *6, 13. Here, Professor Gompers' own testimony admits (as Mr. Coffman's analysis confirms) that percentage spread analysis would have impacted the results and, particularly, would have ***diminished*** the differences in his bid-ask spread analysis. Gompers Tr. at 152:21-153:1. Accordingly, even under the standard set forth in *Live Concert*, Professor Gompers' Report should be excluded.

[12] Motion at 10 n.6. Defendants fail to distinguish the cases cited by Lead Plaintiff relying on percentage spread analysis. *See* Opp. at 11 n.10. The length of the court's discussion, or whether the analysis was a "contested issue," are immaterial to the fact that percentage spread analysis is generally accepted for measuring efficiency while dollar spread analysis is not. This makes Professor Gompers' decision to forego percentage spread analysis particularly troublesome, especially where he acknowledged that it would have "diminished" the differences in the bid-ask spread analysis highlighted in his Report. Gompers Tr. at 152:21-153:1.

## III. <u>CONCLUSION</u>

For the foregoing reasons and the reasons in Lead Plaintiff's opening brief, the Court should exclude the Gompers Report submitted in opposition to Lead Plaintiff's Motion for Class Certification.

Dated: September 27, 2012

Respectfully submitted,

BERNSTEIN LITOWITZ BERGER
 & GROSSMANN LLP

   /s/ Blair A. Nicholas

BLAIR A. NICHOLAS
(blairn@blbglaw.com)
BENJAMIN GALDSTON
(beng@blbglaw.com)
DAVID KAPLAN
(davidk@blbglaw.com)
JOSEPH W. GOODMAN
(joseph.goodman@blbglaw.com)
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:   (858) 793-0070
Fax:   (858) 793-0323
   -and-
GERALD H. SILK
(jerry@blbglaw.com)
1285 Avenue of the Americas, 38th Floor
New York, NY 10019
Tel:   (212) 554-1400
Fax:   (212) 554-1444

*Counsel for Lead Plaintiff Maryland State Retirement and Pension System and Lead Counsel for the Class*

FAIRBANK & VINCENT
ROBERT H. FAIRBANK
(rfairbank@fairbankvincent.com)
DIRK L. VINCENT
(dvincent@fairbankvincent.com)
444 S. Flower Street, Suite 3860
Los Angeles, CA 90071
Tel:   (213) 891-9010
Fax:   (213) 891-9011

*Liaison Counsel for the Class*

13

REPLY MEMO IN FURTHER SUPPORT OF MOTION TO
EXCLUDE GOMPERS EXPERT REPORT
Master File No. CV 10-922 DSF (AJWx)

MARYLAND OFFICE OF ATTORNEY
 GENERAL
DOUGLAS F. GANSLER
Attorney General of Maryland
JOHN J. KUCHNO
Assistant Attorney General
(jkuchno@oag.state.md.us)
200 St. Paul Place, 20th Floor
Baltimore, MD 21202
Tel:    (410) 576-7291
Fax:    (410) 576-6955

*Counsel for Lead Plaintiff Maryland State Retirement and Pension System*